**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| IN RE: | § § § § § § § § § § § | |
| | § | Chapter 11 |
| PDG PRESTIGE, INC. | § § | |
| | § | Case No. 21-30107-hcm |
| | § § | |
| Debtor. | § | |

---

| | | |
|---|---|---|
| LEGALIST DIP GP, LLC, | § § § | |
| Plaintiff, | § | |
| | § § § | |
| PDG PRESTIGE, INC. AND MICHAEL DIXSON, INDIVIDUALLY, | § § § § § § | Adv. Case No. _____ |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE H. CHRISTOPHER MOTT,**
**UNITED STATES BANKRUPTCY JUDGE:**

      **COMES NOW,** Plaintiff Legalist DIP GP, LLC ("Plaintiff," "Legalist," or "DIP Lender")

and files this, its Original Complaint and states the following:

## III.
### PARTIES

      1.    Plaintiff Legalist DIP GP, LLC can be served through its counsel of record in this

proceeding.

2. Defendant PDG Prestige Inc. ("PDG" or "Debtor") can be served via its President Michael Dixson, at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or wherever he may be found and through its counsel, Jeff Carruth, 3030 Matlock Rd., Suite 201, Arlington, Texas 76105.

3. Defendant Michael Dixon, individually ("Dixson") can be served at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or wherever he may be found and through his counsel, David Lutz, Martin & Lutz, P.C. P.O. Drawer 1837, Las Cruces, NM 88004.

## IV.
## JURISDICTION AND VENUE

4. The Court may exercise subject matter jurisdiction over this action under 28 U.S.C. § 157 and 1334 because the matter is a core proceeding arising in a case under Title 11.

5. Venue is proper in this Court under 28 U.S.C. § 1409 the matter is arising in or related to a case under Title 11.

## VI.
## FACTS AND PROCEDURAL HISTORY

A. <u>DIP Lending History - PDG</u>

6. On February 15, 2021 (the "Petition Date"), PDG filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code" or "Code").

7. PDG has continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108. *Id*.

8. Dixson is President of PDG and has managed all of the operations of PDG at all times. PDG owns the majority of the equity of Gateway.

9. On April 12, 2021 the Court conducted an expedited hearing regarding the *Motion to (I) Enter into PDG Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec.*

*364(d), and (III) Provide Related Relief* (Docket No. 24) (the "DIP Motion") filed herein on March 26, 2021 by PDG. ECF No. 24.

10. On April 12, 2021, the Court entered the Final Order Granting Motion of Debtor to (1) Enter Into Debtor Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec. 364(D), and (III) Provide Related Relief (Re: Docket No. 24) (the "DIP Order"). ECF No. 43.

11. On April 12, 2021, PDG and DIP Lender entered into a PDG-In-Possession Term Loan Credit Agreement (the "DIP Agreement") concerning certain investment fund(s) for which DIP Lender serves as general partner, as lender, agent, and collateral agent. The DIP Lender agreed to extend DIP Loans (each a "DIP Draw") on the certain terms described in the DIP Agreement in an aggregate maximum amount of $4,700,000 (the "DIP Commitment").

12. On April 14, 2021, DIP Lender loaned Debtor $3,300,870.33.

13. On April 23, 2021, DIP Lender loaned Debtor $1,399,129.67.

14. *In toto*, DIP Lender loaned PDG the principal amount of $4,700,000 (the "DIP Loan").

15. The DIP Loan was integral for PDG to refinance the existing debt that had precipitated the bankruptcy and to complete the development of the underlying property and "to preserve the ultimate value of the Property." (DIP Motion, at paras. 38-39). The DIP Loan was integral to the implementation of PDG's reorganization

16. Pursuant to the DIP Agreement, the DIP Loan, along with all DIP Obligations (interest and fees), matured on June 24, 2022.

17. On March 31, 2022, PDG filed its *Second Amended Plan of Reorganization of PDG Prestige Inc. dated March 29, 2022, as Modified* (ECF No. 145) (the "Plan"). On March 31, 2022, the Court entered the *Order Confirming Second Amended Plan of Reorganization PDG Prestige,*

*Inc. Dated March 29, 2022 as* Modified (ECF No. 148) (the "Order Confirming Plan") in which it confirmed the Plan.

18. The Plan, incorporated all pre-plan obligations and interests contained in the DIP Agreement and the DIP Order, including payments due to the DIP Lender and the DIP Lender's rights as to its collateral.

19. PDG's failure to pay the DIP Lender has defeated implementation of the Plan and DIP Order and arose from the actions described herein.

B. DIP Lending History - Gateway

20. On February 2, 2021, Gateway filed its voluntary petition for relief under Chapter 11 of the United States Code (the "Gateway Bankruptcy").

21. The debtor in the Gateway Bankruptcy obtained funds from the DIP Lender pursuant to the Gateway Court's June 23, 2021, Agreed Final Order Granting Motion of Debtor to (I) Enter into Debtor In Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec. 364(D), and (III Provide Related Relief (Re: Docket No. 77) (the "Gateway DIP Order").

22. On June 24, 2021, DIP Lender and Gateway entered the Debtor-In-Possession Term Loan Credit Agreement (the "Gateway Agreement"), pursuant to which the DIP Lender agreed to extend DIP Loans up to an aggregate maximum amount of $10,000,000 (the "Gateway DIP Commitment").

23. The DIP Lender loaned Gateway the principal amount of $10,000,000 (the "Gateway DIP Loan").

24. On October 14, 2021, Debtor filed the First Amended Plan of Reorganization as Modified of the Gateway Ventures LLC Dated October 14, 2021. Doc. No. 245.

25. On October 15, 2021, the Court entered the Order (I) Approving First Amended

Disclosure Statement in Support of Plan of Reorganization of the Gateway Ventures LLC Dated September 1, 2021 and (II) Confirming First Amended Plan of Reorganization as Modified of the Gateway Ventures LLC Dated October 14, 2021 (Re: Docket Nos. 155,245) (the "Order Confirming Gateway Plan") in which its confirmed the First Amended Plan of Reorganization as Modified of the Gateway Ventures LLC Dated October 14, 2021 (the "Gateway Plan"). [Doc. # 246].

26. The Gateway DIP Loan matured on June 19, 2022, at which time the full balance of the principal, plus all fees and interest became due and owing (the "Gateway DIP Obligation").

27. To date, despite notice and demand, Debtor has failed to pay the Gateway DIP Obligation in the amount of $12,426,495.

28. On May 30, 2023, the Gateway Bankruptcy was converted to Chapter 7. Doc. No. 477.

C. <u>Lot 1A Ownership History</u>

29. Pursuant to the DIP Order and the DIP Agreement, Legalist acquired priming liens on all of PDG's assets, including but not limited to a ± 3.29 acre tract of unimproved real property in Las Cruces, Dona Ana County, New Mexico sometimes referred to as Mesilla Valley Mall Subdivision Replat No. 5, and located at 510 and 550 S. Telshor Blvd., Las Cruces, New Mexico 88011 (the "MV Development").

30. The MV Development was comprised of two tracts, Lot 1A and Lot 3A.

31. Mesilla Valley Ventures, LLC ("Mesilla Valley") is a single purpose entity owned by PDG and Dixson.

32. Mesilla Valley and LPC Retail, LLC ("LPC") entered a Purchase and Sale Agreement for the assignment of Lot 1A effective March 4, 2022 (the "PSA"), though PDG still owned Lot 1A on that date.

33. On or about April 12, 2022, PDG informed Legalist that it intended to sell Lot 1A and to use the net proceeds from that sale to pay certain claims of the estate and to complete the MV Development thereby increasing the value of Legalist's collateral.

34. PDG requested that Legalist execute a partial lien release to allow the sale to close.

35. Based on PDG's representation that the proceeds from the sale of Lot 1A would be used to improve its collateral, the MV Development, on April 14, 2022, Legalist signed a partial lien release.

36. On April 21, 2022, PDG executed a Special Warranty Deed and transferred Lot 1A to Mesilla Valley whose Director and President is Dixson. PDG is also identified as Mesilla Valley's manager. On information and belief, PDG did not receive any consideration for the transfer of Lot 1A.

37. On May 4, 2022, LPC assigned the PSA to FSLRO 510 South Telshor Las Cruces, LLC ("FSLRO").

38. On May 27, 2022 Mesilla Valley executed a Special Warranty Deed and transferred Lot 1A to FSLRO.

39. On May 31, 2022 the sale of Lot 1A to FSLRO closed.

D. <u>Dixson Spends All of the Lot 1A Sales Proceeds</u>

40. At closing of the sale of Lot 1A on May 31, 2022 (from Mesilla Valley to FSLRO), $1,916,558.82 (the "Sales Proceeds") were wired into PDG's account #5229 at Chase Bank.

41. Mesilla Valley was nothing more than a figurehead seller having received Lot 1A from PDG to enable PDG to sell Lot 1A without Court approval and to avoid paying bankruptcy related fees. PDG and Dixson facilitated the sale of Lot 1A through Mesilla Valley all the while intending the proceeds from the sale to go to PDG.

42. So, while PDG did not receive any consideration for the transfer of Lot 1A to Mesilla Valley, Mesilla Valley likewise did not receive any consideration for the Sales Proceeds routed to PDG, the net result of which was PDG received consideration for the sale of Lot 1A to FSLRO.

43. On the same day that the sale closed, May 31, 2022, Dixson facilitated the wiring of $500,000 of the Sales Proceeds from PDG's Account #5229 to a title company for the purchase of real property and improvements located at 6 Candleleaf Ct, The Hills, Texas 78738 (the "Candleleaf Property"). The Candleleaf Property is owned by Entrada Development, LLC ("Entrada"). Dixson formed Entrada and the manager of Entrada is PDG. Entrada is presently in Chapter 11 bankruptcy. *In re Entrada Development, LLC,* No. 23-10317, United States Bankruptcy Court for the Western District of Texas.

44. Thereafter, Dixson made improvements to, furnished, and moved into the Candleleaf Property, where he and his family resided for a time. On information and belief, Dixson's wife still resides at the Candleleaf property, though Dixson and his wife are going through a divorce.

45. By October 31, 2022, account #5229 at Chase Bank had a zero balance. Dixson used most of the Sales Proceeds to support his extravagant lifestyle, for expenses unrelated to PDG, or expenses not to "improve" Legalist's collateral.

46. Dixson used the Sales Proceeds to purchase, by way of example and not limitation, $500,000 for the Candleleaf Property, a $75,000 2018 Cadillac Escalade and a $17,000 watch. Dixson even used $229,531.60 of the Sales Proceeds to pay Legalist for extension fees to forestall Legalist's efforts to collect on the DIP Loan and the Gateway DIP Loan (the "Extension Fees").

47. Dixson transferred portions of the Sales Proceeds to his personal account at Chase Bank and then used those funds to purchase furniture, make improvements to the Candleleaf Property, for food, entertainment, and a myriad of other personal expenses.

48. Dixson transferred portions of the Sales Proceeds to a separate PDG account at Chase Bank and then transferred those funds to one of his personal accounts at Chase where he then squandered them.

49. Dixson transferred funds to Gateway's account at Chase Bank. Dixson admits he used PDG funds to pay Gateway expenses.

E. PDG Defaults on the DIP Loan

50. The DIP Loan matured by its terms on June 24, 2022, at which time the full balance of the principal, plus all interest, fees, costs and other charges as set forth in the DIP Agreement became due and owing.

51. PDG has failed to repay the DIP Loan, which, as of October 17, 2022, exceeds the sum of $5,959,710.

52. PDG failed to use the Sales Proceeds to pay Legalist anything other than the Extension Fees.

53. Instead PDG used the lion's share of the process for things other than improvement of the MV Development.

F. <u>The Fraudulent Transfer</u>

54. Dixson did not pay PDG or provide equivalent consideration to justify the funds from the Sales Proceeds that were transferred from PDG to his personal account and/or used for his personal vehicle, residence, home improvements, child support, and other personal expenses.

55. There is no evidence that PDG owed antecedent debt to Dixson that would justify PDG transferring funds to Dixson, prior to PDG paying Legalist.

56. Gateway did not pay PDG or provide equivalent consideration to justify the funds from the Sales Proceeds that were transferred from PDG to Gateway and/or used for its (and Dixson's) expenses.

57. There is no evidence that PDG owed antecedent debt to Gateway that would justify PDG transferring funds to Gateway, prior to PDG paying Legalist.

G. <u>PDG's False Representations Induced Legalist to Sign the Partial Lien Release</u>

58. In a recent deposition, Dixson testified under oath that PDG transferred Lot 1A to Mesilla Valley in exchange for Mesilla Valley paying certain PDG expenses.

59. In reality, PDG transferred Lot 1A to Mesilla Valley when counsel for LPO/FSLRO objected to a sale pursuant to the PSA that listed Mesilla Valley as the seller, though Mesilla Valley did not own the property.

60. PDG reached out to Legalist to obtain the partial lien release when the title company agreed to accept a lien release to close the sale with Mesilla Valley listed as the seller.

61. Legalist only signed the partial lien release based on PDG's representations that the net proceeds would be used to improve the MV Development and that PDG had plans to pay Legalist in full.

62. None of the Sales Proceeds were paid to Legalist as payment towards the DIP Loan, in fact the only payments to PDG were payments to Legalist used from the Sales Proceeds, unbeknownst to Legalist, to secure extensions of deadlines under the DIP Agreement.

63. Only a small fraction of the Sales Proceeds were used to develop the MV Development.

64. PDG is the manager of Mesilla Valley, and a related entity to Mesilla Valley. Both PDG and Mesilla Valley are controlled by Dixson. The foregoing actions were clear efforts to defraud PDG's creditors. Dixson defrauded Legalist into giving a release of Lot 1A, Dixson then removed Lot 1A from PDG's control and outside the purview of this Court, all with the plan to sell Lot 1A, route the proceeds from that sale to PDG, at which time, PDG fraudulently transferred the Sales Proceeds to, *inter alia*, Dixson and Gateway and for the purchase of the Candleleaf Property. PDG and Dixson attempted to prevent the disclosure of these sales and sales receipts by failing to report them to the Bankruptcy Court and they were only uncovered by Legalist's investigation.

## COUNT 1 – FRAUD: PDG & DIXSON

65. All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

66. PDG and Dixson, seeking to induce Legalist to release its prime lien on Lot 1A to allow for the sale of Lot 1A to a non-debtor, made misrepresentations to Legalist regarding how PDG intended to use the Sales Proceeds. Specifically, PDG represented that the net sales proceeds would be used to pay claims and to complete the MV Development and further that "[t]here is a take out of Legalist waiting in the wings for this to close . . . ."

67. When PDG and Dixson made the representations, they knew the representations were false, or made the representations recklessly as a positive assertion and without knowledge of their trust. By way of example and not limitation, considering Dixson arranged for a $500,000 payment to the title company for the purchase of the Candleleaf Property the same day the Lot 1A sale closed, it is clear that the net proceeds were not to be used as he and PDG represented to Legalist.

68. PDG and Dixson made the misrepresentations with the intent that Legalist act upon them in providing the partial lien release to allow the sale of Lot 1A.

69. Legalist relied on these misrepresentations and signed the partial lien release.

70. Legalist relied on those misrepresentations to its detriment and, as a result suffered economic injury. Legalist was harmed in the amount of the Sales Proceeds, and in the amount of the loss in value of the MV Development due to the sale of Lot 1A and PDG and Dixson's failure to use the Sales Proceeds to improve the MV Development. Further, because the partial lien release was obtained via fraud, Legalist requests it be set aside.

### COUNT 2 - FRAUDULENT TRANSFER : PDG AND MICHAEL DIXSON

71. All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

72. At all times relevant, Dixson has controlled PDG and Mesilla Valley. Dixson has directed and orchestrated all actions on behalf of PDG and Mesilla Valley.

73. PDG always intended to abscond with the proceeds from the sale of Lot 1A. It transferred Lot 1A to Mesilla Valley (an entity owned by PDG and Dixson) to avoid Court oversight and approval of the sale. Once PDG transferred Lot 1A to Mesilla Valley, PDG, Dixson, and Mesilla Valley moved forward with the sale of Lot 1A to FSLRO.

74. Dixson, individually, and as an agent of PDG and Mesilla Valley, or on behalf of PDG and Mesilla Valley, orchestrated the transfer of Lot 1A from PDG to Mesilla Valley and then from Mesilla Valley to FSLRO.

75. The DIP Lender has a lien on all of the proceeds from the sale of Lot 1A.

76. At the closing of the sale of Lot 1A to FSLOR, the seller (Mesilla Valley) was to receive $1,916,558.82.

77. The Sales Proceeds were not deposited into a Mesilla Valley account, but instead were wired into PDG's account #5229 at Chase Bank.

78. Dixson, individually and as an agent of PDG then orchestrated the transfer of the Sales Proceeds to himself and Gateway after the DIP Lender's claim arose and shortly before the money owed to the DIP Lender became due.

79. The transfer of the Sales Proceeds from PDG to Dixson was a fraudulent transfer because the DIP Lender's claim arose before or within a reasonable time after transfers, and the transfers were done with the actual intent to hinder, delay, or defraud the DIP Lender.[1] *See* TEX. BUS. & COM. CODE § 24.005(a)(1).

80. Intent can be inferred from such circumstances as the following, most of which are present herein:

   a. the transfer was to an "insider" – Dixson controls both PDG and Mesilla Valley and ultimately was always in control of the Sales Proceeds (*see* TEX. BUS. & COM. CODE §§ 24.002(7), 24.005(b)(1));
   b. PDG and Dixson retained possession and control of the Sales Proceeds after the transfer of Lot 1A to FSLRO (*see* TEX. BUS. & COM. CODE § 24.005(b)(2));
   c. The transfer was concealed – the transfer of the Sales Proceeds from PDG was fraud in that:

---

[1] Because the DIP Lender was defrauded into signing the partial lien release, the partial lien release is void.

      i. Dixson failed to inform the DIP Lender that it received the Sales Proceeds;

      ii. PDG and/or Dixson did not use the Sales Proceeds to pay the DIP Lender or to improve other estate collateral;

      iii. PDG and/or Dixson instead transferred the Sales Proceeds, without informing the DIP Lender, to, *inter alia*:

           a. a title company for the purchase of the Candleleaf Property;

           b. two PDG accounts and one personal account at Chase Bank for use on personal, living, and entertainment expenses, including child support; and

           c. to The Gateway Ventures' account at Chase Bank;

      iv. PDG and Dixson did not inform the DIP Lender how the Sales Proceeds were used (*see* TEX. BUS. & COM. CODE § 24.005(b)(3));

d. the transfer was of substantially all Debtor's assets (*see* TEX. BUS. & COM. CODE § 24.005(b)(5));

e. PDG and Dixson removed or concealed assets – Dixson took the Sales Proceeds and used them for virtually everything but developing the remainder of the MV Development ((*see* TEX. BUS. & COM. CODE § 24.005(b)(7));

f. PDG did not receive any consideration for the Sales Proceeds used by Gateway and Dixson (*see* TEX. BUS. & COM. CODE § 24.005(b)(8)); and

g. the transfers occurred shortly before or after a substantial debt was incurred – the DIP Lender loaned the money on April 14, 2021, and April 23, 2021, the transfer from Mesilla Valley to FLSRO occurred on May 31, 2022, and PDG defaulted on June 24, 2022; (*see* TEX. BUS. & COM. CODE § 24.005(b)(10)).

81. The transfers of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time of the transfer, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due. *See* TEX. BUS. & COM. CODE § 24.005(a)(2).

82. The transfer of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time after the transfer was made, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG was insolvent at that time or it became insolvent as a result of the transfer. *See* TEX. BUS. & COM. CODE § 24.006(a). PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation, and because PDG does not generally pay its debts as they become due are presumed to be insolvent. *See* TEX. BUS. & COM. CODE § 24.003.

83. The transfer of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time after the transfer, and the transfer was made to insiders (*see* TEX. BUS. & COM. CODE § 24.002(7)(A)(i)) for an antecedent debt, PDG was insolvent at the time, and the insiders had reasonable cause to believe PDG was insolvent. *See* TEX. BUS. & COM. CODE § 24.006(b). PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation, and because PDG does not generally pay its debts as they become due, it is presumed to be insolvent. *See* TEX. BUS. & COM. CODE § 24.003.

84. The impact of the foregoing on the DIP Lender's collateral was particular to the DIP Lender. Accordingly, the DIP Lender requests that this Court declare the transfer of the funds in favor of Dixson void and unwind the transfers. *See* TEX. BUS. & COM. CODE § 24.008(a)(1). The DIP Lender also requests an attachment against the funds or other property of Dixson in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings. *See* TEX. BUS. & COM. CODE § 24.008(a)(2). The DIP Lender also requests an injunction restricting Dixson from disposing of other property

and assets. *See* TEX. BUS. & COM. CODE § 24.008(a)(3)(A) & (B). The DIP Lender also requests an injunction against Dixson from assigning to, or otherwise negotiating the funds with third parties. *See* TEX. BUS. & COM. CODE § 24.008(a)(3)(A).

### COUNT 3 - MONEY HAD AND RECEIVED: DIXSON AND PDG

85. All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

86. Alternatively, still urging and relying upon the matters alleged above, the DIP Lender would show that Dixson and PDG have been unjustly enriched by receiving funds from Mesilla Valley's transfer of Lot 1A. Those funds rightfully belong to the DIP Lender. PDG, Dixson, and Gateway received funds from the Sales Proceeds that should have been directed for use as payment for DIP Lender, yet PDG and Dixson have refused to remit payment of the amounts due to the DIP Lender. Thus, PDG and Dixson hold money that belongs to the DIP Lender in equity and good conscience.

### COUNT 4 - RECOVERY OF POST-PETITION TRANSFERS

87. All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

88. To the extent PDG made post-petition transfers to Dixson, Gateway, and/or other non-debtors, such transfers were unauthorized post-petition transfers and are avoidable under 11 U.S.C. § 549 and 11 U.S.C. § 550.

89. The Plaintiff seeks to avoid and recover all such transfers and reserves its rights to amend and supplement this complaint to identify all such transfers.

## VII.
### CONCLUSION

For the reasons listed herein, Plaintiff asks that Defendants PDG and Dixson be cited to appear and answer this Complaint, and, upon final hearing, Plaintiff have judgment against Defendants for actual damages, treble damages, and attorneys' fees based on the causes of action asserted in the foregoing Counts; exemplary damages; a judgment pre- and post-judgment interest at the maximum rate allowed by applicable law; avoiding post-petition transfers in the amount of $1,916,558.82 pursuant to 11 U.S.C. § 549 and, to the extent necessary, 11 U.S.C. § 550 ; all costs of suit. Plaintiff also requests the partial lien release related to Lot 1A be set aside. Further, Plaintiff asks this Court to grant all such other and further relief, at law and in equity, to which it may be justly entitled.

Dated: June 16, 2023

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: */s/ Gwen I. Walraven*
Russell W. Mills
Texas Bar No. 00784609
rmills@bellnunnally.com
Gwen I Walraven
Texas Bar No. 24047065
gwalraven@bellnunnally.com
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
214-740-1400 Telephone
214-740-1499 Facsimile

**ATTORNEYS FOR LEGALIST DIP GP, LLC, AS GENERAL PARTNER OF LEGALIST DIP FUND I, LP AND LEGALIST DIP SPV II, L**

7433630_1.DOCX