## UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF TEXAS EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| | § | |
| | § | **Chapter 7** |
| **PDG PRESTIGE, INC.** | § | |
| | § | |
| | § | **Case No. 21-30107-cgb** |
| | § | |
| | § | |
| Debtor. | § | |

---

| | | |
|---|---|---|
| **LEGALIST DIP GP, LLC,** | § | |
| | § | |
| and | § | |
| | § | |
| **PDG PRESTIGE, INC. (by and through Ronald Ingalls, Chapter 7 Trustee)** | § | |
| Plaintiffs, | § | |
| | | |
| v. | | |
| | | |
| **MICHAEL DIXSON, individually, MESILLA VALLEY VENTURES, LLC, MICHAEL DIXSON TRUST THROUGH ITS TRUSTEE MICHAEL J. DIXSON, CHRISTIANA DIXSON, SOUTHWESTERN ABSTRACT & TITLE COMPANY, INC., and WEYCER, KAPLAN, PULASKI & ZUBER P.C.** | § § § § § § § § § | **Adv. No. 23-03004-cgb** |
| Defendants. | | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

TO THE HONORABLE CHRISTOPHER G. BRADLEY,
UNITED STATES BANKRUPTCY JUDGE:

**COME NOW,** Plaintiffs Legalist DIP GP, LLC ("Legalist," or "DIP Lender") and Chapter 7 Trustee Ronald Ingalls ("Trustee" and together with Legalist, "Plaintiffs") and file this, its Second Amended Complaint and state the following:

## PARTIES

1.      Plaintiff Legalist DIP GP, LLC can be served through its counsel of record in this proceeding.

2.      Trustee Ronald Ingalls is the Chapter 7 trustee for Debtor PDG Prestige, Inc. ("Trustee") in the main proceeding captioned above.

3.      Defendant PDG Prestige Inc. ("PDG" or "Debtor") is a Texas corporation company, with its principal place of business at 12912 Hill Country Blvd Ste F-235 Austin, TX 78738-7102, and can be served via its President Michael Dixson, at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or wherever it may be found.

4.      Defendant Michael Dixson, individually ("Dixson") under information and belief resides in Travis County, Texas, and can be served at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or wherever he may be found and through his counsel, David Lutz, Martin & Lutz, P.C. P.O. Drawer 1837, Las Cruces, NM 88004 or at 2011 N. Main Street, Las Cruces, NM 88001.

5.      Defendant Mesilla Valley Ventures, LLC ("Mesilla Valley") is a Texas limited liability company located, and with its principal place of business, at 910 E Redd Rd Ste K El Paso, Texas 79912-7348. It can be served at its registered agent PDGTX Inc. at 2921 E 17th Street, Building B, Austin, Texas 78702. Its sole manager/member is PDG Prestige, Inc.

6.      Defendant Michael Dixson Trust ("Dixson Trust"), through its trustee Michael J. Dixson, can be served at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or

2

wherever he may be found and through his counsel, David Lutz, Martin & Lutz, P.C. P.O. Drawer 1837, Las Cruces, NM 88004.

7.      Defendant Christiana Dixson aka Christiana Marmolejo, individually ("Christiana") is domiciled, and can be served, at 6 Candleleaf Ct, The Hills, Texas 78738-1444.

8.      Defendant Southwestern Abstract & Title Company, Inc. ("Southwestern") is a New Mexico corporation that has had its corporate charter revoked. According to the New Mexico Secretary of State, the most recent registered agent was Kevin L. Davis, who is also the last listed President, and is located at 1125 South Main, Las Cruces, NM 88005. 1125 South Main, Las Cruces, NM 88005 is also the listed principal place of business for Southwestern.

9.      Defendant Weycer, Kaplan, Pulaski & Zuber, P.C. (the "Firm") is a Texas professional corporation, with its principal place of business at 24 Greenway Plaza Suite 2050 Houston, TX 77046, and which provides legal services and regularly transacts business within this district.

## **JURISDICTION AND VENUE**

10.     The Court may exercise subject matter jurisdiction over this action under 28 U.S.C. § 157 and 1334 because the matter is a core proceeding arising in a case under Title 11.

11.     Venue is proper in this Court under 28 U.S.C. § 1409 the matter is arising in or related to a case under Title 11.

12.     This Court has personal jurisdiction over Defendants because they have their principal place of business, reside, or regularly transact business, in this district.

## FACTS AND PROCEDURAL HISTORY

A.    DIP Lending History – PDG

13.    On February 15, 2021 (the "Petition Date"), PDG filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code" or "Code").

14.    PDG has continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108 until the case was converted to Chapter 7 and the Trustee was appointed.

15.    Dixson is President of PDG and has managed all of the operations of PDG at all times and is its sole shareholder. PDG owns the majority of the equity of The Gateway Ventures, LLC ("Gateway"), a related entity.

16.    On April 12, 2021, the Court conducted an expedited hearing regarding the *Motion to (I) Enter into PDG Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec.*364(d), *and (III) Provide Related Relief (Docket No. 24)* (the "DIP Motion") filed herein on March 26, 2021 by PDG. ECF No. 24.

17.    On April 12, 2021, the Court entered the Final Order Granting Motion of Debtor to (1) Enter Into Debtor Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec. 364(D), and (III) Provide Related Relief (Re: Docket No. 24) (the "DIP Order"). ECF No. 43.

18.    On April 12, 2021, PDG and DIP Lender entered into a PDG-In-Possession Term Loan Credit Agreement (the "DIP Agreement") concerning certain investment fund(s) for which DIP Lender serves as general partner, lender, agent, and collateral agent. The DIP Lender agreed to extend DIP Loans (each a "DIP Draw") on the certain terms described in the DIP Agreement in an aggregate maximum amount of $4,700,000 (the "DIP Commitment").

19.    On April 14, 2021, DIP Lender loaned Debtor $3,300,870.33.

4

20.     On April 23, 2021, DIP Lender loaned Debtor $1,399,129.67.

21.     *In toto*, DIP Lender loaned PDG the principal amount of $4,700,000 (the "DIP Loan").

22.     According to Dixson and PDG, the DIP Loan was integral for PDG to refinance the existing debt that had precipitated the bankruptcy and to complete the development of the underlying property and "to preserve the ultimate value of the Property." (DIP Motion, at paras. 38-39). The DIP Loan was integral to the implementation of PDG's reorganization.

23.     Pursuant to the DIP Agreement, the DIP Loan, along with all DIP Obligations (interest and fees), matured on June 24, 2022.

24.     On March 31, 2022, PDG filed its *Second Amended Plan of Reorganization of PDG Prestige Inc. dated March 29, 2022, as Modified* (ECF No. 145) (the "Plan"), which was confirmed the same day when the Court entered the *Order Confirming Second Amended Plan of Reorganization PDG Prestige Inc. Dated March 29, 2022 as* Modified (ECF No. 148) (the "Order Confirming Plan")/

25.     The Plan incorporated all pre-plan obligations and interests contained in the DIP Agreement and the DIP Order, including payments due to the DIP Lender and the DIP Lender's rights as to collateral.

26.     PDG's failure to pay the DIP Lender has defeated implementation of the Plan and DIP Order and arose from the actions described herein, and contributed to the case being converted to Chapter 7.

B.     <u>Lot 1A Ownership History</u>

27.     Among PDG's assets, PDG owned a ± 3.29-acre tract of unimproved real property in Las Cruces, Dona Ana County, New Mexico sometimes referred to as Mesilla Valley Mall

Subdivision Replat No. 5, and located at 510 and 550 S. Telshor Blvd., Las Cruces, New Mexico 88011 (the "MV Development").

28.     Pursuant to the DIP Order and the DIP Agreement, Legalist acquired priming liens on all of PDG's assets, including but not limited to the MV Development.

29.     The MV Development consisted of two tracts, Lot 1A and Lot 3A.

30.     Defendant Mesilla Valley Ventures, LLC ("Mesilla Valley") is a Texas company wholly owned by PDG. Mesilla Valley and Dixson is its President. It has no business purpose; its single purpose it to act as holding company for Lot 1A.

31.     Despite the automatic stay being in force, and prior to the Plan's Confirmation, the law firm of Weycer, Kaplan, Pulaski & Zuber, and more specifically counsel Jeff Caruth, aided Debtor in transferring Lot 1A to Debtor's insider, Mesilla Valley, for no consideration and without Court approval.

32.     Subsequently, Mr. Caruth negotiated the sale of Lot 1A from Mesilla Valley to a third party.

33.     Specifically, on March 4, 2022, prior to the Plan's Confirmation, Mesilla Valley and LPC Retail, LLC ("LPC") entered a Purchase and Sale Agreement for the sale of Lot 1A.

34.     At the time of the PSA, Mesilla Valley did not own Lot 1A, as it was owned by Debtor.

35.     The Firm represented Mesilla Valley in the negotiation of the PSA, while simultaneously representing PDG. Thus, the Firm facilitated the transfer of Debtor's asset to Debtor's insider, for no consideration, in order to sell that asset to a third party outside this Court's view and supervision.

36.     The PSA states that the Seller is the debtor in this bankruptcy proceeding, despite the seller being identified in the PSA as Mesilla Valley.

37.     At the time the PSA was negotiated and executed, there was not a confirmed plan allowing either Mesilla Valley or the Debtor to negotiate the sale of Lot 1A and, in fact, the automatic stay prohibited Mesilla Valley and LPC from exercising control over the Debtor's property, including Lot 1A.

38.     On or about April 12, 2022 (more than a month after the PSA was executed) PDG informed Legalist that it intended to sell Lot 1A and to use the net proceeds from that sale to pay certain claims of the estate, including to Legalist, and to complete the MV Development thereby increasing the value of Legalist's collateral.

39.     PDG requested that Legalist execute a partial lien release to allow the sale to close.

40.     Based on PDG's representation that the proceeds from the sale of Lot 1A would be used to improve its collateral, the MV Development, Legalist signed a partial lien release on April 14, 2022.

41.     Nevertheless, at the time, Legalist was a secured creditor of PDG, pursuant to the Plan, the DIP Agreement, and its related security and loan documents.

42.     On April 21, 2022, PDG executed a Special Warranty Deed and transferred Lot 1A to Mesilla Valley, whose Director and President is Dixson. PDG is also identified as Mesilla Valley's manager. On information and belief, PDG did not receive any consideration for the transfer of Lot 1A.

43.     On May 4, 2022, LPC assigned the PSA to FSLRO 510 South Telshor, Las Cruces, LLC ("FSLRO").

44.     On May 27, 2022 Mesilla Valley executed a Special Warranty Deed and transferred Lot 1A to FSLRO.

45.     On May 31, 2022 the sale of Lot 1A to FSLRO closed, and with proceeds being disbursed to various entities, including to (1) R2 Contractors Specialty, Inc. ($4,825.32), and Utility Block Company, Inc. ($70,981.70) as "Payoff Claim[s] of Lien," despite the liens of these entities no longer being effective as a result of Debtor's Bankruptcy and the Plan, (2) for legal fees of Ferguson Braswell Fraser Kubasta PC ($50,000) based on invoices issued to Prestige Development Group, Inc., an entity distinct from the Debtor and with entitlement to proceeds, and to the Firm, for work done on behalf of Mesilla Valley and invoiced to Mesilla Valley ($75,000).

46.     Despite Mesilla Valley being the title owner of Lot 1A at the time of closing, the overwhelming portion of the remaining amounts, $1,916,558.82 ("Sale Proceeds") were wired into an account of PDG at Chase Bank (Account xx5229) used by Debtor and immediately spent by Dixson for his personal benefit, and for that of entities affiliated with him but not entitled to such proceeds, in complete derivation of Legalist's security interest, and contrary to Dixson's representations as to how such funds would be used.

C.      Escrow Agreements/Southwestern

47.     As part of the closing of the sale of Lot 1A, Mesilla Valley, FSLRO, and Southwestern (the title company), were party to a Lien Escrow Agreement, which provided, among other things, that Southwestern would hold back $200,000 of proceeds to pay off certain liens that may come to exist on Lot 1A within a certain period of time.

48.     All conditions of the Lien Escrow Agreement have since been satisfied and neither Southwestern, FSLRO, or any lien holders, are entitled to the $200,000 currently being held by Southwestern ("Lien Escrow Monies"), and which has been confirmed by Southwestern.

49.     The Lien Escrow Agreement provides that monies currently held by Southwestern should be released to Mesilla Valley. However, as Lot 1A was fraudulently transferred to Mesilla Valley for no consideration and the Sale Proceeds were deposited directly into Debtor's account, the $200,000 in Southwestern's possession belongs to the Debtor and, accordingly, must be turned over to Plaintiffs.

50.     Additionally, as part of the closing of the sale of Lot 1A, Mesilla Valley, FSLRO, and Southwestern, were party to a Rent Escrow Agreement, which provided, among other things, that Southwestern would hold back $35,000 of the proceeds to provide for rent payments to FSLRO if the tenant of Lot 1A did not pay rent, resulting from certain construction delays and other obligations of Mesilla Valley, provided certain conditions were met ("Rent Escrowed Monies" collectively with Lien Escrowed Monies, the "Escrowed Monies").

51.     Despite all of the conditions of the Rent Escrow Agreement not being met, Southwestern released all of these funds to FSLRO, or otherwise released these funds.

52.      Because the proceeds of the sale of Lot 1A belong to the Debtor, the Escrowed Monies also belong to Debtor and must be turned over to Plaintiffs.

D.      Dixson Misappropriates and Dissipates Lot 1A Sales Proceeds

53.     As Dixson was arranging for the improper sale of Lot 1A, he began transferring PDG funds to Doma Insurance Agency ("Doma"), a title company, for the benefit of "The Dixson Trust[,] 6 Candleleaf CT…The Hills TX," and on April 19, 2022, transferred $17,000 from PDG's Account #6935 to Doma.

54.     Upon information and belief, the Dixson Trust is an entity used solely for the purpose of assisting Dixson secrete funds from creditors, such as Plaintiffs.

55.     Mesilla Valley was nothing more than a figurehead seller having received Lot 1A from PDG to enable PDG to sell Lot 1A without Court involvement and to allow Dixson and PDG to dissipate funds as they saw fit, and without the knowledge or involvement of Plaintiffs.

56.     With the Firm's substantial assistance, Dixson was able to sell PDG's asset—Lot 1A—through its affiliate, Mesilla Valley.

57.     At the time, Legalist was unaware of the existence of Mesilla Valley, or that it had received title to Lot 1A from PDG.

58.     So, while PDG did not receive any consideration for the transfer of Lot 1A to Mesilla Valley, Mesilla Valley likewise did not receive any consideration for the Sales Proceeds routed to PDG, the net result of which was PDG received consideration for the sale of Lot 1A to FSLRO even though it was not a party to the sale of Lot 1A.

59.     On the same day that the sale closed, May 31, 2022, Dixson wired $500,000 of the Sale Proceeds from PDG's Account #5229 to Doma, also for the benefit of "The Dixson Trust[,] 6 Candleleaf CT…The Hills TX."

60.     The following day, on June 1, 2022, Dixson wired an additional $28,018.53 from PDG's Account #5229 to Doma for the benefit of "The Dixson Trust[,] 6 Candleleaf CT…The Hills TX."

61.     Dixson then instructed Doma to use these funds for Entrada Development, LLC's purchase of real property and improvements located at 6 Candleleaf Ct, The Hills, Texas 78738 (the "Candleleaf Property").

62.     Entrada is part of Dixson's web of companies. Specifically, Dixson formed Entrada, established PDG as its manager, while, the Dixson Trust owns its membership interests.

Entrada is presently in Chapter 11 bankruptcy. *In re Entrada Development, LLC,* No. 23-10317 (Bankr. W.D. Tex.).[1]

63.     Neither Dixson, the Dixson Trust, Entrada, nor anyone else, provided any consideration for the PDG monies used for the purchase of the Candleleaf Property.

64.     Thereafter, Dixson made improvements to, furnished, and moved into the Candleleaf Property, where he, Christiana, and his family resided for a time. On information and belief, Dixson's wife Christiana still resides at the Candleleaf property, though Dixson and his wife are seemingly going through a divorce.

65.     By October 31, 2022, PDG's Account #5229 at Chase Bank had a zero balance. Dixson used most of the Sale Proceeds to support his extravagant lifestyle and for other expenses unrelated to PDG. Dixson did not use any of the Sale Proceeds to improve Legalist's collateral, as he had represented to Legalist previously.

66.     Dixson used the Sale Proceeds to purchase, by way of example and not limitation, $528,013.53 for the Candleleaf Property (the "Candleleaf Monies"), a $75,000 2018 Cadillac Escalade and a $17,000 watch. Dixson even used $229,531.60 of the Sales Proceeds to pay Legalist for extension fees to forestall Legalist's efforts to collect on the DIP Loan and the Gateway DIP Loan[2] (the "Extension Fees").

---

[1] While Entrada's role in the related transactions are set forth in this Amended Complaint, Entrada is not a defendant herein and the Plaintiffs are not seeking any relief from Entrada. However, the Plaintiffs reserve all rights as creditors or parties-in-interest in the Entrada Chapter 11 bankruptcy case.

[2] On February 2, 2021, Gateway, an entity wholly owned by PDG, filed its voluntary petition for relief under Chapter 11 of the United States Code (the "Gateway Bankruptcy"). Case No. 21-bk-30071, *In re The Gateway Ventures, LLC.* Based upon representations made by Dixson, the debtor in the Gateway Bankruptcy also obtained funds from the DIP Lender, with its DIP Loan maturing on June 19, 2022, at which time the full balance of the principal, plus all fees and interest became due and owing (the "Gateway DIP Obligation"). To date, despite notice and demand, Gateway has failed to pay the Gateway DIP Obligation in the amount of $12,426,495. On May 30, 2023, the Gateway Bankruptcy was converted to Chapter 7.

67.     Dixson transferred portions of the Sale Proceeds to his personal account at Chase Bank and then used those funds to purchase furniture, make improvements to the Candleleaf Property, for food, entertainment, and a myriad other personal expenses.

68.     Dixson transferred portions of the Sale Proceeds to a separate PDG account at Chase Bank and then transferred those funds to one of his personal accounts at Chase where he then squandered them.

69.     Dixson transferred funds to Gateway's account at Chase Bank. Dixson admits he used PDG funds to pay Gateway expenses.

70.     Additionally, Christiana Dixon was provided with access to PDG funds and used such monies for her own personal benefit, without providing consideration to PDG, including but not limited to $25,000 in purchases at Pottery Barn in and around July 2022, which purchases she retained.

71.     PDG monies were also used to make mortgage payments on residential properties owned jointly by Dixson and Christiana Dixson, providing Christiana with benefits including from sale proceeds of such properties.

72.     Additionally, Christiana Dixson has had the benefit of living in the Candleaf Property since it was purchased by Entrada, and on December 12, 2022, temporary orders were entered in her divorce proceeding with Dixson, providing her with sole possession of the Candleaf Property during those proceedings.

E.      PDG Defaults on the DIP Loan

73.     The DIP Loan matured by its terms on June 24, 2022, at which time the full balance of the principal, plus all interest, fees, costs and other charges as set forth in the DIP Agreement became due and owing.

74.     PDG has failed to repay the DIP Loan, which, as of October 17, 2022, exceeded $5,959,710.

75.     PDG failed to use the Sale Proceeds to pay Legalist anything other than the Extension Fees.

76.     Contrary to its prior representations, PDG used the lion's share of the Sale Proceeds for everything *but* improving the MV Development.

F.      The Fraudulent Transfers

77.     Dixson did not pay PDG or provide equivalent consideration in exchange for the portion of the Sale Proceeds that was transferred from PDG to his personal account and/or used for his personal vehicle, residence, home improvements, child support, and other personal expenses.

78.     There is no evidence that PDG owed antecedent debt to Dixson that would justify PDG transferring funds to Dixson, prior to PDG paying Legalist. Dixson did not, and has not, filed a proof of claim in the PDG bankruptcy case.

79.     Gateway did not pay PDG or provide equivalent consideration to justify the funds from the Sales Proceeds that were transferred from PDG to Gateway and/or used for its (and Dixson's) expenses.

80.     There is no evidence that PDG owed antecedent debt to Gateway that would justify PDG transferring funds to Gateway, prior to PDG paying Legalist.

G.      PDG's False Representations Induced Legalist to Sign the Partial Lien Release

81.     In a recent deposition, Dixson testified under oath that PDG transferred Lot 1A to Mesilla Valley in exchange for Mesilla Valley paying certain PDG expenses.

82.     In reality, PDG transferred Lot 1A to Mesilla Valley when counsel for LPC/FSLRO objected to a sale pursuant to the PSA that listed Mesilla Valley as the seller, though Mesilla Valley did not own the property.

83.     Legalist only signed the partial lien release based on PDG's representations that the net proceeds would be used to improve the MV Development and that PDG had plans to pay Legalist in full.

84.     None of the Sale Proceeds were used to repay the DIP Loan. In fact, the only payments Legalist received from PDG were, unbeknownst to Legalist, portions of the Sale Proceeds paid to Legalist to secure extensions of deadlines under the DIP Agreement.

85.     At best, only a small fraction of the Sales Proceeds was used to develop the MV Development.

86.     Both PDG and Mesilla Valley are beneficially owned, and controlled by Dixson. The foregoing actions were clear efforts to defraud PDG's creditors. Dixson defrauded Legalist into giving a release of Lot 1A, Dixson then removed Lot 1A from PDG's control and outside the purview of this Court, all with the plan to sell Lot 1A, route the proceeds from that sale to PDG, at which time, PDG fraudulently transferred the Sales Proceeds to, *inter alia*, Dixson and Gateway and for the purchase of the Candleleaf Property. PDG and Dixson attempted to conceal the sale of Lot 1A and the resulting Sale Proceeds by failing to report them to the Bankruptcy Court. They were only uncovered through Legalist's investigation.

87.     More so, in March 2023, Dixson offered to purchase a valuable property of Gateway, out of bankruptcy, with consent from Legalist. Along with his offer of purchase, Dixson falsely represented that he had sufficient available funds and submitted a forged Wells

Fargo Bank statement, dated "February 1, 2023 – February 28, 2023," which reflected an account in the name of the Dixson Trust, with a balance of $1,967,765.58.

88.  In reality, Dixson, on behalf of himself and the Dixson Trust, manipulated this document, as this account did not exist or hold such funds. In fact, the Dixson Trust's accounts with Wells Fargo had been closed years prior.

89.  Dixson submitted forged bank statements for the purpose of misleading Plaintiffs.

### COUNT I – FRAUD
#### (PDG And Michael Dixson)

90.  All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

91.  PDG and Dixson, seeking to induce Legalist to release its prime lien on Lot 1A to allow for the sale of Lot 1A to a non-debtor, made misrepresentations to Legalist regarding how PDG intended to use the Sales Proceeds. Specifically, PDG represented that the net sales proceeds would be used to pay claims and to complete the MV Development and further that "[t]here is a take out of Legalist waiting in the wings for this to close.".

92.  When PDG and Dixson made the representations, they knew the representations were false, or made the representations recklessly as a positive assertion and without knowledge of their trust. By way of example and not limitation, considering Dixson arranged for a $528,013.53 payment to the title company for the purchase of the Candleleaf Property the same day the Lot 1A sale closed, it is clear that the net proceeds were not to be used as he and PDG represented to Legalist.

93.  PDG and Dixson made the misrepresentations with the intent that Legalist act upon them in providing the partial lien release to allow the sale of Lot 1A.

94.  Legalist relied on these misrepresentations and signed the partial lien release.

95.     Legalist relied on those misrepresentations to its detriment and, as a result suffered economic injury. Legalist was harmed in the amount of the Sales Proceeds, and in the amount of the loss in value of the MV Development due to the sale of Lot 1A and PDG and Dixson's failure to use the Sales Proceeds to improve the MV Development. Further, because the partial lien release was obtained via fraud, Legalist requests it be set aside.

## COUNT II - FRAUDULENT TRANSFER (Tex. Bus. & Com. Code Ann. § 24.005(a)(1))
### (PDG And Michael Dixson)

96.     All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

97.     At all times relevant, Dixson has controlled PDG and Mesilla Valley. Dixson has directed and orchestrated all actions on behalf of PDG and Mesilla Valley.

98.     PDG and Dixson always intended to abscond with the proceeds from the sale of Lot 1A. It transferred Lot 1A to Mesilla Valley (an entity owned by PDG) to avoid Court oversight and approval of the sale. Once PDG transferred Lot 1A to Mesilla Valley, PDG, Dixson, and Mesilla Valley moved forward with the sale of Lot 1A to FSLRO.

99.     Dixson, individually, and as an agent of PDG and Mesilla Valley, or on behalf of PDG and Mesilla Valley, orchestrated the transfer of Lot 1A from PDG to Mesilla Valley and then from Mesilla Valley to FSLRO.

100.    Legalist has a lien on all of the proceeds from the sale of Lot 1A.

101.    At the closing of the sale of Lot 1A to FSLOR, the seller (Mesilla Valley) was to receive no less than $1,916,558.82.

102.    The Sales Proceeds were not deposited into a Mesilla Valley account, but instead were wired into PDG's account #5229 at Chase Bank.

103.    Dixson, individually and as an agent of PDG then orchestrated the transfer of the Sales Proceeds to himself, the Dixson Trust, Gateway, among other entities not entitled to funds, after the DIP Lender's claim arose and shortly before the money owed to the DIP Lender became due.

104.    The transfer of the Sales Proceeds from PDG to Dixson was a fraudulent transfer because the DIP Lender's claim arose before or within a reasonable time after transfers, and the transfers were done with the actual intent to hinder, delay, or defraud the DIP Lender.  *See* TEX. BUS. & COM. CODE § 24.005(a)(1).

105.    Intent can be inferred from such circumstances as the following, most of which are present herein:

  a.  the transfer was to an "insider" – Dixson controls both PDG and Mesilla Valley and ultimately was always in control of the Sales Proceeds (*see* TEX. BUS. & COM. CODE §§ 24.002(7), 24.005(b)(1));

  b.  PDG and Dixson retained possession and control of the Sales Proceeds after the transfer of Lot 1A to FSLRO (*see* TEX. BUS. & COM. CODE § 24.005(b)(2));

  c.  The transfer was concealed – the transfer of the Sales Proceeds from PDG was fraud in that:

   i.  Dixson failed to inform the DIP Lender that it received the Sales Proceeds;

   ii.  PDG and/or Dixson did not use the Sales Proceeds to pay the DIP Lender or to improve other estate collateral;

   iii.  PDG and/or Dixson instead transferred the Sales Proceeds, without informing the DIP Lender, to, *inter alia*:

    a.  a title company for the purchase of the Candleleaf Property;

    b.  two PDG accounts and one personal account at Chase Bank for use on personal, living, and

17

entertainment expenses, including child support; and

    c.   to The Gateway account at Chase Bank;

    iv.  PDG and Dixson did not inform the DIP Lender how the Sales Proceeds were used (*see* TEX. BUS. & COM. CODE § 24.005(b)(3));

d.  the transfer was of substantially all Debtor's assets (*see* TEX. BUS. & COM. CODE § 24.005(b)(5));

e.  PDG and Dixson removed or concealed assets – Dixson took the Sales Proceeds and used them for virtually everything but developing the remainder of the MV Development ((*see* TEX. BUS. & COM. CODE § 24.005(b)(7));

f.  PDG did not receive any consideration for the Sales Proceeds used by Gateway and Dixson (*see* TEX. BUS. & COM. CODE § 24.005(b)(8)); and

g.  the transfers occurred shortly before or after a substantial debt was incurred – the DIP Lender loaned the money on April 14, 2021, and April 23, 2021, the transfer from Mesilla Valley to FLSRO occurred on May 31, 2022, and PDG defaulted on June 24, 2022; (*see* TEX. BUS. & COM. CODE § 24.005(b)(10)).

106.    The impact of the foregoing on the DIP Lender's collateral was particular to the DIP Lender. Accordingly, the DIP Lender requests that this Court declare the transfer of the funds in favor of Dixson void and unwind the transfers. *See* TEX. BUS. & COM. CODE § 24.008(a)(1). The DIP Lender also requests an attachment against the funds or other property of Dixson in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings. *See* TEX. BUS. & COM. CODE § 24.008(a)(2). The DIP Lender also requests an injunction restricting Dixson from disposing of other property and assets. *See* TEX. BUS. & COM. CODE § 24.008(a)(3)(A) & (B). The DIP Lender also requests an injunction against Dixson from assigning to, or otherwise negotiating the funds with third parties. *See* TEX. BUS. & COM. CODE § 24.008(a)(3)(A).

## COUNT III – FRAUDULENT TRANSFER, 11 U.S.C. § 548(a)(1)(A)
### (PDG and Michael Dixson)

107.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

108.    The transfer of the Sales Proceeds from PDG to Dixson was a fraudulent transfer because the DIP Lender's claim arose before or within a reasonable time after transfers, and the transfers were done with the actual intent to hinder, delay, or defraud the DIP Lender. *See* 11 U.S.C. § 548(a)(1)(A).

109.    Intent can be inferred from such circumstances as the following, most of which are present herein, from the facts as set forth in the subsections of paragraph 105 above.

110.    The impact of the foregoing on the DIP Lender's collateral was particular to the DIP Lender. Accordingly, the Plaintiffs request that this Court declare the transfer of the funds in favor of Dixson void and unwind the transfers. *See* 11 U.S.C. § 548(a)(1)(A).

## COUNT IV - FRAUDULENT TRANSFER (Tex. Bus. & Com. Code Ann. § 24.005(a)(2))
### (PDG And Michael Dixson)

111.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

112.    The transfers of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time of the transfer, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due. *See* TEX. BUS. & COM. CODE § 24.005(a)(2).

113.    The transfer of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time after the transfer was made, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG was insolvent at that time or it became insolvent as a result of the transfer. *See* TEX. BUS. & COM. CODE § 24.006(a). PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation, and because PDG does not generally pay its debts as they become due are presumed to be insolvent. *See* TEX. BUS. & COM. CODE § 24.003.

114.    The transfer of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time after the transfer, and the transfer was made to insiders (*see* TEX. BUS. & COM. CODE § 24.002(7)(A)(i)) for an antecedent debt, PDG was insolvent at the time, and the insiders had reasonable cause to believe PDG was insolvent. *See* TEX. BUS. & COM. CODE § 24.006(b). PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation, and because PDG does not generally pay its debts as they become due, it is presumed to be insolvent. *See* TEX. BUS. & COM. CODE § 24.003.

115.    Accordingly, these transfers are fraudulent as to Plaintiffs and Plaintiffs are entitled to judgment against PDG and Dixson disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT V – FRAUDULENT TRANSFER, 11 U.S.C. § 548(a)(1)(B)
## (PDG and Michael Dixson)

116.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

117.     The transfers of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time of the transfer, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due. *See* 11 U.S.C. § 548(A)(1)(B).

118.     The transfer of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time after the transfer was made, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG was insolvent at that time or it became insolvent as a result of the transfer. *See* 11 U.S.C. § 548(A)(1)(B). PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation, and because PDG does not generally pay its debts as they become due are presumed to be insolvent.

119.     The transfer of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before or within a reasonable time after the transfer, and the transfer was made to insiders for an antecedent debt, PDG was insolvent at the time, and the insiders had reasonable cause to believe PDG was insolvent. PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation, and because PDG does not generally pay its debts as they become due, it is presumed to be insolvent. *See* 11 U.S.C. § 548(a)(1)(B).

120.     Accordingly, these transfers are fraudulent as to Plaintiffs and Plaintiffs are entitled to judgment against PDG and Dixson disregarding the transfers and allowing Plaintiffs

to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT VI - MONEY HAD AND RECEIVED
### (PDG And Michael Dixson)

121. All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

122. Alternatively, still urging and relying upon the matters alleged above, the DIP Lender would show that Dixson, PDG, Christiana Dixson and the Dixson Trust have been unjustly enriched by receiving funds from Mesilla Valley's transfer of Lot 1A. Those funds rightfully belong to the DIP Lender. PDG, Dixson, the Dixson Trust, Christiana Dixson, and Gateway received funds from the Sales Proceeds that should have been directed for use as payment for DIP Lender, yet payment has been refused to remit payment of the amounts due to the DIP Lender. Thus, PDG, Dixson, the Dixson Trust, Christiana Dixson, and Gateway hold money that belongs to the DIP Lender in equity and good conscience.

## COUNT VII - RECOVERY OF POST-PETITION TRANSFERS

123. All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

124. To the extent PDG made post-petition transfers to Dixson, the Dixson Trust, Gateway, and/or other non-debtors, such transfers were unauthorized post-petition transfers and are avoidable under 11 U.S.C. § 549 and 11 U.S.C. § 550.

125. The Plaintiff Trustee seeks to avoid and recover all such transfers and reserves its rights to amend and supplement this complaint to identify all such transfers.

## COUNT VIII – (TURNOVER OF PROPERTY, 11 U.S.C. § 542(a))
### (Defendant Southwestern)

126.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

127.    Section 542(a) of the Bankruptcy Code provides that an entity (other than a custodian) in possession, custody or control, during the case, of property of the estate must "deliver to the trustee, and account for, such property or the value of such property." 11 U.S.C. § 542(a).

128.    Defendant Southwestern is in possession of the Escrowed Monies.

129.    The Escrowed Monies are property of the Debtors' bankruptcy estate.

130.    Demand has been made upon Southwestern for the turnover of the Escrowed Monies and Southwestern has failed and refused to turnover the Escrowed Monies.

131.    Pursuant to Section 542(a) of the Bankruptcy Code, Southwestern is required to turnover the Escrowed Monies to the Trustee of the Debtor for the benefit of the Debtors' bankruptcy estate and provide an accounting with respect to the Escrowed Monies.

## COUNT IX – FRAUDULENT TRANSFER (Tex. Bus. & Com. Code Ann. § 24.005(a)(1)
### (Defendant Debtor, Christiana Dixson, Dixson, Dixson Trust)

132.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

133.    At all relevant times, Legalist has a been creditor of Debtor.

134.    After Legalist's claim arose, Debtor transferred no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson without consideration.

135.    The Dixson Trust then transferred the Candeleaf Monies towards the purchase of the Candleleaf Property, for the benefit of Dixson, the Dixson Trust, and Christiana Dixson.

136.    No consideration was provided to the Debtor, Dixson Trust, or otherwise, for its receipt of the benefit of the Candleleaf Property.

137.    These monies were transferred by the Debtor, for the ultimate benefit of the Dixson Trust, Dixson, and Christiana Dixson, with the actual intent to hinder, delay, and defraud Plaintiff and the Debtor's estate.

138.    Accordingly, these transfers are fraudulent as to Plaintiffs and Plaintiffs are entitled to judgment against Debtor, Christiana Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT X – FRAUDUENT TRANSFER, 11 U.S.C. § 548(a)(1)(A)
### (Defendant Debtor, Christiana, Dixson, Dixson Trust)

139.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

140.    At all relevant times, Legalist has a been creditor of Debtor.

141.    After Legalist's claim arose, Debtor transferred no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson without consideration.

142.    The Dixson Trust then transferred the Candeleaf Monies towards the purchase of the Candleleaf Property, for the benefit of Dixson, the Dixson Trust, and Christiana Dixson.

143.    No consideration was provided to the Debtor, Dixson Trust, or otherwise, for its receipt of the benefit of the Candleleaf Property.

144.    These monies were transferred by the Debtor, for the ultimate benefit of the Dixson Trust, Dixson, and Christiana Dixson, with the actual intent to hinder, delay, and defraud Plaintiff and the Debtor's estate.

145.    Accordingly, these transfers are fraudulent as to Plaintiffs and Plaintiffs are entitled to judgment against Debtor, Christiana Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT XI – FRAUDULENT TRANSFER (Tex. Bus. & Com. Code Ann. § 24.005(a)(2))
### (Defendant Debtor, Christiana, Dixson, Dixson Trust)

146.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

147.    At all relevant times, Legalist has a been creditor of Debtor.

148.    After Legalist's claim arose, Debtor transferred no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson, without consideration.

149.    The Dixson Trust, via Doma, then transferred the Candleleaf Monies towards the purchase of the Candleleaf Property, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson, without consideration.

150.    Reasonably equivalent value was not provided to the Debtor, or otherwise, for its receipt of the benefit of the Candleleaf Property.

151.    At the time of the transfers of the Candleleaf Monies, Debtor was insolvent, intended incur, or believed or reasonably believed that it would incur debtor beyond its ability to pay them as they came due.

152.    Accordingly, these transfers are fraudulent as to Plaintiffs and Plaintiffs are entitled to judgment against Debtor, Christiana Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT XII – FRAUDUENT TRANSFER, 11 U.S.C. § 548(a)(1)(B)
### (Defendant Debtor, Christiana Dixson, Dixson, Dixson Trust)

153.     All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

154.     At all relevant times, Legalist has a been creditor of Debtor.

155.     After Legalist's claim arose, Debtor transferred no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson, without consideration.

156.     The Dixson Trust, via Doma, then transferred the Candleleaf Monies towards the purchase of the Candleleaf Property, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson, without consideration.

157.     Reasonably equivalent value was not provided to the Debtor, or otherwise, for its receipt of the benefit of the Candleleaf Property.

158.     At the time of the transfers of the Candleleaf Monies, Debtor was insolvent, intended incur, or believed or reasonably believed that it would incur debtor beyond its ability to pay them as they came due.

159.     Accordingly, these transfers are fraudulent as to Plaintiffs and Plaintiffs are entitled to judgment against Debtor, Christiana Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT XIII – FRAUDULENT TRANSFER (Tex. Bus. & Com. Code Ann. § 24.006
### (Defendant Debtor, Christiana Dixson, Dixson, Dixson Trust)

160.     All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

161.    At all relevant times, Legalist has a been creditor of Debtor.

162.    After Legalist's claim arose, Debtor transferred no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson, without consideration.

163.    The Dixson Trust, via Doma, then transferred the Candeleaf Monies towards the purchase of the Candleleaf Property, for the benefit of the Dixson Trust, Dixson, and Christiana Dixson.

164.    The Candleleaf Monies were transferred without the receipt of reasonably equivalent value in exchange for the transfers, and PDG was insolvent at the time the Candleleaf Monies were transferred.

165.    Additionally, to the extent that any portion of the Candleleaf Monies were transferred as payment on an antecedent debt, such transfer is fraudulent as the Dixson Trust, Dixson, and Christiana Dixson, are insiders of PDG, and the Dixson Trust, Dixson, and Christiana Dixson, were aware that PDG was insolvent at the time of the transfers.

166.    At the time of the transfers of the Candleleaf Monies, Debtor was insolvent, intended incur, or believed or reasonably believed that it would incur debtor beyond its ability to pay them as they came due.

167.    Accordingly, these transfers are fraudulent as to Plaintiffs and Plaintiffs are entitled to judgment against Debtor, Christiana Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT XIV - (Avoidance of Postpetition Transfers - 11 U.S.C. § 549)

168.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

169.    The Candleleaf Monies were transferred after the Petition Date.

170.    The Candleaf Monies were transfers of the property of the estate.

171.    The Candleaf Monies were not authorized under the Bankruptcy Code or by the Bankruptcy Court.

172.    Based upon the foregoing, Plaintiff Trustee may avoid the Candleleaf Monies pursuant to Section 549 of the Bankruptcy Code.

## COUNT XV (Recovery of Avoided Postpetition Transfers - 11 U.S.C. § 550)

173.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

174.    Plaintiff Trustee is entitled to avoid the postpetition Candleleaf Monies pursuant to Section 549 of the Bankruptcy Code.

175.    Defendant Dixson Trust and Dixson were the initial transferees of the Candleleaf Monies.

176.    Entrada was the entity for whose benefit the Candleleaf Monies were made.

177.    Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff Trustee is entitled to recover the postpetition Candleleaf Monies from Defendants Dixson, and Dixson Trust, plus interest thereon to the date of payment and the costs of this action.

178.    By reason of the foregoing, Plaintiff Trustee is entitled to recover the proceeds or value of the postpetition Candleleaf Monies pursuant to Section 550(a) of the Bankruptcy Code.

## COUNT XVI – ALTER EGO
(Mesilla Valley)

179.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

180.    This is an action seeking a declaration that Mesilla Valley is the alter ego of Debtor.

181.    Mesilla Valley is influenced and governed by Debtor. Neither Mesilla Valley nor Debtor has any employees and they are both beneficially owned and controlled by Dixson.

182.    There is such unity of ownership and interest between Mesilla Valley and Debtor that one is inseparable from the other. Indeed, Mesilla Valley has no business purpose other than to act as holding company for an asset of Debtor, Lot 1A.

183.    Mesilla Valley serves at the behest of Dixson and PDG, and is used solely for the purpose of Dixson and PDG committing fraud.

184.    Moreover, Mesilla Valley negotiated the sale of Lot 1A (as seller) at a time when it did not own the property, as Debtor was the owner of the property. Thus, Mesilla Valley as a mere instrumentality of Debtor to achieve the sale of Debtor's asset outside the purview and supervision of this Court.

185.    While Mesilla Valley retained the Firm to represent it in the sale of Lot 1A, the Firm received payment from Debtor.

186.    Moreover, the Sale Proceeds from the sale of Lot 1A (in which Mesilla Valley was the alleged seller) were deposited directly into an account of Debtor, after which they were promptly squandered or otherwise use at the behest of Dixon and PDG, and for non-business purposes of PDG.

29

187.    Debtor's receipt of the Lot 1A Sale Proceeds was concealed, as it was not reported in Debtor's periodic reporting to this Court.

188.    Mesilla Valley and PDG are alter egos of one another, did not observe corporate formalities particularly when transacting business with one another, and acted as if they were one and the same.

189.    Thus, adherence to the corporate fiction of a separate entity would, under these circumstances, sanction a fraud or promote injustice. Plaintiffs respectfully request the Court find that Mesilla Valley is an alter ego of Debtor.

190.    Accordingly, Plaintiff is entitled to judgment against Mesilla for any amounts shown to be due and owing by Debtor to Plaintiffs.

## COUNT XVII – CIVIL CONSPIRACY
(Weycer, Kaplan, Pulaski & Zuber, Debtor, Dixson, Mesilla Valley)

191.    All factual allegations set forth elsewhere in this Complaint are incorporated by reference in support of this cause of action as if specifically alleged herein.

192.    The Firm, through Mr. Caruth, together with Dixson (acting personally and as representative of Debtor and Mesilla Company) reached an agreement to sell Lot 1A, before the Plan was confirmed and while the automatic stay was in place, outside of this Court's purview and supervision.

193.    To accomplish that goal, Defendants conspired to fraudulently transfer an asset of the Debtor—Lot 1A—to Messila Valley for no consideration.

194.    During the sale negotiations, Mr. Caruth sent correspondence to all parties involved stating that the sale would have to be approved by the Court under section 363(f) of the Bankruptcy Code.

195.    Instead, Mr. Caruth acted in furtherance of the conspiracy when he facilitated the fraudulent transfer of Lot 1A from Debtor to Debtor's alter ego, Messila Valley, for no consideration and without the Court's authorization.

196.    Mr. Caruth negotiated the Purchase and Sale Agreement for Lot 1A and represented Messila Valley in said transaction.

197.    The Purchase and Sale Agreement for Lot 1A was executed on March 4, 2022, before the Plan was confirmed and when the automatic stay was still in place.

198.    The Firm received $75,000 in compensation for the sale of Lot 1A, which were paid from the proceeds of the sale. The Firm invoiced Messila Valley c/o Debtor for its fees in connection with the sale of Lot 1A.

199.    But for the Firm's actions, Debtor would not have been able to sell Lot 1A and, in turn, Dixson would not have had access to the sale proceeds that he immediately dissipated.

200.    Plaintiffs suffered damages as a direct result of Defendants' conspiracy to fraudulently transfer Lot 1A from Debtor to Mesilla Valley in the amount of the Sale Proceeds plus the amounts paid to third-parties, by Southwestern, from the proceeds of the sale.

## **CONCLUSION**

For the reasons listed herein, Plaintiff asks that Defendants PDG Prestige, Inc., Dixson, the Dixson Trust through Dixson, Southwestern Abstract & Title Company, Inc., and Christiana Dixson, be cited to appear and answer this Complaint, and, upon final hearing, Plaintiffs have judgment against Defendants for actual damages, treble damages, and attorneys' fees based on the causes of action asserted in the foregoing Counts; exemplary damages; pre- and post-judgment interest at the maximum rate allowed by applicable law; avoiding post-petition transfers in the amount of no less than $1,916,558.82 pursuant to 11 U.S.C. § 549 and, to the

extent necessary, 11 U.S.C. § 550; and all costs of suit. Plaintiffs also request the partial lien release related to Lot 1A be set aside; and for turnover of the Escrowed Monies from Defendant Southwestern Abstract & Title Company, Inc. pursuant to 11 U.S.C. §542(a). Further, Plaintiff asks this Court to grant all such other and further relief, at law and in equity, to which it may be justly entitled.

Dated: February 23, 2024

Respectfully submitted,

*/s/ Zachary Bluestone*
M. Zachary Bluestone
D.C. Bar No. 994010
BLUESTONE, P.C.
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: 202-655-2250
Email: mzb@bluestonelaw.com

-and-

*/s/ Jason Binford*
Jason Binford
State Bar No. 24045499
ROSS, SMITH & BINFORD, PC
2003 N. Lamar Blvd., Ste. 100
Austin, TX 78705
Phone: 512-351-4778
Email:  jason.binford@rsbfirm.com

*Counsel to Legalist DIP Fund I, LP;*
*Legalist DIP SVP II, LP; and Legalist DIP*
*GP, LLC*

*/s/ Ronald Ingalls*
Ronald Ingalls
SBT 10391900
Law Office of Ronald Ingalls
PO Box 2867
Fredericksburg, TX 78624
Tel: (830) 321-0878
Fax: (830) 321-0913
Email: ingallstrustee@gmail.com

*Counsel for Chapter 7 Trustee*