## IN THE UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **BANKRUPTCY NO. 21-30107-CBG** |
| | § | |
| **PDG PRESTIGE, INC.,** | § | **CHAPTER 7** |
| | § | |
| *Debtor.* | § | |
| | § | |
| | § | |
| **LEGALIST DIP GP, LLC and PDG** | § | |
| **PRESTIGE, INC. (by and through** | § | |
| **Ronald Ingalls, Chapter 7 Trustee),** | § | **ADVERSARY NO. 23-03004-CGB** |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MICHAEL DIXSON, individually,** | § | |
| **MESILLA VALLEY VENTURES,** | § | |
| **LLC, MICHAEL DIXSON TRUST** | § | |
| **THROUGH ITS TRUSTEE** | § | |
| **MICHAEL J. DIXSON, CHRISTINA** | § | |
| **DIXSON, SOUTHWESTERN** | § | |
| **ABSTRACT & TITLE COMPANY,** | § | |
| **INC., WEYCER, KAPLAN, PULASKI** | § | |
| **& ZUBER P.C., ENTRADA** | § | |
| **DEVELOPMENT, THE GATEWAY** | § | |
| **VENTURES, LLC, LPC RETAIL,** | § | |
| **LLC, and FSLRO 510 SOUTH** | § | |
| **TELSHOR LAS CRUCES, LLC,** | | |
| | | |
| *Defendants.* | | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

**TO THE HONORABLE CHRISTOPHER G. BRADLEY,**
**UNITED STATES BANKRUPTCY JUDGE:**

COME NOW, Plaintiffs Legalist DIP GP, LLC ("**Legalist**," or "**DIP Lender**") and

Chapter 7 Trustee Ronald Ingalls ("**Trustee**" and together with Legalist, "**Plaintiffs**") and file

this, its Third Amended Complaint and state the following:

## **PARTIES**

1.      Plaintiff Legalist DIP GP, LLC can be served through its counsel of record in this proceeding.

2.      Trustee Ronald Ingalls is the Chapter 7 trustee for Debtor PDG Prestige, Inc. ("**Trustee**") in the main proceeding captioned above.

3.      Defendant PDG Prestige Inc. ("**PDG**" or the "**Debtor**") is a Texas corporation company, with its principal place of business at 12912 Hill Country Blvd Ste F-235 Austin, TX 78738-7102, and can be served via its President Michael Dixson, at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or wherever it may be found.

4.      Defendant Michael Dixson, individually ("**Dixson**") under information and belief resides in Travis County, Texas, and can be served at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or wherever he may be found and through his counsel, David Lutz, Martin & Lutz, P.C. P.O. Drawer 1837, Las Cruces, NM 88004 or at 2011 N. Main Street, Las Cruces, NM 88001.

5.      Defendant Entrada Development, LLC ("**Entrada**") is a Texas limited liability company located, and with its principal place of business, at 1912 Hill Country Blvd, Ste F-235 Bee Cave, Texas 78738-7102. Michael Dixson is the sole member.  It can be served at its registered agent at Herrera Tax & Bookkeeping Firm, 720 Belvidere Rd Suite E-5 El Paso, Texas 79912.

6.      Defendant Mesilla Valley Ventures, LLC ("**Mesilla Valley**") is a Texas limited liability company located, and with its principal place of business, at 910 E Redd Rd Ste K El Paso, Texas 79912-7348.  It can be served at its registered agent PDGTX Inc. at 2921 E 17th Street, Building B, Austin, Texas 78702. Its sole manager/member is PDG Prestige, Inc.

7.      Defendant Michael Dixson Trust ("**Dixson Trust**"), through its trustee Michael J. Dixson, can be served at 12912 Hill Country Blvd., Bldg. F, Ste. 235, Austin, Texas 78738, or wherever he may be found and through his counsel, David Lutz, Martin & Lutz, P.C. P.O. Drawer 1837, Las Cruces, NM 88004.

8.      Defendant Christina Dixson aka Christina Marmolejo, individually ("**Christina**") is domiciled, and can be served, at 6 Candleleaf Ct, The Hills, Texas 78738-1444.

9.      Defendant Southwestern Abstract & Title Company, Inc. ("**Southwestern**") is a New Mexico corporation that has had its corporate charter revoked. According to the New Mexico Secretary of State, the most recent registered agent was Kevin L. Davis, who is also the last listed President, and is located at 1125 South Main, Las Cruces, NM 88005.  1125 South Main, Las Cruces, NM 88005 is also the listed principal place of business for Southwestern.

10.     Defendant Weycer, Kaplan, Pulaski & Zuber, P.C. (the "**Firm**") is a Texas professional corporation, with its principal place of business at 24 Greenway Plaza Suite 2050 Houston, TX 77046, and which provides legal services and regularly transacts business within this district.

11.     Defendant The Gateway Ventures, LLC ("**Gateway**") is currently a Chapter 7 debtor pending in proceedings before the Bankrutpcy Court for the Western District of Texas, *In re The Gateway Ventures, LLC*, Case No. 21-30071 in which the Trustee is the Trustee of that proceeding as well.

12.     Defendant LPC Retail, LLC ("**LPC**") is a Delaware limited liability company authorized to do business in Texas and New Mexico.

13.     Defendant FSLRO 510 South Telshor Las Cruces, LLC ("**FSLRO**") is a Delaware limited liability company authorized to do business in Texas and New Mexico.

**JURISDICTION AND VENUE**

14.     The Court may exercise subject matter jurisdiction over this action under 28 U.S.C. § 157 and 1334 because the matter is a core proceeding arising in a case under Title 11.

15.     Venue is proper in this Court under 28 U.S.C. § 1409 because the matter is arising in or related to a case under Title 11.

16.     This Court has personal jurisdiction over Defendants because they have their principal place of business, reside, or regularly transact business in this district.

**FACTS AND PROCEDURAL HISTORY**

A.     DIP Lending History – PDG

17.     On February 15, 2021 (the "**Petition Date**"), PDG filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**" or "**Code**").

18.     PDG has continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108 until the case was converted to Chapter 7 and the Trustee was appointed.

19.     Dixson is President of PDG and has managed all of the operations of PDG at all times and is its sole shareholder.  PDG owns the majority of the equity of The Gateway Ventures, LLC, a related entity.

20.     On April 12, 2021, the Court conducted an expedited hearing regarding the *Motion to (I) Enter into PDG Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec.364(d), and (III) Provide Related Relief* [Docket No. 24] (the "**DIP Motion**") filed herein on March 26, 2021 by PDG.  [Docket No. 24].

4

21.     On April 12, 2021, the Court entered the *Final Order Granting Motion of Debtor to (1) Enter Into Debtor Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec. 364(D), and (III) Provide Related Relief (Re: Docket No. 24)* (the "**DIP Order**").  [Docket No. 43].

22.     On April 12, 2021, PDG and DIP Lender entered into a PDG-In-Possession Term Loan Credit Agreement (the "**DIP Agreement**") concerning certain investment fund(s) for which DIP Lender serves as general partner, lender, agent, and collateral agent.  The DIP Lender agreed to extend DIP Loans (each a "**DIP Draw**") on the certain terms described in the DIP Agreement in an aggregate maximum amount of $4,700,000 (the "**DIP Commitment**").

23.     On April 14, 2021, the DIP Lender loaned Debtor $3,300,870.33.

24.     On April 23, 2021, the DIP Lender loaned Debtor $1,399,129.67.

25.     Collectively, the DIP Lender loaned PDG the principal amount of $4,700,000 (the "**DIP Loan**").

26.     According to Dixson and PDG, the DIP Loan was integral for PDG to refinance the existing debt that had precipitated the bankruptcy and to complete the development of the underlying property and "to preserve the ultimate value of the Property."  (DIP Motion, ¶¶, 38-39).  The DIP Loan was integral to the implementation of PDG's reorganization.

27.     Pursuant to the DIP Agreement, the DIP Loan, along with all DIP Obligations (interest and fees), matured on June 24, 2022.

28.     On March 31, 2022, PDG filed its *Second Amended Plan of Reorganization of PDG Prestige Inc. dated March 29, 2022, as Modified* (ECF No. 145) (the "**Plan**"), which was confirmed the same day when the Court entered the *Order Confirming Second Amended Plan of*

*Reorganization PDG Prestige Inc. Dated March 29, 2022 as Modified* (the "**Confirmation Order**"). [Docket No. 148].

29.     The Plan incorporated all pre-plan obligations and interests contained in the DIP Agreement and the DIP Order, including payments due to the DIP Lender and the DIP Lender's rights as to collateral.

30.     PDG's failure to pay the DIP Lender has defeated implementation of the Plan and DIP Order and arose from the actions described herein, and contributed to the case being converted to Chapter 7.

B.     Lot 1A Ownership History

31.     Among PDG's assets, PDG owned a ± 3.29 acre tract of unimproved real property in Las Cruces, Dona Ana County, New Mexico sometimes referred to as Mesilla Valley Mall Subdivision Replat No. 5, and located at 510 and 550 S. Telshor Blvd., Las Cruces, New Mexico 88011 (the "**MV Development**").

32.     Pursuant to the DIP Order and the DIP Agreement, Legalist acquired priming liens on all of PDG's assets, including but not limited to the MV Development.

33.     The MV Development consisted of two tracts, Lot 1A and Lot 3A.

34.     Defendant Mesilla Valley Ventures, LLC ("**Mesilla Valley**") is a Texas company wholly owned by PDG.  Dixson is Mesilla Valley's President.  Mesilla Valley has no business purpose but instead acts as holding company for Lot 1A.

35.     Despite the automatic stay being in force, and prior to the Plan Confirmation Order, the Firm, and more specifically counsel Jeff Carruth, aided the Debtor in transferring Lot 1A to Debtor's insider, Mesilla Valley, for no consideration and without Court approval.

36. Subsequently, Mr. Carruth negotiated the sale of Lot 1A from Mesilla Valley to a third party.

37. Specifically, on March 4, 2022, prior to the Plan's Confirmation Order, and without notice or court approval as required by the Bankruptcy Code, Mesilla Valley and LPC entered a Purchase and Sale Agreement for the sale of Lot 1A ("**PSA**").

38. At the time of the PSA, Mesilla Valley did not own Lot 1A, as it was owned by the Debtor.

39. The Firm represented Mesilla Valley in the negotiation of the PSA, while simultaneously representing PDG, again without disclosing any of this to the Court. Thus, the Firm facilitated the transfer of Debtor's asset to Debtor's insider, for no consideration, in order to sell that asset to a third party outside this Court's view and supervision as required by the Bankruptcy Code and Bankruptcy Rules.

40. The PSA states that the seller is the Debtor in this bankruptcy proceeding, despite the seller being identified in the PSA as Mesilla Valley.

41. At the time the PSA was negotiated and executed, there was not a confirmed plan allowing either Mesilla Valley or the Debtor to negotiate the sale of Lot 1A and, in fact, the automatic stay prohibited Mesilla Valley and LPC from exercising control over the Debtor's property, including Lot 1A. Furthermore, none of these negotiations were disclosed to the Court as required by Section 363 of the Bankruptcy Code.

42. On or about April 12, 2022, (more than a month after the PSA was executed), PDG informed Legalist that it intended to sell Lot 1A and use the net proceeds from that sale to pay certain claims of the estate, including to Legalist, and to complete the MV Development thereby increasing the value of Legalist's collateral.

43.     PDG requested that Legalist execute a partial lien release to allow the sale to close.

44.     Based on PDG's fraudulent representation that the proceeds from the sale of Lot 1A would be used to improve its collateral, the MV Development, Legalist signed a partial lien release on April 14, 2022.

45.     Nevertheless, at the time, Legalist was a secured creditor of PDG, pursuant to the Plan, the DIP Agreement, DIP Order, Confirmation Order and its related security and loan documents.

46.     On April 21, 2022, PDG executed a Special Warranty Deed and transferred Lot 1A to Mesilla Valley, whose Director and President is Dixson. PDG is also identified as Mesilla Valley's manager.   On information and belief, PDG did not receive any consideration in exchange for the transfer of Lot 1A to Mesilla Valley.

47.     On May 4, 2022, LPC assigned the PSA to FSLRO.

48.     On May 27, 2022, Mesilla Valley executed a Special Warranty Deed and transferred Lot 1A to FSLRO.

49.     On May 31, 2022, the sale of Lot 1A to FSLRO closed and the proceeds were disbursed to various entities, including to (1) R2 Contractors Specialty, Inc. ($4,825.32), and Utility Block Company, Inc. ($70,981.70) as "Payoff Claim[s] of Lien," despite the liens of these entities no longer being effective as a result of Debtor's bankruptcy and the Plan, (2) for legal fees of Ferguson Braswell Fraser Kubasta PC ($50,000) based on invoices issued to Prestige Development Group, Inc., an entity distinct from the Debtor and with entitlement to proceeds, and to the Firm, for work done on behalf of Mesilla Valley and invoiced to Mesilla Valley ($75,000).

50.     Despite Mesilla Valley being the title owner of Lot 1A at the time of closing, the overwhelming portion of the remaining amounts, $1,916,558.82 ("**Sale Proceeds**") were wired

into an account of PDG at Chase Bank (Account xx5229) used by Debtor and immediately spent by Dixson for his personal benefit, and for that of entities affiliated with him but not entitled to such proceeds, to the detriment of Legalist's security interest and contrary to Dixson's representations as to how such funds would be used. The use by Dixson of the Sale Proceeds violates the DIP Order, DIP Agreement, Plan and Confirmation Order.

C.    Escrow Agreements/Southwestern

51.    As part of the closing of the sale of Lot 1A, Mesilla Valley, FSLRO, and Southwestern (the title company), were party to a Lien Escrow Agreement, which provided, among other things, that Southwestern would hold back $200,000 of proceeds to pay off certain liens that may come to exist on Lot 1A within a certain period of time.

52.    All conditions of the Lien Escrow Agreement have since been satisfied and neither Southwestern, FSLRO, or any lien holders, are entitled to the $200,000 currently being held by Southwestern ("**Lien Escrow Monies**"), and which has been confirmed by Southwestern.

53.    The Lien Escrow Agreement provides that monies currently held by Southwestern should be released to Mesilla Valley. However, as Lot 1A was fraudulently transferred to Mesilla Valley for no consideration, Lot 1A was owned by the Debtor when Mesilla Valley purported to sell it to LPC, and the Sale Proceeds were deposited directly into Debtor's account, the $200,000 in Southwestern's possession belongs to the Debtor and, accordingly, must be turned over to Plaintiffs.

54.    Additionally, as part of the closing of the sale of Lot 1A, Mesilla Valley, FSLRO, and Southwestern, were party to a Rent Escrow Agreement, which provided, among other things, that Southwestern would hold back $35,000 of the proceeds to provide for rent payments to FSLRO if the tenant of Lot 1A did not pay rent, resulting from certain construction delays and

other obligations of Mesilla Valley, provided certain conditions were met ("**Rent Escrowed Monies**" collectively, with Lien Escrowed Monies, the "**Escrowed Monies**").

55.     Despite all of the conditions of the Rent Escrow Agreement not being met, Southwestern released all of these funds to FSLRO, or otherwise released these funds.

56.      Because the proceeds of the sale of Lot 1A belong to the Debtor, the Escrowed Monies also belong to Debtor and must be turned over to Plaintiffs.

D.     Dixson Misappropriates and Dissipates Lot 1A Sales Proceeds

57.     As Dixson was arranging for the improper sale of Lot 1A, he began transferring PDG funds to Doma Insurance Agency ("**Doma**"), a title company, for the benefit of "The Dixson Trust[,] 6 Candleleaf CT…The Hills TX," and on April 19, 2022, transferred $17,000 from PDG's Account #6935 to Doma.

58.     Upon information and belief, the Dixson Trust is an entity used solely for the purpose of assisting Dixson to secrete funds from creditors, such as the Plaintiff Legalist.

59.     Mesilla Valley was nothing more than a figurehead seller having received Lot 1A from PDG to enable PDG to sell Lot 1A without Court supervision and approval and to allow Dixson and PDG to dissipate funds as they saw fit, and without the knowledge or involvement of Plaintiffs.

60.     With the Firm's substantial assistance, Dixson was able to sell PDG's asset—Lot 1A—through its affiliate, Mesilla Valley.

61.     At the time, Legalist was unaware of the existence of Mesilla Valley, or that it had received title to Lot 1A from PDG.

62.     So, while PDG did not receive any consideration for the transfer of Lot 1A to Mesilla Valley, Mesilla Valley likewise did not receive any consideration for the Sales Proceeds

routed to PDG, the net result of which was PDG received consideration for the sale of Lot 1A to FSLRO even though it was not a party to the sale of Lot 1A.

63.    On the same day that the sale closed, May 31, 2022, Dixson wired $500,000 of the Sale Proceeds from PDG's Account #5229 to Doma, also for the benefit of "The Dixson Trust[,] 6 Candleleaf CT...The Hills TX."

64.    The following day, on June 1, 2022, Dixson wired an additional $28,018.53 from PDG's Account #5229 to Doma for the benefit of "The Dixson Trust[,] 6 Candleleaf CT...The Hills TX."

65.    Dixson then instructed Doma to use these funds for Defendant Entrada Development, LLC's purchase of real property and improvements located at 6 Candleleaf Ct, The Hills, Texas 78738 (the "**Candleleaf Property**").

66.    Entrada is part of Dixson's web of companies. Specifically, Dixson formed Entrada, established PDG as its manager, while the Dixson Trust owns its membership interests.

67.    Entrada recently commenced its own Chapter 11 bankruptcy proceedings. *In re Entrada Development, LLC,* No. 23-10317 (Bankr. W.D. Tex). That proceeding was ultimately dismissed on August 3, 2023. *See id.,* Docket. No. 29. A second proceeding was filed on November 7, 2023. *In re Entrada Development, LLC*, No. 23-10941 (Bankr. W.D. Tex.). On May 29, 2024, however, the second proceeding was dismissed as well, and the automatic stay was lifted. *See id.*, Docket. No. 49.

68.    Neither Dixson, the Dixson Trust, Entrada, nor anyone else, provided any consideration for the PDG monies used to purchase the Candleleaf Property.

69.     Thereafter, Dixson made improvements to, furnished, and moved into the Candleleaf Property, where he, Christina, and his family resided for a time.  On information and belief, Dixson's wife Christina still resides at the Candleleaf property, though Dixson and his wife are, upon information and belief, in divorce proceedings.

70.     By October 31, 2022, PDG's Account #5229 at Chase Bank had a zero balance. Dixson used most of the Sale Proceeds to support his extravagant lifestyle and for other expenses unrelated to PDG.  Dixson did not use any of the Sale Proceeds to improve Legalist's collateral, as he had represented to Legalist previously.

71.     By way of example and not limitation, Dixson used $528,013.53 of the Sale Proceeds to purchase the Candleleaf Property (the "Candleleaf Monies"); $75,000 to purchase a 2018 Cadillac Escalade; and $17,000 to purchase a watch.  Dixson even used $229,531.60 of the Sales Proceeds to pay Legalist for extension fees to forestall Legalist's efforts to collect on the DIP Loan and the Gateway DIP Loan[1] (the "**Extension Fees**").

72.     Dixson transferred portions of the Sale Proceeds to his personal account at Chase Bank and then used those funds to purchase furniture, make improvements to the Candleleaf Property, for food, entertainment, and a myriad other personal expenses.

73.     Dixson transferred portions of the Sale Proceeds to a separate PDG account at Chase Bank and then transferred those funds to one of his personal accounts at Chase where he then squandered them.

---

[1] On February 2, 2021, Gateway, an entity wholly owned by PDG, filed its voluntary petition for relief under Chapter 11 of the United States Code (the "**Gateway Bankruptcy**").  *See* Case No. 21-bk-30071, *In re The Gateway Ventures, LLC*.  Based upon representations made by Dixson, the debtor in the Gateway Bankruptcy also obtained funds from the DIP Lender, with its DIP Loan maturing on June 19, 2022, at which time the full balance of the principal, plus all fees and interest became due and owing (the "**Gateway DIP Obligation**").  To date, despite notice and demand, Gateway has failed to pay the Gateway DIP Obligation in the amount of $12,426,495.  On May 30, 2023, the Gateway Bankruptcy was converted to Chapter 7.

74.     Dixson transferred funds to Gateway's account at Chase Bank.  Dixson admits he used PDG funds to pay Gateway expenses.

75.     Additionally, Christina Dixson was provided with access to PDG funds and used such monies for her own personal benefit, without providing consideration to PDG, including but not limited to $25,000 in purchases at Pottery Barn in and around July 2022, which purchases she retained.

76.     PDG monies were also used to make mortgage payments on residential properties owned jointly by Dixson and Christina Dixson, providing Christina with benefits including from sale proceeds of such properties.

77.     Additionally, Christina Dixson has had the benefit of living in the Candleleaf Property since it was purchased by Entrada, and on December 12, 2022, temporary orders were entered in her divorce proceeding with Dixson, providing her with sole possession of the Candleleaf Property during those proceedings.

E.      PDG Defaults on the DIP Loan

78.     The DIP Loan matured by its terms on June 24, 2022, at which time the full balance of the principal, plus all interest, fees, costs and other charges as set forth in the DIP Agreement became due and owing.

79.     PDG has failed to repay the DIP Loan, which, as of May 31, 2024, exceeded $8,326,725.65.

80.     PDG failed to use the Sale Proceeds to pay Legalist anything other than the Extension Fees.

81.     Contrary to its prior representations to Legalist, PDG used the lion's share of the Sale Proceeds for everything *but* improving the MV Development.

F.      The Fraudulent Transfers

82.     Dixson did not pay PDG or provide equivalent consideration in exchange for the portion of the Sale Proceeds that was transferred from PDG to his personal account and/or used for his personal vehicle, residence, home improvements, child support, and other personal expenses.

83.     There is no evidence that PDG owed antecedent debt to Dixson that would justify PDG transferring funds to Dixson, prior to PDG paying Legalist.

84.     Gateway did not pay PDG or provide equivalent consideration to justify the funds from the Sales Proceeds that were transferred from PDG to Gateway and/or used for its (and Dixson's) expenses.

85.     There is no evidence that PDG owed antecedent debt to Gateway that would justify PDG transferring funds to Gateway, prior to PDG paying Legalist.

G.      PDG's False Representations Induced Legalist to Execute the Partial Lien Release

86.     In a recent deposition, Dixson testified under oath that PDG transferred Lot 1A to Mesilla Valley in exchange for Mesilla Valley paying certain PDG expenses.

87.     In reality, PDG transferred Lot 1A to Mesilla Valley when counsel for LPC/FSLRO objected to a sale pursuant to the PSA that listed Mesilla Valley as the seller, though Mesilla Valley did not own the property.

88.     Legalist only signed the partial lien release based on PDG's representations that the net proceeds would be used to improve the MV Development and allow PDG to pay Legalist in full.

89.     None of the Sale Proceeds were used to repay the DIP Loan. In fact, the only payments Legalist received from PDG were, unbeknownst to Legalist, portions of the Sale Proceeds paid to Legalist to secure extensions of deadlines under the DIP Agreement.

90.     At best, only a small fraction of the Sales Proceeds was used to develop the MV Development.

91.     Both PDG and Mesilla Valley are beneficially owned and controlled by Dixson. The foregoing actions were clear efforts to defraud PDG's creditors.  Dixson fraudulently induced Legalist into giving a release of Lot 1A, Dixson then removed Lot 1A from PDG's control and outside the purview of this Court, all with the plan to sell Lot 1A, route the proceeds from that sale to PDG, at which time, PDG fraudulently transferred the Sales Proceeds to, *inter alia*, Dixson and Gateway and for the purchase of the Candleleaf Property.  PDG and Dixson attempted to conceal the sale of Lot 1A and the resulting Sale Proceeds by failing to report them to the Bankruptcy Court.  They were only uncovered through Legalist's investigation.

92.     Moreover, in March 2023, Dixson offered to purchase a valuable property of Gateway, out of bankruptcy, with consent from Legalist.  Along with his offer of purchase, Dixson falsely represented that he had sufficient available funds and submitted a forged Wells Fargo Bank statement, dated "February 1, 2023 – February 28, 2023," which reflected an account in the name of the Dixson Trust, with a balance of $1,967,765.58.

93.     In reality, Dixson, on behalf of himself and the Dixson Trust, manipulated this document, as this account did not exist or hold such funds. In fact, the Dixson Trust's accounts with Wells Fargo had been closed years prior.

94.     Dixson submitted forged bank statements for the purpose of misleading Legalist.

H.     <u>Dixson Has No Claims Against the PDG Estate</u>

95.     The *First Amended Disclosure Statement (as Corrected) in Support of First Amended Plan of Reorganization of PDG Prestige, Inc. Dated January 17, 2022*, 21-bk-30107, [Docket No. 116] (the "**Disclosure Statement**"), provides a summary of all unsecured claims against PDG in Exhibit PDG304.   Neither Dixson nor any other company controlled by Dixson is listed as having a claim.

96.     In addition, neither the schedules of assets and liabilities nor the statement of financial affairs, submitted under penalty of perjury, list any debt owed by PDG to Dixson. [Docket No. 14].

97.     Neither the Plan nor the Order Confirming Plan provides for payment to Dixson as a creditor.

98.     The Order Confirming Plan at paragraph 10, terminates and discharges all claims. 21-bk-30107, Docket No. 148.

## COUNT I – FRAUD
### (Michael Dixson)

99.     The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

100.     At all times relevant, Dixson has controlled PDG and Mesilla Valley.  Dixson has directed and orchestrated all actions on behalf of PDG and Mesilla Valley.

101.     Dixson, seeking to induce Legalist to release its prime lien on Lot 1A to allow for the sale of Lot 1A to a non-debtor, made material misrepresentations to Legalist regarding how PDG intended to use the Sales Proceeds.  Specifically, Dixson represented that the net sales proceeds would be used to pay claims and to complete the MV Development and further that "[t]here is a take out of Legalist waiting in the wings for this to close."

102.    When Dixson made the representations, he knew the representations were false, or made the representations recklessly as a positive assertion and without knowledge of their trust.  By way of example and not limitation, considering Dixson arranged for a $528,013.53 payment to the title company for the purchase of the Candleleaf Property the same day the Lot 1A sale closed, it is clear that the net proceeds were not to be used as he represented to Legalist.

103.    Dixson made the misrepresentations with the intent that Legalist act upon them in providing the partial lien release to allow the sale of Lot 1A.

104.    Legalist relied on these misrepresentations and signed the partial lien release.

105.    Legalist relied on those misrepresentations to its detriment and, as a result suffered economic injury.

106.    Dixson's fraudulent conduct resulted in injury to Debtor and the creditors in the bankruptcy proceeding including, without limitation, Legalist.

107.    Debtor did not benefit, directly or indirectly, from Dixson's fraudulent conduct. To the contrary, Debtor was harmed by Dixson's fraud, as Debtor was deprived of the benefit of the Sales Proceeds and prevented from paying its creditors and improving the MV Development.

108.    Legalist was harmed in the amount of the Sales Proceeds, and in the amount of the loss in value of the MV Development due to the sale of Lot 1A and Dixson's failure to use the Sales Proceeds to improve the MV Development.  Further, because the partial lien release was obtained via fraud, Legalist requests it be set aside.

## COUNT II - FRAUDULENT TRANSFER (Tex. Bus. & Com. Code Ann. § 24.005(a)(1))
### (Michael Dixson)

109.     The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

110.     At all times relevant, Dixson has controlled PDG and Mesilla Valley.  Dixson has directed and orchestrated all actions on behalf of PDG and Mesilla Valley.

111.     Dixson always intended to abscond with the proceeds from the sale of Lot 1A. Dixson caused PDG to transfer Lot 1A to Mesilla Valley (an entity owned by PDG and ultimately by Dixson) to avoid Court oversight and approval of the sale as required by the Bankruptcy Code. Once PDG transferred Lot 1A to Mesilla Valley, PDG, Dixson, and Mesilla Valley moved forward with the sale of Lot 1A to FSLRO.

112.     Dixson, individually, and as an agent of PDG and Mesilla Valley, or on behalf of PDG and Mesilla Valley, orchestrated the transfer of Lot 1A from PDG to Mesilla Valley and then from Mesilla Valley to FSLRO.

113.     Legalist has a lien on all of the proceeds from the sale of Lot 1A.

114.     At the closing of the sale of Lot 1A to FSLRO, the seller (Mesilla Valley) was to receive no less than $1,916,558.82.

115.     At Dixson's instruction, the Sales Proceeds were not deposited into a Mesilla Valley account, but instead were wired into PDG's account #5229 at Chase Bank.

116.     Dixson, individually and as an agent of PDG then orchestrated the transfer of the Sales Proceeds to himself, the Dixson Trust, Gateway, among other entities not entitled to funds, after the DIP Lender's claim arose and shortly before the money owed to the DIP Lender became due.

117.    The transfer of the Sales Proceeds from PDG to Dixson was a fraudulent transfer because the DIP Lender's claim arose before the transfers, and the transfers were done with the actual intent to hinder, delay, or defraud the DIP Lender.  *See* TEX. BUS. & COM. CODE § 24.005(a)(1).

118.    Intent can be inferred from such circumstances as the following, most of which are present herein:

    a.  the transfer was to an "insider" – Dixson controls both PDG and Mesilla Valley and ultimately was always in control of the Sales Proceeds (*see* TEX. BUS. & COM. CODE §§ 24.002(7), 24.005(b)(1));

    b.  Dixson (through PDG) retained possession and control of the Sales Proceeds after the transfer of Lot 1A to FSLRO (*see* TEX. BUS. & COM. CODE § 24.005(b)(2));

    c.  The transfer was concealed – the transfer of the Sales Proceeds from PDG was fraud in that:

        i.  Dixson failed to inform the DIP Lender or the Court that it received the Sales Proceeds;

        ii.  PDG and/or Dixson did not use the Sales Proceeds to pay the DIP Lender or to improve the MV Development;

        iii.  Dixson instead transferred the Sales Proceeds, without informing the DIP Lender, to, *inter alia*:

            a.  a title company for the purchase of the Candleleaf Property;

            b.  two PDG accounts and one personal account at Chase Bank for use on personal, living, and entertainment expenses, including child support; and

            c.  to The Gateway account at Chase Bank;

        iv.  PDG and Dixson did not inform the DIP Lender how the Sales Proceeds were used (*see* TEX. BUS. & COM. CODE § 24.005(b)(3));

    d.  the transfer was of substantially all Debtor's assets (*see* TEX. BUS. & COM. CODE § 24.005(b)(5));

  e. PDG and Dixson removed or concealed assets – Dixson took the Sales Proceeds and used them for virtually everything but developing the remainder of the MV Development ((*see* TEX. BUS. & COM. CODE § 24.005(b)(7));

  f. PDG did not receive any consideration for the Sales Proceeds transferred to third parties and used by Gateway and Dixson (*see* TEX. BUS. & COM. CODE § 24.005(b)(8)); and

  g. the transfers occurred shortly before or after a substantial debt was incurred – the DIP Lender loaned the money on April 14, 2021, and April 23, 2021; the transfer from Mesilla Valley to FLSRO occurred on May 31, 2022; and PDG defaulted on June 24, 2022; (*see* TEX. BUS. & COM. CODE § 24.005(b)(10)).

119. PDG did not benefit, directly or indirectly, from Dixson's fraudulent conduct. To the contrary, Debtor was harmed by Dixson's fraud, as Debtor was deprived of the benefit of the Sales Proceeds and prevented from paying its creditors and improving the MV Development.

120. The impact of the foregoing on the DIP Lender's collateral was particular to the DIP Lender. Accordingly, the DIP Lender requests that this Court declare the transfer of the funds in favor of Dixson void and unwind the transfers. *See* TEX. BUS. & COM. CODE § 24.008(a)(1). The DIP Lender also requests an attachment against the funds or other property of Dixson in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings. *See* TEX. BUS. & COM. CODE § 24.008(a)(2). The DIP Lender also requests an injunction restricting Dixson from disposing of other property and assets up to the amount owed to Legalist (i.e., $8,326,725.65 as of May 31, 2024). *See* TEX. BUS. & COM. CODE § 24.008(a)(3)(A) & (B). The DIP Lender also requests an injunction against Dixson from assigning the funds or otherwise dispersing them to third parties. *See* TEX. BUS. & COM. CODE § 24.008(a)(3)(A).

### COUNT III - FRAUDULENT TRANSFER
### (11 U.S.C. § 548(a)(1)(A))
(Michael Dixson)

121.     The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

122.     The transfer of the Sales Proceeds from PDG to Dixson was a fraudulent transfer because the DIP Lender's claim arose before the time of the transfer, and the transfer was done with the actual intent to hinder, delay, or defraud the DIP Lender.  *See* 11 U.S.C. § 548(a)(1)(A).

123.     Intent can be inferred from such circumstances as the following, most of which are present herein, from the facts as set forth in the subsections of paragraph 118 above.

124.     The impact of the foregoing on the DIP Lender's collateral was particular to the DIP Lender.  Accordingly, the Plaintiffs request that this Court declare the transfer of the funds in favor of Dixson void and unwind the transfers.  *See* 11 U.S.C. § 548(a)(1)(A).

### COUNT IV - FRAUDULENT TRANSFER
### (Tex. Bus. & Com. Code Ann. § 24.005(a)(2))
(Michael Dixson)

125.     The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

126.     The transfers of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because the DIP Lender's claim arose before the time of the transfer, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due.  *See* TEX. BUS. & COM. CODE § 24.005(a)(2).

127.     The transfer of the Sales Proceeds from PDG to Dixson was a fraudulent transfer as to the DIP Lender under TEX. BUS. & COM. CODE § 24.006(a) because the DIP Lender's claim arose before the transfer was made, the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer, and PDG was insolvent at that time or it became insolvent as a result of the transfer.

128.     The transfer of the Sales Proceeds from PDG to Dixson was a fraudulent transfer as to the DIP Lender under TEX. BUS. & COM. CODE § 24.006(b) because the DIP Lender's claim arose before the transfer, and the transfer was made to insiders (as defined by TEX. BUS. & COM. CODE § 24.002(7)(A)(i)) for an antecedent debt, PDG was insolvent at the time, and the insiders had reasonable cause to believe PDG was insolvent.

129.     PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation.  Moreover, PDG was presumed to be insolvent because it did not generally pay its debts as they became due.  *See* TEX. BUS. & COM. CODE § 24.003.

130.     Dixson, as the sole member and ultimate owner of PDG, had actual knowledge of PDG's insolvency.

131.     Accordingly, these transfers are fraudulent as to Legalist and Plaintiffs are entitled to judgment against PDG and Dixson disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT V – FRAUDULENT TRANSFER
### (11 U.S.C. § 548(a)(1)(B))
(Michael Dixson)

132.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

133.    The transfers of the Sales Proceeds from PDG to Dixson were fraudulent transfers as to the DIP Lender because

        a.    the DIP Lender's claim arose before the transfer;

        b.    the transfer was made without PDG receiving a reasonably equivalent value in exchange for the transfer;

        c.    PDG was insolvent at that time or it became insolvent as a result of the transfer.  Specifically, PDG was insolvent because the sum of its debts was greater than all of its assets at fair valuation, and because PDG does not generally pay its debts as they become due are presumed to be insolvent; and

        d.    PDG intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due.  *See* 11 U.S.C. § 548(a)(1)(B).

134.    Accordingly, these transfers are fraudulent as to Legalist and the Plaintiffs are entitled to judgment against Dixson disregarding the transfers and allowing the Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to the Plaintiffs.

## COUNT VI - MONEY HAD AND RECEIVED
(PDG, Dixson, the Dixson Trust, Christina Dixson, and Gateway)

135.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

136.    Alternatively, still urging and relying upon the matters alleged above, Dixson, PDG, Entrada, Christina Dixson and the Dixson Trust have been unjustly enriched by receiving funds from Mesilla Valley's transfer of Lot 1A.  Those funds rightfully belong to the DIP Lender.

137.    PDG, Dixson, the Dixson Trust, Christina Dixson, and Gateway received funds from the Sales Proceeds that should have been used to pay DIP Lender, but was not.  Thus, PDG, Dixson, the Dixson Trust, Christina Dixson, and Gateway hold money that belongs to the DIP Lender in equity and good conscience.

## COUNT VII - RECOVERY OF POST-PETITION TRANSFERS
### (11 U.S.C. §§ 549, 550)
(PDG, Dixson, Dixson Trust, Gateway)

138.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

139.    To the extent PDG made post-petition transfers to Dixson, the Dixson Trust, Gateway, and/or other non-debtors, such transfers were unauthorized post-petition transfers and are avoidable under 11 U.S.C. § 549 and 11 U.S.C. § 550.

140.    The Trustee seeks to avoid and recover all transfers of the entire Sale Proceeds, including, but not limited to the transfer of the Candleleaf Monies, and reserves its rights to amend and supplement this Complaint to identify all such transfers.

## COUNT VIII – TURNOVER OF PROPERTY
### (11 U.S.C. § 542(a))
(Southwestern)

141.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

142.    Section 542(a) of the Bankruptcy Code provides that an entity (other than a custodian) in possession, custody or control, during the case, of property of the estate must

"deliver to the trustee, and account for, such property or the value of such property." 11 U.S.C. § 542(a).

143.    Defendant Southwestern is in possession of the Escrowed Monies.

144.    The Escrowed Monies are property of the Debtor's bankruptcy estate.

145.    Demand has been made upon Southwestern for the turnover of the Escrowed Monies and Southwestern has failed and refused to turn over the Escrowed Monies.

146.    Pursuant to Section 542(a) of the Bankruptcy Code, the Trustee requests that the Court order Southwestern to turn over the Escrowed Monies to the Trustee for the benefit of the Debtor's bankruptcy estate and provide an accounting with respect to the Escrowed Monies.

**COUNT IX – TURNOVER OF PROPERTY**
**11 U.S.C. § 542(a)**
(Entrada)

147.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

148.    Section 542(a) of the Bankruptcy Code provides that an entity (other than a custodian) in possession, custody or control, during the case, of property of the estate must "deliver to the trustee, and account for, such property or the value of such property." 11 U.S.C. § 542(a).

149.    Defendant Entrada is in possession of the Candleleaf Monies, including but not limited to by virtue of its ownership of the Candleleaf Property.

150.    The Candleleaf Monies are property of the Debtors' bankruptcy estate.

151.    Pursuant to Section 542(a) of the Bankruptcy Code, Defendant Entrada is required to turnover the Candleleaf Monies, totaling $528,013.53, to the Trustee for the benefit of the Debtor's bankruptcy estate and provide an accounting to with respect to the Candleleaf Monies.

## COUNT X – FRAUDULENT TRANSFER
### (Tex. Bus. & Com. Code Ann. § 24.005(a)(1))
(Christina Dixson, Dixson, Dixson Trust)

152.　The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

153.　At all relevant times, Legalist has a been creditor of the Debtor.

154.　After Legalist's claim arose, the Debtor transferred no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christina Dixson without consideration.

155.　The Dixson Trust then transferred the Candleleaf Monies towards the purchase of the Candleleaf Property, for the benefit of Dixson, the Dixson Trust, and Christina Dixson.

156.　The Dixson Trust did not provide any consideration in exchange for the Debtor's transfer of Sales Proceeds for the purchase of the Candleleaf Property.

157.　These monies were transferred by the Debtor, for the ultimate benefit of the Dixson Trust, Dixson, and Christina Dixson, with the actual intent to hinder, delay, and defraud Legalist and the Debtor's estate.

158.　Accordingly, these transfers are fraudulent as to Legalist and the Plaintiffs are entitled to judgment against Debtor, Christina Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to the Plaintiffs.

## COUNT XI – FRAUDUENT TRANSFER
### 11 U.S.C. § 548(a)(1)(A)
(Christina Dixson, Dixson, Dixson Trust)

159.　The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

26

160.     At all relevant times, Legalist has a been creditor of the Debtor.

161.     After Legalist's claim arose, the Debtor transferred no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christina Dixson without consideration.

162.     The Dixson Trust then transferred the Candleleaf Monies towards the purchase of the Candleleaf Property, for the benefit of Dixson, the Dixson Trust, and Christina Dixson.

163.     No consideration was provided to the Debtor, Dixson Trust, or otherwise, for its receipt of the benefit of the Candleleaf Property.

164.     These monies were transferred by the Debtor, for the ultimate benefit of the Dixson Trust, Dixson, and Christina Dixson, with the actual intent to hinder, delay, and defraud Plaintiff and the Debtor's estate.

165.     Accordingly, these transfers are fraudulent as to the Plaintiffs and the Plaintiffs are entitled to judgment against Debtor, Christina Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

### COUNT XII – FRAUDULENT TRANSFER
### (Tex. Bus. & Com. Code Ann. § 24.005(a)(2))
(Christina Dixson, Dixson, Dixson Trust)

166.     Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

167.     At all relevant times, Legalist has a been creditor of Debtor.

168.     After Legalist's claim arose, Dixson caused PDG to transfer no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christina Dixson, without consideration.

169. The Dixson Trust, via Doma, then transferred the Candleleaf Monies towards the purchase of the Candleleaf Property, for the benefit of the Dixson Trust, Dixson, and Christina Dixson, without consideration.

170. Dixson, the Dixson Trust or Christina Dixson did not provide reasonably equivalent value to PDG, or otherwise, for their receipt of the benefit of the Candleleaf Property.

171. At the time of the transfer of the Candleleaf Monies, Debtor was insolvent, intended to incur, or believed or reasonably believed that it would incur debts beyond its ability to pay them as they came due.

172. Accordingly, these transfers are fraudulent as to Legalist and Plaintiffs are entitled to judgment against Debtor, Christina Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

### COUNT XIII – FRADUENT TRANSFER
### 11 U.S.C. § 548(a)(1)(B)
(Christina Dixson, Dixson, Dixson Trust)

173. The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

174. At all relevant times, Legalist has a been creditor of the Debtor.

175. After Legalist's claim arose, Dixson caused PDG to transfer no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, and Christina Dixson, without consideration.

176. The Dixson Trust, via Doma, then transferred the Candleleaf Monies towards the purchase of the Candleleaf Property, for the benefit of the Dixson Trust, Dixson, and Christina Dixson, without consideration.

177.    Dixson, the Dixson Trust or Christina Dixson did not provide reasonably equivalent value to PDG, or otherwise, for the Candleleaf Monies or their receipt of the benefit of the Candleleaf Property.

178.    At the time of the transfers of the Candleleaf Monies, the Debtor was insolvent, intended incur, or believed or reasonably believed that it would incur debtor beyond its ability to pay them as they came due.

179.    Accordingly, these transfers are fraudulent as to the Plaintiffs and the Plaintiffs are entitled to judgment against Debtor, Christina Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

**COUNT XIV – FRAUDULENT TRANSFER**
**(Tex. Bus. & Com. Code Ann. § 24.006)**
(Entrada, Christina Dixson, Dixson, Dixson Trust)

180.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

181.    At all relevant times, Legalist has a been creditor of the Debtor.

182.    After Legalist's claim arose, Dixson caused PDG to transfer no less than the Candleleaf Monies to Doma, for the benefit of the Dixson Trust, Dixson, Christina Dixson, and Entrada, without consideration.

183.    The Dixson Trust, via Doma, then transferred the Candleleaf Monies towards the purchase of the Candleleaf Property, for the benefit of the Dixson Trust, Dixson, Christina Dixson, and Entrada.

184.    Dixson, the Dixson Trust or Christina Dixson did not provide reasonably equivalent value to PDG, or otherwise, for the Candleleaf Monies or their receipt of the benefit of the Candleleaf Property.

185.    Additionally, to the extent that any portion of the Candleleaf Monies were transferred as payment on an antecedent debt, such transfer is fraudulent as the Dixson Trust, Dixson, Christina Dixson, and Entrada, are insiders of PDG, and the Dixson Trust, Dixson, Christina Dixson, and Entrada were aware that PDG was insolvent at the time of the transfers.

186.    At the time of the transfers of the Candleleaf Monies, Debtor was insolvent, intended to incur, or believed or reasonably believed that it would incur debts beyond its ability to pay them as they came due.

187.    Accordingly, these transfers are fraudulent as to Legalist and Plaintiffs are entitled to judgment against Debtor, Entrada, Christina Dixson, Dixson, and the Dixson Trust, disregarding the transfers and allowing the Plaintiffs to attach or levy execution upon the property conveyed, or awarding the value of the transfers to Plaintiffs.

## COUNT XV – ALTER EGO
(Mesilla Valley)

188.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

189.    This is an action seeking a declaration that Mesilla Valley is the alter ego of Debtor.

190.    Mesilla Valley is influenced and governed by the Debtor.  Neither Mesilla Valley nor Debtor has any employees and they are both beneficially owned and controlled by Dixson.

191.    There is such unity of ownership and interest between Mesilla Valley and the Debtor that one is inseparable from the other. Indeed, Mesilla Valley has no business purpose other than to act as holding company for an asset of Debtor, Lot 1A.

192.    Mesilla Valley serves at the behest of Dixson and PDG, and is used solely for the purpose of Dixson and PDG committing fraud.

193.    Moreover, Mesilla Valley negotiated the sale of Lot 1A (as seller) at a time when it did not own the property, as the Debtor was the owner of the property. Thus, Mesilla Valley as a mere instrumentality of the Debtor to achieve the sale of the Debtor's asset outside the purview and supervision of this Court and compliance with the Bankrutpcy Code and Bankruptcy Rules.

194.    While Mesilla Valley retained the Firm to represent it in the sale of Lot 1A, the Firm received payment from Debtor.

195.    Moreover, the Sale Proceeds from the sale of Lot 1A (in which Mesilla Valley was the alleged seller) were deposited directly into an account of the Debtor, after which they were promptly squandered or otherwise use at the behest of Dixon and PDG, and for non-business purposes of PDG.

196.    The Debtor's receipt of the Lot 1A Sale Proceeds was concealed, as it was not reported in the Debtor's periodic reporting to this Court.

197.    Mesilla Valley and PDG are alter egos of one another, did not observe corporate formalities particularly when transacting business with one another, and acted as if they were one and the same.

198.     Thus, adherence to the corporate fiction of a separate entity would, under these circumstances, sanction a fraud or promote injustice.  The Plaintiffs respectfully request the Court find that Mesilla Valley is an alter ego of Debtor.

199.     Accordingly, the Plaintiffs are entitled to judgment against Mesilla Valley for any amounts shown to be due and owing by Debtor to the Plaintiffs.

## COUNT XVI – CIVIL CONSPIRACY
(Weycer, Kaplan, Pulaski & Zuber; Dixson, Mesilla Valley)

200.     The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

201.     The Firm, through Mr. Carruth, together with Dixson (acting personally and as representative of PDG and Mesilla Valley) reached an agreement to sell Lot 1A, before the Plan was confirmed and while the automatic stay was in place, outside of this Court's purview and supervision.

202.     To accomplish that goal, Defendants conspired to fraudulently transfer an asset of the Debtor—Lot 1A—to Mesilla Valley for no consideration.

203.     During the sale negotiations, Mr. Carruth sent correspondence to all parties involved stating that the sale would have to be approved by the Court under Section 363(f) of the Bankruptcy Code.

204.     Instead, Mr. Carruth acted in furtherance of the conspiracy when he facilitated the fraudulent transfer of Lot 1A from PDG to Debtor's alter ego, Mesilla Valley, for no consideration and without the Court's authorization as required by the Bankruptcy Code.

205.     Mr. Carruth negotiated the Purchase and Sale Agreement for Lot 1A and represented Mesilla Valley in said transaction.

206.   The Purchase and Sale Agreement for Lot 1A was executed on March 4, 2022, before the Plan was confirmed and when the automatic stay was still in place.

207.   The Firm received $75,000 in compensation for the sale of Lot 1A, which were paid from the proceeds of the sale.  The Firm invoiced Mesilla Valley c/o Debtor for its fees in connection with the sale of Lot 1A.

208.   But for the Firm's actions, Dixson would not have been able to sell Lot 1A and, in turn, Dixson would not have had access to the Sale Proceeds that he immediately dissipated.

209.   Legalist suffered damages as a direct result of Defendants' conspiracy to fraudulently transfer Lot 1A from PDG to Mesilla Valley in the amount of the Sale Proceeds plus the amounts paid to third-parties, by Southwestern, from the proceeds of the sale.

### COUNT XVII – WILLFUL VIOLATION OF THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362
**(**LPC Retail, LLC and FSLRO 510 South Telshor, Las Cruces, LLC)

210.   The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

211.   When LPC negotiated, and entered into, the PSA, it was aware of the main bankruptcy proceeding (21-30107-CBG) connected with this adversary action, and was aware of the existence of the automatic stay.

212.   LPC intentionally and willfully negotiated, and entered into, the PSA in violation of the automatic stay.

213.   LPC's aforementioned acts violated the stay by acting to obtain possession of Lot 1A, and to exercise control of Lot 1A.

214.   As a result of LPC's stay violation, LPC obtained control over property of the Debtor's estate to the detriment of its creditors.

### COUNT XVIII – UNAUTHORIZED POST-PETITION TRANSFERS IN VIOLATION 11 U.S.C. § 549 AND 11 U.S.C. § 550
**(**LPC Retail, LLC and FSLRO 510 South Telshor, Las Cruces, LLC)

215.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

216.    Section 549(a) of the Bankruptcy Code provides that the trustee may avoid a transfer of property of the estate that occurs after the commence of the case and is not authorized by the bankruptcy court.  11 U.S.C. § 549(a).

217.    The transfers to LPC and FSLRO occurred after the Petition Date.

218.    The transfers to LPC and FSLRO were not authorized by the bankruptcy court.

219.    The transfers constitute an unauthorized transfer of property of the Debtor's bankruptcy estate.

220.    The transfers are avoidable pursuant to Section 549 of the Bankruptcy Code.

221.    Pursuant to Section 550(a) of the Bankruptcy Code, the plaintiffs are entitled to recover the transfers, or the value thereof, from Defendants LPC and FSLRO plus interest thereon to the date of payment and the costs of this action.

### COUNT XIX – UNAUTHORIZED SALE OF ESTATE PROPERTY OUTSIDE THE ORDINARY COURSE OF BUSINESS IN VIOLATION 11 U.S.C. § 363
**(**LPC Retail, LLC and FSLRO 510 South Telshor, Las Cruces, LLC)

222.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

223.    Section 363(a) of the Bankruptcy Code defines "cash collateral" as cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges,

accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title. *See* 11 U.S.C. § 363(a).

224.    Legalist is DIP Lender to the Debtor's estates and has an interest in the property transferred.

225.    Section 363(b)(1) of the Bankruptcy Code provides that the trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. *See* 11 U.S.C. § 363(b)(1).

226.    The Debtor transfer the property to LPC and subsequently to FSLRO was not in the ordinary course of the Debtor's business and not conducted after notice and a hearing and accordingly, was unauthorized pursuant to Section 363(b)(1) of the Bankruptcy Code.

227.    Section 363(c)(2)(B) of the Bankruptcy Code provides that the trustee [or debtor-in-possession] may not use, sell, or lease cash collateral unless the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section. *See* 11 U.S.C. § 363(c)(2)(B).

228.    The Debtor's transfer to LPC and subsequently to FSLRO were not in the ordinary course of the Debtor's business and not conducted after notice and a hearing and accordingly, were unauthorized transfers pursuant to Section 363(c)(2)(B) of the Bankruptcy Code.

229.    Accordingly, the transfer is avoidable for failure of the Debtor to comply with Section 363 of the Bankruptcy Code.

**COUNT XX – REVOCATION OF THE CONFIRMATION ORDER PURSUANT TO IN VIOLATION 11 U.S.C. § 1144**
**(LPC Retail, LLC and FSLRO 510 South Telshor, Las Cruces, LLC)**

230.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

231.    The Confirmation Order was procured by fraud as a result of the transfer to LPC and subsequently FSLRO.

232.    Section 1144 of the Bankruptcy Code provides that "[o]n request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud." 11 U.S.C. § 1144.

233.    On March 4, 2022, the PSA from Mesilla to LPC was executed.

234.    On March 31, 2022, this Court entered the Confirmation Order.

235.    The Debtor did not seek court approval of the PSA prior or during the Courts confirmation hearing.

236.    On April 21, 2022, a warranty deed was executed from PDG to Mesilla.

237.    On May 4, 2022, LPC assigned the PSA to FLSRO.

238.    On May 9, 2022, a warranty deed was executed from Mesilla to FSLRO

239.    On May 27, 2022, a Bill of Sale was executed from Mesilla to FLSRO.

240.    May 27, 2022, a lease assignment was executed from Mesilla to FSLRO.

241.    None of the above-referenced transfers that the Debtor began negotiation and execution of in early March 2022 were disclosed to the Court or the Debtor's creditors.

242.    Notwithstanding that the 180 day statute of limitations has expired against the

Debtor, the 180-day time period does not apply to the non-debtors that participated and were

beneficiaries of the transactions that commenced in early March 2022.

243.    Accordingly, the Confirmation Order may be revoked as to the non-debtor

entities.

### COUNT XXI – CIVIL CONTEMPT
(PDG, Dixson, Weycer, Kaplan, Pulaski & Zuber)

244.    The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if

fully set forth herein.

245.    PDG, Dixson and the Firm were all persons on notice were bound by the DIP

Order.

246.    The DIP Order provided, among other things, the following:.

The proceeds of the DIP Loans shall be used by the Debtor exclusively to (a) pay
DIP Lender Expenses, (b) pay all other DIP Obligations, and ( c) pay other amounts
permitted under the Budget; provided that no portion of the DIP Loans shall be used
for fees, costs, or expenses incurred by any party in (x) investigating or pursuing
any claim or cause of action against the DIP Lender, any Affiliate thereof, or any
other Indemnified Person or (y) questioning or challenging, or taking any other
action that could reasonably be expected otherwise to impair, any DIP Loan, DIP
Lien, DIP Claim, DIP Obligation, DIP Loan Document, or right or remedy of the
DIP Lender.

DIP Order, ¶ 7.

247.    PDG, Dixson and the Firm willfully and intentionally violated the DIP Order

when they, among other things as set forth in this Complaint, fraudulently induced Legalist to

grant a partial lien release and utilize funds other than in accordance with the express terms of

the DIP Order.

248.    By reason of the foregoing, PDG and Dixson knowingly and willfully violated the

DIP Order.

249.     The Plaintiffs request the entry of judgment against each of PDG, Dixson and the Firm, jointly and severally, for civil contempt of the DIP Order in an amount to be determined at trial, but including the Plaintiffs costs and expenses of prosecuting this adversary proceeding.

## COUNT XXII – REVOCATION OF RETENTION ORDER AND FEE DISGORGEMENT
(Weycer, Kaplan, Pulaski & Zuber)

250.     The Plaintiffs repeat and reallege the foregoing paragraphs of this Complaint as if fully set forth herein.

251.     On March 17, 2021, the Firm filed the *Motion to Employ Weycer, Kaplan, Pulaski & Zuber P.C. as Attorneys for the Debtor* (the "**Retention Application**").  [Docket No. 16].

252.     The Firm did not disclose its representation of non-debtor entities related to the Debtor in connection with this bankruptcy proceeding.

253.     On April 16, 2021, this Court entered that certain *Order Granting Motion to Employ Weycer, Kaplan, Pulaski & Zuber P.C. as Attorneys for the Debtor (RE: Docket No. 16)* (the "**Retention Order**").  [Docket No. 47].

254.     On May 2, 2022, the Firm filed its third and final fee application (the "**Final Fee Application**").  [Docket No. 72]

255.     ECF pages 26 and 40 of the Final Fee Application indicates time billed for the PSA transfer not disclosed to this Court as required by the Bankruptcy Code and Bankruptcy Rules.

256.     On May 22, 2022, this Court approved the Firm's Final Fee Application.

257.     Because the Firm neither disclosed his representation of non-debtor entities in connection with the PDG Chapter 11 proceeding, and yet sought approval of fees in connection with the representation, the Firm violated the Retention Order.

258.    Accordingly, the Plaintiffs requests that this Court revoke its approval of the Retention Order and disgorge all fees and expenses awarded to the Firm in the Final Fee Application.

**<u>CONCLUSION</u>**

For the reasons discussed herein, Plaintiffs ask that Defendants PDG; Dixson; the Dixson Trust through Dixson; Mesilla Valley Ventures, LLC; Entrada Development, LLC; Southwestern Abstract & Title Company, Inc.; Christina Dixson; Weycer, Kaplan, Pulaski & Zuber; The Gateway Ventures, LLC; LPC Retail, LLC; and FSLRO 510 South Telshor Las Cruces, LLC be cited to appear and answer this Complaint, and, upon final hearing, Plaintiffs have judgment against Defendants for actual damages, treble damages, and attorneys' fees based on the causes of action asserted in the foregoing Counts; exemplary damages; pre- and post-judgment interest at the maximum rate allowed by applicable law; avoiding post-petition transfers in the amount of no less than $1,916,558.82 pursuant to 11 U.S.C. § 549 and, to the extent necessary, 11 U.S.C. § 550; 11 U.S.C. § 363; revocation of the Confirmation Order as to non-debtors pursuant to 11 U.S.C. § 1144; and all costs of suit.  Plaintiffs also request the partial lien release related to Lot 1A be set aside; and for turnover of the Escrowed Monies from Defendant Southwestern Abstract & Title Company, Inc. pursuant to 11 U.S.C. §542(a), and monies received by Dixson Trust and Entrada Development, LLC.  The Plaintiffs also request a finding of civil contempt against Defendants PDG, Dixson and the Firm.  The Plaintiffs also request that the Court revoke the Retention Order of the Firm and disgorge the fees and expenses awarded to the Firm pursuant to the Final Fee Application.  Further, Plaintiff asks this Court to grant all such other and further relief, at law and in equity, to which it may be justly entitled.

Dated: August 6, 2024          Respectfully submitted,

*/s/ Richard J. Corbi*       
Richard J. Corbi
(admitted *pro hac* vice)
**THE LAW OFFICES OF RICHARD J. CORBI PLLC**
1501 Broadway, 12th Floor
New York, NY 10036
Phone: 646-571-2033
Email: rcorbi@corbilaw.com

-and-

*/s/ Jason Binford*       
Jason Binford
State Bar No. 24045499
**ROSS, SMITH & BINFORD, PC**
2003 N. Lamar Blvd., Ste. 100
Austin, TX 78705
Phone: 512-351-4778
Email: jason.binford@rsbfirm.com

*Counsel to Legalist DIP Fund I, LP; Legalist DIP SVP II, LP; and Legalist DIP GP, LLC*

*/s/ Ronald Ingalls*       
Ronald Ingalls
SBT 10391900
**Law Office of Ronald Ingalls**
PO Box 2867
Fredericksburg, TX 78624
Tel: (830) 321-0878
Fax: (830) 321-0913
Email: ingallstrustee@gmail.com

*Counsel for Chapter 7 Trustee*