**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **LEGALIST DIP GP, LLC, ET AL,** | ) | **CASE NO: 23-03004-cgb** |
| | ) | **ADVERSARY** |
| Plaintiffs, | ) | |
| | ) | **El Paso, Texas** |
| vs. | ) | |
| | ) | **Wednesday, May 22, 2024** |
| **MICHAEL DIXSON, ET AL,** | ) | |
| | ) | **10:44 a.m. to 11:47 a.m.** |
| Defendants. | ) | |

**LEAD CASE: 21-30107-cgb**
**PDG Prestige, Inc.**
**Converted 07/13/2023**

      25-1)   MOTION TO DISMISS CASE [DKT.NO.56];

      25-2)   MOTION TO DISMISS CASE [DKT.NO.60];

      25-3)   FIRST MOTION TO REQUIRE JOINDER OF A PARTY [DKT.NO.65];

      25-4)   MOTION TO DEPOSIT REGISTRY FUNDS [DKT.NO.66];

      25-5)   MOTION TO EXTEND TIME DISCOVERY RESPONSES [DKT.NO.75]

      BEFORE THE HONORABLE CHRISTOPHER G. BRADLEY,
          UNITED STATES BANKRUPTCY JUDGE

**APPEARANCES:**      See page 2

**Court Reporter:**      Recorded; Digital

**Transcribed by:**      Exceptional Reporting Services, Inc.
             P.O. Box 8365
             Corpus Christi, TX 78468
             361 949-2988

**Proceedings recorded by electronic sound recording;**
**transcript produced by transcription service.**

2

**APPEARANCES:**

| | |
|---|---|
| **For Trustee:** | **RONALD E. INGALLS, ESQ.** |
| | **P.O. Box 2867** |
| | **Fredericksburg, TX 78624** |
| | **830-321-0878 x 102** |
| | |
| **For Legalist DIP GP:** | **MICHAEL Z. BLUESTONE, ESQ.** |
| | **1717 K Street** |
| | **Suite 900** |
| | **Washington, DC 20006** |
| | **202 655-2250** |
| | |
| **For Southwestern** | **MATTHEW P. HOLT, ESQ.** |
| **Abstract & Title Co.:** | **Holt & Mason** |
| | **P.O. Box 16495** |
| | **Las Cruces, NM 88004** |
| | **575-649-2493** |
| | |
| **For Weycer Kaplan** | **RILEY TUNNELL, ESQ.** |
| **Pulaski & Zuber:** | **Thompson Coe Cousins & Irons** |
| | **700 North Pearl St.** |
| | **25th Floor** |
| | **Dallas, TX 75201** |
| | **214-871-8200** |
| | |
| **For Michael Dixson:** | **DAVID P. LUTZ, ESQ.** |
| | **Martin Lutz Roggow & Eubanks** |
| | **2100 N. Main St.** |
| | **Las Cruces, NM 88001** |
| | **575-526-2449** |

3

**El Paso, Texas; Wednesday, May 22, 2024; 10:44 a.m.**

--oOo--

THE COURT: I'm going to call Adversary Number 23-3004, *Legalist DIP GP, LLC versus Dixson*. We're here on Docket numbers 56, 60, 65, 66, and 75.

Let's go ahead and take appearances, you all, with the understanding that, you know, we may have to take a short recess in this case at some point for me to deal with that other adversary.

Just they have a agreed motion to continue so I don't think it'll take long. But I want to say something to them.

So anyway, okay, let's start -- let's take appearances starting with counsel for the Trustee.

MR. INGALLS: This is Ronald Ingalls, Trustee, and the attorney for the Trustee.

THE COURT: Okay. Thank you. So let's see, Legalist.

MR. BLUESTONE: Good morning, Your Honor. Zahcary Bluestone on behalf of Legalist. And I'm here with my colleague Craig Gaver, and also Casey Roy.

THE COURT: Okay. Thank you. Okay. Let's see. Okay.

So, okay, Mr. Holt, are you there?

MR. HOLT: Your Honor, I am.

THE COURT: Okay. You want to go ahead and make your

4

appearance?

MR. HOLT:  Your Honor, Matthew Holt for Legal Description, Inc. doing business as Southwestern Abstract and Title.

THE COURT:  Thank you.  Okay.  For -- I'm not sure how to pronounce this firm name, Weycer, Kaplan.

MR. TUNNELL:  Good morning, Your Honor.  Riley Tunnell on behalf of Weycer, Kaplan, Pulaski, and Zuber, P.C.

THE COURT:  Great.  Good morning.

Okay.  And then Mr. Lutz and --

MR. LUTZ:  Yes, Your Honor.  David Lutz.  I am counsel since earlier in the case for Mr. Dixson.  I understand that Mr. Dixson filed some matters pro so both for himself and his trust.

We have talked about it particularly as to whether he can represent himself as the Trust, and I think he can confirm that he's asked me to represent him and the trust going forward in the matter.

And apologies to all for any confusion in that regard.  But we'll probably talk about it more as the motions proceed.

THE COURT:  Okay.  Thank you.

Mr. Dixson, is that correct?

MR. DIXSON:  Yes, Your Honor, that's correct.

THE COURT:  Okay.  Thank you.

5

**MR. DIXSON:**  Thank you.

**THE COURT:**  Okay.  Where to start on this.  We've got -- well, so we've got these three -- we've got two motions to dismiss.

We've got the two motions from Southwestern Abstract and Title, one to require joinder of a party, one to deposit registry funds.

And then we have a motion to extend time on discovery responses.

Mr. Ingalls, where do you propose we start on these?

**MR. INGALLS:**  Your Honor, I believe that maybe starting with the two Southwest Title motions would be the best place to start.

**THE COURT:**  Okay.  Thank you.  Okay.  So on -- okay.

Well, Mr. Holt, I'll let you go ahead and present your motions then.

**MR. HOLT:**  Your Honor, with regard to motion to join a party, I don't believe that it's opposed.

The part of why Southwest is involved in this matter is it acted as an escrow agent, is holding money that was in escrow, and there are competing claims for that money by Mesilla Valley, which is now alleged to be the alter ego of PDG, as best as I can tell.

And FLSRO (phonetic), felt it only fair that FLSRO had an opportunity to be heard since it has an interest in this

6

matter and I moved to have it joined as a party in this matter.

**THE COURT:** Great. Yeah. So does anybody oppose the joinder of this entity, this purchaser entity?

(No audible response.)

Okay. So then Mr. Holt, I'm just wondering how -- what would they be joined as; just an interested party?

**MR. HOLT:** Your Honor, I don't know if they're merely an interested party or whether they'd be a defendant because they seem to have the same claim to the proceeds as does Mesilla Valley itself.

**THE COURT:** Yeah. So they -- I mean, I -- so you think they would be what?

**MR. HOLT:** Judge, I personally think they would be a defendant in the matter.

**THE COURT:** Okay. Does anybody else have any thoughts on this? I mean, it looks to me like, you know, you typically would see this kind of thing in an interpleader, right, and you would call them something like an interpleader defendant maybe. Am I remembering that right?

**MR. HOLT:** Yes, sir.

**THE COURT:** Okay. Well, I will -- let me look at this, the actual proposed order here.

So I mean obviously, I mean, I agree with you as to the relief so it's just a purely technical matter to try to figure out exactly how to put them in. I agree with you that

**EXCEPTIONAL REPORTING SERVICES, INC**

7

they may well be in that posture.

Okay. So anyway let's go ahead and talk then. Mr. Holt, why don't you go ahead on your other motion as well?

**MR. HOLT:** Your Honor, when I first read the complaint, I thought the only allegation against Southwestern Abstract and Title was that we're holding $200,000 that Legalist claims should be given to it.

In light of their response, they may be asking for more than that. It's still not clear to me.

But if the only fight with us is that we have $200,000 that they say belongs to somebody else, we'd like to give you the $200,000, less fees and costs that we can talk about in a moment, and get out of this fight because it's not our money.

We know it's not our money. And there's parties that are fighting over it. I'd like them to fight over it without our presence in the matter. So we'd like to put it in the Court registry and be dismissed from this matter.

**THE COURT:** Right. Okay. Yeah, so let's talk about the fees. What's your argument on that? They responded to your initial argument on it. And, frankly, it seems fairly compelling to me. What's your thoughts on this?

**MR. HOLT:** Your Honor, if I understand their argument, it is that the statute says when there's a fight between the parties, we're entitled to recover our fees.

8

They're saying there isn't a fight between the parties.

The DIP claims that it is the real party in interest. In paragraph 55 of its second amended complaint, it says that Mesilla Valley is merely a figurehead. In paragraph 82, they allege that Mesilla Valley never really owned the property.

In paragraphs 97 and 98 they essentially allege that PDG is its alter ego and that they have the right to speak on its behalf.

Well, Judge, if they have the right to speak on behalf of PDG, then PDG is the one that is picking this fight with us and, therefore, the statutory right to attorneys' fees accrues.

**THE COURT:** Okay. So let's take that issue for just a little bit. What -- who would like to respond to that issue? Southwestern wants their fees. Who thinks you're ahead of them?

**MR. BLUESTONE:** I can respond on that, Your Honor. Zachary Bluestone for Legalist.

I mean, you know, this is a -- as we see this, as Plaintiffs see this, there was an agreement that provided for $200,000 -- at least focusing on that component for a minute -- that was being held and to be disbursed upon certain proceeds or rather certain conditions being met. They were met.

Then during this litigation a document appears referred to as an amendment to that agreement, (inaudible) no

new consideration, not signed by all the parties and all the (inaudible) saying, hey, there's a dispute, we're not going to, you know, take a look at the legality of this, we're just going to give it to the Court, take our fees, and get out of it.

And we don't think that Southwestern should have the right to do that (inaudible) paid for it. We think that the escrow agreement is clear.

The amendment isn't within the scope of being binding, which we referenced in our opposition papers, and that funds should be turned over to the -- to -- funds should be turned over as a result.

**THE COURT:** Okay. Sorry. So what about this New Mexico statute? Sorry, just I'm not following very well, I apologize. So what -- how does that -- that's the basis of his argument right here I think, right?

**MR. BLUESTONE:** Well, there's not an interpleader. I mean, this is, you know, Southwestern is a defendant. This is not an action that was commenced by Southwestern. This is an action for a turnover for funds that are being held with Southwestern.

And Southwestern's attempt to just sort of wash their hands of anything going on in this matter should not -- they shouldn't be able to avail themselves of their legal fees in the New Mexico interpleader statute.

**THE COURT:** Okay. Does anybody else wish to be heard

10

against this, the -- on the attorneys' fees issue or on this general -- the motion in general?

MR. LUTZ: Your Honor, David Lutz.

I would just say that as part of the relief that Mr. Dixson submitted, in fairness to my client, if his motion to dismiss is granted, he did indicate that he wanted release of the funds to him. I'd just be remiss not pointing that out.

But otherwise I believe if the funds are deposited, I agree with Mr. Holt that these are appropriate under New Mexico law to Southwestern Abstract and Title.

MR. INGALLS: Your Honor, this is --

THE COURT: : So --

MR. INGALLS: -- Ron Ingalls.

THE COURT: Yeah, please.

MR. INGALLS: Certainly any -- if there's any money that's not deposited in the Court it should come to the PDG bankruptcy estate (inaudible) allege this whole chain of fraudulent transfers of PDG proceeds that have never been properly returned to the PDG estate.

So if anything happens other than to deposit in the Court or just holding into the money while we argue about this, their -- Southwest Title's role in this fraudulent transfer scheme, certainly Mr. Dixson should not receive these funds.

THE COURT: Okay. So going back to the joinder issue, so, Mr. Bluestone or Mr. Ingalls, do you all oppose -- I

mean, so the way this proposed order reads, it just says that you all shall cause FLSRO, you know, it gives the name of the entity, to be joined as a party. Is that okay?

I mean, you all -- it sounds like they want you all to take the action to do that. Are you comfortable with that, is that okay with you?

**MR. BLUESTONE:** I think that's a difficult question for the same reasons why Your Honor was mentioning earlier is that, I mean, at least from Legalist's perspective I don't know what the claim is against FSLRO (phonetic).

I mean, for example, from Southwestern's moving papers, we don't even know what the demand is. I mean, the -- Southwestern's motion alludes to there being a demand.

But outside of the unsigned amendment to the escrow agreement, we have no idea what demand was made, what claims there are. So it's a little challenging to see at least how Legalist would be able to add FSLRO as a defendant.

**THE COURT:** Yeah. I kind of agree with that.

Mr. Holt, I think you should add them as a party. You're holding money, you think you're going to be subject to conflicting obligations. That's what the joinder statute says.

So I think it's -- obviously they should be joined, I agree with you. But I don't see that the Plaintiffs should be the one joining them. It seems like that you all should be the one joining them if you're worried about these conflicting

12

obligations.

So can you revise your order and just -- and can you -- you need to upload and order that doesn't have an exhibit stamp on it so that we can just get it -- well, actually I see -- sorry, I'm looking at this.

If you can just upload a new order that just says that you will join them, then I will grant that.  Does that sound good to you?

**MR. HOLT:**  Yes, Your Honor.

**THE COURT:**  Okay.  So then I realize I'm asking you to do something, and I'm about to say that I'm not convinced on the fees.  I mean, do you want to respond to what they've said on the fees?

I'm not necessarily going to rule on this right now. I may order you to deposit the money and then seek your fees later is what I'm inclined to do.  But I will listen to your response first if you want.

**MR. HOLT:**  Your Honor, rely on nothing more than the statute, the regulation that says when an escrow company is put in the position of having to interplead funds, it should be allowed to recover its attorney's fees.

**THE COURT:**  Yeah.  Okay.  I mean, I have a supremacy clause questions about that.

I mean, I think if you had a security -- I don't know why you wouldn't take a security interest in this -- these

13

funds.  But you don't have a security interest it doesn't sound like.  That would put you at a high priority.

But, you know, this is a bankruptcy proceeding.  I mean, a lot of people who have a legal right to get paid don't get paid.  So it's a priority question which strikes me as a question of federal law.

And so I'm not saying you don't.  I don't -- I just don't know.  I've -- you know, candidly never thought about it before.  But I'm not ready to say that right now.

So, you know, so I will, you know, grant the motion to deposit the funds with the Court.

We can -- if you -- you could -- we can, you know, leave your motion partially outstanding in the adversary or you can, you know, amend it and file something else later if you want to re-up that claim for fees.

Now, the other obligation that I see in terms of your motion does request to be relieved from any further participation in this proceeding.  So I don't know if you're still going to want that if I haven't awarded your fees.

And then I'm not sure whether the parties disagree with that or not.

It looks to me like the only other demand that was made on you was to provide an accounting with respect to the escrowed monies which I -- that doesn't seem like it'd be too hard to do.

14

And -- but is -- what do you think you want at this point, aside from an order saying to deposit the money with the Court?

MR. HOLT: Judge, we would like to be out of this case. We don't have to continue to spend attorneys' fees on it.

THE COURT: I hear you. Okay. So have you talked to anybody about what they mean by provide an accounting with respect to the escrow money or do you want me to just ask them right now? I mean, --

MR. HOLT: Your Honor, I don't know what they mean.

THE COURT: Okay. So who -- so the motion from Southwestern, so assuming that I'm going to order them to deposit the money with the Court, then -- all of it, they want -- then want out of the case. Who opposes them being out of the case once they've done that?

MR. BLUESTONE: Your Honor, Zach Bluestone for Legalist.

At this stage we oppose them being dismissed from the case. I don't -- there's so much uncertainty with what has happened with this escrow agreement.

I mean, for example, our understanding of this, I mean, we had never been advised, for example, as to even the existence of this amendment, you know, despite, you know, communications as to the role of Southwestern. And so it's all

15

very perplexing how all this came about.

So we think it makes more sense for Southwestern to be in this matter, you know, just based on that.

I mean, you know, I would like to be in a position, or perhaps there would be a position of Legalist to have them dismissed, you know, in the short term.

But given what we know and what's been put forth by Southwestern, it doesn't seem appropriate to us at this juncture for them to be dismissed.

**THE COURT:**  Okay.  Does anybody else want to speak against Southwest's request to get the heck out of the case?

(No audible response.)

I mean, you know, Mr. Bluestone, I understand what you're saying.  I'm sympathetic to it.

But I also -- it sounds to me like you just want discovery from them.  And they -- can't you send discovery to them anyway?  Why do you need them to be a party to the case? It just seems to me like there's no -- there's -- they don't have an interest in the case anymore.

**MR. BLUESTONE:**  Yeah.  No, and I understand that point, Your Honor.

And, you know, I'm hesitant to, you know, make any allegations.  But I don't know that Southwestern's role in this entire scheme is limited to just being an escrow agent.

And I say that, you know, in that I don't know that

16

answer. But there's enough that's going on to give us, you know, pretty significant suspicions.

**THE COURT:** So what did -- so what do you mean? So the only thing that's in your complaint is to provide an accounting with respect to the escrowed monies. What do you mean by that?

**MR. BLUESTONE:** Give me one second, Your Honor. A portion of the -- in addition -- so there's two escrow agreements, and there's also monies that were held for rent that were presumably held for it was referred to as a rent holdback. And I think we don't know exactly what happened with those monies.

**THE COURT:** Okay. So you think that maybe some money passed through Southwestern's hands that you don't know about or that you don't know enough about.

**MR. BLUESTONE:** Well, there's not a dispute I believe that there was additional monies that Southwestern held as part of this transaction that Southwestern no longer has. We don't know the specifics on that and why it was disbursed and to whom and what the demand was for that.

**THE COURT:** Okay. Sorry. I'm just looking for your -- So because -- okay, escrowed monies. Okay. So there are two different pots of escrowed monies, according to your complaint.

One was the 35,000 and the rent escrow agreement.

**EXCEPTIONAL REPORTING SERVICES, INC**

17

And where is that right now?

MR. BLUESTONE: That -- as far as I'm aware that has been disbursed to FSLRO. But I don't have any details on it other than that.

THE COURT: Okay. But the two -- and then the 200,000.

Okay. So let me go back then to you, Mr. Holt. So the -- it sounds to me like the 200,000 is what it is. They want to know kind of any details that you have about the 35,000.

And then it sounds to me like you should be out of the lawsuit once you've kind of said, look, we've given you the money we do have, we've told you about the money we don't have.

And unless Mr. Bluestone has, you know -- can -- you know, I think it would take an amended complaint to actually bring some sort of allegation against you.

I would be at that point ready to dismiss, you know, at least dismiss without prejudice. Does that make sense? I'm just trying to wrap my mind around this a little bit.

MR. HOLT: Your Honor, it does.

I can represent that I understand from my client that all of the rent holdback money was distributed to the buyer.

If what they're looking for is specific dates and times when checks were written, happy to get that information and provide it to Mr. Bluestone. I don't have it with me at

18

the moment.

THE COURT:  Okay.  So, Mr. Bluestone, with that representation made on the record, I would be prepared to dismiss them without prejudice.  How does that sound to you?

MR. BLUESTONE:  I mean, Your Honor, and obviously the Court is going to do what it does.  I mean, I think that I don't see prejudice to my client for that provided that it's without, you know, it's without prejudice and we still have the right to take discovery.

I think as it pertains to the rent that's $35,000, I think the checks would be helpful.

I think it's also like the circumstances as to what they were paid for and sort of when (inaudible) see is that the escrow agreement was complied with and that they were duly paid whatever they needed to be paid.

THE COURT:  Yeah.  I think all that's reasonable.

And, I mean, and, Mr. Holt, just for what it's worth, I do think that they should be entitled to that discovery.

I do think that, you know, folks whose hands fraudulently transferred money goes through have -- find themselves in a bad position very frequently.  It's just not uncommon at all.  And that's just the unfortunate position it sounds like your client might be in.

But based on the allegations in the amended complaint, the second amended complaint, whatever it is, I'm

comfortable granting this relief. So I will --

MR. INGALLS: Your Honor, --

THE COURT: I --

MR. INGALLS: -- may I be heard?

THE COURT: Yeah, please, go ahead. I'm sorry, yeah, Mr. Ingalls, yeah, please.

MR. INGALLS: Yeah, this is Ron Ingalls, Trustee for PDG>

I just want to make sure that this ruling jives with the previous ruling about them including FSLRO as a defendant or, you know, them being the one to have to do that. You can't dismiss them and require them to do so.

THE COURT: Mr. Ingalls, that's a very good observation, and I appreciate it. I'm sure I would have thought of that at some point, probably too late to do anything about it here. So yeah.

Well, yeah, so we're back to -- I'm just trying to remember who usually gives notice when you have an -- I mean, this isn't formally an interpleader. But I think that -- you know, it's a -- they're a known party that has a claim on this same pot of money, right?

So, well, here's my suggestion. I mean, they need to be joined. I do think they should be joined actually. Well, but I take the point that they're joined by -- seems the federal rules are supposed to be elegant and reasonable but I'm

20

not sure how to do them -- how to apply them here.

MR. HOLT: Your Honor, if I may?

THE COURT: Yeah, please.

MR. HOLT: At least in State Court in New Mexico when the interpleader deposits the funds, it is then dismissed out of the action with the fight amongst those who are fighting over it.

So perhaps a single that order allows us to interplead the funds, that joins FLSRO, and dismisses us out once the funds are deposited.

THE COURT: Okay. Yeah, that's fine. I'll just join them by that order and let the chips fall where they may.

And if -- I assume you have some kind of contact information for them and you can let them know what's going on. Okay. Thank you.

So I will then write and sign an order that applies to both of these motions. And it will order you to deposit the $200,000, it will dismiss you, and it will join this buyer entity.

And, you know, and so I assume that means, Mr. Holt, that their -- that your client doesn't want to stay in this case to claim on the -- for its fees on the fund; is that correct?

MR. HOLT: Your Honor, I cannot bind them on that point. I suspect that is true. And I can let the Court know

21

if I have erred in that regard.

**THE COURT:** Okay. Yeah, if you do that, we'll wait a few days to enter the order, how about that?

**MR. HOLT:** Yes, sir.

**THE COURT:** Okay.

**MR. BLUESTONE:** Your Honor, --

**THE COURT:** Yes, please.

**MR. BLUESTONE:** -- just one thing for that order. Can that order also include language to the effect that Southwestern will produce, you know, the accounting?

I don't know how specific we need to be in the order with the language but just that, you know, monies paid pursuant to the rent escrow agreement, you know, were paid according to "X" and "Y" schedule and based on "X" and "Y" representations.

Or, you know, I would be agreeable to, you know, language that just says accounting with Legalist and Southwestern to sort of work that out, provide it, and Mr. Holt, you know, generally agrees with what we're looking for.

**THE COURT:** I hate trying to write language like that. Do you think you all can reach a basic agreement on some language?

**MR. BLUESTONE:** I'd be happy to.

**THE COURT:** Okay. And, you know, and I don't think -- irregardless it wouldn't relieve their obligation. If

22

they're targes of discovery, they're targets of discovery, and that's that.

So, you know, I would hope that that could be just done informally and that whatever Southwestern has, it can just cough up and then -- and be done with this.

Again, Mr. Holt, I'm not -- you know, I'm sympathetic to the position that you and your client are in so -- but, okay, why don't you all try to hammer out some language and -- on that and then let me know?

And we -- and Mr. Holt will check with his client on the attorneys' fees issue. And then --

**MR. BLUESTONE:** Okay. And then --

**MR. HOLT:** (Inaudible) yes, sir.

**THE COURT:** -- (inaudible) move from there. Yeah, please, go ahead.

**MR. BLUESTONE:** What's the most efficient way for us to get that language to the Court?

**THE COURT:** That's a good -- that's a fair question. I think you can -- why don't you just file it, just put a notice of proposed language for the Court's order?

I mean, you know, that's right on the line of something that I'd be comfortable with us, you know, emailing Court staff about. But I think it's substantive enough and there's enough parties here that we should just do it that way. So sorry for the formality.

23

MR. BLUESTONE: Sure.

THE COURT: But you can just upload it to the docket, and that's all you need to do. You can link it to the -- to one of these motions.

Okay. Thank you all for that. I appreciate it. All right.

So then let's talk to -- so I suggest -- well, Mr. Ingalls, I let you pick the first matter. What do you think should go next?

MR. INGALLS: Ron Ingalls. I think we need to address the two motions to dismiss first, probably the law firm's motion before Mr. Dixson's.

THE COURT: Okay. Great. So, yes. Okay. So Mister -- is it -- do you pronounce it Tunnel? I'm sorry.

MR. TUNNELL: Yes, Your Honor, Tunnel.

THE COURT: Okay. Great. Why don't you proceed on your motion then, sir.

MR. TUNNELL: Thank you, Your Honor.

I'm here on behalf of Weycer, Kaplan, Pulaski, and Zuber. We filed this motion to dismiss because the Plaintiff failed to allege that Weycer, Kaplan intended to cause its damages. And as its damages it alleges that it lost sale proceeds from the sale of Lot 1-A.

It must allege that Weycer, Kaplan intended to cause this injury to sustain its cause of action for conspiracy

24

against Weycer, Kaplan.

Your Honor, Legalist responded to our motion, and we replied.  PDG did not respond.

Your Honor, the complaint alleges an agreement between Mr. Dixson and Legalist that if Legalist would partially release their lien, Mr. Dixson would sell Lot 1-A and then use the proceeds therefrom to pay creditors, and then presumably to invest in development of Lot 1-A.

And then presumably again the proceeds would come to Legalist I guess after the fact or after the development.

Your Honor, the only allegation against Weycer, Kaplan is that it participated -- provided legal services pursuant to what was basically an interest sale transfer of the property from PDG to Mesilla Valley.  And by property I mean Lot 1-A.

This was done, based on the allegations in the complaint, because of the objection from the ultimate buyer, who I believe is FSLRO, who we discussed earlier.

Your Honor, the Plaintiffs also allege that Mr. Carruth, who was a shareholder with Weycer, Kaplan, informed all the parties at that time -- and Weycer, Kaplan used the term parties.

So presumably that -- I'm sorry, Legalist used the term parties, so presumably that includes Legalist. Mr. Carruth informed all those people that such a transfer

would need Court approval.

And so there's no allegation that Weycer, Kaplan was involved, you know, in this agreement with -- between Mr. Dixson and Legalist, and that Weycer, Kaplan was involved in the I guess dissipation of proceeds after that Lot 1-A, which Legalist alleges was counter to their agreement with Mr. Dixson.

Your Honor, if we take the Plaintiffs' argument a step further, any time a law firm provides legal services to a client and that client goes out and performs counter to an agreement with a third party, then the law firm may be on the hook for conspiracy to violate that contract with the third party.

Your Honor, Judge Isgur in the Southern District of Texas last year took up a very similar issue in the adversary *Austin v. Brown and Fortunato*. Brown and Fortunato was the law firm. Your Honor, we referenced this in our pleadings, in our motion, in our reply.

In that case Brown and Fortunato was providing legal services to I believe a pharmaceutical provider who was Brown and Fortunato found defrauding some of its clients.

Brown and Fortunato continued to provide legal services. And in bankruptcy the Trustee filed an adversary against Brown and Fortunato alleging conspiracy.

Judge Isgur found that providing legal services is

26

not illegal and that if you -- just because you can infer that the law firm knew or did know, just because you can infer that the law firm knew of the fraudulent underlying action of its client, that was insufficient under the Supreme Court's precedent, 12(b)(6) precedent pursuant to Iqbal v. Ashcraft (sic).

And Judge Isgur granted a motion to dismiss pursuant to 12(b)(6) on the conspiracy allegations against Brown and Fortunato.

So, Your Honor, along those lines, because Weycer, Kaplan did not participate in the dissipation of proceeds from the sale of Lot 1-A, they were not a party, they did not participate in the agreement between Legalist and PDG that allowed the sale of Lot 1-A, they did not specifically intend to cause the loss of sales proceeds -- precedes (sic) which from the complaint seems to be because Legalist agreed to partially release their lien, we move to dismiss the cause of action against -- the cause of action for conspiracy against Weycer, Kaplan.

**THE COURT:** Okay. So the transfer -- you're saying that -- so I don't -- I -- it's like so Mr. Carruth knows that this transfer from -- of Lot 1-A from the Debtor to Mesilla had to be approved by the Court, but then he went ahead and did it without court approval; is that -- that's the allegation, right?

27

**MR. TUNNELL:** Your Honor, I think the allegation is that Mr. Dixson went ahead and moved it from PDG to Mesilla Valley. I may be incorrect on that. Plaintiffs can respond to that.

But all that's alleged is that Mr. Kaplan participated in that transaction and made everybody aware of that, yes.

**THE COURT:** Well, I think the making of everybody aware just shows his own knowledge that the transfer would be unlawful if it happened.

It says -- all right. Well let me hear from the other side on this. So, Mr. Bluestone or Mr. Ingalls, who wants to go on this one?

**MR. BLUESTONE:** I would, Your Honor. Zach Bluestone for Legalist.

There's a couple sort of ways to look at this. But first off, the (inaudible) issue that we're talking about here is whether or not there is intent by the law firm.

And the law requires specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.

And in taking a look at that, the chronology is important. And just to clarify, so prior to any plan confirmation, okay, the Debtor or -- and Mesilla Valley Ventures were both -- well let me say this again.

28

The law firm was the only entity that facilitated the transfer of Lot 1-A from the Debtor to Mesilla Valley Ventures, LLC, okay. And it was entirely negotiated before the plan came into place.

And then as soon as the plan was completed, the property was sold, Legalist's lien was no longer on the property, and Southwestern, the escrow agent, had all of the proceeds of the sale.

And what happened with those proceeds is that a portion, nearly $2 million, went to -- you know, were dissipated by Mr. Dixson.

But there was also significant monies that were paid directly by Southwestern, including $75,000 to the law firm.

So in essence the law firm agreed with Mr. Dixson in order to have this Lot 1-A transferred to Mesilla Valley Ventures, which nobody knew about from Legalist's position. Legalist had no idea who Mesilla Valley Ventures were.

Then the property sold and all of a sudden the law firm's getting $75,000, all these other entities are receiving money with Legalist receiving none of it.

And so the intent of the law firm was for the proceeds to be used for, one, to pay themselves, as well as to pay other entities. And we have no idea the involvement that the law firm had with those other entities. But we don't need it.

And I think it's also important -- and Mr. Tyler refers to the *Austin v. Brown and Fortunato* case, you know, which addresses specific intent.  And that case was very different from our case.

In that case, there was a law firm that was advising a client as to billing practices.  And they were not in touch with any third parties, it was only internal to their client.

And the court said in that case that there was no plausibility that the law firm was aware of the fraud or helped the fraud, and that all of its actions were directed internally, which is entirely different from our case where the law firm here is communicating with the escrow agent, which is communicating with Mesilla Valley, which is communicating with FSLRO, the ultimate buyer, for a sale, despite the fact that the property hadn't even been transferred yet.

Then all of a sudden monies from the sale get paid to the law firm, which they were obviously aware of.

They submitted their bills to the escrow agent to be paid while representing Mesilla Valley and also submitting bills seemingly for PDG.  It's confusing.  There's one very thin note as to what those were for.

So this case is very different in that the law firm was involved every step of the way, from the initial transfer to Mesilla Valley Ventures, as well as through proceeds being paid to the law firm.

30

And from a pleading standard, the law allows the Court to take inferences from the complaint as a whole and hear the details, you know, over 200 paragraphs detailing this significant fraud, multiple transfers.

And the firm's involvement is significantly different from the *Brown and Fortunato* case which only involved the law firm providing advice to its client internally as to billing practices.

**THE COURT:**  Okay.  Thank you.

Mr. Ingalls, do you have anything to add on this?  It seems to me like the estate's argument here is pretty strong, maybe stronger than Legalist's.

**MR. INGALLS:**  Yes, Your Honor.  So, I mean, this is our attorney that has participated in essentially a scheme where property's transferred without consideration out of the bankruptcy estate.

And then he gets a fee out of that money.  So it's like maybe it's a legal malpractice claim the estate has against the firm.

But we believe that, you know, to the extent that that's possible, that's germane to this whole contest about what happened at this closing, who got the money, where's it go, who's entitled to it.

**THE COURT:**  Well, I did have a question about whether the estate is investigating legal malpractice claims because

certainly that's the first thing that one thinks of if they were also representing the Debtor at this time.

**MR. INGALLS:** Yes. So as what's been pled, you know, (inaudible) been part of this transaction that created these fraudulent transfers out of the estate. And so I don't see how they get out of saying we didn't know and they're getting paid (inaudible) fee from (inaudible).

**THE COURT:** Yeah. Okay. Back to you, Mr. Tunnell.

**MR. TUNNELL:** Yes, Your Honor.

Just to respond specifically to Mr. Bluestone's argument. Page 17, paragraph 103 of their complaint, Dixson individually and as an agent of PDG then orchestrated the transfer of the sales proceeds to himself, the Dixson Trust, Gateway, among other entities not entitled to the funds after the DIP lender's claim arose and shortly before the money owed to the DIP lender became due.

And so that it went to Southwest Title and then went out, I don't know that that's fair. I don't know specifically what happened to the proceeds.

There were a number of parties that received the proceeds. And I believe Legalist actually received some proceeds as well. They may not have been aware of it at the time. I believe that's alleged in their complaint.

But, Your Honor, for a conspiracy claim (inaudible) Weycer, Kaplan has to intend to cause the injury, they have to

32

meet with Mr. Dixson to cause the injury.

And there's no allegation that Weycer, Kaplan knew that Mr. Dixson was going to disburse the proceeds in the way that he did. And so that's -- we're going to -- that's going to be our argument, Your Honor.

THE COURT: Well, but what about the initial fraudulent transfer? I mean, the transfer of the property from the Debtor to another entity had to be approved by the Court. That is a fraudulent transfer just on its face.

So -- and also an unapproved transfer contrary to bankruptcy law.

So -- and apparently there's -- the allegation is that Mr. Carruth knew that and yet you're -- and yet the allegation is that he at least had some role in making that transfer happen.

I agree with you the language is a little bit vague on his role. But if they could substantiate the allegation that he had a role in that transfer, that seems very much like an injury that would suffice to underlie a conspiracy allegation.

So leaving aside the proceeds, I mean, I hear, you know, Mr. Bluestone's really emphasizing the proceeds, and that's fine. I -- because I think, you know, I understand why. And that's an important part of this that needs more elaboration.

33

But, I mean, the initial transfer of the property alone without Court approval, which is frankly just absolutely shocking, for me is that -- you know, there's at least sufficient allegations that the law firm was involved in that part of it I guess is where I'm at on the -- on these allegations.

MR. TUNNELL: Your Honor, I believe Weycer, Kaplan provided legal services to the Debtor and they were the Debtor's counsel, as you know, for a while.

And I believe that this sale was part of a larger sale. I believe that this interest sale transfer was based on an objection by the ultimate buyer.

THE COURT: Right.

MR. TUNNELL: That's what's alleged.

THE COURT: Right. Okay. Yeah, that -- but none of that excuses the fact that as to a bankruptcy estate, it's fraudulent to transfer an asset out of the bankruptcy without the bankruptcy estate getting a consideration.

Now, you could say the bankruptcy estate got the consideration maybe. That's -- could be a defense or that could be -- undermine one of the other elements.

But if the law firm knew that it was participating in an action that was unapproved by the Court but that needed approval by the Court, I don't know, that looks sufficient to me.

Okay. Thank you. Does anybody else have anything further to add on that motion to dismiss?

(No audible response.)

Okay. Let's turn them to the other motion to dismiss. Mr. Lutz, are you going to argue this one?

**MR. LUTZ:** Yes, Your Honor.

So as to the motion to dismiss that Mr. Dixson filed with respect to the claims against him and his trust, specifically as to fraud and fraudulent transfer, what he brings up is that the pleading standard is not met both under the Bell/Twombly decision and Rule 9(b) for fraud to be pled with particularity as to the fraud that Mr. Dixson himself initiated with respect to Legalist as to anything related to the sale of Lot 1-A.

Mr. Dixson didn't make any representations to Legalist at all and none are alleged. Therefore, his concern is there's nothing there that from a pleading standard would be sufficient to make these kind of fraudulent claims against him individually and his trust.

With respect to money had and received, unjust enrichment, the motion is correct. If there is a legal contract, express contract that covers that specific situation, under Texas State law, because these are state law claims, you cannot bring an unjust enrichment claim.

Mr. Bluestone correctly notes in a footnote in his

response that money had and received and unjust enrichment are considered the same type of claim.

The last item that was indicated in the motion as to post-petition transfer, believe the point that was being made was that these were done prior to the conversion to Chapter 7. That's just a bankruptcy law issue that the Court can address just on the legal merits of it.

**THE COURT:** Okay. Thank you. Mr. Bluestone or Mr. Ingalls, do you want to respond to those?

**MR. BLUESTONE:** Yes, Your Honor.

You know, I've read and re-read Mr. Dixson's motion to dismiss. And it seems entirely divorced from the actual allegations in the complaint which are significant and detailed as to every step along the way.

The complaint addresses, for example, on page seven, on number -- starting on page 38, how on April 12th, 2002 Legalist was informed that proceeds from the sale were going to be going to Legalist as well as to complete Lot 3 development.

It talks about a lien was released as a result of that, talks about Mr. Dixson's involvement in all of this.

And, you know, as part of Mr. Dixson's response, he states that he never spoke with Legalist, you know. One, that's a factual -- I mean, that's a factual issue.

Legalist has alleged that they were informed, which they were, that, you know, as to these representations -- and

36

we allege the date, we allege what happened, we allege our reliance on it.  And nothing more is needed on that.

And to just make general conclusions that a highly detailed with dates complaint is insufficient doesn't meet the standard for a motion to dismiss.

I mean, as to the unjust enrichment, which is the money in hand, Legalist and the Trustee are allowed to plead alternative claims for relief.

So it's hard to fathom how any legs (phonetic) on this motion be dismissed as to the specific allegations as to fraud and Mr. Dixson.

You know, I (inaudible) reference that, you know, the motion to dismiss (inaudible) to be addressed to the prior complaint.  It isn't entirely clear what claims they're challenging, which we note in our opposition.

And the claims which it appeared to be challenging don't even appear to include the Trust.  So I think to the extent the Trust is involved there's no basis for the Trust to be dismissed from any of the claims.

And as we've discussed in this hearing, as well as in prior ones, I believe, I mean, the involvement of Mr. Dixson and his entities and the dissipation of these funds is laid out pretty clearly and which is identified in the briefing and (inaudible) just now.

**THE COURT:**  Okay.  Thank you.

37

Mr. Lutz, do you want to respond?

**MR. LUTZ:** Your Honor, the only thing I'd say is as to the detail, I do believe when you're making a fraud claim under 9(b) it does require more.

And I would like to see a claim of specific representations made by Mr. Dixson as to individual claims against him.

**THE COURT:** Okay. Thank you. Okay.

So, you know, I think resolving matters at the motion to dismiss stage is great, when possible.

I also really appreciate the counsel, Mr. Lutz, Mr. Tunnell, you did a great job.

But, you know, here the allegations are sufficient. It just very -- and as to the Dixson and Dixson Trust motion to dismiss, it's not a close call. I mean, they've obviously alleged fraudulent transfers within the statutory standards.

And the other causes of action are -- you know, based on the allegations are sufficiently pled. I mean, again, what the proof will look like, I don't know. But that's what discovery is for. And we can talk again about it at the motion for summary judgment stage if -- when we get there.

On the law firm motion to dismiss, it's a bit more complex. I agree that the law is more favorable in that case to the law firm.

But, you know, there's very specific -- there is

sufficient allegations of active and knowing participation in the very actions that injured the estate and to some degree Legalist.

And so I think it's got to proceed.  I don't think there's a way that I can dismiss the claims against the law firm.

And I do have serious questions about whether -- why the estate hasn't brought malpractice claims against the law firm as well.  I'm surprised that hasn't happened.  And I hope the estate is going to make sure it's doing whatever it needs to do to maximize the recovery for the creditors.

Okay.  So that brings us to the -- so I'll deny both those motions to dismiss.  But thank you all very much for your argument on that.

So that brings us to docket number 75, the motion to extend time for discovery responses.  So, Mr. Lutz, this is again your motion.

MR. LUTZ:  And your --

MR. HOLT:  Matthew Holt.  If I can jump in for just a second.  May I be excused?  I have another hearing I'm supposed to go to.

THE COURT:  I'm so sorry, who is that speaking right now?

MR. HOLT:  I'm sorry, Matthew Holt, I apologize, --

THE COURT:  Yes.

MR. HOLT: -- Southwestern Abstract.

THE COURT: No, it's very difficult on these web hearings to figure out what the heck is going on. Yes, Mr. Holt, you're absolutely excused.

MR. HOLT: Thank you, Your Honor.

David, I apologize for interrupting you.

MR. LUTZ: Oh, no problem, Matt, thanks.

THE COURT: Thank you. Please proceed, Mr. Lutz.

MR. LUTZ: Yeah, Your Honor, obviously there was some confusion, as I pointed out in the motion. Technically Legalist didn't amend the right way under Rule 15.

You know, Mr. Dixson responded pro se, which is my fault. I should have been in communication better with him about where we stood on things; kind of a lot of blame to go around.

They served discovery. It was coming up. I needed to file something just to be as a protective measure.

What I'm generally asking that very rarely comes before the Court in this context is as a professional courtesy to get an extension. And I hope Mr. Bluestone will allow that.

THE COURT: Okay. Have you all talked details?

MR. LUTZ: I haven't with him. I'd like to hear his position, you know. I'll certainly grant --

THE COURT: Okay.

MR. LUTZ: -- any extensions they want on discovery

40

as we go forward.

**THE COURT:** Okay. All right. Mr. Bluestone.

**MR. BLUESTONE:** Yes, thank you, Your Honor.

It's important for Plaintiffs to note to the Court the extensive lengths that Legalist and to an extent the Trustee -- and I'll let the Trustee for -- speak for himself -- as to figuring out where $2 million of proceeds went.

So as referred to earlier, when Lot 1-A was sold, a fairly sizable chunk was paid directly from the escrow agent to pay various expenditures, including the Weycer law firm.

About $2 million was then dissipated by Mr. Dixson. And it's been, you know, over a year, so a significant amount of time both in the main proceed in this action as well as more recently in this adversary.

And you'll note that there was a -- we recently filed a motion for contempt for Mr. Dixson's failure to comply with this Court's -- the main proceeding's order compelling a response to discovery.

(Inaudible) there's a significant crossover between what's being sought in that order to compel as well as our discovery here, which is what happened to the money. We had a deposition which, you know, left a lot of questions unanswered.

And so a key point in this matter, and as it pertains to Mr. Dixson, is not just what account were these funds dissipated to, but to whom, for what reason, what benefit did

the estate receive, if any, and where is it now.

And so our interest is not to engage in significant and extended motion practice. It's to actually have the documents.

So to the extent that we're going to, you know, receive a full and complete production to these requests in the very short term then, you know, we're agreeable to that.

But we don't want to engage in extended motion practice. And we'd like these documents to be produced. And I'm bringing this to the attention of the Court for that reason.

**THE COURT:** Okay. Thank you. So your point is you're willing to wait until June 12th, but you want June 12th to actually involve you getting the discovery that you've been asking for.

**MR. BLUESTONE:** I mean, I don't -- Your Honor, with respect, I don't understand why you need, you know, until June 12th.

I mean, there was a deposition that was done. I don't have it in front of me. You know, it was -- I believe it was over a year, where all of these questions were asked.

You know, this is not a new topic. We (inaudible) you know, at the last minute thrown questions at Mr. Dixson and requiring -- we're asking the Court to require him to provide on unreasonably short notice.

42

These are -- you know, these have been front of mind for over a year. He had -- May 16, 2023 was when the deposition was. So, I mean, I don't see why they can't be provided in a week.

In fact, during a previous deposition of Mr. Dixson, he even identified that he possessed the spreadsheet that had certain links to all of the documents that would be responsive. And I'm speaking of, you know, certain requests.

So we would request that we would have these documents prior to June 12th. You know, I don't see why we can't have them by the end of the month.

I mean, if there's a particular document that Mr. Lutz needs additional time for then, you know, we have no problem in having a conversation about that and don't want to be unreasonable.

But at this time we believe that we need the Court to intervene so that these cases can move forward.

**THE COURT:** Okay. Well, I saw that you had filed this motion in the main case as well.

So, listen, Mr. Lutz, I'm going to grant the relief that you've requested. But I do -- I'm going to add language to the effect that the discovery needs to be complete by that date.

**MR. LUTZ:** Thank you, Your Honor.

**THE COURT:** Okay. And we'll set -- and I think that

43

I guess that motion for show cause is just sitting out there. I'm not sure.

MR. BLUESTONE: I don't believe it's been set for a hearing.

THE COURT: Okay. So -- yeah, sorry, I'm just looking for it.

Right. So my hope is that that will be, you know, mooted by the discovery that is done both in this case and that is produced in the main case.

So I don't know if Mr. Dixson's still here. But those discovery obligations, they're -- it's not optional. It's required to disclose. And, you know, if -- that's just part of the legal system that is the way we have to do things.

So it is not optional. It has to be done. And, you know, I will enforce it if I have to. So -- and again, Mr. Dixson, yeah, hey, listen, I'm not accusing you of doing anything wrong right now.

I'm just telling you we're going to extend this deadline. We'll hold that order on the show cause hearing if necessary, and we can move from there, okay?

MR. DIXSON: Your Honor, I (inaudible) --

THE COURT: I just don't -- yeah, go ahead.

MR. DIXSON: -- spreadsheet -- I know the spreadsheet they're referring to, and it was delivered to Russell Mills over a year ago. But I can obviously deliver it again. It's

44

not a problem.

But the continuous light that these people are painting me in that I'm not -- I gave them exactly what they asked for and --

**THE COURT:** Okay. I will -- listen, I'll listen -- you will have ample opportunity to make that case. And I'm not judging you based on what they're saying, I can assure you. That's -- I take it all with a big grain of salt.

Okay. So, Mr. Lutz, I will sign that order. I will add some language about full compliance, but it won't be anything surprising to you I don't think.

Okay. Well, thank you all (inaudible) --

**MR. BLUESTONE:** One point to add on that.

**THE COURT:** -- please go ahead.

**MR. BLUESTONE:** Sorry, one point --

**THE COURT:** I'm sorry, Mr. Bluestone, --

**MR. BLUESTONE:** -- to add.

**THE COURT:** -- yes, yes.

**MR. BLUESTONE:** Thank you. Just (inaudible) concerning Your Honor's point as to the June 12th production hopefully mooting the pending motion for sanctions, we would like to, you know, reserve the right to also have our legal fees in addressing that, you know, considered by the Court.

So to the extent that, you know, part of the relief in that motion for sanctions was that the order's complied with

45

and documents are produced. But in addition we seek fees.

So to the extent that the June 12th production satisfies the obligation to produce documents, I think I would agree that it would moot that relief sought.

But just wanted to note that we're also seeking our legal fees in that.

THE COURT: Yeah, okay. Yeah, nothing is -- nothing will prejudice your ability to seek fees as appropriate.

MR. LUTZ: And, Your Honor, I just want to comment, once you filed an adversary proceeding, you're not allowed under bankruptcy law to continue under Rule 2004. So I was very surprised to see that motion.

I'll respond within the time but, you know, we're operating through this case now. And I just want to make that clear because it was not proper to bring that legally the way they did.

THE COURT: Okay. Well, yeah, that's an issue that you can brief. I mean, I -- candidly, I mean, I'm aware that there's obviously Rule 2004 says what it says. I don't know if you can run out the clock or not on that. I don't know how that works so I'd have to -- I'll have to look into that.

But thank you. You're obviously welcome to respond.

And, you all, I'm not prejudging any of those issues right now.

Okay. Thank you all again, I appreciate it. I know

46

this is a really important case and a hard-fought one.  And I appreciate your time today.

So with that we are -- we can -- I think I've -- we've done everything we need to do in the *Legalist versus Dixson* adversary.  So thank you all.  You may all be excused.

**(This proceeding was adjourned at 11:47 a.m.)**

47

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>August 23, 2024</u>

        **Signed**                                            **Dated**


*TONI HUDSON, TRANSCRIBER*