## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **BANKRUPTCY NO. 21-30107-CGB** |
| **PDG PRESTIGE, INC.,** | § | |
| | § | **CHAPTER 7** |
| *Debtor.* | § | |
| _____ | § | _____ |
| | § | |
| **LEGALIST DIP GP, LLC and** | § | |
| **PDG PRESTIGE, INC. (by and through** | § | |
| **Ronald Ingalls, Chapter 7 Trustee),** | § | **ADVERSARY NO. 23-03004-CGB** |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MICHAEL DIXSON, individually;** | § | |
| **MESILLA VALLEY VENTURES, LLC;** | § | |
| **MICHAEL DIXSON TRUST THROUGH** | § | |
| **ITS TRUSTEE MICHAEL J. DIXSON;** | § | |
| **CHRISTINA DIXSON; SOUTHWESTERN** | § | |
| **ABSTRACT & TITLE COMPANY, INC.;** | § | |
| **WEYCER, KAPLAN, PULASKI &** | § | |
| **ZUBER P.C.; ENTRADA** | § | |
| **DEVELOPMENT, LLC; THE GATEWAY** | § | |
| **VENTURES, LLC; LPC RETAIL, LLC,** | § | |
| **and FSLRO 510 SOUTH TELSHOR LAS** | § | |
| **CRUCES, LLC,** | § | |
| | § | |
| *Defendants*. | § | |

### WEYCER, KAPLAN, PULASKI & ZUBER P.C.'s
### MOTION FOR SUMMARY JUDGMENT

Defendant Weycer, Kaplan, Pulaski & Zuber P.C. ("Weycer Kaplan") moves this Court

pursuant to Federal Rule of Bankruptcy Procedure 7056 for summary judgment on the claims

brought against it by Plaintiffs Legalist DIP GP, LLC ("Legalist") and PDG Prestige, Inc. (by and

through Ronald Ingalls, Chapter 7 Trustee) ("PDG") (collectively, "Plaintiffs"), and for summary

judgment on Weycer Kaplan's affirmative defense of attorney immunity as to Legalist's claims.

## I.
### JURISDICTION, VENUE, AND STANDARD OF REVIEW

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. § 157(a) and

§ 1334(a) as referred by *Order of Reference of Bankruptcy Cases and Proceedings* entered by the

United States District Court for the Western District of Texas.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court under 28 U.S.C. § 1408 and

§ 1409.  The relief requested herein may be granted in accordance with 11 U.S.C. § 105(a).

2.      Federal Rule of Bankruptcy Procedure 7056 applies Federal Rule of Civil

Procedure 56 to adversary proceedings, and pursuant thereto,

> A party may move for summary judgment, identifying each claim or defense—or
> the part of each claim or defense—on which summary judgment is sought.  The
> court shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter
> of law.[1]

## II.
### SUMMARY JUDGMENT EVIDENCE

Exhibit 1: Email from Jeff Carruth to Michael Dixson (Feb. 15, 2021) (WKPZ 001).
Exhibit 2: Email from Michael Dixson to Jeff Carruth (Feb. 15, 2021) (WKPZ 002).
Exhibit 3: *Voluntary Petition* (Dkt. 1),
Exhibit 4: *Schedules* (Dkt. 14).
Exhibit 5: *DIP Order* (Dkt. 43).
Exhibit 6: *Order Granting Motion to Employ Weycer Kaplan* (Dkt. 47).
Exhibit 7: *Order Approving First Amended Disclosure Statement* (Dkt. 118).
Exhibit 8: *First Amended Disclosure Statement* (Dkt. 116).
Exhibit 9: *Order Confirming Plan* (Dkt. 148) (hereinafter "*Plan*").
Exhibit 10: Deposition Transcript of Brian T. Rice (Excerpt).
Exhibit 11: Email from Jeff Carruth to Brian Rice (Mar. 30, 2022) (Rice 0012).
Exhibit 12: Email Chain Between Jeff Carruth and Brian Rice (March 30, 2022) (Rice 0015).
Exhibit 13: Deposition Transcript of Michael Dixson (Excerpt) (WKPZ 11).
Exhibit 14: Email from Jeff Carruth to Brian Rice (Apr. 12, 2022) (Rice 0016).
Exhibit 15: Email from Brian Rice to Jeff Carruth (Apr. 14, 2022) (Rice 0023).
Exhibit 16: Special Warranty Deed, Lot 1A, PDG to Mesilla Valley (Apr. 21, 2022).
Exhibit 17: Email from Brian Rice to Jeff Carruth (Apr. 13, 2022) (Rice 0019).
Exhibit 18: Email from Jeff Carruth to Brian Rice (Apr. 13, 2022) (Rice 0020).
Exhibit 19: Email from Jeff Carruth to Brian Rice (Apr. 13, 2022) (Rice 0022).
Exhibit 20: Seller's Statement, Lot 1A (May 26, 2022).

---

[1] FED. R. CIV. P. 7056; FED. R. CIV. P. 56(a).

Exhibit 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022).
Exhibit 22: *Order Converting Case* (Dkt. 271).
Exhibit 23: *Motion to Convert* (Dkt. 264).
Exhibit 24: *Motion to Withdraw* (Dkt. 277).
Exhibit 25: *Order Granting Motion to Withdraw* (Dkt. 283).

### III.
### UNCONTROVERTED SUMMARY JUDGMENT FACTS

#### A.  The Hiring of Weycer Kaplan through Plan Confirmation in the PDG Bankruptcy.

3.      On February 15, 2021, Michael Dixson[2] ("Dixson") engaged Weycer Kaplan to represent PDG in a Chapter 11 bankruptcy.[3]  PDG's primary contact at Weycer Kaplan was Jeff Carruth ("Carruth").[4]  That same day, Carruth filed PDG's *Voluntary Petition*.[5]

4.      On March 14, 2021, Carruth filed PDG's *Schedules* which listed as real property, "510 and 550 S Telshor, Las Cruces.  Referred to by parties often as Lot 1A and Lot 3A," valued at $4,700,000.00.[6]  On April 12, 2021, this Court entered the *DIP Order*, which authorized use of proceeds from the DIP loan and gave Legalist a security interest.[7]  On April 16, 2021, this Court entered an *Order Granting Motion to Employ* Weycer Kaplan.[8]  On January 20, 2022, this Court approved the *First Amended Disclosure Statement* which stated

> PDG[] owns and is the developer of a ±3.29 acre tract of real property in Las Cruces, Dona Ana County, New Mexico and sometimes referred to as Mesilla Valley Mall Subdivision, Replat No. 5 (the "Subject Property").  The Subject Property is divided into two lots, Lot 3A and Lot 1A . . . .[9]  The Debtor believes that the Subject Property as of the Petition Date possessed a stabilized value of $4,700,000. . . . Legalist DIP GP, LLC . . . holds a first consensual lien against the subject property in the amount of . . . $4,700,000 under the DIP Credit Agreement . . . .[10]  To the extent necessary, this Plan also constitutes a sale motion under Code §363(f) to sell Lot 1A free and clear and all liens, claims, and encumbrances as described below, with the proceeds of such sale being used to

---

[2] PDG's president.  *See* Exhibit 13: Depo. of Dixson, Pg. 14, Lines 8-11.
[3] Ex. 1: Email from Carruth to Dixson (Feb. 2, 2021); Ex. 2: Email from Dixson to Carruth (Feb. 2, 2021).
[4] Ex. 1: Email from Carruth to Dixson (Feb. 2, 2021).
[5] Ex. 3: *Voluntary Petition* (Dkt. 1).
[6] Ex. 4: *Schedules* (Dkt. 14) (Schedule A/B, pg. 3).
[7] Ex. 5: *DIP Order* (Dkt. 43).
[8] Ex. 6: *Order Granting Motion to Employ* (Dkt. 47).
[9] Ex. 7: *Order Approving First Amended Disclosure Statement* (Dkt. 118); Ex. 8: *First Amended Disclosure Statement* (Dkt. 116) (¶ 3.1).
[10] Ex. 8: *First Amended Disclosure Statement* (Dkt. 116) (¶ 3.3).

fund the Plan as described herein.[11] . . . .Payments and distributions under the Plan will be funded by the continued development, refinance, and/or sale of the Subject Property.[12] As discussed above, the Debtor believes that the sale of Lot 1A will result in cash of approximately $1,800,000 to $2,000,000 to fund the Plan, almost all of which will go to reduce the claim of Legalist.[13] PDG[] believes that the Various Leases will be revived following the Effective Date, and upon such revival will permit a sale of Lot 3A and/or refinancing of the remaining indebtedness following the sale of Lot 1A.[14] PDG[] is also seeking exit financing from a more traditional asset-based and/or real estate lenders which financing would be used to reduce the remaining balance of the Legalist debt and to pay [] additional costs of development. . . . [15]

5. On March 31, 2022, this Court confirmed the Plan with an effective date of April 1, 2022.[16] Per the Plan, its purpose was "to pay creditors of PDG Prestige, Inc. . . . from cash flow from future operations and/or *sales of property*."[17] The Plan noted an estimated claim of Weycer Kaplan for $70,000 and a secured claim of Legalist for $5,200,000.00.[18] The Plan was to be funded by "(1) a *sale of the Subject Property*, (2) lease and/or rental income of the Subject Property, and/or (3) existing financing and/or post-Effective Date re-financing," and "each of Lot 1A and Lot 3A . . . will be subject of one or more sales post-Effective Date by the Reorganized Debtor."[19]

6. Per the Plan,

Any sales, transfers, and/or conveyances of some or all of the Subject Property shall be made pursuant to, at minimum, constitute sales under Code §§ 363(f), 1122(a)(5), and/or 1125(b)(4), and each such sale, transfer, and/or conveyance shall be free and clear and any lien, claims, encumbrances, and/or any other interests, except as specified above with respect to particular Lots and/or particular conveyances and except any intertest of Bubba's Holdings in and to the Subject Property (Lot 1A) pursuant to the Bubba's Holdings Lease, to which any sale, transfer and/or conveyance of Lot 1A will be subject. . . . .[20]

And,

---

[11] Ex. 8: *First Amended Disclosure Statement* (Dkt. 116) (¶ 6.1).

[12] *Id.* at ¶ 6.2.

[13] *Id.*

[14] *Id.*

[15] *Id.* The *Disclosure Statement* also noted, "On December 20, 2021 the Debtor entered into a Purchase and Sale Agreement with The Paul Rothbard Revocable Living Trust . . . for the sale of Lot 1A . . . $2,615,000.00. Closing is expected to occur before March 31, 2022," but this sale ultimately did not go through. *See id.* at ¶ 3.5.2; Ex. 9: *Plan* (Dkt. 148) (Plan, ¶ 8.1).

[16] Ex. 9: *Plan* (Dkt. 148) (¶ 21).

[17] *Id.* at Plan, ¶ 1.1 (emphasis added).

[18] *Id.* at Plan, § 2. Because its claim was unimpaired, Legalist was deemed to accept the Plan. *See id.* at Plan, § 5.2.

[19] *Id.* at Plan, ¶ 8.1 (emphasis added).

[20] *Id.* at Plan, ¶ 9.9.

> For the avoidance of doubt, and without contradiction of any portion of the Code, upon the Effective Date, all property of the estate, including but not limited to any and all real property of the Debtor in Dona Ana County, New Mexico and further including without limitation each of Lot 1A and Lot 3A of the Subject Property, *shall vest and/or return to Reorganized Debtor*, and which property the *Reorganized Debtor shall be free to sell, lease, encumber, and otherwise transact and/or use in any manner* without the necessity of further notice to any creditors and/or parties in interest and without the necessity of prior approval of the Bankruptcy Court.[21]

7.      On March 30, 2022, prior to confirmation, Carruth emailed Brian Rice ("Rice"), Legalist's current Chief Operating Officer and General Counsel,[22] a *Notice of Plan Redline (First Amended vs. Second Amended)* and a *Second Amended Plan of Reorganization of PDG Prestige Inc. Dated March 29, 2022*.[23]  In his deposition, Rice confirmed Carruth sent these documents "to Legalist for Legalist's input,"[24] that these documents demonstrated that PDG could "sell [Lots] 1A and 3A in compliance with the code,"[25] and that Legalist had no objection to these documents.[26] Later that same day in a follow up, Carruth asked Rice if he could "tell the Court that Legalist approves of the plan," to which Rice responded, "So long as we're getting repaid from a post-confirmation refi/sale, which I think everyone is on the same page about -- and not 120 monthly payments over 10 yrs [sic] [emoji face with tears of joy] -- then, yes, we consent."[27]

### B. Legalist's Lien Release and the Sale of Lot 1A.

#### a. Negotiation of DIP Loan.

8.      Dixson testified the DIP Loan from Legalist was needed to pay off a loan secured by both Lot 1A and Lot 3A and for operating capital, and the rest would be "put back into re-developing the property."[28]  Per Dixson, Lot 1A would be sold, and the remaining debt to Legalist

---

[21] *Id.* at Plan, § 10 (emphasis added).
[22] Ex. 10: Depo. of Rice, Pg. 20, Lines 9-19.
[23] Ex. 11: Email from Carruth to Rice (Mar. 30, 2022).
[24] Ex. 10: Depo. of Rice, Pg. 56, Lines 11, 24; Pg. 57, Lines 4-18; Pg. 59, Lines 13-15.
[25] *Id.* at Pg. 61, Lines 21-23.
[26] *Id.* at Pg. 62, Lines 16-17.
[27] Ex. 12: Email Chain Between Carruth and Rice (March 30, 2022).
[28] Ex. 13: Depo. of Dixson, Pg. 24, Lines 3-21; Pg. 26, Lines 2-25.

would be paid off with a refinance of Lot 3A.[29]  Rice testified that Legalist understood and agreed.[30]  He testified, "There was a prepetition lender to be repaid . . . [a]nd the balance was to be used to develop the underlying collateral . . . that secured the loan."[31]  Dixson testified Legalist first called him to open discussions on DIP financing.[32]  After "hundreds of phone calls" between Dixson and Legalist personnel, Zach Campbell ("Campbell") (Investment Manager),[33] Eva Shang (CEO),[34] Nate Jones ("Jones") (Head of DIP Underwriting),[35] and Rice, and after Legalist sent him a term sheet, Dixson testified he and Legalist came to an agreement for DIP financing.[36]  Rice confirmed he negotiated the credit agreement with Dixson based on the term sheet.[37]

b. _Sale of Lot 1A._

9.    According to Rice, around "year end of '21," he, Dixson, Carruth, and Legalist's investment team (composed of Jones and Remy Cipriano ("Cipriano")) discussed an agreement by Legalist to release its lien on Lot 1A to allow this property to be sold, and allow PDG to use the proceeds from the sale of Lot 1A to develop Lot 3A.[38]  Following these discussions, on April 12, 2022, Carruth emailed Rice and Campbell (Dixson was cc'd) a release of lien document and a FedEx label.[39]  Rice testified that he conferred with Jones and Cipriano, who previously spoke with Dixson directly about the lien release, and based on their conversations, he executed and

---

[29] _Id._ at Pg. 55, Lines 5-25; Pg. 56, Lines 9-16.
[30] Ex. 10: Depo. of Rice, Pg. 62, Lines 16-17.
[31] _Id._ at Pg. 34, Lines 9-25; Pg. 35, Lines 1-2.
[32] Ex. 13: Depo. of Dixson, Pg. 34, Lines 2-25.
[33] Ex. 10: Depo. of Rice, Pg. 70, Lines 14-17.
[34] _Id._ at Pg. 21, Lines 19-20.
[35] _Id._ at Pg. 37, Lines 6-8.
[36] Ex. 13: Depo. of Dixson, Pg. 34, Lines 2-25; Pg. 35, Lines 1-25; Pg. 36, Lines 1-2.
[37] Ex. 10: Depo. of Rice, Pg. 28, Lines 22-24; Pg. 29, Lines 1-25; Pg. 30, Lines 1-22.
[38] _Id._ at Pg. 46, Lines 15-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-13; Pg. 54, Lines 16-19.
[39] Ex. 14: Email from Carruth to Rice (Apr. 12, 2022); Ex. 10: Depo. of Rice, Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 70, Lines 1-25; Pg. 71, Lines 1-25; Pg. 72, Lines 1-25; Pg. 73, Lines 1-13.

submitted the release of lien document.[40]  In executing the release, Legalist put no stipulations on the use of proceeds from the sale of Lot 1A, nor did Rice request any.[41]

10.     To aid the sale of Lot 1A, Dixson testified *he* decided to transfer it from PDG to Mesilla Valley Ventures, LLC ("Mesilla Valley") (a similar, single purpose entity he and PDG owned that he used to attempt to purchase a property near Lot 1A), which he did "to get away from the liabilities that were associated with the ongoing litigation with the Cremins parties and the [Noorani Group] on the [Gateway Ventures] [bankruptcy and adversary]"[42]  He testified there was an agreement and consideration between PDG and Mesilla Valley for the transfer of Lot 1A, in which he represented both entities.[43]  Per a Special Warranty Deed, PDG conveyed Lot 1A to Mesilla Valley on April 20, 2022.[44]  Dixson testified he discussed selling Lot 1A to LPC Retail, LLC ("LPC") prior to his transfer of Lot 1A from PDG to Mesilla Valley, and that *he* negotiated the sale of Lot 1A by Mesilla Valley to LPC.[45]

11.     In an email on April 13, 2022, Rice asked Carruth for a copy of the Lot 1A Purchase and Sale Agreement with LPC,[46] and later that day, Carruth provided Rice an executed copy.[47]  The first paragraph of the Purchase and Sale Agreement notes it "is entered into . . . by and between **MESILLA VALLEY VENTURES, LLC** . . . and **LPC RETAIL, LLC** . . . ."[48]

---

[40] Ex. 10: Depo. of Rice, Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 83, Lines 13-25; Pg. 84, Lines 1-5; Ex. 15: Email from Rice to Carruth (Apr. 14, 2022).

[41] Ex. 10: Depo. of Rice, Pg. 52, Lines 1-25 ("[T]he lien release itself did nothing except release the lien."); Pg. 53, Lines 1-14.

[42] Ex. 13: Depo. of Dixson, Pg. 36, Lines 12-24; Pg. 38, Lines 1-20; Pg. 39, Lines 8-9, 15-20; Pg. 40, Lines 1-5; Pg. 42, Lines 23-25.  He elaborated, "As far as I was concerned, the bankruptcy plan had been confirmed and we were moving forward with the plan.  So I wasn't too worried about the bankruptcy at that point.  I was worried about something coming up later on, which could put their collateral in jeopardy, and put our transaction in jeopardy as well."  *Id.* at Pg. 43, Lines 15-21.

[43] *Id.* at Pg. 46, Lines 20-23.

[44] Ex. 16: Special Warranty Deed, Lot 1A, PDG to Mesilla Valley (Apr. 21, 2022).

[45] Ex. 13: Depo. of Dixson, Pg. 44, Lines 5-18; Pg. 68, Lines 15-16.

[46] Ex. 17: Email from Rice to Carruth (Apr. 13, 2022); Ex. 10: Depo. of Rice, Pg. 73, Lines 18-25; Pg. 74, Lines 1-25; Pg. 75, Line 1.

[47] Ex. 18: Email from Carruth to Rice (Apr. 13, 2022); Ex. 10: Depo. of Rice, Pg. 75, Lines 2-10.

[48] Ex. 18: Email from Carruth to Rice (Apr. 13, 2022) (Purchase and Sale Agreement (emphasis original)).

Legalist raised no issue with Mesilla Valley being listed as the seller.[49]  Rice responded, "Cool.  I can go to the notary tmrw [sic] AM and FedEx it then[,]"and he asked, "Can we expect the $2.345M paydown or is there a holdback for other claimants, etc.?"[50]  Carruth replied,

> Mike and other Legalist folks have been working on use of proceeds, separately from me.
>
> The basic concept, though, is to use net proceeds to pay claims (including yours truly) and use the remaining net (around $1.8M) to complete the development.
>
> There is a take out of Legalist waiting in the wings for this to close, and Mike has sent those terms.[51]

Rice responded the next day, "Sent this AM," which confirmed he sent the release of lien document.[52]  Prior to responding, though, Rice testified he conferred with Jones and Cipriano to confirm the accuracy of Carruth's email, namely as to the "use of proceeds" "work[ed] on" by "Mike [Dixson] and other Legalist folks."[53]  Rice understood this email conveyed Carruth's *understanding* of the use of proceeds, which Carruth explained were "work[ed] on . . . *separately* from [him]," namely between Dixson, Jones, and Cipriano.[54]  Rice also testified he understood Carruth's "(including yours truly)" to mean Weycer Kaplan would be paid from the sales proceeds.[55]  By the "take out of Legalist waiting in the wings," Rice understood Legalist would be paid with funds from a refinance.[56]  Rice testified that he believed Carruth's email was consistent with what Jones and Cipriano explained to him based on their conversations with Dixson.[57]  Dixson (who was cc'd) understood this email to mean "using net proceeds [from the sale of Lot

---

[49] Ex. 10: Depo. of Rice, Pg. 75, Lines 20-25; Pg. 76, Lines 1-25; Pg. 78, Lines 1-21.
[50] Ex. 19: Email from Carruth to Rice (Apr. 13, 2022); Ex. 10: Depo. of Rice, Pg. 78, Lines 15-25; Pg. 79, Lines 1-17.
[51] Ex. 19: Email from Carruth to Rice (Apr. 13, 2022).
[52] Ex. 15: Email from Rice to Carruth (Apr. 14, 2022).
[53] Ex. 10: Depo. of Rice, Pg. 79, Lines 18-25; Pg. 80, Lines 1-11; Ex. 19: Email from Carruth to Rice (Apr. 13, 2022).
[54] Ex. 10: Depo. of Rice, Pg. 40, Lines 14-23; Pg. 81, Lines 6-9; Ex. 19: Email from Carruth to Rice (Apr. 13, 2022) (emphasis added).
[55] Ex. 10: Depo. of Brian T. Rice, Pg. 81, Lines 10-14; Ex. 19: Email from Carruth to Rice (Apr. 13, 2022).
[56] Ex. 10: Depo. of Rice, Pg. 81, Lines 15-25; Pg. 82, Lines 1-6; Ex. 19: Email from Carruth to Rice (Apr. 13, 2022).
[57] Ex. 10: Depo. of Rice, Pg. 82, Lines 15-19.

1A] to pay claims, pay all of the creditors, use remaining net [$1.8 million] to complete the development [Lot 3A]."[58]  Dixson testified, "We closed on Lot 1A.  We finished the portions of Lot 1A.  We . . . finished up a significant portion of Lot 3A, got it to a point where it was ready to get refinanced, and then began going in the route of refinancing the project with another company refinancing them."[59]  Dixson stated,

> We had to catch up with some old professional fees.  PDG had some outstanding bills that hadn't been paid in several months.  We had to get caught up.  We had to pa[y] like county fees and, you know, Secretary of State fees and that kind of stuff.  Then we also used a portion of this to purchase a property in Lakeway, Texas.[60]

Dixson identified the property in Lakeway, Texas as the "6 Candleleaf Property."[61]

   *c.   Use of Proceeds.*

12.   The Sellers Statement from the sale of Lot 1A dated May 26, 2022 shows that, following the sale, $1,916,558.82 was due to the seller, Mesilla Valley Ventures, LLC.[62]  The Seller Statement also shows a $75,000 payment to Weycer Kaplan for legal fees, among other similar payments to other creditors.[63]  A Chase bank statement for PDG's account shows a deposit on May 31, 2022 of $1,916,558.82 described as "Pro[c]eeds of Sale 510 South Telshor Blv[d]. . . . , and a $500,000 withdrawal described as "Online Domestic Wire Transfer . . . Doma Insurance Agency of Texas Inc . . . The Dixson Family Trust 6 Candleleaf[.]"[64]  Thus, PDG actually received the net proceeds, $1,916,558.82, from the sale of Lot 1A.[65]

---

[58] Ex. 13: Depo. of Dixson, Pg. 61, Lines 5-15.
[59] *Id.* at Pg. 61, Lines 18-24.
[60] *Id.* at Pg. 62, Lines 7-25.
[61] *Id.* at Pg. 89, Lines 23-25.
[62] Ex. 20: Seller's Statement, Lot 1A (May 26, 2022).
[63] A $50,000 payment to Ferguson Braswell Fraser Kubasta PC for legal fees; a $47,572.88 payment to New Mexico Real Estate Advisors, Inc. to pay off a lien; a $4,825.32 payment to R2 Contractors Specialty, Inc. to pay off a lien; a $70,981.70 payment to Utility Block Company, Inc. to pay off a lien; and a $6,350 payment to Partner Engineering and Science, Inc. to pay a survey invoice.  *See id.*
[64] Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022).
[65] *Id.*; *see also Plaintiffs' Third Amended Complaint*, Pgs. 8-9, ¶ 50 (Dkt. 97).

### C. *Filing of the Adversary, Conversion to Chapter 7, and Withdrawal of Weycer Kaplan.*

13.     On June 16, 2023, a month after Dixson's deposition by Rule 2004 exam in the PDG bankruptcy, Legalist filed this adversary solely against PDG and Dixson contending that it received no funds from the sale of Lot 1A.[66]  On July 13, 2023, this Court entered an Order on PDG's own Motion that converted the bankruptcy to Chapter 7 and appointed Trustee Ronald E. Ingalls.[67]  Given the conversion, Weycer Kaplan and Carruth withdrew as counsel.[68]

### IV.
### SUMMARY JUDGMENT ARGUMENT

14.     By the time Legalist filed this adversary, it knew where the proceeds from the sale of Lot 1A went (into the PDG bank account, as Dixson previously testified, and as was shown to him by Legalist's then-counsel)[69] and why the proceeds went there (because Legalist voluntarily released its lien on Lot 1A, as Rice later testified).[70]  Ignoring this, on February 23, 2024, Legalist amended its complaint to add Weycer Kaplan as a defendant and to realign PDG as a Plaintiff.

15.     Legalist has no injury that it can blame on anyone but itself.  Rice voluntarily released Legalist's lien on Lot 1A based on his communications with Legalist employees Jones and Cipriano, who, themselves, communicated with Dixson.[71]  Rice testified he made no effort to control PDG's use the sale proceeds from Lot 1A.[72]  And, because PDG received the Lot 1A sales

---

[66] *See Plaintiff's Original Complaint* (Dkt. 1), this Adversary; *see generally* Ex. 13: Depo. of Dixson.
[67] Ex. 22: *Order Converting Case* (Dkt. 271).  As grounds, which Legalist opposed, PDG noted incomplete Plan performance and Legalist's rejection of multiple offers to sell Lot 3A.  *See* Ex. 23: *Motion to Convert* (Dkt. 264).
[68] Ex. 24: *Motion to Withdraw* (Dkt. 277); Ex. 25: *Order Granting Motion to Withdraw* (Dkt. 283).
[69] Ex. 13: Depo. of Dixson, Pg. 62, Lines 7-25; *see also Plaintiff's Original Complaint*, Pg. 6, ¶ 40 (Dkt. 1).
[70] Ex. 10: Depo. of Rice, Pg. 52, Lines 1-25; Pg. 53, Lines 1-14.
[71] *Id.* at Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 83, Lines 13-25; Pg. 84, Lines 1-5.
[72] Ex. 10: Depo. of Rice, Pg. 52, Lines 1-25; Pg. 53, Lines 1-14.

proceeds into its Chase Bank account,[73] any injury to PDG was done by Dixson, who controlled the PDG bank account and who took out the funds to pay for the 6 Candleleaf Property.[74]

16.     The Plaintiffs' *Third Amended Complaint*, nonetheless, raises causes of action against Weycer Kaplan for Civil Conspiracy, Civil Contempt, and for Revocation of Weycer Kaplan's Retention Order and for Fee Disgorgement.[75]  Weycer Kaplan moves for summary judgment on these claims because Dixson testified it was *his* decision to transfer Lot 1A from PDG to Mesilla Valley (after Plan confirmation),[76] *he* negotiated the DIP Loan and the lien release with Legalist,[77] *he* negotiated the sale to LPC,[78] and the funds from the sale of Lot 1A went back into a PDG account that *he* controlled.[79]  Additionally, Weycer Kaplan moves for summary judgment on its affirmative defense of Attorney Immunity as to the claims brought against it by Legalist, because Weycer Kaplan has no liability to Legalist based on its representation of PDG.  Further, Legalist lacks standing to seek a revocation of Weycer Kaplan's Retention Order and, therefore, cannot make a claim for fee disgorgement.  PDG has no damages arising from Weycer Kaplan's representation of it, so a revocation of Weycer Kaplan's Retention Order and a disgorgement of its fees is wholly unwarranted.

---

[73] *See Plaintiffs' Third Amended Complaint* (Dkt. 97), Pgs. 8-9, ¶ 50.
[74] Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022); Ex. 13: Depo. of Dixson, Pg. 87, Lines 20-25; Pg. 88, Lines 1-25; Pg. 89, Lines 1-25.
[75] *See generally Plaintiffs' Third Amended Complaint* (Dkt. 97), Pgs. 32-33, Pgs. 37-38, Pgs. 38-39.
[76] Ex. 13: Depo. of Dixson, Pg. 36, Lines 12-24; Pg. 38, Lines 1-20; Pg. 39, Lines 8-9, 15-20; Pg. 40, Lines 1-5; Pg. 42, Lines 23-25.
[77] *Id.* at Pg. 34, Lines 2-25; Pg. 35, Lines 1-25; Pg. 36, Lines 1-2; Ex. 10: Depo. of Rice, Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 83, Lines 13-25; Pg. 84, Lines 1-5; Ex. 15: Email from Rice to Carruth (Apr. 14, 2022).
[78] Ex. 13: Depo. of Dixson, Pg. 44, Lines 5-18; Pg. 68, Lines 15-16.
[79] Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022); Ex. 13: Depo. of Dixson, Pg. 87, Lines 20-25; Pg. 88, Lines 1-25; Pg. 89, Lines 1-25.

**WEYCER, KAPLAN, PULASKI & ZUBER P.C.'S MOTION FOR SUMMARY JUDGMENT**
19820545v1
10660.217                                                                                                   **11**

### A. Attorney Immunity as to Legalist's Claims Against Weycer Kaplan.

17.    Weycer Kaplan has no liability to Legalist.  All Weycer Kaplan's actions took place within the scope of its representation of PDG.  Under Texas law, generally, "attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation."[80]  "Put differently, an attorney may be liable to nonclients only for conduct outside the scope of his representation of his client or for conduct foreign to the duties of a lawyer."[81]  Attorney immunity applies even to wrongful conduct performed by the lawyer in representing his client, so long as the conduct is not entirely foreign to the duties of an attorney.[82]  The analysis "focuses on the *kind* of conduct at issue rather than the *alleged wrongfulness* of said conduct[,]" and "[A] lawyer is not more susceptible to liability for a given action merely because it is alleged to be fraudulent or otherwise wrong."[83]  Weycer Kaplan represented PDG,[84] not Legalist.[85]  Rice testified it was Legalist's responsibility to protect *its* security interest in Lot 1A.[86]  The Plaintiffs' other allegations in its *Third Amended Complaint* attempt to allege, without evidence, that Weycer Kaplan aided Dixson in conduct that Dixson previously testified was his own, or by conveniently conflating Weycer Kaplan's conduct with Dixson's conduct, despite Plaintiffs alleging the conduct elsewhere was solely Dixson's or PDG's.[87]

---

[80] *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015) (internal quotations omitted) (citing *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); other citations omitted).

[81] *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018) (citing *Cantey Hanger, LLP*, 467 S.W.3d at 482).

[82] *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 767 (5th Cir. 2019)

[83] *Youngkin*, 546 S.W.3d at 681 (emphasis original) (citing *Cantey Hanger, LLP*, 467 S.W.3d at 483).

[84] Ex. 2: Email from Dixson to Carruth (Feb. 2, 2021); Ex. 6: *Order Granting Motion to Employ* (Dkt. 47).

[85] Ex. 10: Depo. of Rice, Pg. 36, Line 15.

[86] *Id.* at Pg. 36, Lines 2-18 ("They were not our lawyers.").

[87] *Compare Third Amended Complaint* (Dkt. 97), Pg. 6, ¶ 35 ("Jeff Carruth[] aided the Debtor in transferring Lot 1A to Debtor's insider, Mesilla Valley . . . ."), *and id.* at Pg. 7, ¶¶ 36 ("Mr. Carruth negotiated the sale of Lot 1A from Mesilla Valley to a third party."), *with id.* at Pg. 18, ¶ 112 ("Dixson, individually, and as an agent of PDG and Mesilla Valley, or on behalf of PDG and Mesilla Valley, orchestrated the transfer of Lot 1A from PDG to Mesilla Valley and then from Mesilla Valley to FSLRO.").

18.     In Paragraph 35 of the *Third Amended Complaint*, the Plaintiffs allege "Carruth[] aided the Debtor in transferring Lot 1A to Debtor's insider, Mesilla Valley,"[88] but Dixson previously testified, *he* decided to transfer Lot 1A to Mesilla Valley,[89] *he* represented both PDG and Mesilla Valley in that transaction, and *he* negotiated on their behalf.[90]   In Paragraph 36, similarly, the Plaintiffs allege, "Carruth negotiated the sale of Lot 1A from Mesilla Valley to a third party," and in Paragraph 39, Plaintiffs allege Weycer Kaplan represented Mesilla Valley in negotiation of the purchase and sale agreement for Lot 1A,[91] but again, Dixson previously testified *he* negotiated the sale of Lot 1A to LPC.[92]   That Carruth was involved in the drafting of the purchase and sale agreement (of which Legalist had a copy)[93] does not mean he represented Mesilla Valley.  But, even assuming Legalist's allegations against Weycer Kaplan are true, these allegations all relate to Weycer Kaplan's conduct in representing PDG, so Weycer Kaplan is protected by the Attorney Immunity Doctrine from Legalist's causes of action.

19.     These allegations are factually similar to those addressed in the Supreme Court of Texas's opinions in *Cantey Hanger, LLP v. Byrd* and *Youngkin v. Hines*, both of which applied the Attorney Immunity Doctrine and dismissed the non-client/plaintiffs' claims.[94]   In *Cantey Hanger*, Cantey Hanger's client received a plane in a divorce decree, and Cantey Hanger prepared the documents necessary for its transfer.[95]   In preparing these documents, Cantey Hanger used its client's former last name  and referred to her, allegedly wrongfully, as a "manager" of a company

---

[88] *Third Amended Complaint* (Dkt. 97), Pg. 6, ¶ 35; *see also id.* at Pg. 10, ¶ 60.
[89] Ex. 13: Depo. of Dixson, Pg. 36, Lines 12-24; Pg. 38, Lines 1-20; Pg. 39, Lines 8-9, 15-20; Pg. 40, Lines 1-5; Pg. 42, Lines 23-25.
[90] *Id.* at Pg. 46, Lines 20-23.
[91] *Third Amended Complaint* (Dkt. 97), Pg. 7, ¶¶ 36, 39.
[92] Ex. 13: Depo. of Dixson, Pg. 44, Lines 5-18; Pg. 68, Lines 15-16.
[93] Ex. 10: Depo. of Rice, Pg. 75, Lines 20-25; Pg. 76, Lines 1-25; Pg. 78, Lines 1-21.
[94] *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015); *Youngkin v. Hines*, 546 S.W.3d 675 (Tex. 2018).
[95] *Cantey Hanger, LLP*, 467 S.W.3d at 479-80.

awarded to her ex-spouse.[96]  The non-client/ex-spouse and his companies sued Cantey Hanger alleging "fraud, aiding and abetting, and conspiracy, asserting that Cantey Hanger falsified the bill of sale in order to shift tax liability for the" plane to the non-client/ex-spouse in violation of the divorce decree.[97]  The Court found, "Meritorious or not, the *type* of conduct alleged falls squarely within the scope of Cantey Hanger's representation of [its client] in the divorce proceedings[,]"[98] and that this conduct "was not foreign to the duties of an attorney," and was "protected by attorney immunity."[99]  Similarly in *Youngkin*, a non-client litigant alleged Youngkin (an adverse attorney) "knowingly participated in [a] fraudulent scheme to deprive [him] of his property," by entering a settlement agreement on behalf of his clients, "knowing they had no intention to comply," preparing a deed to transfer the property, and aiding another party to "wrongfully assert ownership over a portion of the property[.]"[100]  The Court, relying on *Cantey Hanger*,[101] found "Youngkin's conduct was directly within the scope of his representation of his clients, regardless of any disagreement over the substance of the settlement agreement," that "[i]t would strain the very existence of settlement agreements if a party could hold an opposing attorney liable for subsequently taking an action or position at odds with that party's understanding of the agreement[,]" and that, "[e]ven more concerning," "such a practice could impute a guarantee of the client's performance onto the attorney merely because he played a role in negotiating his client's agreement."[102]

---

[96] *Id.*
[97] *Id.* at 480-81 (among other causes of action not included in the opinion).
[98] *Id.* at 480 (emphasis original).
[99] *Id.* at 485.
[100] *Youngkin*, 546 S.W.3d at 678-79.
[101] *See generally id.* at 681-83.
[102] *Id.* at 682.

20.     Much like the non-client in *Youngkin*, Legalist is trying to pass its mistake onto Weycer Kaplan, though Rice testified there was no mistake,[103] and the Plaintiffs' own *Complaint* states Legalist released its lien on the basis of PDG's and Dixson's representations.[104]  Like the non-client/ex-spouse in *Cantey Hanger*, Legalist is trying to pass its resulting misfortune (that Dixson removed funds from the PDG account instead of reinvesting them into Lot 3A) onto Weycer Kaplan, even though Dixson testified those actions were his own.[105]  Borrowing from *Youngkin*, it was not Weycer Kaplan's responsibility to ensure Legalist understood the risk of the deal it made with Dixson, nor was it Weycer Kaplan's responsibility to ensure Dixson or PDG complied with the deal.  Carruth even sought to ensure Rice, also an attorney,[106] shared his understanding of the deal.[107]  Communicating with creditors is a fundamental part of representing debtors in bankruptcy.  The actions of Carruth and Weycer Kaplan were all well within the scope of their representation of PDG, and Weycer Kaplan is entitled to summary judgment on its affirmative defense of Attorney Immunity against the claims brought by Legalist.

## B.  Civil Conspiracy

21.     Weycer Kaplan did not conspire with Dixson to do anything.  It represented PDG during the pendency of its Chapter 11 bankruptcy and communicated with Dixson and Legalist in that capacity.  "Providing legal advice to a client is not illegal,"[108] nor is it fraud to explain to

---

[103] Ex. 10: Depo. of Rice, Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 52, Lines 2-25; Pg. 53, Lines 1-14, Pg. 83, Lines 13-25; Pg. 84, Lines 1-5; Ex. 15: Email from Rice to Carruth (Apr. 14, 2022).

[104] *Third Amended Complaint* (Dkt. 97), Pg. 8, ¶ 44 ("Based on PDG's fraudulent representation . . . ."); *id.* at Pg. 9, ¶ 50 ("[C]ontrary to Dixson's representations . . . ."); *id.* at Pg. 12, ¶ 70 ("Dixson did not use any of the Sale Proceeds to improve Legalist's collateral, as he had represented to Legalist previously.").

[105] Ex. 10: Depo. of Rice, Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 83, Lines 13-25; Pg. 84, Lines 1-5; Ex. 15: Email from Rice to Carruth (Apr. 14, 2022); Ex. 13: Depo. of Dixson, Pg. 36, Lines 12-24; Pg. 38, Lines 1-20; Pg. 39, Lines 8-9, 15-20; Pg. 40, Lines 1-5; Pg. 42, Lines 23-25; Pg. 61, Lines 16-17; Pg. 62, Lines 11-25.

[106] And, formerly a finance and restructuring associate.  *See* Ex. 10: Depo. of Rice, Pg. 14, Lines 2-25.

[107] Ex. 15: Email from Rice to Carruth (Apr. 14, 2022).

[108] *In re Uplift RX, LLC*, Adv. No. 21-3936, 2023 WL 5355353, at *19 (Bankr. S.D. Tex. 2023).

someone your understanding of a deal.[109]  This is a baseless cause of action, and Weycer Kaplan moves for its summary judgment.  The elements of civil conspiracy in Texas are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result."[110] Additionally, "civil conspiracy requires *specific intent* to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."[111]  "The gist of a civil conspiracy is *the injury* the conspirators *intended* to cause."[112]  "Thus, proof of a joint intent to engage in the conduct that resulted in the injury is not sufficient to establish civil conspiracy."[113]  For conspiracy allegations against attorneys, particularly in the context of fraud, "there must be some indication that the attorney agreed to the fraud."[114]  For an attorney to be held liable for conspiracy to defraud by assisting his client, "the attorney must have agreed *to the injury to be accomplished*, not merely the conduct ultimately resulting in injury."[115]

22.    By their *Third Amended Complaint*, Plaintiffs allege Weycer Kaplan, through Carruth, "together with Dixson . . . reached an agreement to sell Lot 1A," and "conspired to fraudulently transfer . . . Lot 1A to Mesilla Valley for no consideration."[116]  Plaintiffs also allege

---

[109] Ex. 15: Email from Rice to Carruth (Apr. 14, 2022).

[110] *First State Bank of Mesquite v. Bellinger & Dewolf, LLP*, 342 S.W.3d 142, 150 (Tex. App.—El Paso 2011, no pet.) (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968); *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 80 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

[111] *Id.* (emphasis added) (citing *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996); *A.H. Belo Corp. v. Corcoran*, 52 S.W.3d 375, 384 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)).

[112] *Greenberg Traurig*, 161 S.W.3d at 80 (emphasis added) (citing *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996)).

[113] *Id.* (citing *Juhl*, 936 S.W.2d at 644).

[114] *Id.* (citing *Bernstein v. Portland Savs. & Loan Ass'n*, 850 S.W.2d 694, 706 (Tex. App.—Corpus Christi 1993, writ denied), *overruled on other grounds by Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000)).

[115] *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 379 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (emphasis added) (citing *Chu v. Hong*, 249 S.W.3d 441, 446-47 (Tex. 2008)).

[116] *Plaintiffs' Third Amended Complaint* (Dkt. 97), Pg. 32, ¶¶ 201, 202; *but cf. In re Uplift RX, LLC*, Adv. No. 21-3936, 2023 WL 5355353, at *19 (Bankr. S.D. Tex. 2023) (finding an allegation against a defendant-attorney that "sprinkled" fraud-related language into a civil conspiracy claim did "not meet the heightened requirements of Federal Rule of Civil Procedure 9" and dismissing it pursuant to Federal Rule of Civil Procedure 12(b)(6))).

Carruth "facilitated the fraudulent transfer" and "negotiated the Purchase and Sale Agreement for Lot 1A[.]"[117] Paragraph 209 of the *Third Amended Complaint* notably only alleges "*Legalist* suffered damages as a direct result of the Defendants' alleged conspiracy to fraudulently transfer Lot 1A from PDG to Mesilla Valley," *not PDG*,[118] and that these damages are "the Sales Proceeds plus the amount paid to third-parties, by Southwestern, from the proceeds of the sale."[119] These are all allegations of Weycer Kaplan's *conduct*, but nowhere do the Plaintiffs allege Weycer Kaplan intended to cause their injury, which they allege is *Legalist's* loss of the sale proceeds.[120] Again, PDG received the net proceeds of $1,916,558.82 from the sale of Lot 1A.[121] The injury, though, was not caused by Weycer Kaplan, but was a result of Legalist's agreement with Dixson to release its lien on Lot 1A, and Dixson's subsequent use of the sale proceeds in PDG's account.

23.     It was always the intention to sell Lot 1A,[122] and PDG transferred it to Mesilla Valley *after confirmation*[123] to avoid other litigation in the Gateway Ventures bankruptcy, as Dixson testified.[124] Carruth provided Rice a copy of the Purchase and Sale Agreement for the sale of Lot 1A to LPC, and Rice raised no issue that it listed Mesilla Valley as the seller.[125] Any errant inclusion of language in the Purchase and Sale Agreement (again, for which Rice raised no issue)

---

[117] *Plaintiffs' Third Amended Complaint* (Dkt. 97), Pg. 32, ¶¶ 204, 205.; *but cf. In re Uplift RX, LLC*, 2023 WL 5355353, at *19 ("Providing legal advice to a client is not illegal.").

[118] Because, regardless of the transfer from PDG to Mesilla Valley, the sales proceeds went back into PDG's bank account, and Legalist had a claim to those proceeds in the PDG bank account, but it voluntarily released its lien. *See* Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022); Ex. 13: Depo. of Dixson, Pg. 87, Lines 20-25; Pg. 88, Lines 1-25; Pg. 89, Lines 1-25.

[119] *Plaintiffs' Third Amended Complaint* (Dkt. 97), Pg. 33, ¶ 209 (emphasis added).

[120] *Id.*

[121] Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022); *see also Plaintiffs' Third Amended Complaint* (Dkt. 97), Pgs. 8-9, ¶ 50.

[122] Ex. 7: *Order Approving First Amended Disclosure Statement* (Dkt. 118); Ex. 8: *First Amended Disclosure Statement* (Dkt. 116); Ex. 9: *Plan* (Dkt. 148). Per Dixson, the purpose of PDG was to purchase and sell Lot 1A. *See* Ex. 13: Depo. of Dixson, Pg. 17, Lines 3-13; Pg. 18, Lines 22-24.

[123] *Compare* Ex. 9: *Plan* (Dkt. 148) (effective date, April 1, 2022), *with* Ex. 16: Special Warranty Deed, Lot 1A, PDG to Mesilla Valley (Apr. 21, 2022).

[124] Ex. 13: Depo. of Dixson, Pg. 36, Lines 12-24; Pg. 38, Lines 1-20; Pg. 39, Lines 8-9, 15-20; Pg. 40, Lines 1-5; Pg. 42, Lines 23-25.

[125] Ex. 19: Email from Carruth to Rice (Apr. 13, 2022); Ex. 10: Depo. of Rice, Pg. 78, Lines 15-25; Pg. 79, Lines 1-17.

is not proof of a conspiracy.  Carruth also explained to Rice that, as he understood *Legalist's deal with Dixson*, creditors of PDG, including Weycer Kaplan, would be paid from the proceeds from the sale of Lot 1A, and Rice raised no issue with that either, because it was, apparently, the same information Rice was told by Legalist employees, Jones and Cipriano, who previously spoke with Dixson.[126]  Because there was never a conspiracy between Weycer Kaplan and Dixson to cause Legalist to voluntarily release its lien on Lot 1A to allow Dixson to use the proceeds from the sale of Lot 1A, this Court can enter summary judgment on the Plaintiffs' claim for civil conspiracy.

## C. Civil Contempt

24.     Weycer Kaplan did not violate the DIP Order nor is it in contempt.  "[T]he elements of civil contempt are '(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order.'"[127] "[C]ivil contempt is a 'severe remedy'" and "should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct."[128]  Here, Legalist and PDG allege Weycer Kaplan, Dixson, and PDG, violated the DIP Order by "fraudulently induc[ing] Legalist to grant a partial lien release and utiliz[ing] funds other than in accordance with the express terms of the DIP Order."[129]  Rice, though, voluntarily released Legalist's lien on Lot 1A to allow PDG to use the sales proceeds to develop Lot 3A to obtain a refinance to payoff

---

[126] Ex. 10: Depo. of Rice, Pg. 40, Lines 14-23; Pg. 81, Lines 6-14; Pg. 82, Lines 15-19; Ex. 19: Email from Carruth to Rice (Apr. 13, 2022).
[127] *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009) (emphasis removed) (citing *Fed. Deposit Ins. Corp. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995) (citing *Martin v. Trinity Indus.*, 959 F.2d 45, 47 (5th Cir. 1992))).
[128] *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (emphasis original) (citing *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).
[129] *Plaintiffs' Third Amended Complaint* (Dkt. 97), Pg. 37, ¶ 247.

Legalist.[130] Jones and Cipriano negotiated this deal with Dixson.[131] Rice placed no stipulation on the use of the proceeds from the sale of Lot 1A.[132] Legalist was well aware that Weycer Kaplan would receive payment for its legal fees from the sales proceeds.[133] And, PDG actually received the net proceeds from the sale of Lot 1A.[134]

25.     Legalist's conduct was inconsistent with the language of the DIP Order that the Plaintiffs cite in their *Third Amended Complaint* as the basis for their cause of action for Civil Contempt.[135] Under Texas law, "waiver is the 'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'"[136] Legalist waived any argument that Weycer Kaplan violated the DIP Order when it agreed with PDG to voluntarily release its lien (provided by the DIP Order) on Lot 1A. And, PDG has no argument that Weycer Kaplan violated the DIP Order, because PDG, through Dixson, made the deal with Legalist, and PDG, through Dixson, received the sale proceeds.[137] Weycer Kaplan, as bankruptcy counsel, cannot be held liable for its client's use of funds in its account.[138] Such is not wrongful nor is it contempt. Weycer Kaplan did not violate the DIP Order and moves this Court for summary judgment on the Plaintiffs' claim for Civil Contempt.

---

[130] Ex. 10: Depo. of Rice, Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 83, Lines 13-25; Pg. 84, Lines 1-5; Ex. 15: Email from Rice to Carruth (Apr. 14, 2022).
[131] Ex. 10: Depo. of Rice, Pg. 46, Lines 22-25; Pg. 47, Lines 1-25; Pg. 48, Lines 1-25; Pg. 49, Lines 1-16; Pg. 50, Lines 1-25; Pg. 51, Lines 1-25; Pg. 83, Lines 13-25; Pg. 84, Lines 1-5.
[132] Ex. 10: Depo. of Rice, Pg. 52, Lines 2-25; Pg. 53, Lines 1-14.
[133] *Id.* at Pg. 79, Lines 18-25; Pg. 80, Lines 1-11; Pg. 81, Lines 10-14; Ex. 19: Email from Carruth to Rice (Apr. 13, 2022).
[134] Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022); *see also Plaintiffs' Third Amended Complaint* (Dkt. 97), Pgs. 8-9, ¶ 50.
[135] *Plaintiffs' Third Amended Complaint* (Dkt. 97), Pg. 37, ¶ 246.
[136] *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 298 (5th Cir. 2010) (citing *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)).
[137] Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022).
[138] *See Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. App.—Dallas 1910, writ ref'd) ("[A]ttorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages.").

## D. *Revocation of Retention Order and Disgorgement of Fees*

26. Plaintiffs seek an order revoking the Order Granting Motion to Employ Weycer Kaplan and for disgorgement of the fees Weycer Kaplan incurred in representing PDG. The Plaintiffs base this on an allegation that Weycer Kaplan "represent[ed] non-debtor entities,"[139] which it did not do. It represented PDG,[140] and the proceeds from the sale of Lot 1A went into to PDG's bank account after the sale.[141] That Weycer Kaplan's services potentially benefited Mesilla Valley, a subsidiary of PDG,[142] does not warrant a revocation of the retention order or a disgorgement of fees. Dixson testified he used Mesilla Valley, after confirmation, to avoid other litigious parties (Cremins, Noorani),[143] and, nonetheless, Legalist was aware of Dixson's use of Mesilla Valley[144] and, again, PDG received the net proceeds from the sale of Lot 1A.[145] Weycer Kaplan is not the proximate cause of any damage to PDG, so PDG is not entitled to a revocation of the Order Granting Motion to Employ Weycer Kaplan, nor is it entitled to a disgorgement of fees. Legalist is not an interested party under the Order Granting Motion to Employ Weycer Kaplan and has no standing[146] to seek its revocation or the disgorgement fees. No judgment in Legalist's favor on this cause of action will redress any of its alleged injuries, and PDG is merely seeking a windfall for the services Weycer Kaplan provided to it. This Court can, therefore, enter

---

[139] *Plaintiffs' Third Amended Complaint* (Dkt. 97), Pg. 38, ¶¶ 252, 257.

[140] Ex. 2: Email from Dixson to Carruth (Feb. 2, 2021).

[141] Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022).

[142] Ex. 13: Depo. of Dixson, Pg. 36, Lines 12-24.

[143] *Id.* at Pg. 29, Lines 15-20; Pg. 40, Lines 1-5; Pg. 43, Lines 15-21.

[144] Ex. 18: Email from Carruth to Rice (Apr. 13, 2022) (Purchase and Sale Agreement); Ex. 10: Depo. of Rice, Pg. 75, Lines 20-25; Pg. 76, Lines 1-25; Pg. 78, Lines 1-21; Pg. 79, Lines 1-17.

[145] Ex. 13: Depo. of Dixson, Pg. 62, Lines 7-25; *see also Plaintiff's Original Complaint* (Dkt. 1), Pg. 6, ¶ 40 (Dkt. 1); Ex. 21: Chase Bank Statement for PDG Prestige Inc. (Apr. 30, 2022 – May 31, 2022).

[146] *Tenth Street Residential Ass'n v. City of Dallas*, 968 F.3d 492, 499 (5th Cir. 2020) (requiring for standing, (1) an injury in fact, "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) 'actual or imminent, not conjectural or hypothetical[;]'" (2) "a causal connection between the injury and the conduct complained of," in that it is "'fairly . . . trace[able] to the challenged action of the defendant[;]'" and (3) is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'") (quoting *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).

summary judgment on Plaintiffs' cause of action for Revocation of the Order Granting Motion to Employ Weycer Kaplan and for a disgorgement of fees.

### E. Conclusion

27.     Because all Weycer Kaplan's actions took place within the scope of its representation of PDG, Legalist's claims against Weycer Kaplan are barred by attorney immunity, and this Court can enter summary judgment on that affirmative defense.  Because there was not a conspiracy between Weycer Kaplan and Dixson to cause Legalist to voluntarily release its lien on Lot 1A to allow Dixson to use the proceeds from the sale of Lot 1A in the PDG bank account, Weycer Kaplan is entitled to summary judgment on the Plaintiffs' claim for Civil Conspiracy. Weycer Kaplan did not violate the DIP Order, and when Legalist released its lien on Lot 1A, Legalist waived any argument that Weycer Kaplan violated the DIP Order.  Since the proceeds from the sale of Lot 1A went back into the PDG bank account, PDG has no argument that Weycer Kaplan violated the DIP Order.  This Court can, therefore, enter summary judgment on the Plaintiffs' claim for Civil Contempt.  Finally, this Court can enter summary judgment on the Plaintiffs' claim for a Revocation of the Order Granting Motion to Employ Weycer Kaplan and for a disgorgement of Weycer Kaplan's fees because Weycer Kaplan is not the proximate cause of any damage to PDG, and because Legalist has no standing to seek revocation of the Order Granting Motion to Employ Weycer Kaplan nor plea for disgorgement of Weycer Kaplan's fees.

### PRAYER

Weycer Kaplan prays this Court enter an order granting it summary judgment on (1) its affirmative defense of Attorney Immunity as to Legalist's claims, (2) Plaintiffs' claim of Civil Conspiracy, (3) Plaintiffs' claim for Civil Contempt, and (4) Plaintiffs' claim for a Revocation of the Order Granting Motion to Employ Weycer Kaplan and for a disgorgement of its fees.

Respectfully submitted,

THOMPSON, COE, COUSINS & IRONS, L.L.P.

By:   */s/ Riley F. Tunnell*
      THOMAS A. CULPEPPER
      State Bar No. 05215650
      RILEY F. TUNNELL
      State Bar No. 24115879

Plaza of the Americas
700 N. Pearl Street, Twenty-Fifth Floor
Dallas, TX 75201-2832
Telephone: (214) 871-8233
Telecopy: (214) 871-8209
Email: tculpepper@thompsoncoe.com
        rtunnell@thompsoncoe.com

**ATTORNEYS FOR WEYCER, KAPLAN, PULASKI & ZUBER P.C.**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I served this pleading on the parties listed below, either by the CM/ECF of the Bankruptcy Court for the Western District of Texas pursuant to Bankruptcy Local Rule 7005 or by mail on May 28, 2025.

Legalist DIP GP, LLC
c/o Richard Corbi
The Law Offices of
Richard J. Corbi PLLC
1501 Broadway, 12th Floor
New York, NY 10036
***Plaintiff***

Frances A. Smith
Ross & Smith, PC
700 N. Pearl St., Suite 1610
Dallas, TX 75201
***Plaintiff's Counsel***

Richard Corbi
The Law Offices of
Richard J. Corbi PLLC
1501 Broadway, 12th Floor
New York, NY 10036
***Plaintiff's Counsel***

PDG Prestige, Inc.
c/o Ronald E. Ingalls
PO Box 2867
Fredericksburg, TX
78624-1927
***Plaintiff***

Ronald E Ingalls
PO Box 2867
Fredericksburg, TX
78624-1927
***Plaintiff's Counsel / Trustee***

Michael Dixson
c/o David P. Lutz
Martin, Lutz, Roggow, &
Eubanks, P.C.
P.O. Box 16495
Las Cruces, NM 88001
***Defendant***

Mesilla Valley Ventures, LLC
c/o David P. Lutz
Martin, Lutz, Roggow, &
Eubanks, P.C.
P.O. Box 16495
Las Cruces, NM 88001
***Defendant***

Michael Dixson Trust,
through its Trustee
Michael J. Dixson
c/o David P. Lutz
Martin, Lutz, Roggow, &
Eubanks, P.C.
P.O. Box 16495
Las Cruces, NM 88001
***Defendant***

Christina Dixson
6 Candleleaf Ct.
The Hills, TX
78738-1444
***Defendant***

Southwestern Abstract &
Title Company, Inc.
c/o Matthew P. Holt
Holt & Mason, P.C.
P.O. Box 16495
Las Cruces, NM 88004
***Defendant***

Entrada Development, LLC
c/o David P. Lutz
Martin, Lutz, Roggow, &
Eubanks, P.C.
P.O. Box 16495
Las Cruces, NM 88001
***Defendant***

Gateway Ventures, LLC
154 N. Festival
Building D
El Paso, TX 79912
***Defendant***

LPC Retail LLC
c/o Mark Curtis Taylor
Holland & Knight
100 Congress Ave., Suite 1800
Austin, TX 78701
***Defendant***

FSLRO 510 South Telshor
Las Cruces, LLC
c/o Mark Curtis Taylor
Holland & Knight
100 Congress Ave., Suite 1800
Austin, TX 78701
***Defendant***

*/s/ Riley F. Tunnell*
RILEY F. TUNNELL