```
 1                              VOLUME:    I

                                PAGES:     1-94
 2                              EXHIBITS:  1-7
 3           IN THE UNITED STATES BANKRUPTCY COURT
                  WESTERN DISTRICT OF TEXAS
 4                      EL PASO DIVISION
                BANKRUPTCY NO. 21-30107-CCGB
 5                        CHAPTER 7
 6    _____
 7    LEGALIST DIP GP, LLC and PDG PRESTIGE, INC.      )
 8    (By and through Ronald Ingalls, Chapter 7        )
 9    Trustee),                                        )
10                      Plaintiffs,                    )
11               vs.                                   )
12    MICHAEL DIXSON, Individually; MESILLA VALLEY     )
13    VENTURES, LLC; MICHAEL DIXSON TRUST THROUGH ITS  )
14    TRUSTEE MICHAEL J. DIXSON; CHRISTINA DIXSON;     )
15    SOUTHWESTERN ABSTRACT & TITLE COMPANY, INC.;     )
16    WEYCER KAPLAN PULASKI & ZUBER P.C.; ENTRADA      )
17    DEVELOPMENT, LLC; THE GATEWAY VENTURES, LLC;     )
18    LPC RETAIL, LLC, and FSLRO 510 SOUTH TELSHOR LAS )
19    CRUCES, LLC,                                     )
20                      Defendants.                    )
21    _____ )
22
23        REMOTE VIDEOTAPED DEPOSITION OF BRIAN T. RICE
24               THURSDAY, NOVEMBER 21, 2024
25                     10:32 AM (EST)

                                          Page 1
```

1

2

3

4                    REMOTE VIDEOTAPED DEPOSITION OF

5        BRIAN T. RICE, called as a witness by and on behalf

6        of Defendant Weycer, Kaplan, Pulaski & Zuber, P.C.,

7        pursuant to the applicable provisions of the

8        Federal Rules of Civil Procedure, before P. Jodi

9        Ohnemus (remotely), RPR, RMR, CRR, CA-CSR #13192,

10       NH-LSR #91, MA-CSR #123193, and Notary Public,

11       within and for the Commonwealth of Massachusetts,

12       at West Wareham, Massachusetts, on Thursday,

13       November 21, 2024, commencing at 10:32 a.m. (EST)

14

15

16

17

18

19

20

21

22

23

24

25

Page  2

```
 1      APPEARANCES:

 2

 3

 4                      (Via Videoconference)

 5                      THE LAW OFFICES OF RICHARD J.

 6                      CORBI PLLC

 7                      BY:  Richard Corbi, Esq.

 8                      151 Broadway, 12th Floor

 9                      New York, NY  10036

10                      646 571-2033

11                      Rcorbi@corbilaw.com

12                      For the Plaintiffs

13

14                      (Via Videoconference)

15                      THOMPSON, COE, COUSINS

16                      & IRONS, L.L.P.

17                      BY:  Thomas A. Culpepper, Esq.

18                      Riley F. Tunnell, Esq.

19                      700 N. Pearl Street, 25th Floor

20                      Dallas, TX  75201-2832

21                      214 871-8200

22                      Tculpepper@thompsoncoe.com

23                      Rtunnell@thompsoncoe.com

24                      For Defendant Weycer, Kaplan,

25                      Pulaski & Zaber, P.C.
```

Page 3

```
 1      APPEARANCES:   (CONT'D)

 2

 3

 4                      (Via Videoconference)

 5                      Ronald E. Ingalls, Esq.

 6                      504 N. Washington Street

 7                      PO Box 2867

 8                      Fredericksburg, TX  78624-1927

 9                      830 321-0878

10                      Ingallstrustee@gmail.com

11                      As Trustee for PDG Prestige, Inc.

12

13

14                      (Via Videoconference)

15                      MARTIN, LUTZ, ROGGOW

16                      & EUBANKS, P.C.

17                      BY:  David P. Lutz, Esq.

18                      2110 N. Main Street

19                      Las Cruces, NM  88001

20                      575 526-2449

21                      dplutz@questoffice.net

22                      For Michael Dixson, Michael Dixson

23                      Trust, and Mesilla Valley.

24                      Ventures

25

                                              Page  4
```

1     APPEARANCES:   (CONT'D)

2

3     ALSO PRESENT:

4                        (Via Videoconference)

5                        Richard M. Kaplan, Esq.

6                        Jeff Carruth

7                        Michael Dixson

8

9                        Kevin Gallagher, Video Operator

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    I N D E X

 2

 3      TESTIMONY OF:                    PAGE

 4

 5      BRIAN T. RICE

 6

 7      (By Mr. Culpepper)                 9

 8      (By Mr. Lutz)                     88

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page  6
```

```
 1                    E X H I B I T S

 2      EXHIBIT          DESCRIPTION              PAGE

 3

 4      Exhibit 1        email, 3/30/2022, 11:11 a.m.    56

 5      Exhibit 1A       Notice of Plan redline          58

 6                       (First Amended vs. Second

 7                       Amended)

 8      Exhibit 1B       Second Amended Plan of          62

 9                       Reorganization of PDG

10                       Prestige, Inc., dated March

11                       29, 2022

12      Exhibit 2        email, 3/30/2022, 11:20 a.m.    67

13      Exhibit 3        email, 4/12/2022, 5:38 p.m.     70

14      Exhibit 3A       Release of Lien Granted         72

15                       Pursuant to Bankruptcy Court

16                       Order (and With Respect to

17                       Lot 1A Only).

18      Exhibit 4        email, 4/13/2022, 1:43 p.m.     73

19      Exhibit 5        email, 4/13/2022, 12:43 p.m.    75

20      Exhibit 5A       Purchase and Sale Agreement,    76

21                       March 2022

22      Exhibit 6        email, 4/13/2022, 3:52 p.m.     78

23      Exhibit 7        email, 4/14/2022, 12:00 p.m.    83

24

25

                                          Page  7
```

1              VIDEO OPERATOR:  We are now going on the

2      record at approximately 10:32 a.m.  Today's date is

3      November 21st, 2024.  This is media unit No. 1 in

4      the recorded video deposition of Brian Rice, taken

5      in the matter of Legalist DIP, GP, LLC, et al,

6      filed in the US Bankruptcy Court, Western District

7      of Texas, El Paso Division.  Bankruptcy case number

8      is 21-30107-CGB.

9              This deposition is being held via Zoom

10     technology remotely.  My name is Kevin Gallagher.

11     I am the videographer.  The court reporter is Jodi

12     Ohnemus.  We're both from the firm of Veritext

13     Legal Solutions.

14             At this time the attorneys present in the

15     deposition will identify themselves and their

16     affiliations for the record.

17             MR. CULPEPPER:  I'm Tom Culpepper.  I

18     represent Weycer Kaplan, the defendant in this

19     case.  And Riley Tunnell is here with me.

20             MR. CORBI:  Richard Corbi from the law

21     offices of Richard J. Corbi, PLLC.  I represent

22     Legalist in this matter.

23             MR. LUTZ:  David Lutz.  I represent

24     Michael Dixson, the Michael Dixson Trust, and the

25     Messila Valley Ventures LLC in this matter.

                                                    Page 8

1          MR. INGALLS:  I'm Ron Ingalls.  I'm the

2     Chapter 7 trustee and also the attorney for the

3     trustee in this matter.

4          VIDEO OPERATOR:  And now our court

5     reporter will swear or affirm the witness and we

6     can proceed.

7          BRIAN T. RICE, having

8               satisfactorily been identified by

9               the production of a driver's license,

10              and being first duly sworn by the Notary

11              Public, was examined and testified as

12              follows to interrogatories

13    BY MR. CULPEPPER:

14         Q.   Mr. Rice, my name's Tom Culpepper, and as

15    you heard just a minute ago, I represent Weycer

16    Kaplan in a lawsuit that's been brought by

17    Legalist, as well as the bankruptcy trustee for PDG

18    Prestige.  Are you aware of that?

19         A.   Yes, sir.  Good morning.

20         Q.   All right.  And have you ever done this

21    before, given a deposition?

22         A.   No.

23         Q.   All right.  Are you a lawyer?

24         A.   Yes.

25         Q.   Are you familiar with the deposition

                                          Page  9

1          A.    No.

2          Q.    All right.   What did you do after you

3    graduated?

4          A.    I joined Brown Rudnick in Boston in their

5    restructuring and finance department.

6          Q.    Would that have been in 2012?

7          A.    Right.

8          Q.    All right.   And did you -- how long did

9    you work at Brown Rudnick?

10          A.    Until 2019.

11          Q.    For seven years?

12          A.    Yes, sir.

13          Q.    And did you always remain in the finance

14    and restructuring area?

15          A.    I did.

16          Q.    Okay.   And were you an associate during

17    those seven years?

18          A.    I was.

19          Q.    Okay.   And did you work in the bankruptcy

20    area of law?

21          A.    I did.

22          Q.    All right.   And did you handle cases for

23    debtors?   Creditors?   Both?

24          A.    Both, but principally creditors.

25          Q.    Okay.   Primarily creditors?

Page 14

```
 1          A.   Yes, sir.
 2          Q.   All right.  All right.  And did your --
 3     did your role change from 2020 moving forward to
 4     today?
 5          A.   Yes, sir.
 6          Q.   Can you walk me through the changes in
 7     your roles -- your role at Legalist since you began
 8     work there?
 9          A.   At the end of 2021 I moved from chief
10     compliance officer to chief operating officer; and
11     at the end of 2022 I moved from investment counsel
12     to corporate counsel; and at the end of 2023 I
13     moved from corporate counsel to general counsel.
14     And so those are my two current titles, COO and GC.
15          Q.   All right.  Let me make sure I've got
16     that.  So you currently are corporate counsel and
17     general counsel for Legalist?
18          A.   Currently general counsel and chief
19     operating officer.
20          Q.   Oh, and chief operating -- all right.
21          And you became chief operating officer at
22     the end of 2021?
23          A.   Yes, sir.
24          Q.   All right.  What's the -- explain to me
25     what the difference is first in the -- the
```

Page 20

```
 1      corporate counsel to general counsel.
 2           A.   With corporate counsel I was principally
 3      performing noninvestment-facing legal work for the
 4      company.  So everything related to the company as a
 5      company as opposed to the investments that the
 6      funds the company manages invest in.  And as
 7      general counsel I continued to perform that
 8      function while managing a transactions counsel that
 9      performs the investment-facing legal work for the
10      company.
11           Q.   So you're -- I guess the corporate counsel
12      reports to you now?
13           A.   Currently we don't have a corporate
14      counsel, but the transactions counsel reports to
15      me, yes, sir.
16           Q.   Fair enough.  All right.
17                And who would you report to as chief
18      operating officer?
19           A.   I report to Eva Shang, S-h-a-n-g, who is
20      Legalist's chief executive officer.
21           Q.   So Eva is her first name?
22           A.   Yes, sir.
23           Q.   All right.  And -- and how old a person is
24      Eva Shang, roughly?
25           A.   About 30.
```

Page 21

1          A.    They both live in San Francisco.

2          Q.    All right.  And -- and where do you

3     reside?

4          A.    West Wareham, Plymouth County,

5     Massachusetts.

6          Q.    And just so I -- give me an idea where --

7     is that near Boston?  Or where is that?

8          A.    It's about an hour south of Boston.

9          Q.    All right.  And Mr. Li you said works out

10    of Long Island, New York?

11         A.    Yes.

12         Q.    All right.  Now, let's go back to -- to

13    PDG and your involvement there.  You said -- you

14    previously told me you got involved after the

15    investment group had -- had approved the loan but

16    before it was approved by the bankruptcy court;

17    correct?

18         A.    That's my memory, yes.

19         Q.    All right.  And what was your

20    understanding about what you were going to do and

21    handle as it related to the loan made to PDG?

22         A.    My job was to negotiate the credit

23    agreement for the loan with the borrower and the

24    borrower's counsel.

25         Q.    Anything else?

                                              Page 28

1           A.    No.

2           Q.    So you were there to negotiate the credit

3      agreement with the borrower and the borrower's

4      counsel?

5           A.    Yes, sir.

6           Q.    And did you do that?

7           A.    I did.

8           Q.    And when -- when you say -- refer to

9      credit agreement, are you referring to the loan

10     itself?

11          A.    So the -- the economic and other terms of

12     the loan had already been agreed to in the term

13     sheet.

14          Q.    Okay.

15          A.    And so I was taking that and in essence

16     turning it into a loan agreement with the borrower.

17          Q.    Okay.  So you took the -- the term sheet

18     and negotiated it into a final loan agreement to be

19     executed by Legalist and the borrower?

20          A.    Yes, sir.

21          Q.    Okay.  And who executed the loan agreement

22     on behalf of Legalist?

23          A.    I would think it was our chief investment

24     officer.

25          Q.    Okay.  And who -- negotiated or -- excuse

Veritext Legal Solutions
800-336-4000

1  me -- who executed the loan agreement on behalf of

2  PDG Prestige?

3       A.   It must have been Mr. Dixson.

4       Q.   And what did you understand Mr. Dixson's

5  role was?

6       A.   Either CEO or sole member or -- he was in

7  charge of -- of the debtor, the borrower.

8       Q.   Got it.

9            So your understanding was Mr. Dixson was

10  in control of PDG Prestige and -- and had the

11  ultimate say on what PD [verbatim] Prestige was

12  going to do?

13       A.   I think I limited my, you know, concern

14  with his authority to sign the credit agreement,

15  which he had, on behalf of the borrower.

16       Q.   Correct.   And I understand.   What -- all

17  I'm getting at is, was it -- was it your

18  understanding, though, that he was the ultimate

19  authority for PDG Prestige?

20       A.   I think so.   It -- yeah, to the extent I

21  -- I had any kind of thought on that at the time.

22  I never interacted with anyone besides Mr. Dixson.

23       Q.   Okay.   And that was going to be my next

24  question.

25            So your -- your interactions as it related

Page 30

```
 1            A.   I don't believe there was a personal
 2       guarantee.
 3            Q.   Okay.  So it was a term loan secured by
 4       all of PDG's assets?
 5            A.   Yes, sir.
 6            Q.   All right.  And you believe it was for a
 7       period of eight -- approximately 18 months?
 8            A.   Yes, sir.
 9            Q.   All right.  And based on the -- on the
10       loan agreement, what was your understanding of what
11       Mr. Dixson was to do, if anything, with the money
12       from the loan?
13            A.   There was a prepetition lender to be
14       repaid.
15            Q.   Yes, sir.
16            A.   And the balance was to be used to develop
17       the underlying collateral, the underlying land that
18       secured the loan.
19            Q.   And can you describe for me what the
20       underlying land that secured the loan was?
21            A.   These were two un-- unimproved parcels of
22       land that were going to be developed into
23       commercial real estate.
24            Q.   Okay.  And are they -- is it -- is it your
25       understanding that those parcels were referred to
```

Page 34

1       as Lot 1A and lot 3A?
2           A.   Yes, sir.
3           Q.   Okay.  And that was the security for the
4       loan, those lots?
5           A.   All of the estate assets were security for
6       the loan --
7           Q.   Fair enough.
8           A.   -- including those two, yes.
9           Q.   Which included those two lots?
10          A.   Yes, sir.
11          Q.   All right.  And so your understanding was
12      the loan was used to pay off a debtor and then you
13      were to become the -- the debtor pursuant to your
14      loan agreement.
15          A.   To pay off a creditor --
16          Q.   A creditor?
17          A.   -- then we would become the creditor.
18          Q.   Good point.  Said that earlier.
19               All right.  And is it your understanding
20      that that part occurred; that it was used to pay
21      off a creditor?
22          A.   Yes, sir.
23          Q.   All right.  All right.  And the -- the
24      loan agreement gave you a security interest in Lot
25      1A and Lot 3A?

                                          Page 35

1          A.   Yes, sir.

2          Q.   Okay.  And was that your job to protect

3     that security interest?

4          A.   Once the -- once the loan agreement closed

5     and it was approved by the bankruptcy court, that

6     go-forward relationship with the borrower was run

7     by our investment team.

8          Q.   Well, let me put it in a different way,

9     then:  Was it Legalist's job to protect their

10    security interest?

11         A.   Yes.

12         Q.   Okay.  And the only reason I'm asking is,

13    it wasn't Weycer Kaplan's job to protect Legalist's

14    security interest.

15         A.   They were not our lawyers.

16         Q.   Correct.  They were the lawyers for PDG

17    Prestige, the debtor; correct?

18         A.   They were.

19         Q.   All right.  And was the -- what -- were --

20    were the -- was there anything to your knowledge

21    in the loan agreement or anything that denoted who

22    was going to control the PDG bank account?

23         A.   Not to my knowledge.

24         Q.   Okay.  So was it your understanding that

25    Mr. Dixson was in control of the PDG bank account

                                          Page 36

1      or accounts if there were more than one?

2          A.    Yes.

3          Q.    Now, you've previously told me about an

4      investment team that you mentioned previously.

5                Who were you referring to?

6          A.    At that time the -- the DIP strategy was

7      run by a gentleman named Nate Jones, Nathan Jones,

8      who had the title head of DIP underwriting.

9          Q.    Okay.  And was there anybody else

10     involved?

11         A.    He worked with Remy Cipriano --

12         Q.    Can you spell that?

13         A.    Ci -- C-i-p-r-i-a-n-o.

14               -- who -- at that time his title I believe

15     was underwriting coordinator.  So he assisted Mr.

16     Jones with the initial underwriting and then the

17     monitoring of the investments on this strategy.

18         Q.    Okay.  All right.  And so are Mr. Jones

19     and Mr. Cipriano still at Legalist?

20         A.    Nate Jones is not.  Remy Cipriano is.

21         Q.    And what's Mr. Cipriano's title today?

22         A.    I believe it's the same.

23         Q.    Underwriter coordinator?

24         A.    I believe so.

25         Q.    All right.  And do you know why Mr. Jones

Veritext Legal Solutions
800-336-4000

1        counsel.  When you refer to his counsel, are you

2        referring to Jeff Carruth at Weycer Kaplan?

3              A.   Yes, sir.

4              Q.   All right.  Did you deal with anyone other

5        than Jeff Carruth at Weycer Kaplan?

6              A.   I don't think so.

7              Q.   All right.  Is it your understanding that

8        -- that Mr. Jones and Mr. Cipriano had

9        conversations with Jeff Carruth?  Or do you know

10       one way or the other?

11             A.   It's possible.  Mr. Jones was an attorney.

12       But I suspect they would have -- I would have been

13       involved in those.

14             Q.   Okay.  So at least as you sit here today,

15       your understanding is you were the person at

16       Legalist who was dealing with Jeff Carruth at

17       Weycer Kaplan?

18             A.   Yes, sir.

19             Q.   All right.  Is it your understanding that

20       Mr. Jones and Mr. Cipriano were dealing with Mr.

21       Dixson?

22             A.   They were dealing with Mr. Dixson, yes.

23             Q.   All right.  And is it your understanding

24       that they were having conversations with Mr.

25       Dixson?

                                                Page 40

1    that conversation being about?

2         A.   It would either have been about the plan

3    or about Lot 1A.  I don't think I spoke to either

4    of them myself other than those two events after

5    the credit agreement was signed.

6         Q.   Okay.  And tell me, though -- and I

7    understand as you sit here today you don't recall

8    specifically whether -- you don't recall

9    specifically what your conversation was with Mr.

10   Dixson and Mr. Carruth; you just believe it was one

11   of those topics?

12        A.   I'm not sure whether I spoke to them about

13   the plan.  I know I spoke with them about -- I know

14   I spoke with them about Lot 1A.

15        Q.   Okay.  And what time did you speak to them

16   about Lot 1A?

17        A.   That would have been -- my memory is that

18   we -- roughly -- we closed the loan agreement in

19   the spring of '21.  The plan confirmation was in

20   the summer; and that the Lot 1A discussions were

21   closer to year end of '21.

22        Q.   Okay.  And -- and tell me what you recall

23   about your conversation with Mr. Dixson and Mr.

24   Carruth about Lot 1A at the end of 2021.

25        A.   They had reached out to the investment

                                          Page  46

1    team regarding their plan to sell Lot 1A and

2    reinvest the proceeds in the remaining -- the

3    remaining parcel of land, 3A.

4         So I spoke with -- and I recall this was a

5    phone call -- I spoke with Mr. Carruth and Mr.

6    Dixson on the -- the lien release they would need

7    by Legalist to effect the sale of Lot 1A.

8         Q.   Okay.  And did you speak to them on one

9    occasion or more than one occasion?

10        A.   I think I only had one phone call with

11   them --

12        Q.   Okay.

13        A.   -- on 1A.

14        Q.   And what can you tell me about that phone

15   call?  What do you remember?  Tell me what was

16   said.

17        A.   So we had had -- our -- Legalist had had

18   discussions with either Mr. Dixson or Mr. Dixson

19   and Mr. Carruth about their plan to liquidate 1A

20   and use the proceeds to develop 3A.

21        In connection with that, there was legal

22   paperwork that needed to be signed, specifically

23   the lien release.  And so after we spoke -- I spoke

24   internally with the investment team, I spoke to Mr.

25   Carruth and Mr. Dixson to get the specifics on what

Page  47

1          they needed us to sign, where to deliver it,
2          etcetera.
3               Q.    Okay.  I think I -- I gotcha.
4                     So your -- your memory is -- and when
5          you're talking about the team, are you talking
6          about Mr. Jones and Mr. -- Mr. -- Caprian-
7          [verbatim] -- make sure I pronounce his name right?
8          What was it again, Mr....
9               A.    Cipriano, yes, sir.
10              Q.    Cipriano.  I was going to say Capriano
11         [verbatim].  I apologize.
12                    When you say somebody spoke to the
13         investment team, are you referring to Mr. Jones and
14         Mr. Cipriano when you --
15              A.    Yes, sir.
16              Q.    Okay.  So your understanding is prior to
17         the lien -- the lien was ultimately released;
18         correct?
19              A.    Yes, sir.
20              Q.    Okay.  And your understanding is you spoke
21         with Mr. Jones?  Mr. Cipriano?  Or both?
22              A.    I would think both.
23              Q.    Okay.
24              A.    I don't remember the specific discussion,
25         but I -- I would guess I spoke with both of them

Page  48

1    about it.
2         Q.    Okay.    So you spoke to you believe both
3    Mr. Jones and Mr. Cipriano about the need to
4    release a lien; true?
5         A.    Yes, sir.
6         Q.    All right.    And is it a fair description
7    that your understanding was that Mr. Dixson had
8    spoken to them -- at least Mr. Dixson, I'm not --
9    we'll get into the specifics -- had spoken to Mr.
10   Jones, Mr. Cipriano, and/or both about what his
11   intentions were with Lot 1A and needing a release
12   of lien?
13        A.    Yes, sir.
14        Q.    All right.    You were not party to those
15   discussions?
16        A.    No, sir.
17        Q.    All right.    All right.    Do you know
18   whether Mr. Jones and/or Mr. Cipriano or both
19   discussed the plans related to Lot 1A solely with
20   Mr. Dixson or with -- with Mr. Dixson and Mr.
21   Carruth?    Do you know one way or the other?
22        A.    I don't know; no, sir.
23        Q.    All right.    Fair enough.
24             Can you tell me did they contact you to
25   fill you in on their discussion with Mr. Dixson

Veritext Legal Solutions
800-336-4000

1       about the need for a release of lien?

2               A.    I believe Mr. Carruth reached out to me --

3               Q.    Okay.

4               A.    -- and after getting his email, I went

5       back and discussed it with our team to get up to

6       speed, in essence.

7               Q.    Okay.   Okay.   And we'll walk through

8       those.   I just want to get your understanding

9       first.

10              So your understanding is Mr. Carruth sent

11      you some emails related to a release of lien.   And

12      was it -- was it fair to say that when you got that

13      you weren't -- you weren't in the loop at that

14      point?   You had to go get in the loop and talk to

15      Mr. Jones and Mr. Cipriano?

16              A.    Yes, sir.

17              Q.    Okay.   So you received an email from Mr.

18      Carruth about a release of lien and you then

19      proceeded to discuss that with Mr. Cipriano and Mr.

20      Jones.

21              A.    Yes, sir.

22              Q.    And what do you recall Mr. Jones and Mr.

23      Cipriano telling you in your conversation?

24              A.    They had discussed with Mr. Dixson

25      liquidating Lot 1A --

Page 50

1      Q.    Okay.

2      A.     -- and reinvesting the proceeds into Lot

3   3A.  And that was something we were willing to

4   consent to.  And so that was the -- kind of the

5   background, if you will, to going ahead and -- and

6   speaking with or emailing or both with Mr. Carruth

7   and I believe Mr. Dixson about procedurally the

8   paperwork they needed to effect that lien release.

9      Q.    Okay.  Understood.  So anything else you

10  recall about your conversations with Mr. Jones and

11  Mr. Cipriano other than Mr. Dixson wanted to sell

12  Lot 1A and put the proceeds into Lot 3A?

13     A.    I don't think so, no.

14     Q.    Okay.  All right.  And so you're -- is it

15  -- is it a fair statement that your role at that

16  point, then, was to put in place a release of lien

17  so that could take place?

18     A.    Yes, sir.

19     Q.    All right.  And, in fact, that's what you

20  did; correct?

21     A.    Yes, sir.

22     Q.    And you did -- you did -- your -- your

23  job, which was to effectuate the paperwork to

24  release the lien, based on your conversations with

25  Mr. Jones and Mr. Cipriano?

Page 51

1          A.    Yes, sir.

2          Q.    All right.   And there was no restrictions

3     on the release of the lien.

4          A.    Unless there were restrictions in the

5     paperwork itself, no --

6          Q.    Okay.  Were you aware of --

7          A.    -- I don't think so.

8          Q.    -- any restrictions in the paperwork

9     itself?

10         A.    No.  I haven't -- I haven't looked at the

11    lien release in some time, but I -- I don't believe

12    there were.

13         Q.    All right.  So your understanding, at

14    least, is, based on those discussions, you

15    effectuated the release of the lien.  And there

16    wasn't any written contractual agreement with Mr.

17    Dixson requiring him to use the funds from the sale

18    of Lot 1A in any particular way?

19         A.    Well, the credit agreement was still in

20    place, which, you know, had limitations around

21    what --

22         Q.    Yeah.

23         A.    -- money could be spent on, but the lien

24    release itself did nothing except release the lien.

25         Q.    That's all I'm getting at.   And I

1    understand there was a credit agreement.  Whatever
2    the credit agreement required it required.  But you
3    didn't do anything -- and no one asked you to do
4    anything additionally to effectuate an agreement
5    about the understanding you had based on your
6    conversations with Mr. Jones and Mr. Cipriano.
7         A.   No.  I just released the lien.
8         Q.   Okay.  And that's all I'm getting at.  You
9    weren't asking and you didn't ask to put something
10   together in writing that was going to bind Mr.
11   Dixson in some way to ensure that he used the
12   proceeds as you understood he was going to based on
13   your conversations with Mr. Jones and Cipriano.
14        A.   I did not.
15        Q.   Okay.  Have you seen people do that in --
16   in your experience?
17             MR. CORBI:  Objection as to form.
18        A.   In connection with a lien release?
19        Q.   Yes, sir.  Have -- you know, got a formal
20   written agreement about how the proceeds would be
21   utilized.
22        A.   I don't think I've done that myself, no,
23   sir.
24        Q.   And I understand you may not have done it,
25   but are you aware of that practice?

```
 1              A.    No, sir.
 2              Q.    Okay.  You've never seen anybody do that?
 3              MR. CORBI:  Objection.  He's already
 4        answered it.
 5              A.    No, sir.
 6              Q.    Okay.  All right.  All right.
 7              So is it fair to say that you put --
 8        released the lien.  And was it your expectation, as
 9        an officer for Legalist, that Lot 1A would be sold;
10        is that fair?
11              A.    We released it expecting it would be sold,
12        yes, sir --
13              Q.    Okay.  And --
14              A.    -- or we released it to allow it to be
15        sold, yes, sir.
16              Q.    Correct.  Understood.  And your
17        understanding was the proceeds were going to be put
18        into Lot 3A.
19              A.    Yes, sir.
20              Q.    Okay.  And is it your understanding we
21        wouldn't be here today if the proceeds would have
22        gone into Lot 3A?
23              A.    I understand they were not invested in 3A;
24        correct.
25              Q.    All right.  But your expectation was that
```

Page 54

1       conversations with Mr. Carruth -- let's start with

2       him -- after the sale took place and the funds went

3       into the PDG account?

4            A.   I don't think so, no.

5            Q.   Okay.  Did you have any conversations with

6       Mr. Dixson, to your knowledge, after the -- the

7       sale of Lot 1A and the -- the funds were put into

8       the PDG account?

9            A.   I don't think so.

10           Q.   All right.  Let's look at a few exhibits.

11                     MR. CULPEPPER:   Start with Exhibit 1.

12                     MR. CORBI:  Are you uploading these in the

13      chat box?

14                     MR. TUNNELL:  I'll email them afterwards.

15      These are -- this is still from -- from y'all's

16      production.  It is mostly stuff from y'all's

17      production.

18                     MR. CORBI:  I know, but I'm just -- I

19      understand that.  Is it going to be -- are you

20      going to share the screen or put it in the chat

21      box?

22                     MR. TUNNELL:  Share the screen.

23                     MR. CORBI:  Okay.  Thank you.

24                     (Exhibit 1, email, 3/30/2022, 11:11 a.m.)

25           Q.   All right.  I'm showing you what we've

                                          Page 56

```
 1      marked as Exhibit No. 1.
 2              MR. CULPEPPER:  Is there any way to get
 3      that thing off there?  Okay.
 4          Q.  And, you know, I'll represent to you it's
 5      an email from Jeff Carruth to you dated March 30th,
 6      2022, at 11:11 a.m.  And he's sending you two
 7      attachments.
 8              See that?
 9          A.  Yes, sir.
10          Q.  All right.  And one appears to be a
11      "Notice of Plan Redline"; and the second seems to
12      be a "Second Amended Chapter 11 plan."
13              Do you see that?
14          A.  Yes, sir.
15          Q.  All right.  Do you recall receiving this
16      email?
17          A.  I don't recall, but I don't have any
18      reason to think I didn't.
19          Q.  Okay.  And -- and just so you're aware,
20      the -- the document -- it doesn't have any Bates
21      labels on it.  They were produced to us without
22      Bates labels.  But this is a document that your
23      counsel or Legalist counsel provided to us.  So you
24      don't have any reason to believe this wasn't sent
25      to you at that time.
```

Page 57

1    you were involved in the negotiation of the plan

2    agreement.  Were you making changes and suggesting

3    changes to this plan of reorganization to Jeff

4    Carruth?

5        A.  I may have.

6        Q.  Okay.  Let me put it to you this way:  Is

7    it your understanding Mr. Carruth was sending you

8    redline changes and then a -- another document that

9    we'll look at in a minute, the -- the amended plan

10   -- because you were reviewing -- you were reviewing

11   it and offering your suggestions?

12       A.  I'm not sure whether I reviewed this

13   myself or sent it to the investment team, but he

14   was certainly sending it to Legalist for Legalist's

15   input, yes, sir.

16       Q.  Okay.  That's all I'm getting at.  He's

17   sending it to Legalist.  And you're the person he's

18   dealing with at Legalist; correct?

19       A.  Yes, sir.

20       Q.  All right.  As it relates to this plan of

21   reorganization, he's sending it to you for your

22   input to -- to get your approval of the plan;

23   correct?

24       A.  He's soliciting my client's input, yes,

25   sir.

Veritext Legal Solutions
800-336-4000

1       A.    I'm not sure whether we gave him comments
2    on the plan or were just told the changes that were
3    being made because of the other creditors'
4    objection.  I'm not sure.
5       Q.    Okay.  Fair enough.  All right.
6            MR. CULPEPPER:  And go ahead and go to
7    page 18.  This top -- the other.
8            Should be there, according to mine.
9    Paragraph 10.
10           MR. TUNNELL:  Yeah.  Right there.
11      Q.    Okay.  Is it -- you were -- or Legalist, I
12    guess, was aware that there was an effective date
13    obviously for the plan, correct?  Was going to be
14    an effective date?
15      A.    Yes, sir.  I see it in section 11.
16      Q.    All right.  And -- and the plan was going
17    to allow PDG to sell Lot 1A and Lot 3A after --
18    pursuant to the -- to the plan?
19            And I'm referring to the portion in blue
20    under paragraph 10 of Exhibit 1A.
21      A.    Yeah.  This says that they can sell 1A and
22    3A in compliance with the code.  That's how I'm
23    reading the second paragraph of section 10.
24      Q.    Okay.  So Legalist understood that the --
25    the plan that was being presented by Mr. Carruth on

                                          Page 61

1     behalf of his client, PDG, was going to allow PDG

2     to sell Lot 1A or Lot 3A free and clear without

3     notice to creditors and without the necessity of

4     bankruptcy approval; correct?

5            MR. CORBI:  Objection as to -- objection

6     as to form.

7        A.   I'm not sure I know that.  I -- I -- it

8     looks like the whole thing is qualified "without

9     contradiction of any portion of the code."  So if

10    the code required it, they couldn't do it.  If the

11    code didn't require it, then they could.

12        Q.   Well, in any event, you were aware of

13    paragraph 10 and you had -- Legalist didn't have

14    any objection to paragraph 10 which allowed the

15    lots to be sold?

16        A.   I don't believe we objected to this draft

17    language; no, sir.

18        Q.   Okay.  And we'll look at Exhibit 1B.  It's

19    the second amended plan.

20            (Exhibit 1B, Second Amended Plan of

21            Reorganization of PDG Prestige, Inc.,

22            Dated March 29, 2022.)

23        Q.   There it is.  So now the redlines are

24    taken out and this is the second amended plan.  If

25    you look at it, go back to the same -- I think it's

1    let's go on to Exhibit 3.

2              (Exhibit 3, email, 4/12/2022, 5:38 p.m.)

3         Q.    And Exhibit 3 again I'll represent to you

4    is an email chain that you produced or your -- your

5    counsel produced to us between you and Jeff

6    Carruth.

7              Do you see that?

8         A.    Yes, sir.

9         Q.    All right.    And on this email Mr. Carruth

10   sends an email to you, he copies Zach Campbell at

11   Legalist and Mr. Dixson and Jasmine Esnayder;

12   correct?

13        A.    Yes, sir.

14        Q.    And who's Zach Campbell?

15        A.    He's one of the investment managers at

16   Legalist.    He -- I believe he originated the -- the

17   investment.

18        Q.    Okay.    So your -- your understanding is

19   he's the one who originated the investment with

20   PDG?

21        A.    Yes, sir.

22        Q.    All right.    All right.    So in this email

23   he sends you a copy of proposed form of partial

24   release for the sale of Lot 1A; correct?

25        A.    I believe so, yes, sir.

1      Q.   All right.  And based on the testimony
2   you've previously given, is this the email where
3   you went to Mr. Jones and Mr. Cipriano to confirm
4   or to find out why this was coming to you?
5      A.   It may have been, or they may have -- this
6   may have been a subsequent -- a subsequent email,
7   but it's -- it's certainly that -- certainly that
8   set of -- set of events we were talking about, yes,
9   sir.
10      Q.   Okay.  And I -- just so I'm clear, the
11   only email that I've seen that were produced by
12   y'all that -- where he enclosed the release is
13   this.
14           And are you aware of another email?
15      A.   I don't think so.  I'm just not 100
16   percent sure that, you know, this date, April 12th,
17   was before rather than right after I had that
18   conversation.
19      Q.   Oh.
20      A.   I don't have any reason to think it is.
21   I'm just not 100 percent certain how everything
22   stacked up day to day in that part of time -- in
23   that period of time.
24      Q.   Understood.  Okay.  And I'm with you.  I
25   understand what you're saying.

Page 71

1           So in any event, either prior to this or

2     right after this is when you had your conversations

3     with Mr. Jones and Mr. -- is it -- it is Capriano,

4     isn't it? -- or Cipriano?

5          A.    Cipriano, yes, sir.

6          Q.    I'm sorry.  So either -- prior -- just

7     prior to this or after this is when you believe you

8     had your conversations with Jones and Cipriano that

9     you previously told me about?

10         A.    Yes, sir.

11         Q.    Okay.  All right.  All right.  So -- and

12    do you recall receiving an email enclosed --

13    attaching the partial release?

14         A.    I do, yes.  I remember this email.

15         Q.    All right.  And I'll go ahead and show you

16    3A, which is a copy of the release.

17             (Exhibit 3A, Release of Lien Granted

18             Pursuant to Bankruptcy Court Order (and

19             With Respect to Lot 1A Only).)

20         Q.    All right.  And 3A is a copy of the

21    release, do you recall -- proposed release.

22             Do you recall seeing that?

23         A.    Yes.  I don't have any reason to think

24    this isn't the version I'm thinking of, yes, sir.

25         Q.    All right.  And he enclosed also I guess a

Page  72

1    FedEx address for you to ship it to?

2              Did you see that in -- it was on the

3    attachments to Exhibit 3?  It would have been the

4    second attachment.

5         A.   Yes, sir.

6         Q.   Okay.  And did you execute that release

7    and send it on?

8         A.   I did.

9         Q.   All right.  And you were executing that

10   release based on your understanding that the

11   proceeds were going to be used to -- or put into

12   Lot 3A; correct?

13        A.   Yes, sir.

14        Q.   Okay.  All right.

15             MR. CULPEPPER:  So let's go to Exhibit 4.

16        Q.   And it's, again, just a continuation of

17   this email chain between you and Mr. Carruth.

18             (Exhibit 4, email, 4/13/2022, 1:43 p.m.)

19        Q.   And after -- if you just look at the

20   bottom -- Exhibit 4 again is a continuation of the

21   email chain -- do you recall receiving these

22   emails?

23        A.   (Witness reviews document.)  Yes, I -- I

24   don't know whether I saw it prepping for this

25   deposition -- you know, as part of the documents

Page 73

1      that were pulled for this deposition or I'm

2      remembering it from back then, but I know this

3      chain.   Yes, sir.

4          Q.    Okay.   Fair enough.   All right.

5                So Exhibit 4, after he sent you the

6      release on April 12th, 2022, you sent him an email

7      -- and "you" being -- you sent an email that same

8      day to Jeff Carruth and copied Michael Dixson and

9      Zach Campbell; correct?

10         A.    The next day, yes, sir.

11         Q.    All right.   And it says -- you asked "When

12     is the closing?"; correct?

13         A.    Yes, on the 12th.

14         Q.    All right.   And Mr. Carruth responded the

15     next day, saying "Trying to close as soon as

16     Friday"; correct?

17         A.    Yes, sir.

18         Q.    And then you asked for a copy of the "P&S

19     for 1A," meaning the purchase and sale agreement?

20         A.    Yes, sir.

21         Q.    Okay.   And so you wanted to see it and

22     review it?

23         A.    I am guessing that was something our

24     investment team wanted to see.   And I was, you

25     know, the attorney requesting it.   But, yes, that's

1         what we asked for.

2              Q.    All right.  And that same day -- we're

3         going to go on to the next exhibit, Exhibit 5.

4                   (Exhibit 5, email, 4/13/2022, 12:43 p.m..)

5              Q.    Exhibit 5 is a continuation of that email

6         chain between you and Mr. Carruth and you -- where

7         you requested Purchase and Sale Agreement for Lot

8         1A.  And that same day he sent you, on April 13th,

9         2022, an executed purchase-sale agreement; correct?

10             A.    Yes, sir.

11             Q.    All right.  And did you review -- or your

12        team or -- did Legalist review the document that

13        they requested?

14             A.    I don't have any reason to think we

15        didn't.

16             Q.    Okay.  Did you send any emails with any

17        concerns related to the sale agreement to your

18        knowledge?

19             A.    Not to my knowledge, no, sir.

20             Q.    Okay.  Did you, on behalf of Legalist,

21        raise any questions or concerns as it related to

22        the Purchase and Sale Agreement that was sent to

23        you on April 13th, 2022?

24             A.    Not to my knowledge, no.

25             Q.    All right.  So let's look at that

Veritext Legal Solutions
800-336-4000

1    document, the purchase and sale that was sent to

2    you.  It is Exhibit 5A.  It's the attachment.

3         (Exhibit 5A, Purchase and Sale Agreement,

4         March 2022.)

5         Q.   Specifically do you recall what you did

6    with Exhibit 5A when you received it from Jeff

7    Carruth on April 13th, 2022?

8         A.   No, sir.

9         Q.   Okay.  Did you provide it to the

10   investment team or to anyone else at Legalist?

11        A.   I'm sure I did, but I -- I don't remember

12   specifically doing it or who -- who I gave it to.

13        Q.   Okay.  Did you have any conversations with

14   Mr. Carruth about the Purchase and Sale Agreement

15   which is Exhibit 5A?

16        A.   Not that I remember; no, sir.

17        Q.   Did you have any conversations with anyone

18   at Legalist about the Purchase and Sale Agreement?

19        A.   I'm sure I did, but none that I

20   specifically remember; no, sir.

21        Q.   Okay.  And who do you believe those

22   conversations would have been with?

23        A.   Some members of the investment team we've

24   been talking about.

25        Q.   Okay.  And you see that the -- the name on

Page  76

1      A.   I'm not sure about that.  We were

2  certainly concerned about that issue, but I don't

3  know if I can say what all would not have concerned

4  us.

5      Q.   Well, then, let me put it this way, then:

6  Was there -- do you recall any discussion or

7  anything being raised about the fact that Mesilla

8  Valley was the seller --

9          MR. CORBI:   Objection to form.

10     Q.   -- for the Purchase and Sale Agreement?

11     A.   Not that I remember; no, sir.

12     Q.   Okay.  All right.  All right.  Let's

13  continue through the chain.  Let's go to Exhibit 6.

14  Again, it's just a continuation of that chain.

15         (Exhibit 6, email, 4/13/2022, 3:52 p.m..)

16     Q.   All right.  So after -- Exhibit 6 again is

17  just a continuation on April 13th, 2022, of the

18  email communications you had with Jeff Carruth

19  where Mr. Dixson and Mr. Campbell were copied.

20         Do you see that?

21     A.   Yes, sir.

22     Q.   All right.  So if you go to -- after you

23  asked for the -- the Purchase and Sale Agreement

24  for the sale of Lot 1A and were provided it, you

25  sent a -- an email -- again, dated April 13, 2022,

1    where you said you were going to go get a notary

2    and FedEx the release; correct?

3         A.    Yes, sir.

4         Q.    And then you -- you ask when can you

5    expect the $2.34 million paydown "...or is there a

6    holdback for other claimants?"

7              Do you see that?

8         A.    Yes, sir.

9         Q.    All right.   And Mr. Carruth responded to

10   your email again that same day on April 13 with the

11   same folks copied, carbon copied, and he said (as

12   read):

13              "Mike and other Legalist folks have been

14   working on the use of proceeds, separately from

15   me."

16              Did I read that correctly?

17        A.    Yes, sir.

18        Q.    All right.   And did -- did you consult

19   with Mr. Cipriano and Mr. Jones and -- and confirm

20   that Mr. Dixson had been discussing how the

21   proceeds were going to be used specifically?

22        A.    I must have because in my email I was

23   asking about a repayment rather than a

24   reinvestment.   So this must have been around when I

25   spoke with them about the common-play use of

1    proceeds.

2        Q.    Okay.   And so do you believe you confirmed

3    what Mr. Carruth said in the first sentence of --

4    of this email from Mr. Carruth to you?

5        A.    Yes.

6        Q.    Okay.   And do you believe that you

7    confirmed that email -- the first sentence of that

8    email with the two gentlemen I just mentioned, Mr.

9    Jones and Mr. Cipriano?

10       A.    Regarding reinvestment of the 1.8?   I do

11   remember that discussion, yes, sir.

12       Q.    Okay.  Did you confirm that with anyone

13   else about how -- what Mr. Dixson was telling

14   Legalist about the use of the proceeds?

15       A.    No.   No.  I mean, my -- you know, I was --

16   I was looking for confirmation that we at Legalist

17   wanted me to execute the lien release.  So that

18   would have been the extent of the discussion before

19   going off and doing that.

20       Q.    Okay.

21       A.    It would have been either this date or the

22   next day, I think.

23       Q.    Okay.  And then Mr. Carruth goes on and

24   said (as read):

25            "The basic concept, though, is to use net

Page 80

```
1        proceeds to pay claims (including yours truly) and

2        use the remaining net (around 1.8) to complete

3        development."

4               Did I read that correctly?

5        A.   Yes, sir.

6        Q.   And did you understand that Mr. Carruth

7   was giving you his understanding of how the funds

8   were going to be utilized?

9        A.   Yes, sir.

10        Q.   All right.  And when he said "pay claims,

11   (including yours truly)," you understood that he

12   was saying that the proceeds were to be used to pay

13   the Weycer Kaplan firm in part?

14        A.   Yes, sir.

15        Q.   All right.  And then the last sentence

16   says (as read):

17               "There is a take-out of Legalist waiting

18   in the wings for this to close, and Mike has sent

19   those terms."

20               Did you confirm that -- that Mike had sent

21   terms and -- to someone at Legalist?

22        A.   I'm not sure I did then.  I -- I know

23   there were active discussions about a refinancing,

24   though, at that time.

25        Q.   Okay.  So is it fair to say your
```

Veritext Legal Solutions
800-336-4000

1      understanding was that Mr. Carruth was -- in giving

2      you his understanding -- was -- that -- that -- on

3      that last sentence -- that there was going to be a

4      refinance and that money would be used to take out

5      Legalist?

6          A.    We were expecting a refinancing, yes, sir.

7          Q.    Okay.  And you're -- I think you -- you've

8      testified that you understood that Mr. Dixson was

9      having conversations with people at Legalist about

10     the terms of that refinancing and taking out of

11     Legalist?

12             MR. CORBI:  Object as to form.

13         A.    I remember -- I remember hearing about

14     those discussions, yes, sir.

15         Q.    Okay.  So Mr. Caruth's email was

16     consistent with what you understood from Mr. Jones

17     and Mr. Cipriano based on their conversations with

18     Mr. Dixson?

19         A.    I believe so, yes.

20         Q.    Okay.  All right.

21             And, again, I guess, just to confirm:

22     After receiving this email, Exhibit 6, did you have

23     conversations right after then you believe with Mr.

24     Jones or Mr. Cipriano or both?

25         A.    Right before or right after.  Certainly

Page 82

1 that time frame.  But it could have been one or the

2 other and not both.

3   Q. Got it.

4   And do you believe your conversations were

5 with both of those gentlemen?

6   A. I think so, yes.  I usually spoke to them

7 together.

8   Q. Okay.  And did you have any conversations

9 with anyone else at Legalist, to your knowledge,

10 related to these -- these series of email chains

11 and release of the lien?

12   A. Not that I remember.

13   Q. Okay.  All right.  So based on your

14 understanding, after having spoken with Mr. Jones

15 and Mr. Cipriano, you agreed to release the lien

16 and did release the lien?

17   A. Yes, sir.  I sent the FedEx myself.

18   Q. Okay.  And that would be Exhibit 7, I

19 believe, and that's again just a continuation of

20 the -- of the chain.

21   (Exhibit 7, email, 4/14/2022, 12:00 p.m.)

22   Q. And Exhibit 7 is that your email to Jeff,

23 copying Zach Campbell, Michael Dixson, and Jasmine

24 Esnayder, confirming you had sent the release of

25 lien?

Page 83

1      A.   Yes, sir.

2      Q.   Okay.  And that was done the following day

3  after you'd received the emails from Mr. Carruth on

4  the 13th -- April 13th, 2022?

5      A.   Yes, sir.

6      Q.   Okay.  So it -- is it fair to say, then,

7  everything, as far as you understood, went as

8  planned.  It's -- the only thing that didn't occur

9  as planned is that your contention is, is that Mr.

10  Dixson and/or PDG utilized the funds for purposes

11  other than the completion of the development of Lot

12  3A?

13          MR. CORBI:  Objection as to form.  Also,

14  you're asking for a legal analysis.

15      A.   Our contention is that he did not use them

16  to complete development, yes, sir.

17      Q.   Okay.  I mean, I -- what I'm getting at

18  is, that -- that's your understanding of -- of what

19  didn't occur based on your communications related

20  to the sale of Lot 1A.

21      A.   I don't think I had any communication

22  subsequent to actually sending the release.  So...

23      Q.   Yeah, that's what I'm getting at.  I guess

24  let me ask it a different way.  I'm -- I can

25  rephrase it.

Page 84

```
 1                    DEPONENT'S ERRATA SHEET

 2                  AND SIGNATURE INSTRUCTIONS

 3

 4              A review the transcript was not

 5    requested.

 6              The original of the Errata Sheet has

 7    been delivered to Richard Corbi, Esq.

 8              When the Errata Sheet has been

 9    completed by the deponent and signed, a copy

10    thereof should be delivered to each party of record

11    and the ORIGINAL delivered to Thomas Culpepper,

12    Esq., to whom the original deposition transcript

13    was delivered.

14

15

16              INSTRUCTIONS TO DEPONENT

17

18              After reading this volume of your

      deposition, indicate any corrections or changes to

19    your testimony and the reasons therefor on the

      Errata Sheet supplied to you and sign it.  DO NOT

20    make marks or notations on the transcript volume

      itself.

21

22

23

24    REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

25    COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.
```

Page 92

```
 1      Commonwealth of Massachusetts
 2      Middlesex, ss.
 3
 4
              I, P. Jodi Ohnemus, Notary Public
 5      in and for the Commonwealth of Massachusetts,
        do hereby certify that there came before me
 6      (remotely) on the 21st day of November, 2024, the
        deponent herein, who was duly sworn by me; that the
 7      ensuing examination upon oath of the said deponent
        was reported stenographically by me and transcribed
 8      into typewriting under my direction and control;
        and that the within transcript is a true record of
 9      the questions asked and answers given at said
        deposition.
10
11              I FURTHER CERTIFY that I am neither
        attorney nor counsel for, nor related to or
12      employed by any of the parties to the action
        in which this deposition is taken; and, further,
13      that I am not a relative or employee of any
        attorney or financially interested in the outcome
14      of the action.
15
                IN WITNESS WHEREOF I have hereunto set my
16      hand and affixed my seal of office this
        9th day of December, 2024, at Waltham.
17
18      _____

19

20              P. Jodi Ohnemus, RPR, RMR, CRR,
                CSR, Notary Public,
21              Commonwealth of Massachusetts
                My Commission Expires:
22              3/3/2028
23
24
25
```

Page 93

```
1        ATTACH TO DEPOSITION OF:  BRIAN T. RICE
         CASE:  LEGALIST vs. DIXSON, ET AL.
2
                         ERRATA SHEET
3
         INSTRUCTIONS:  After reading the transcript of your
4        deposition, note any change or correction to your
         testimony and the reason therefor on this sheet.
5        DO NOT make any marks or notations on the
         transcript volume itself.  Sign and date this
6        errata sheet (before a Notary Public, if required).
         Refer to page 92 of the transcript for errata sheet
7        distribution instructions.
8        PAGE LINE
         ____ ____      CHANGE: _____
9                       REASON: _____
         ____ ____      CHANGE: _____
10                      REASON: _____
         ____ ____      CHANGE: _____
11                      REASON: _____
         ____ ____      CHANGE: _____
12                      REASON: _____
         ____ ____      CHANGE: _____
13                      REASON: _____
         ____ ____      CHANGE: _____
14                      REASON: _____
         ____ ____      CHANGE: _____
15                      REASON: _____
         ____ ____      CHANGE: _____
16                      REASON: _____
         ____ ____      CHANGE: _____
17                      REASON: _____
18              I have read the foregoing transcript of
         my deposition and except for any corrections or
19       changes noted above, I hereby subscribe to the
         transcript as an accurate record of the statements
20       made by me.

21       _____
         BRIAN T. RICE
22
                    Subscribed and sworn to before me
23       this _____ day of _____, 2024.
24       _____
         Notary Public
25       My Commission Expires:

                                            Page 94
```

1   Rcorbi@corbilaw.com

2                               December 9, 2024

3   Legalist DIP GP, LLC, Et Al. v. Dixson, Michael, Et Al.

4   DEPOSITION OF: Brian T. Rice (# 7014725)

5        The above-referenced witness transcript is

6   available for read and sign.

7        Within the applicable timeframe, the witness

8   should read the testimony to verify its accuracy. If

9   there are any changes, the witness should note those

10  on the attached Errata Sheet.

11       The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14       According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18                          Yours,

19                          Veritext Legal Solutions

20

21

22

23

24

25