1        IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2                 EL PASO DIVISION
IN RE:              ) Chapter 11
3  PDG PRESTIGE, INC.,   ) Case No. 21-30107
    Debtor.         )
4

5             ------------------------
        ORAL and VIDEOTAPE DEPOSITION OF
6               MICHAEL DIXSON
              May 16, 2023
7                 Volume 1
             ------------------------
8

9       ORAL DEPOSITION OF MICHAEL DIXSON, Volume 1,

10  produced as a witness at the instance of Legalist, and

11  duly sworn, was taken in the above-styled and numbered

12  cause on the May 16, 2023, from 10:08 a.m. to 2:57

13  p.m., before Dana Shapiro, CSR, in and for the State of

14  Illinois, reported by machine shorthand, at 5301

15  Southwest Parkway, Suite 400, Austin, Texas 78735,

16  pursuant to the Federal Rules of Civil Procedure and

17  any provisions stated on the record or attached hereto.

18

19

20

21

22

23

24

25

PRODUCTION WKPZ 011 - 1

1                    A P P E A R A N C E S

2

3      FOR LEGALIST:

4      MR. RUSSELL W. MILLS
        MS. GWEN WALRAVEN
5      BELL NUNNALLY & MARTIN LLP
        2323 Ross Avenue, Suite 1900
6      Dallas, Texas 75201
        214-740-1400
7      rmills@bellnunnally.com
        gwalraven@bellnunnally.com
8
        FOR THE DEBTOR:
9
        MR. JEFF CARRUTH
10     WEYCER, KAPLAN, PULASKI & ZUBER, P.C.
        3030 Matlock Road, Suite 201
11     Arlington, Texas 76015
        214-552-7242
12     jcarruth@wkpz.com

13
        FOR THE DEPONENT:
14
        MR. DAVID P. LUTZ
15     MARTIN & LUTZ, P.C.
        2110 North Main Street
16     Las Cruces, New Mexico 88001
        575-526-2449
17     dplutz@qwestoffice.net

18     ALSO PRESENT:
        MR. CHRIS WREN
19     MR. STEPHEN PINKSTON, the videographer

20

21

22

23

24

25

PRODUCTION WKPZ 011 - 2

LEXITAS

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 3 of 31                    Pages 3

Michael Dixson

```
 1                         INDEX

 2                                              PAGE

 3   Appearances....................................2

 4   MICHAEL DIXSON VOLUME 1

 5         Examination by MR. MILLS..................4

 6   Signature and Changes.........................179

 7   Reporter's Certificate........................181

 8                        EXHIBITS

 9   NO.                 DESCRIPTION             PAGE
     No. 1                motion                 29
10   No. 2                motion                 29
     No. 3             loan agreement            30
11   No. 4                response               50
     No. 5            warranty deed              50
12   No. 6                 email                 54
     No. 7                 email                 56
13   No. 8                 deed                  66
     No. 9                 email                 67
14   No. 10             assignment               67
     No. 11              statement               69
15   No. 12              stipulation             73
     No. 13               banking                74
16   No. 14               banking                76
     No. 15               banking                77
17   No. 16             Chase account            87
     No. 17             Chase account           103
18   No. 18             Chase account           111
     No. 19             Chase account           119
19   No. 20                Check                120
     No. 21             Chase account           125
20   No. 22             Chase account           130
     No. 23             Chase account           131
21   No. 24               checks                132
     No. 25             Chase account           138
22   No. 26             Chase account           142
     No. 27             Chase account           143
23   No. 28             Chase account           150
     No. 29             Chase account           151
24   No. 30             Chase account           154
     No. 31                MOR                  156

25
```

1          THE VIDEOGRAPHER:  Today's date is May 16,

2    2023.  The time is 10:06 a.m. Central.  We are on the

3    record.  This is the deposition of Michael Dixson.  You

4    may swear in the witness.

5                    (WHEREUPON, the witness was duly

6                    sworn.)

7                    MICHAEL DIXSON,

8    called as a witness herein, having been first duly

9    sworn, was examined and testified as follows:

10                   EXAMINATION

11   BY MR. MILLS:

12        Q.     Good morning, Mr. Dixson.  My name is

13   Russell Mills.  I represent Legalist, who is the DIP

14   lender in this case here, which is In Re: PD Prestige

15   pending in Western District Bankruptcy Court.  You are

16   here today for deposition.  So the first thing I would

17   like to do is talk with you just very briefly about

18   sort of ground rules for the deposition if you will.

19   So you have been deposed before I take it?

20        A.     Twice.

21        Q.     Twice in your life?

22        A.     Uh-huh.

23        Q.     So you are familiar with the process.  You

24   have been sworn in by Madam court reporter here, and

25   you will testify today just as if you are in front of a

PRODUCTION WKPZ 011 - 4

LEXITAS

23-03004-cgb Doc#139-13 Filed 05/28/25 Entered 05/28/25 18:09:38 Exhibit 13.
Deposition Transcript of Michael Dixson Pg 5 of 31                    Pages 14

Michael Dixson

```
1          Q.      What happened in the one in which you were
2    a defendant or what was the outcome?
3          A.      It's on appeal.  I don't know.
4          Q.      So that's currently --
5          A.      Yes.
6          Q.      -- ongoing?
7          A.      Yes.
8          Q.      Let me ask you.  What about the debtor PDG,
9    let me ask you first what's your title with PDG, the
10   debtor?
11         A.      President.
12         Q.      Who are the other officers and directors of
13   PDG?
14         A.      Just me.
15         Q.      Okay.  Who are the equity owners or who
16   owns the stock in PDG the debtor?
17         A.      Me.
18         Q.      Only?
19         A.      Only.
20         Q.      Who are its employees?
21         A.      Me.  Currently none.  There is no
22   employees.
23         Q.      So when you set it up, was it you were the
24   sole owner and the sole equity owner, correct?
25         A.      Uh-huh.
```

PRODUCTION WKPZ 011 - 14

```
 1        A.    No.

 2        Q.    Cool.

 3              So tell me where then did you acquire the

 4   land for Lot 1A?

 5        A.    From Sunshine Partners.

 6        Q.    Who was Sunshine Partners?

 7        A.    Real estate developer out of California.

 8        Q.    When was that?

 9        A.    2017 or '18.

10        Q.    Did you -- like your other developments,

11   did you set up PDG the debtor for the purpose of

12   acquiring title to that?

13        A.    Yes.

14        Q.    How was PDG the debtor capitalized?

15        A.    Through me.

16        Q.    Did you contribute capital to PDG the

17   debtor?

18        A.    Yes.

19        Q.    What was that?

20        A.    I don't know off the top of my head.

21        Q.    So it was capital, but you don't know what

22   it was?

23        A.    It was cash.

24        Q.    Cash.  Okay.  All right.  How much cash?

25        A.    I don't know.
```

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson Pg 7 of 31                    Pages 18

Michael Dixson

```
 1          Q.     You set it up '17 or '18, and you bought

 2    this property.  At that time was it developed?

 3          A.     Yes.

 4          Q.     Was it ever developed -- did you develop it

 5    more I guess is the question during the time that PDG

 6    owned it?

 7          A.     I don't know what you mean by develop it

 8    more.

 9          Q.     Sorry.  That's probably my inartful use of

10    the word.

11                 Did the structure change in any way?  Did

12    you add to the Lot 1A, the property, the improvement on

13    Lot 1A?

14          A.     You are asking like two different

15    questions.

16          Q.     Okay.  What state was it in when you bought

17    it?

18          A.     It was a fully developed restaurant when I

19    bought it.

20          Q.     So what did you add to it, if anything?

21          A.     Nothing.

22          Q.     You just bought it to hold it then to sell

23    it basically?

24          A.     That's right.

25          Q.     Good.  All right.
```

```
 1              A.      I don't know what you are asking.  Can you
 2    repeat the question.
 3              Q.      Two questions.  One, the first one was
 4    describe to me your need for operating capital in the
 5    bankruptcy.  You borrowed money in the bankruptcy,
 6    correct?
 7              A.      Correct.
 8              Q.      The debtor did?
 9              A.      Yes.
10              Q.      Describe to me the need for it.  What did
11    you need it for?
12              MR. CARRUTH:  Objection, form.
13    BY MR. MILLS:
14              Q.      Go ahead.
15              A.      The operating capital portion of it?
16              Q.      Uh-huh, operating capital.
17              A.      Salaries to pay, mortgages to pay, rents to
18    pay, utilities, typical operating stuff.
19              Q.      Did you need it for other purposes?
20              A.      The rest of the money was used to put back
21    into re-developing the property.
22              Q.      So there was TGV.  We will set that aside
23    for right now.
24              A.      We're talking about TGV.  I thought we were
25    talking about PDG.
```

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixon  Pg 9 of 31                    Pages 26

Michael Dixon

```
 1   yes.
 2          Q.      Let me make sure I have this straight.
 3   After the bankruptcy was filed, you needed money to, as
 4   you said, scrape the building that was --
 5          A.      No.
 6          Q.      Okay.  Try again.
 7          A.      I needed money.
 8          Q.      Help me through it.
 9          A.      I needed money to pay off the existing
10   loan, which is encumbered both Lots 1A and 3A, which is
11   the debtor's property.  We paid off that loan with
12   Century Bank or City Bank.  We then took a portion of
13   that money and put it into the development of the rest
14   of the property.  So paid off the loan that we had
15   existing, took an allocation of those funds.  I don't
16   know what they are off the top of my head, put them
17   into Lot 1A to scrape the building, re-pave it, new
18   light poles, new landscaping, all of that good stuff,
19   scrape it and bring it back.  Then put the other money
20   into Lot 3A to get the site work done, retaining walls
21   build, utility to the site and go from there.
22          Q.      And the G&A?
23          A.      And G&A.
24          Q.      So those four uses?
25          A.      Yes.
```

```
 1    negotiations or Mr. Carruth's negotiations with

 2    Legalist.  I asked you earlier basically how did you

 3    come to know Legalist.  Where did this loan originate?

 4    Did you or Mr. Carruth go to Legalist?  Did you seek

 5    them out and say, "Hey, we want to borrow money?"

 6         A.    No.

 7         Q.    How did that happen?

 8         A.    They called me.

 9         Q.    Who called you?

10         A.    Legalist.

11         Q.    Who at Legalist called you, if you

12    remember?

13         A.    Zach something or other.

14         Q.    So this Zach calls you and says what?

15         A.    "See that you have recently filed for

16    bankruptcy.  We do debtor-in-possession financing.

17    What -- can we give you a loan?"  Basically.

18         Q.    So were you interested in that?  Had you

19    spoken to other people about a loan?

20         A.    We had.  I was in negotiations with two

21    other groups at the time.

22         Q.    Did you find Legalist's terms more

23    competitive?

24         A.    I -- I after speaking with Eva, the CEO of

25    the company, on the second phone call, I thought they
```

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 11 of 31                    Pages 35

Michael Dixson

1    would be -- since the process was going to be pretty

2    hard.  I thought they were going to be much easier to

3    work with than the other two groups we had.  The terms

4    were all pretty relative.

5           Q.      Eva is Eva -- do you remember her last

6    name?

7           A.      Shane, I believe.

8           Q.      So you had two phone calls with them; is

9    that right?

10          A.      I had.

11          Q.      More?

12          A.      Hundreds of phone calls with them.

13          Q.      Hundreds of calls.  Who did you deal with?

14   Eva?  Ms. Shane?

15          A.      Eva, Zach, Nate, and Brian Rice.

16          Q.      So over those phone calls you came to an

17   agreement at some point I gather, right?

18          A.      Yes.

19          Q.      That's what resulted in this credit

20   agreement, right?

21          A.      The phone calls?

22          Q.      The terms that you discussed in those phone

23   calls, right, were finally reflected in this credit

24   agreement?

25          A.      It came through a term sheet first, which

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 12 of 31

Michael Dixson                                                      Pages 36

1    we had blessed before we move forward with this

2    actually.

3         Q.    And so then your counsel filed a motion to

4    approve that agreement, and the court approved it.  You

5    saw that order there earlier that resulted, right?

6         A.    I believe so, yes.

7         Q.    That was on April 12, 2021 when that DIP

8    order -- what we will call the DIP order was entered?

9    That's Exhibit 2, the DIP order April 12, 2021, okay,

10   right?

11        A.    Yes.

12        Q.    Who was Mesilla Valley?  M-E-S-I-L-L-A

13   Valley.  The question was who is Mesilla Valley

14   Ventures?

15        A.    A single purpose entity.

16        Q.    Owned by who?

17        A.    PDG Prestige.

18        Q.    PDG Prestige owns all of the equity of

19   Mesilla Valley?

20        A.    And Michael Dixson.

21        Q.    Equally?

22        A.    I'm not sure.

23        Q.    The two of you own Mesilla Valley?

24        A.    Correct.

25        Q.    The debtor?

1    about.

2          Q.      Lot 1A?

3          A.      Yes.

4          Q.      So you set it up to develop a -- not Lot

5    1A, but the property that's next to it?

6          A.      700 South Telshor.

7          Q.      Now, who owned 700 South Telshor?

8          A.      Sears.

9          Q.      What was located there?

10         A.      Sears.

11         Q.      Sears?  Vacant Sears store?

12         A.      Yes.

13         Q.      Had you talked to Sears about buying it?

14         A.      Yes.

15         Q.      Had they agreed to sell it?

16         A.      Yes.

17         Q.      So did they ever sell it to you?

18         A.      As of today, no.

19         Q.      Why not?  What happened there?

20         A.      They are still waiting on approvals.

21         Q.      Okay.  So you set this up, this Mesilla

22   Valley as you say for the purpose of buying and taking

23   title to this vacant Sears store owned by Sears?

24         A.      Correct.

25         Q.      But that fell through?

PRODUCTION WKPZ 011 - 38

```
 1    Pakistani parties; is that what you said?

 2          A.      Correct.

 3          Q.      What's that a reference to?  The Noorani

 4    group?

 5          A.      All of those guys from TGV.

 6          MR. MILLS:  N-O-O-R-A-N-I.

 7    BY MR. MILLS:

 8          Q.      But so they were in TGV though, which is

 9    different than PDG, right?

10          A.      They were also in PDGP.

11          Q.      Are they?  How is that?

12          A.      They are creditors listed on the PDGP

13    notices.

14          Q.      So PDG owed Nooranis?

15          A.      PDGP doesn't owe them a dime.

16          Q.      I'm sorry.  I thought I asked -- I thought

17    my point was Noorani had nothing to do with PDG, but

18    you said they were on PDG's schedules as creditors?

19          A.      They are on the notices.  I don't know --

20    they are not creditors by any means, but they are on

21    the notices.

22          Q.      Did they ever appear in the PDG case

23    through their counsel or otherwise?

24          A.      That would be a question for Mr. Carruth

25    not me.  I'm not sure.
```

```
1          A.      Are you referring to Las Cruces?

2          Q.      Yes.  PDG the debtor --

3          A.      Right.

4          Q.      -- did they ever file a lien on any PDG the

5     debtor property --

6          A.      I mentioned to you --

7          Q.      -- direct?

8          A.      Yes, through TGV.

9          Q.      Well, that's no but.

10         A.      It's a no then.

11         Q.      They filed it on the TGV property?

12         A.      Correct.  Yes.

13         Q.      So --

14              THE VIDEOGRAPHER:  I'm sorry to interrupt.  Is

15    your arm maybe on your microphone?

16              MR. MILLS:  Maybe.  Sorry about that.

17              THE VIDEOGRAPHER:  I'm getting arm rustling.

18    BY MR. MILLS:

19         Q.      So why -- when did you decide -- who

20    decided that there would be a transfer of Lot 1A from

21    PDG to Mesilla Valley?

22         A.      Why -- or could you repeat.

23         Q.      Who decided there would be a transfer of

24    Lot 1A from PDG to Mesilla Valley?

25         A.      Me.
```

PRODUCTION WKPZ 011 - 42

1          Q.      Okay.  And why did you decide that?

2          A.      So the reasons I just gave you.

3          Q.      Because there was a tank for lack of a

4     better word.  You were trying to get it away from past

5     bad dealings?

6          MR. CARRUTH:  Objection, form.

7     BY MR. MILLS:

8          Q.      I'm trying to summarize here what you said.

9     I'm not trying to do it unfairly.  But you were trying

10    to get away from the past bankruptcy, I guess, and the

11    bad things that happened in the bankruptcy?

12         A.      Not so much the bankruptcy.  It was the

13    ongoing litigation and stuff that was out of hand that

14    was still outstanding with the parties I have

15    previously named.  As far as I was concerned, the

16    bankruptcy plan had been confirmed and we were moving

17    forward with the plan.  So I wasn't too worried about

18    the bankruptcy at that point.  I was worried about

19    something coming up later on, which could put their

20    collateral in jeopardy, and put our transaction in

21    jeopardy as well.

22         Q.      Okay.  So what was the transaction you were

23    thinking about?

24         A.      It was a closing and sale of Lot 1A.

25         Q.      To Mesilla Valley?

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 17 of 31

Michael Dixson

Pages 44

1      A.      To Mesilla Valley.

2      Q.      But did you do that in contemplation of

3  another transaction later?

4      A.      Can you explain.

5      Q.      So you eventually sold Mesilla Valley, you

6  eventually sold it to LPC?

7      A.      That's correct.

8      Q.      When did you first talk to LPC about that

9  transaction, the potential for that transaction?

10      A.      I couldn't tell you.  Sometime in probably

11  February or March of last year.  I'm not sure.

12      Q.      Was that before you transferred it to

13  Mesilla Valley?

14      A.      It was before, yes.

15      Q.      So when you transferred it to Mesilla

16  Valley, you had in mind you might transfer it to LPC

17  then?

18      A.      Yes.

19      Q.      All right.  So was there some sort of sale

20  agreement between PDG the debtor and Mesilla Valley?

21      A.      Yes, I believe so.

22      MR. MILLS:  Haven't seen that, have we?  So,

23  Jeff, do you know about that we haven't -- or,

24  Mr. Lutz, we haven't seen that.

25      MR. LUTZ:  I don't believe I produced a written

1       Q.      And your counsel can't produce it?

2       A.      I guess if that's how you are saying it,

3   yes.

4       Q.      Was anything paid?

5       A.      From?

6       Q.      Mesilla Valley to PDG the debtor?

7       A.      Yes.

8       Q.      Cash?

9       A.      In the form of cash, bills, creditors,

10  debtors, there is a bunch of creditors.  We paid off a

11  bunch of bills.

12      Q.      You are saying that Mesilla Valley paid off

13  a bunch of the debtor PDG's debts as consideration for

14  the transfer?

15      A.      Yes.

16      Q.      Okay.  PDG was in bankruptcy, why would

17  Mesilla Valley do that?

18      A.      Because that was the agreement that PDG or

19  the debtor and Mesilla Valley came up with.

20      Q.      Who negotiated for PDG?

21      A.      I did.

22      Q.      Who negotiated for Mesilla Valley?

23      A.      I did.

24      Q.      Okay.  So what kind of debt would PDG owe

25  such that Mesilla Valley would pay it?

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 19 of 31

Michael Dixson

Pages 55

1    means.

2    BY THE WITNESS:

3         A.     Yes, I have seen this before, I believe.

4    BY MR. MILLS:

5         Q.     It says -- apparently you are negotiating

6    with the -- this title company here, and they want you

7    to change your plan of confirmation somewhat so that it

8    will -- so that you can transfer the property.  You

9    say, "The development plan for the property is as

10   follows, one, sell Lot 1A to our buyer and close around

11   April 10, 2022.  Two, refinance the rest of the project

12   with Pangea Capital, finish the development and

13   construction.  And three, sell lot 3A to a third party

14   at the appropriate time," right?

15        A.     Yes.

16        Q.     You want to sell Lot 1A and close.  Then

17   you say you want to refinance, I assume you mean

18   refinance. "Refinance the rest of the project," what do

19   you mean by that?

20        A.     Pay off Legalist and finish the project and

21   go sell the property.

22        Q.     Pay off Legalist with what?

23        A.     Proceeds from the refinance.

24        Q.     Okay.  From the sale?

25        A.     From the refinance it says.

1    Q.    But would you use proceeds from the sale to

2  do that?

3    A.    I'm not sure.

4    Q.    But here you are telling the title company

5  you are going to pay off Legalist basically?

6    A.    I don't see anything explicitly says I'm

7  paying off Legalist anywhere in this document you

8  provided me.

9    Q.    I thought that's what you just said.  I

10  asked you what you mean refinance and you said pay off

11  Legalist.

12    A.    When you asked me what I said.  If you are

13  asking me what my testimony is, my testimony was plan

14  to refinance out Legalist after the sale of Lot 1A, pay

15  them in full, move on with the development and finish

16  it.

17    Q.    That's good to know.

18         So that's dated March 23.  Okay.

19              (WHEREUPON, a certain document was

20              marked Deposition Exhibit No. 7,

21              for identification, as of 5/16/23.)

22  BY MR. MILLS:

23    Q.    I asked you earlier if your counsel had

24  been talking to Legalist about selling Lot 1A and

25  releasing the lien.  I'm going to give you an email

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 21 of 31                    Pages 61

Michael Dixson

1    "The basic concept is to use net proceeds to pay claims

2    (including yours truly) and you use the remaining net

3    (around $1.8 million) to complete development."

4              What is he talking about there?

5         A.    It says the basic concept using net

6    proceeds to pay claims, pay all of the creditors, use

7    remaining net to complete the development.  So he's

8    saying to the 1.8 million back into the development.

9         Q.    Using the net proceeds of Lot 1A to pay

10   Legalist?

11        A.    Correct.

12        Q.    Right.  Then use the remaining net around a

13   million eight to complete development of Lot 3?

14        A.    That's exactly what he's saying I think,

15   yes.

16        Q.    Okay.  Is that what happened?

17        A.    No.

18        Q.    What did happen?

19        A.    We closed on Lot 1A.  We finished the

20   portions of Lot 1A.  We needed to -- finished up a

21   significant portion of Lot 3A, got it to a point where

22   it was ready to get refinanced, and then began going in

23   the route of refinancing the project with another

24   company refinancing them.

25        Q.    So I'm clear, you are saying that this

23-03004-cgb Doc#139-13 Filed 05/28/25 Entered 05/28/25 18:09:38 Exhibit 13.
Deposition Transcript of Michael Dixson Pg 22 of 31

Michael Dixson

Pages 62

1    didn't happen, but what happened was you sold Lot 1A

2    and used the proceeds to finish what was necessary to

3    finish on 1A?

4        A.    Plus or minus, yes.

5        Q.    Then finish 3A?

6        A.    We put money into 3A.

7        Q.    No money went to Legalist?

8        A.    No money went to Legalist, that's right.

9        Q.    You used all of the moneys for those

10   purposes that you just told me right there?

11       A.    We used money for TGV.

12       Q.    What did you use money for TGV for?

13       A.    Site work, soft costs, engineering

14   entitlement, grading, utilities, retaining wall,

15   landscaping.

16       Q.    What else?

17       A.    Some of it was G&A.

18       Q.    G&A being what?

19       A.    We had to catch up with some old

20   professional fees.  PDG had some outstanding bills that

21   hadn't been paid in several months.  We had to get

22   caught up.  We had to paid like county fees and, you

23   know, Secretary of State fees and that kind of stuff.

24   Then we also used a portion of this to purchase a

25   property in Lakeway, Texas.

1        Q.     That's Exhibit 10, right?

2        A.     Okay.  Yes.

3        Q.     So who negotiated that transfer?

4        A.     Who -- well, there is three.

5        MR. CARRUTH:  Objection, form.  Which transfer?

6   BY MR. MILLS:

7        Q.     The one we are talking about here.  Not the

8   assignment, correct.  Who negotiated the sale of Lot 1A

9   from PDG the debtor to this FSLRO?

10       MR. LUTZ:  Objection, form.

11  BY MR. MILLS:

12       Q.     Mesilla Valley.  Sorry.  Let me do it

13  again.  Who negotiated the transfer of Lot 1A from

14  Mesilla Valley to FSLRO?

15       A.     I negotiated the sale of Mesilla Valley to

16  LPC.  I didn't negotiate anything with FSLRO.

17       Q.     Okay.  Who did you negotiate with at LPC?

18       A.     Michael Chaiken was their attorney.

19       Q.     Do you have any interest or any of your

20  entities have any interest in LPC?

21       A.     In Lincoln Property Company?  I wish.  No.

22       Q.     That sale closed, the deed was executed on

23  May 27; is that right?

24       A.     9, May 9.  It was executed May 9.

25       Q.     Filed?

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 24 of 31

Michael Dixson                                                      Pages 87

1      A.      Definitely not under the mattress.  Went

2  into an account.

3      Q.      What was that?

4      A.      One of the accounts at Chase.  I'm not

5  sure.  It was our Chase account.

6      Q.      Do you recognize them by their account

7  numbers?

8      A.      I would recognize maybe two of them, the

9  two common ones, but I wouldn't recognize all of them.

10     MS. WALRAVEN:  I just handed this to them.  Are

11  you not going to use it?

12     MR. MILLS:  I will.

13  BY MR. MILLS:

14     Q.      You are going to take my word on this

15  because somebody over redacted something.  The last

16  four numbers on that account are 5229.  Do you

17  recognize 5229 as an account number?

18     A.      Yes, that's our PDG Prestige account at

19  Chase Bank, it's 5229.

20                      (WHEREUPON, a certain document was

21                      marked Deposition Exhibit No. 16,

22                      for identification, as of 5/16/23.)

23  BY MR. MILLS:

24     Q.      Does that look like if you look at those

25  entries it look like the 5229?

PRODUCTION WKPZ 011 - 87

LEXITAS

1    A.    Yes, it sure does.

2    Q.    Let's do this.  Let's write it on the top

3    of it. I'm going to mark this on the exhibit with

4    everyone's agreement that this is ending 5229, right?

5    There we go.  So you recognize that as the PDG account?

6    A.    I do, yes.

7    Q.    Is that the DIP account?

8    A.    I'm not sure if this is the DIP account or

9    not.

10    Q.    I don't think it is.

11    A.    I don't think it is. I'm not sure.

12    Q.    We can see there it says PDG Prestige, Inc.

13    We now know for sure it's 5229.  This is the ledger --

14    rather the statement April 30 to May 31, 2022.  That's

15    Exhibit No. 16.  Let's look at a few things here.  On

16    the second page it says the deposit on May 31, right?

17    A.    Yes.

18    Q.    Do you see that number, 1,916,558.82?

19    A.    Yes.

20    Q.    Do you recognize that number?

21    A.    I do.

22    Q.    What is that?

23    A.    That would be the wire from SWAT title,

24    Southwestern Abstract and Title Company for the Lot 1A

25    sale proceeds.

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 26 of 31

Michael Dixson                                                                    Pages 89

1    Q.    Right.  So we have seen in our last

2    exhibit, the original number 2.545 was original sales

3    proceeds.  There were some numbers taken out, right?

4    The balance then hit this account right here on May 31,

5    right?

6        A.    Correct.

7        Q.    So let's look few for a things in here.

8        A.    Okay.

9        Q.    All right.  So look on the next page.

10       A.    Okay.

11       Q.    Do you see under electronic withdrawals,

12   May 31 same, very same day?

13       A.    Yes.

14       Q.    There was a withdrawal for $500,000 --

15       A.    Correct.

16       Q.    -- to the Dixson Family Trust 6 Candleleaf

17   CT, right?

18       A.    Yes.

19       Q.    What is that?  What's the Dixson Family

20   Trust 6 Candleleaf CT?

21       A.    This was a wire to the title company for

22   the purchase of the 6 Candleleaf property.

23       Q.    Is the 6 Candleleaf property the property

24   in Lakeway you referred to earlier?

25       A.    It is, yes.

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 27 of 31
Michael Dixson

Pages 179

1            CHANGES AND SIGNATURE

2    MICHAEL DIXSON

3    May 16, 2023

4    PAGE/LINE          CHANGE                         REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 28 of 31

Michael Dixson

Pages 180

```
 1            I, MICHAEL DIXSON, have read the foregoing

 2    deposition and hereby affix my signature that the same

 3    is true and correct, except as noted on the previous

 4    page.

 5

 6                 _____

 7                         MICHAEL DIXSON

 8    THE STATE OF _____)

 9    COUNTY OF _____)

10       Before me, _____, on this day

11    personally appeared MICHAEL DIXSON, known to me (or

12    proved to me under oath or through _____)

13    (description of identity card or other document) to be

14    the person whose name is subscribed to the foregoing

15    instrument and acknowledged to me that he executed the

16    same for the purposes and consideration therein

17    expressed.

18       Given under my hand and seal of office this _____

19    day of _____, 20_____.

20

21                 _____

22                      NOTARY PUBLIC IN AND FOR

23                      THE STATE OF _____

24                      COMMISSION EXPIRES: _____

25
```

PRODUCTION WKPZ 011 - 180

LEXITAS

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                         EL PASO DIVISION
     IN RE:                    ) Chapter 11
 3   PDG PRESTIGE, INC.,       ) Case No. 21-30107
         Debtor.               )
 4

 5
                    REPORTER'S CERTIFICATION
 6                    ORAL DEPOSITION OF
                        MICHAEL DIXSON
 7                      May 16, 2023
```

8        I, Dana Shapiro, a Certified Shorthand Reporter,

9   hereby certify to the following:

10       That the witness, MICHAEL DIXSON, was duly sworn

11   by the officer and that the transcript of the oral

12   deposition is a true record of the testimony given by

13   the witness;

14       I further certify that pursuant to FRCP Rule

15   30(e)(1) that the signature of the deponent:

16   was requested by the deponent or a party before the

17   completion of the deposition and that the signature is

18   to be before any notary public and returned within 30

19   days from date of receipt of the transcript.  If

20   returned, the attached Changes and Signature Pages

21   contain any changes and reasons therefore;

22       I further certify that I am neither counsel for,

23   related to, nor employed by any of the parties or

24   attorneys in the action in which this proceeding was

25   taken, and further that I am not financially or

PRODUCTION WKPZ 011 - 181

1    otherwise interested in the outcome of the action.

2         Certified to by me this May 24, 2023.

3         *Dana Shapiro*

4         _____

         DANA SHAPIRO, Illinois CSR 84-3597
5         CSR Expiration:  5/31/25
         Illinois Certified Shorthand Reporter
6         Registered Agent Solutions, Inc.,
         A Lexitas Company, Firm No. 17
7         5301 Southwest Parkway
         Corporate Center One, Suite 400
8         Austin, Texas 78735
         888-893-3767
9         Expires: 1/31/2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

23-03004-cgb  Doc#139-13  Filed 05/28/25  Entered 05/28/25 18:09:38  Exhibit 13.
Deposition Transcript of Michael Dixson  Pg 31 of 31

Michael Dixson                                                                                      Pages 183

```
1    COUNTY OF TRAVIS )

2    STATE OF TEXAS   )

3         I hereby certify that the witness was notified on

4    May 24, 2023 that the witness has 30 days

5    after being notified by the officer that the transcript

6    is available for review by the witness and if there are

7    changes in the form or substance to be made, then the

8    witness shall sign a statement reciting such changes

9    and the reasons given by the witness for making them;

10        That the witness' signature was/was not returned

11   as of _____.

12        Subscribed and sworn to on this _____ day of

13   _____, 20___.

14                    Dana Shapiro

15                    _____
                      DANA SHAPIRO, Illinois CSR 84-3597
16                    CSR Expiration: 5/31/25
                      Illinois Certified Shorthand Reporter
17                    Registered Agent Solutions, Inc.,
                      A Lexitas Company, Firm No. 17
18                    5301 Southwest Parkway
                      Corporate Center One, Suite 400
19                    Austin, Texas 78735
                      888-893-3767
20                    Expires: 1/31/2025

21

22

23

24

25
```