Gmail

**Brian Rice <brian.rice@legalist.com>**

---

## RE: PDGP - sale of Lot 1A + Bubba's lease to LPC (GF 7434-GC-2022)
1 message

---

**Jeff Carruth** <jcarruth@wkpz.com>                                  Wed, Apr 13, 2022 at 3:01 PM
To: Brian Rice <brian.rice@legalist.com>
Cc: Zach Campbell <zach@legalist.com>, "Michael Dixson (mdixson@pdgnm.com)" <mdixson@pdgnm.com>, Jasmine
Esnayder <jesnayder@pdgnm.com>

Here is the executed PSA. There are a couple of amendments to extend dates.- J.C.

---

**From:** Brian Rice <brian.rice@legalist.com>
**Sent:** Wednesday, April 13, 2022 12:43 PM
**To:** Jeff Carruth <jcarruth@wkpz.com>
**Cc:** Zach Campbell <zach@legalist.com>; Michael Dixson (mdixson@pdgnm.com) <mdixson@pdgnm.com>; Jasmine
Esnayder <jesnayder@pdgnm.com>
**Subject:** Re: PDGP - sale of Lot 1A + Bubba's lease to LPC (GF 7434-GC-2022)

Sounds good. Can I see the P&S for 1A?

On Wed, Apr 13, 2022 at 10:53 AM Jeff Carruth <jcarruth@wkpz.com> wrote:

Trying to close as soon as this Friday. – J.C.

---

**From:** Brian Rice <brian.rice@legalist.com>
**Sent:** Tuesday, April 12, 2022 9:17 PM
**To:** Jeff Carruth <jcarruth@wkpz.com>
**Cc:** Zach Campbell <zach@legalist.com>; Michael Dixson (mdixson@pdgnm.com) <mdixson@pdgnm.com>; Jasmine
Esnayder <jesnayder@pdgnm.com>
**Subject:** Re: PDGP - sale of Lot 1A + Bubba's lease to LPC (GF 7434-GC-2022)

When is the closing?

Brian T. Rice
LEGALIST, INC.
Corporate Counsel &
Chief Operating Officer
850-339-8996 (Cell)

On Tue, Apr 12, 2022, 5:38 PM Jeff Carruth <jcarruth@wkpz.com> wrote:

Zach and Brian –
Attached are (1) a proposed form of partial release for the pending closing of the sale of Lot 1A in Las Cruces and (2) a FedEx label to Title.
Please execute and notarize the release and send to title pending closing.
Thank you, and please advise if you have questions.



 Jeff Carruth
W
K
P
Z
Weycer, Kaplan, Pulaski & Zuber, P.C.


Trusted Legal Advisors Since 1976
DALLAS ▪ HOUSTON ▪ AMARILLO
D. (713) 341-1158<tel:7133411158>
M. (214) 552-7242<tel:2145527242>
F. (866) 666-5322<tel:8666665342>

jcarruth@wkpz.com<mailto:jcarruth@wkpz.com>
www.wkpz.com<http://www.wkpz.com/>

This communication and any attachments to it are confidential and intended solely for the use of the person to whom they are addressed. If you have received this e-mail in error, please notify us by telephone immediately at (713) 961-9045, and you are notified that any disclosure, distribution, or the taking of any action in reliance on the contents of this information is prohibited. Nothing in this message may be construed as a digital or electronic signature of any employee of Weycer, Kaplan, Pulaski & Zuber, P.C. ("WKPZ"). WKPZ automatically blocks e-mails containing objectionable language or suspicious content. Messages sent to WKPZ should be considered received only if confirmed by a return receipt. The IRS does not allow the use of informal tax advice, such as this communication, to avoid tax penalties. WKPZ expressly reserves and maintains any attorney-client privilege or work-product protections in this communication.

**PSA - Bubba's 33 - Las Cruces, NM.pdf**
2040K

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is entered into as of the __ day of March, 2022, (the "Effective Date"), by and between **MESILLA VALLEY VENTURES, LLC**, a Texas limited liability company ("Seller"), and **LPC RETAIL, LLC**, a Delaware limited liability company ("Buyer").

### WITNESSETH:

For and in consideration of the promises set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer (each, a "Party" and, collectively, the "Parties") hereby covenant and agree as follows:

1. **Agreement to Purchase**. Buyer agrees to purchase, and Seller agrees to sell, in accordance with the terms, conditions and stipulations set forth in this Agreement (the "Transaction"), all of Seller's right, title and interest in and to:

 (a) the parcel of real property, as more particularly described on Exhibit A attached hereto (the "Real Property").

 (b) all buildings and other improvements located on the Real Property (collectively, the "Improvements"), and all of Seller's interest, if any, in any equipment, machinery and personal property on or used in connection with the Real Property (collectively, the "Personalty").

 (c) all plans, specifications and studies pertaining to the Real Property in Seller's possession or under its control, and to the extent the same are not to be assigned to Tenant under the Lease, Seller's interest in all permits and licenses (collectively, the "Permits"), warranties and guarantees (collectively, the "Warranties"), and contracts and intangibles relating to the Real Property (collectively, the "Contracts").

 (d) all mineral, oil and gas rights, water rights, sewer rights and other utility rights appurtenant to or allocated to the Real Property.

 (e) the Lease (defined below), including without limitation, all rent, prepaid rent, security deposits and other payments and deposits thereunder and all guarantees thereof (subject to the requirements of this Agreement); and

 (f) all fixtures, appurtenances, easements, licenses, privileges, and other property interests belonging or appurtenant to the Real Property (all of the foregoing items in clauses (a) through (f) above, now, or hereafter existing, collectively, the "Property").

2. **Purchase Price**. The purchase price to be paid by Buyer to Seller for the Property is Two Million Five Hundred Forty-Five Thousand Dollars and No Cents ($2,545,000.00) (the "Purchase Price"), which Purchase Price is payable as follows:

 (a) Two Hundred Thousand and No/100 Dollars ($200,000.00) earnest money (said amount, plus all interest earned or accrued thereon, the "Earnest Money Deposit") to be

deposited in escrow with Southwestern Abstract & Title Co. c/o Gricel Chavez (the "Escrow Agent") not later than three (3) business days following the receipt by Escrow Agent of a fully-executed original of this Agreement (said receipt by Escrow Agent of both a fully-executed original of this Agreement and the Earnest Money Deposit, the "Opening of Escrow"), which Earnest Money Deposit is to be held by Escrow Agent until released to Seller or Buyer as provided herein or paid to Seller at close of escrow ("COE");

(b)     The balance of the Purchase Price in the amount of Two Million Five Hundred Forty Thousand Dollars and no Cents ($2,345,000.00) shall be paid in cash or by wire transfer of good U.S. funds, and delivered at Closing. Upon payment of the Purchase Price, Seller shall execute and deliver to Buyer its recordable and transferable Special Warranty Deed (or New Mexico equivalent thereto) conveying to Buyer or its nominee, good, record and marketable title to the Property in fee simple, free, and clear of all liens, encumbrances, covenants, restrictions, easements, rights of way, claims, rights, and other matters except as set forth in the final Buyer approved Title Commitment. If Buyer, in its sole discretion shall elect to close this transaction prior to the actual date upon which the actual commencement of payment of rents under the Lease shall occur (the "Rent Commencement Date"), then Buyer shall receive a credit against the Purchase Price equal to one hundred fifty percent (150%) of all rents or other monetary obligations of the Tenant under the Lease which would have been due from the Tenant if said rents had commenced as of the Close of Escrow for the period from the Close of Escrow through the actual Rent Commencement Date (the "Rent Credit"). Buyer and Seller shall provide Escrow Agent with their best estimate of the Rent Credit. Following the Close of Escrow, in the event that the amount of the Rent Credit is not accurate based on the actual Rent Commencement Date under the Lease, the parties shall make the appropriate adjustment with any shortfall or excess payment tendered or refunded by the appropriate party as applicable. The provisions of this Section 2(b) shall survive Close of Escrow.

(c)     Upon deposit of the Deposit, Buyer will be deemed to have irrevocably paid to Seller a portion thereof equal to ONE HUNDRED AND NO/100 DOLLARS ($100.00) ("Independent Contract Consideration"), which amount Seller and Buyer bargained for and agreed to as consideration for Seller's execution and delivery of this Agreement. The Independent Contract Consideration is non-refundable from and after said date of delivery, and Seller shall retain the Independent Contract Consideration notwithstanding any other provision of this Agreement to the contrary and all references to a return of the Deposit to Buyer shall exclude the Independent Contract Consideration, which shall be delivered to Seller.

3.     **Application of Earnest Money Deposit**. Seller and Buyer hereby instruct Escrow Agent to place the Earnest Money Deposit in a federally insured interest-bearing passbook account on behalf of Seller and Buyer. The Earnest Money Deposit shall be applied as follows:

(a)     if Buyer cancels this Agreement as Buyer is so entitled to do as provided in this Agreement, the Earnest Money Deposit shall be paid immediately to Buyer.

(b)     if the Earnest Money Deposit is forfeited by Buyer pursuant to this Agreement, such Earnest Money Deposit shall be paid to Seller as Seller's agreed and total liquidated damages as contemplated in Section 21(b) below, it being acknowledged and agreed that it would be difficult or impossible to determine Seller's exact damages; and

(c)     if escrow closes, the Earnest Money Deposit shall be credited to Buyer, automatically applied against the Purchase Price, and paid to Seller at COE.

4.      **Transaction Documents**. The personal property shall be transferred by that certain bill of sale from Seller to Buyer, the agreed upon form of which is attached hereto as Exhibit B (the "Bill of Sale"); the Permits, Warranties and Contracts shall be transferred by that certain assignment and assumption agreement, the agreed upon form of which is attached hereto as Exhibit C (the "Assignment Agreement"); the Real Property and the Improvements shall be transferred and conveyed by execution and delivery of Seller's special or limited warranty deed, the agreed upon form of which is attached hereto as Exhibit D (the "Deed"); and the Lease shall be assigned by Seller to Buyer pursuant to certain assignment of lease, the agreed upon form of which is attached hereto as Exhibit E (the "Lease Assignment").   The Bill of Sale, the Assignment Agreement, the Deed, and the Lease Assignment are hereinafter collectively referred to as the "Transaction Documents". Notwithstanding the foregoing, if any Warranty transfer requires the approval of the applicable warrantor and/or satisfaction of any other conditions to such transfer, Seller shall obtain such approval and satisfy all such conditions no later than COE.

5.      **Lease**. The Property is subject to a lease with Texas Roadhouse, Inc., a Kentucky limited liability company, d/b/a Bubbas 33, as Tenant (the "Tenant") (the "Lease") dated November 8, 2019, together with its subsequent Amendments 1-6 and Seventh Amendment and Reinstatement to Ground Lease.  The Lease will survive Closing and will not constitute an Objectionable Matter (as defined in Section below).

6.      **Title Report; Survey; Objectionable Matters**. (a)  Within ten (10) days after the Opening of Escrow, Escrow Agent shall deliver a current Preliminary Title Report (the "Report") for an ALTA or TLTA, as applicable, extended coverage title insurance policy (the "Owner's Policy") on the Property to Buyer and Seller. The Report shall show the status of title to the Property as of the date of such Report and shall also describe the requirements of Escrow Agent for the issuance of the Owner's Policy as described herein. The cost of the Owner's Policy shall be paid by as set forth in this Agreement. In addition to the Report, Escrow Agent shall simultaneously deliver to Buyer complete, legible copies of all documents identified in Schedule B of the Report.

(b)     Promptly after the Opening of Escrow, and receipt of the Report and title exception documents, Buyer shall cause a surveyor licensed in the State in which the Property is located to complete and deliver to Escrow Agent and Buyer a current, certified ALTA survey of the Real Property and Improvements (the "Survey"), whereupon the legal description in the Survey shall control over the description in Exhibit A attached hereto to the extent they may be inconsistent. The Survey shall set forth the legal description and boundaries of the Real Property and all easements, encroachments, and improvements thereon.

(c)     If Buyer determines, in its sole and absolute discretion, that any exception to title as shown in the Report and/or any matter disclosed by the Survey is objectionable and/or unacceptable to Buyer (collectively, the "Objectionable Matters"), then Buyer may, by giving written notice thereof to Escrow Agent and Seller on or before expiration of the Inspection Period or ten (10) days from Buyer's receipt of the Report or Survey disclosing such Objectionable Matter, whichever is later, but in no event later than the later to occur of (i) thirty (30) days after

mutual execution of this Agreement or (ii) five (5) days following Buyer's receipt of Seller's Title Response Notice (defined below) either (i) terminate this Agreement, whereupon the Earnest Money Deposit shall be paid immediately to Buyer and all documents deposited in escrow by Buyer shall be returned to Buyer without delay, or (ii) provisionally accept the title to the Property, subject to Seller's agreement to cause the removal of or otherwise cure such Objectionable Matters prior to COE. If Buyer gives notice to Seller of its election of option (ii) above, Seller shall notify Buyer in writing ("Seller's Title Response Notice") within five (5) days after receiving Buyer's written notice of Objectionable Matters whether Seller intends to remove (or cause Escrow Agent to endorse over, to Buyer's satisfaction) or otherwise cure any such Objectionable Matters. If Seller fails to notify Buyer of its intentions within such five (5) day period, Seller shall be deemed to have elected not to remove or otherwise cure such Objectionable Matters. Buyer acknowledges that Seller shall have no obligation to remove or otherwise cure any Objectionable Matters, except as otherwise expressly provided herein. All costs and expenses to remove or otherwise cure the Objectionable Matters shall be borne by Seller.

(d)     In no event may Seller encumber or allow to be encumbered the Property with any new title matter after the Opening of Escrow. In the event the Report is amended (an "Amended Report") to include new exceptions that are not set forth in the prior Report, or in the event the Survey is amended (an "Amended Survey") to include or depict matters that are not set forth in the prior Survey, Buyer shall have until the later of (i) the expiration of the Inspection Period, (ii) the date five (5) days after Buyer's receipt of both such Amended Report and copies of the documents identified in the new exceptions or new requirements, or (iii) the date five (5) days after Buyer's receipt of the Amended Survey, as applicable, within which to either (Y) terminate this Agreement as set forth in Section 6(c)(i) above, or (Z) to provisionally accept the title to the Property corresponding to such Amended Report or Amended Survey subject to Seller's agreement to cure or otherwise cause the removal of any Objectionable Matters identified by Buyer in a written notice to Seller in the manner set forth in Section 6(c) above.

(e)     In the event Buyer provisionally accepts title to the Property subject to Seller's agreement to cure one or more Objectionable Matters pursuant to Sections 6(c) and/or 6(d) above, if Seller serves notice (or is deemed to have served notice) to Buyer that Seller does not intend to remove or otherwise cure such Objectionable Matters before COE, Buyer shall, within five (5) days after receipt of such notice from Seller, notify Seller and Escrow Agent in writing of Buyer's election to either (i) terminate this Agreement as set forth in Section 6(c)(i) above, or (ii) waive such Objectionable Matter(s). If written notice of either satisfaction or dissatisfaction as to any Report, Survey, Amended Report or Amended Survey is not timely given by Buyer to Seller pursuant to this Section 6, then Buyer shall be deemed to have disapproved of the condition of the title of the Property and shall have elected to terminate this Agreement as set forth in Section 6(c)(i) above.

(f)     If Buyer and Seller mutually agree that an Objectionable Matter cannot be cured by either Seller or Escrow Agent within the five (5) day period specified in this Section 6, but such Parties mutually agree that such Objectionable Matter is reasonably susceptible to cure within thirty (30) days following the scheduled Closing Date, then Seller and Buyer shall amend this Agreement to provide that the Closing shall be delayed until the date which is no later than thirty (30) days following the scheduled Closing Date to allow time for such Objectionable Matter to be cured by Seller or Escrow Agent.

(g)     Notwithstanding anything to the contrary set forth in this Agreement, any lien, including, without limitation, any mortgage lien, deed of trust lien, tax lien, judgment lien and/or mechanics liens affecting the Property must be paid and satisfied by Seller at Closing, whether or not Buyer objects thereto, and such items shall be deemed to be included in all Objectionable Matters even if not specifically so included by Buyer.

(h)     If Seller is unable to convey title to the Property free and clear of the lien of any state or local tax now due and owing, Seller shall be responsible for either paying such tax or providing to Escrow Agent security (such as a cash deposit) so that Escrow Agent can issue the Title Policy to Buyer free and clear of such liens, whether or not Buyer includes such liens as Objectionable Matters.

7.     **Seller's Diligence Materials**. Seller agrees to deliver to Buyer, contemporaneously with the Opening of Escrow, copies of all documents and information in Seller's possession or control relating to the ownership, use, management, or operation of the Property (collectively, "Seller's Diligence Materials"), all at no cost to Buyer. The foregoing deliveries shall include, but not be limited to, the documents, materials and information set forth on the attached Exhibit F. Should Seller receive new or updated information regarding any of the matters set forth in this Section 7 after the Effective Date and prior to COE, Seller will immediately notify Buyer of such fact and will promptly deliver complete copies thereof to Buyer.

8.     **Inspection Period; Entry Rights.**

(a)     Buyer shall have until 11:59 p.m. MST on the twenty first (21st) day after the Opening of Escrow (the "Inspection Period"), at Buyer's sole cost, within which to conduct and approve any investigations, studies or tests deemed necessary by Buyer, in Buyer's sole discretion, to determine the feasibility of acquiring the Property, including, without limitation, Buyer's right to: (i) review and approve the Report and Survey, review and approve the Lease, review Seller's operating statements with respect to the Property, and review the Permits, Warranties and Contracts; and (ii) obtain, review and approve an environmental, property condition and zoning study of the Property (collectively, "Buyer's Diligence").

(b)     Seller hereby grants to Buyer and Buyer's agents, employees, and contractors the right to enter upon the Property, at any time or times prior to COE, to conduct Buyer's Diligence. Buyer and/or its consultants shall, during any entry upon the Property, carry not less than One Million Dollars ($1,000,000.00) commercial general liability insurance insuring all activity and conduct of Buyer and/or such consultants. Buyer agrees that in exercising its right of access hereunder, Buyer will use and will cause its consultants to use commercially reasonable efforts not to unreasonably interfere with the activity of Tenant or any persons providing service at the Property. Buyer shall repair damage to the Property resulting from Buyer's Diligence, and Buyer shall and does hereby agree to indemnify and hold Seller harmless from any and all liabilities, claims, losses, or damages, including, but not limited to, court costs and attorneys' fees, which may be incurred by Seller as a direct result of Buyer's Diligence, but such indemnification shall not apply to the mere discovery of existing conditions or the acts or omissions of any person or party other than Buyer, and/or Buyer's agents, employees or contractors.. Buyer's indemnity and hold harmless obligation shall survive cancellation of this Agreement or COE for a period of six (6) months.

9. **Buyer's Termination Right**. Buyer shall have the right, at any time on or prior to the expiration of the Inspection Period to terminate this Agreement for no reason or any reason at all, by delivering written notice to Seller and Escrow Agent on or before the expiration of the Inspection Period, in which event, this Agreement shall be terminated, whereupon the Earnest Money Deposit shall be returned immediately to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation under this Agreement.

10. **Close of Escrow**. The COE shall occur on that date which is **fifteen (15) days** after the expiration of the Buyer's Inspection Period (the "Closing Date").

11. **Closing Prorations and Costs**.

(a) Insurance, taxes, special assessments, utilities, or any other costs related to the Property shall be prorated between Seller and Buyer at Closing only if and to the extent such costs are not borne by Tenant pursuant to the Lease, but any the same which are not the responsibility of the Tenant and which predate the Closing Date shall be the responsibility of Seller. Any such costs that are not borne by Tenant pursuant to the Lease shall be prorated as of the Closing Date. All rents paid or payable for the month in which the Closing occurs pursuant to the Lease shall be prorated on a per diem basis as of the Closing Date. All such items attributable to the period up to the Closing Date shall be credited or charged to Seller. All such items attributable to the period on and after the Closing Date shall be credited or charged to Buyer. At the Closing, Buyer will be credited with the full amount of all security deposits paid by Tenant, if any, to the extent not previously applied by Seller in accordance with the Lease. Seller shall be credited with the full amount of any refundable deposits paid in connection with contracts with utility providers or vendors that are assumed by Buyer; *provided,* that such providers and vendors acknowledge that such deposits are held, as of the Closing, for Buyer's account. Seller shall not receive any credit at Closing for rents that have not been collected as of Closing. Buyer will pay over to Seller any rents received by Buyer after the Closing attributable to the period prior to the Closing Date (determined on the basis of applying rents received to the most recently accrued rent first), after deduction by Buyer of all expenses incurred in collecting same. If Closing occurs on or after the twenty-fourth (24th) day of the calendar month, the monthly scheduled rent amount(s) payable to the landlord under the Lease for the full calendar month following the month in which Closing occurs will be credited to Buyer at Closing (and, in such event, Seller will be entitled to receive and retain such credited amounts when paid by Tenant). Seller shall be required to deliver to Escrow Agent at COE such affidavits, documents, and security that Escrow Agent may reasonably require so that Escrow Agent can insure title to the Property free and clear of the lien of any state or local tax, and the performance of Seller's obligation set forth in this sentence shall be a condition to Buyer's obligation to purchase the Property.

(b) Seller and Buyer shall be responsible for the payment of costs and expenses incurred by Seller and Buyer in connection with the Transaction as follows:

(i) Seller shall pay: (i) any and all municipal, county and state documentary transfer taxes due on the transfer of the Real Property from Seller to Buyer, (ii) the costs of releasing all liens, judgments, and other encumbrances that are to be released and of recording such releases, (iii) any costs associated with the delivery of the Report, and the cost of

the standard coverage and extended coverage portion of the Owner's Policy, any endorsements which are the obligation of Seller pursuant to Section 6(a); (iv) the cost of the Survey, and (v) one-half (1/2) of any escrow fee charged by Escrow Agent.

(ii)     Buyer shall pay: (i) any endorsements to the Owner's Policy costs for an extended coverage policy and any endorsements thereto, except endorsements which are the obligation of Seller pursuant to Section 6(a), (ii) the standard coverage portion of Buyer's lender's title policy (if any) and any endorsements thereto, and (iii) one-half (1/2) of any escrow fee charged by Escrow Agent.

(iii)     Any other closing costs not specifically designated as the responsibility of either Party to this Agreement shall be paid by Seller and Buyer according to the usual and customary allocation of the same in the jurisdiction in which the Property is located. Except as otherwise set forth in this Agreement, Seller and Buyer will each be solely responsible for and bear all of their own respective expenses, including, without limitation, expenses of legal counsel. Seller agrees that all closing costs payable by Seller shall be deducted from Seller's proceeds otherwise payable to Seller at COE. Buyer shall deposit with Escrow Agent sufficient cash to pay all of Buyer's closing costs.

(c)     If, after COE, the Parties discover any errors in adjustments and apportionments or additional information becomes available which would render the closing prorations inaccurate, the same shall be corrected as soon after their discovery as possible. The provisions of this Section 11(c) shall survive COE except that no adjustment shall be made later than one (1) year after COE unless prior to such date the Party seeking the adjustment shall have delivered a written notice to the other Party specifying the nature and basis for such claim; provided, however, if an adjustment is sought due to the fact that current tax bills with respect to the Property had not yet been issued as of COE, the provisions of this Section 11(c) shall survive with respect to any closing proration of real property taxes until thirty (30) days after Buyer's receipt of tax bills for the period of time during which COE occurred. If any such claim is valid, the Party against whom the claim is sought shall have ten (10) days in which to remit any adjustment due.

12.     **Seller's Representations and Warranties**. Seller hereby represents and warrants to Buyer as of the Effective Date and again as of COE, and subject to Section 40 below, that:

(a)     Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has the full power and lawful authority to enter into and carry out the terms and conditions of this Agreement and to execute and deliver all documents which are contemplated by this Agreement; and all actions necessary to confer such power and authority upon the persons executing this Agreement and all documents which are contemplated by this Agreement to be executed on behalf of Seller have been taken. Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

(b)     Seller's organizational documents and applicable laws do not in any way prohibit, limit, or otherwise affect the right or power of Seller to enter into and perform all of the terms and covenants of this Agreement. Seller is not a party to or bound by any contract,

agreement, indenture, trust agreement, note, obligation or other instrument that could prohibit, limit, or otherwise affect the same. No consent, authorization, or approval of, or other action by, and no notice to or filing with, any governmental agency or any other person are required for the due execution, delivery, and performance by Seller of this Agreement or any of the terms and covenants contained in this Agreement.

(c)     the execution, delivery and performance of this Agreement do not and will not result in the creation or imposition of any lien or other encumbrance upon the assets of Seller, nor will this transaction in any way violate any other agreements to which Seller is a party.

(d)     there are no unrecorded leases, liens or encumbrances which may affect title to the Property (other than the Lease); any existing financing secured by the Property or any part thereof shall be satisfied and discharged in full at or prior to COE and any liens or encumbrances relating thereto shall be terminated and released of record at or prior to COE; and Seller does not have any defeasance, lender approval or prepayment obligations with respect to any existing financing which will delay COE;

(e)     to Seller's knowledge, no notice of violation has been issued with regard to any applicable regulation, ordinance, requirement, covenant, condition, or restriction relating to the present use or occupancy of the Property by any person, authority or agency having jurisdiction, which violation has not been cured.

(f)     to Seller's knowledge, there are no intended public improvements which will or could result in any charges being assessed against the Property which will result in a lien upon the Property, and there is no impending or contemplated condemnation or taking by inverse condemnation of the Property, or any portion thereof, by any governmental authorities.

(g)     there are no suits or claims pending or to Seller's knowledge, threatened with respect to or in any manner affecting the Property, nor does Seller know of any circumstances which should or could reasonably form the basis for any such suits or claims which have not been disclosed in writing to Buyer by Seller.

(h)     Seller has not taken any action before any governmental authority having jurisdiction thereover, the object of which would be to change the present zoning of or other land-use limitations, upon the Property, or any portion thereof, or its potential use, and, to Seller's knowledge, there are no pending proceedings, the object of which would be to change the present zoning or other land-use limitations.

(i)     except as set forth in Seller's Diligence Materials, Seller has no actual knowledge that there exists or has existed, and Seller itself has not caused any generation, production, location, transportation, storage, treatment, discharge, disposal, release or threatened release upon, under or about the Property of any Hazardous Materials. "Hazardous Materials" shall mean any flammables, explosives, radioactive materials, hazardous wastes, hazardous and toxic substances or related materials, asbestos or any material containing asbestos (including, without limitation, vinyl asbestos tile), or any other substance or material, defined as a "hazardous substance" by any federal, state, or local environmental law, ordinance, rule or regulation including, without limitation, the Federal Comprehensive Environmental Response Compensation

and Liability Act of 1980, as amended, the Federal Hazardous Materials Transportation Act, as amended, the Federal Resource Conservation and Recovery Act, as amended, and the rules and regulations adopted and promulgated pursuant to each of the foregoing;

(j)     except as set forth in Seller's Diligence Materials, to Seller's actual knowledge, there is not now, nor has there ever been, on or in the Property or any portion thereof underground storage tanks, any asbestos-containing materials, or any polychlorinated biphenyls, including those used in hydraulic oils, electric transformers, or other equipment.

(k)     to Seller's knowledge, there are no proceedings pending for the increase of the assessed valuation of the Property or any portion thereof.

(m)     to Seller's knowledge, all certificates, permits and licenses from any governmental authority having jurisdiction over the Property and/or any approvals from any third parties under any recorded title instruments which encumber the Property which are necessary to permit the lawful use and operation of the Improvements and the Property as they presently exist, have been obtained (or will be obtained prior to the COE), and are now, and will continue to be at all times before the COE, in full force and effect, and, to Seller's knowledge, there is no pending threat of modification, cancellation, termination or expiration of any such certificate, permit, approval or license;

(n)     with respect to the Lease: (i) the Lease is in full force and effect, (ii) Seller is not in default under the Lease, (iii) Tenant is not in default under the Lease; (iv) Seller has not received any rent paid by Tenant more than thirty (30) days in advance, (v) except as may be set forth therein, no rent concessions have been provided by Seller or asserted by Tenant, (vi) neither the rents nor the Lease have been assigned, transferred or hypothecated by Seller (or any such assignment, transfer or hypothecation shall be terminated and released at Closing), (vii) the Lease delivered with the Seller's Diligence Materials is a true, accurate and complete copy; (viii) Seller has not received any notice or correspondence from Tenant or Tenant's agents indicating Tenant's desire, willingness or intent to amend, modify, assign or terminate the Lease nor any notice or correspondence requesting the consent of Seller to any of the foregoing, (ix) the contingencies in Section 7 (a) and (b) of the Lease have been satisfied and/or waived in writing by Tenant, (x) the contingency set forth in Section 7 (c) of the Lease has been satisfied and/or waived in writing by Seller and Tenant, Seller has obtained all Approvals from the Approval Period, and Seller shall deliver evidence of the same to Buyer as part of the Seller's Diligence Materials, (xi) all of Landlord's Preliminary Site Work, Landlord's Secondary Site Work, and any and all other Landlord's Work, relating to the Premises, the Adjacent Parcel, the Development and/or Common Areas (as such terms are defined in the Lease), have been completed by seller in accordance with the Lease prior to the occurrence of any deadlines and without the imposition of any free rent or termination remedies by Tenant, and has been accepted by Tenant and any and all items on the Final Punchlist have been completed by Landlord in accordance with the Lease prior to the occurrence of any deadlines and without the imposition of any free rent or termination remedies by Tenant and Seller shall deliver evidence of the same to Buyer as part of the Seller's Diligence Materials; (xii) Seller has delivered to the as-built survey to Tenant as and when required by Section 7 (f) of the Lease and Seller shall deliver evidence of the same to Buyer as part of the Seller's Diligence Materials; (xiii) Tenant does not have any right of first offer or first refusal under the Lease; (xiv) the current annual Base Rent due under the Lease, upon the occurrence of

the Rent Commencement Date under the Lease will be **$140,000.00** and will not be subject to any reconciliation or adjustment based on the actual cost to acquire or develop the Premises, the Rent Commencement Date under the Lease is expected to occur by no later than April 30, 2022, the expiration date for the initial Term of the Lease is ten (10) years following the Rent Commencement Date, and Landlord is not currently holding a security deposit from the Tenant under the Lease, (xv) Seller has no outstanding obligation that will not be satisfied by Closing (a) to construct, or pay for, any tenant fixtures or improvements under the Lease, or (b) to pay any leasing or brokerage commission(s) in connection with the Lease..

(o) with respect to any applicable reciprocal easement agreement or declaration of covenants, conditions and/or restrictions (collectively, the "CC&Rs"): (i) all amounts due and payable by under the CC&Rs with respect to the Property have been paid in full, (ii) no default of Seller or Tenant exists under any of the CC&Rs, and (iii) to Seller's knowledge, no default of any other party exists under any of the CC&Rs, and Seller shall request an obtain an estoppel certificate from all applicable parties to said CC&Rs as a condition to Buyer's obligation to close this transaction;

(p) Seller has in place and in force such insurance with such coverages and in such amounts that are equal to or greater than those customarily maintained by similar businesses in the same geographic area in which the Property is located;

(q) the following documents are duly executed and filed of record against the "Adjacent Parcel" (as defined in the Lease), the "Development" (as defined in the Lease), and the "Common Areas" (as defined in the Lease), which contain provisions which provide for the owner of the Property to enforce any and all of the provisions in the Lease which relate to said Adjacent Parcel, Development and/or Common Areas, including, without limitation, the following provisions of the Lease: Section 1 (b), 1 (d), 11 (b), 14 (f), 21 (a), 28 (a), and 31 (d): Instrument # 2007993 "Amendment to Declaration" Recorded April 1, 2020; Instrument # 1825387 Recorded October 23, 2018.

(r) the Premises is a separately assessed tax parcel with a separate tax identification number and Seller will provide evidence of same as part of Seller's Diligence Materials; and

(s) any and all representations and warranties contained in the Lease made by the Landlord thereunder to Tenant as relates to the Development are hereby made to Buyer.

(t) Seller is currently the Debtor in a Chapter 11 reorganization proceeding, Case No. 21-30107, *In re PDG Prestige, Inc.,* (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Western District of Texas, El Paso Division (the "Court"). Prior to confirmation of a Chapter 11 plan, Seller will be required to obtain approval of the Court to proceed to Closing (the "Bankruptcy Approval"), which Bankruptcy Approval Seller will timely seek with due diligence and in good faith, and for which Bankruptcy Approval the Seller expects no opposition from any creditor or party in interest. The approval process will require disclosure of the sales price and/or this Agreement. Following the earlier to occur of (i) Seller's receipt of the Bankruptcy Approval of this sale pursuant to a Section 363 sale or (ii) confirmation of a Chapter 11 plan, as evidenced by an Order from the Court, no further approval by the Court of

this Agreement and Closing will be required. Seller will notify Buyer of the setting of the confirmation hearing and of the entry of the order on the confirmation of the Chapter 11 plan, both of which are anticipated to occur in early March, 2022, and Seller shall otherwise keep Buyer apprised as to the status of the Bankruptcy Case as requested by Buyer.

If, prior to COE, Seller becomes aware of any fact or circumstance that would materially change a representation or warranty of Seller in this Agreement, then Seller shall promptly, and in all events at least five (5) days prior to the Closing Date (which date shall be extended if necessary to give Buyer five days to review such material change), give written notice of such changed fact or circumstance to Buyer. If, prior to COE, upon Seller's notice or otherwise, Buyer becomes aware of the untruth or inaccuracy of, or facts or circumstances that would change materially, any representation or warranty of Seller in this Agreement or would constitute a material adverse change in the Property or its future use or operation, then Buyer shall have the option of: (i) waiving such breach of representation or warranty or material adverse change and completing its purchase of the Property pursuant to this Agreement; (ii) reaching agreement with Seller to adjust the terms of this Agreement to compensate Buyer for such change, but only to the extent Seller agrees in its sole discretion; or (iii) terminating this Agreement and receiving reimbursement by Seller for Buyer's actual, verifiable out-of-pocket costs and expenses incurred with respect to Buyer's Diligence (including, without limitation, reasonable attorneys' fees). Upon a termination of the Agreement pursuant to clause (iii) in the forgoing sentence, the Earnest Money Deposit shall be paid immediately by Escrow Agent to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation hereunder. Seller shall and does hereby indemnify against and hold harmless Buyer from any loss, damage, liability, and expense, together with all court costs and attorneys' fees, if awarded by a court of law, which Buyer may incur, by reason of any material misrepresentation by Seller or any material breach of any of Seller's warranties or covenants. All representations and warranties of Seller made in this Agreement, and Seller's indemnity and hold harmless obligations, shall survive COE for a period of one (1) year.

13. **Buyer's Representations and Warranties**. Buyer hereby represents and warrants to Seller as of the Effective Date and again as of COE that:

(a) In the event that prior to COE, the Buyer, through a valid assignment, is an entity, Buyer is duly formed and validly existing and authorized to transact business in and under the laws of the State of New Mexico and the individuals executing this Agreement on behalf of Buyer are duly authorized to execute and deliver this Agreement and all documents that are contemplated by this Agreement: and

Buyer shall and does hereby indemnify against and hold Seller harmless from any loss, damage, liability, and expense, together with all court costs and attorneys' fees, if awarded by a court of law, which Seller may incur, by reason of any material misrepresentation by Buyer or any material breach of any of Buyer's warranties or covenants. All representations and warranties of Buyer made in this Agreement, and Buyer's indemnity and hold harmless obligations, shall survive COE for a period of six (6) months

14.    **Anti-Terrorism**. Each Party hereby represents that, to the actual knowledge of such Party, neither such Party nor any of such Party's affiliated entities, is in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law No. 107-56. Each Party hereby further represents that, neither such Party, nor to the actual knowledge of such Party, any of such Party's affiliated entities, or their respective brokers or agents acting or benefiting in any capacity in connection with the purchase of the Property, is any of the following: (i) a person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (ii) a person or entity owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity with which a Party is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Laws; (iv) a person or entity that commits, threatens, or conspires to commit or supports "terrorism" as defined in the Executive Order; or (v) a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list. Neither Party nor, to the actual knowledge of such Party, any of its brokers or other agents acting in any capacity in connection with the purchase of the Property: (x) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person as described above; (y) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (z) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any of the Anti-Terrorism Laws.

15.    **Seller's Covenants During Contract Period**. Seller hereby covenants to Buyer as of the Effective Date that:

(a)    From and after the Effective Date, Seller shall: (i) not execute, modify, terminate or amend the Lease, and/or approve any new leases or any contracts or commitments of any kind affecting the Property, or any interest therein, without Buyer's written approval (which approval may be granted or withheld in Buyer's sole and absolute discretion); (ii) not encumber the Property with any liens, encumbrances or other instruments creating a cloud on title or securing a monetary obligation with the Property; (iii) not, without the prior written consent of Buyer, take any action before any governmental authority having jurisdiction thereover, the object of which would be to change the present zoning of or other land-use limitations, upon the Property, or any portion thereof, or its potential use; (iv) continue to operate the Property as heretofore operated by Seller subject to Buyer's rights under this Agreement to direct specific activities of Seller; (v) not make or affirmatively consent to any capital improvements or any material physical changes to the Real Property without the Buyer's written consent, which consent may be granted or withheld in Buyer's sole and absolute discretion; and (vi) upon the reasonable request of Buyer, require Tenant to deliver such documentation and information as landlord is permitted to obtain, and/or Tenant is required to deliver, pursuant to the terms of the Lease.

(b)     From and after the Effective Date, Seller shall, or shall cause Tenant to: (i) maintain the Property in its current condition; and (ii) perform required and routine repairs and maintenance to, and make necessary replacements of, each tangible portion of the Property (whether real or personal) as the relevant conditions require.

(c)     Seller shall reasonably cooperate with Buyer in timely providing information requested by Buyer that is readily available to Seller or within Seller's control. In addition, each Party agrees to provide the other with such consents as may reasonably be necessary so that the other may independently confirm information provided to it by third parties. Seller and Buyer shall cooperate with each other and exercise commercially reasonably efforts to obtain, as of the Closing Date, all approvals, permits, consents from, and provide all notices to, any third party and any governmental or regulatory authority, which are required in connection with the execution, delivery, or performance of this Agreement.

(d)     Until the Closing Date or prior termination of this Agreement by the Parties, Seller shall not offer the Property for sale publicly or otherwise solicit, make, pursue, negotiate, or accept offers for the sale of the Property to or from any party.

16.     **Buyer's Conditions Precedent**. In addition to all other conditions precedent set forth in this Agreement, Buyer's obligations to perform under this Agreement and to close escrow are expressly subject to the following:

(a)     the delivery by Seller to Escrow Agent, for delivery to Buyer at COE, of the executed original Transaction Documents and such further documents as reasonably may be required in order to fully and legally close this Transaction, including a tenant notice letter in the form attached hereto as Exhibit G and any required assignments and assumptions of operating agreements related to the Property.

(b)     the issuance of the Owner's Policy (or a written commitment therefor) subject only to those matters approved or deemed approved by Buyer pursuant to this Agreement (collectively, the "Permitted Exceptions").

(c)     within ten (10) days following the Effective Date, Seller shall request a tenant estoppel certificate with respect to the Lease addressed to Buyer, its lender, and their respective successors and assigns, reasonably acceptable to Buyer, which estoppel certificate: (i) shall be substantially in the form specified by the Lease or, if no form is specified by the Lease, in a commercially reasonable form to be provided by Buyer; (ii) shall be acknowledged by any guarantor of the Lease; (iii) shall not identify any amendment, assignment, modification, or other lease-related documentation which has not been previously provided to Buyer; and (iv) shall not identify any landlord defaults or other claims or exceptions taken by Tenant, or in the event the estoppel certificate identified landlord defaults or other claims or exceptions taken by Tenant, Seller shall have promptly resolved same to Buyer's and Tenant's reasonable satisfaction. Provided that Seller uses commercially reasonable efforts to obtain the estoppel certificate, the Parties agree that any failure by Seller to obtain the estoppel certificate shall in no event be a Seller default under this Agreement; but the receipt of a duly executed estoppel by Tenant in form approved by Buyer and date no sooner than fifteen (15) days prior to Closing shall be an express condition to Buyer's obligation to close this transaction.

(d)     if reasonably requested by Buyer, the deposit by Seller with Buyer not later than three (3) business days prior to COE of (i) an original estoppel certificate executed by all other parties to any CC&Rs and addressed or certified to Buyer stating that such CC&R is in full force and effect and is not modified (except as disclosed in such estoppel certificate) and, to the best knowledge of the party giving the estoppel, the other party or parties thereto is/are not in default under the applicable CC&R and all amounts, if any, owing under the applicable CC&R have been paid in full, and (ii) a subordination, non-disturbance and attornment agreement executed by Tenant, in form and substance reasonably acceptable to Tenant, for the benefit of Buyer's lender (if any).  Provided that Seller uses commercially reasonable efforts to obtain the estoppel certificate, the parties agree that any failure by Seller to obtain any CC&R estoppel or SNDA shall in no event be a Seller Default.

(e)     the deposit with Escrow Agent of an executed affidavit of Seller and such other documentation as may be reasonably required by Escrow Agent to allow for the deletion of the mechanics' lien exception from the Owner's Policy.

(f)     there shall have been no material adverse change to the financial condition of Tenant, nor any material adverse change to the Property, nor any fact, circumstance, condition, or occurrence which would materially and adversely affect the marketability, financing, or insurability of the Property.

(g)     all (i) representations and warranties of Seller set forth herein shall have been true and correct in all respects when made, and (ii) covenants, agreements and conditions required to be performed or complied with by Seller prior to or at the time of COE in connection with the Transaction shall have been duly performed or complied with by Seller prior to or at such time or waived in writing by Buyer.

(h)     delivery to Buyer of certificates evidencing the insurance coverage, limits, and policies to be carried by Tenant under and pursuant to the terms of the Lease.

(i)     except with respect to the Bankruptcy Case, there has been no "Insolvency Event" with respect to either Seller or Tenant. As used in this subsection (i), an "Insolvency Event" shall have occurred if either Seller or Tenant becomes insolvent within the meaning of the United States Bankruptcy Code, 11 U.S.C. Sec. 101 *et seq.*, as amended (the "Bankruptcy Code"), files or notifies Seller or any affiliate of Seller that it intends to file a petition under the Bankruptcy Code, initiates a proceeding under any similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts (collectively, hereinafter, an "Action"), becomes the subject of either a petition under the Bankruptcy Code or an Action, or is not generally paying its debts as the same become due; and

(j)     delivery to Buyer of originals of the Contracts, Warranties and Permits, if any, in the possession of Seller or Seller's agents, including, without limitation, any warranties covering the roof or any other part of the Improvements, and any correspondence with respect thereto, together with such non-proprietary leasing and property manuals, files and records which are material in connection with the continued operation, leasing and maintenance with respect to the Property.

(k)     the occurrence of the Rent Commencement Date under the Lease.

(l)     Seller has obtained Bankruptcy Approval if required at the time of sale.

If the foregoing conditions have not been satisfied by the specified date or COE as the case may be, then Buyer shall have the right, at Buyer's sole option, by giving written notice to Seller and Escrow Agent, to (i) terminate this Agreement as it relates to the Property, whereupon the Earnest Money Deposit shall be paid immediately by Escrow Agent to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation under this Agreement, provided that if the applicable failure of a condition is due to the breach or default by a Party to this Agreement, then the non-defaulting Party shall also have such rights and remedies as are provided for under this Agreement as a result of such breach or default, or (ii) extend such specified date or COE, as applicable, for the Property for such amount of time as Buyer deems reasonably necessary to allow Seller to satisfy such conditions. In any event, Buyer's consent to the closing of the Transaction as to the Property pursuant to this Agreement shall waive any remaining unfulfilled conditions for the benefit of Buyer with respect thereto.

17.     **Seller's Condition Precedent**. Notwithstanding anything in this Agreement to the contrary, Seller's obligation to sell the Property shall be subject to and contingent upon the due performance by Buyer of each and every undertaking and agreement to be performed by Buyer hereunder.

18.     **Brokerage Commissions and Finder's Fees**. Seller and Buyer each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with this Agreement or the sale of the Property, except CP Commercial Real Estate, Attn: Kirby Dederian ("Seller's Broker") and Lincoln Property Company ("Buyer's Broker"). Seller's Broker and Buyer's Broker will be compensated by Seller pursuant to the terms of a separate agreement between Seller and Seller's Broker, and Buyer's Broker, as applicable, which compensation shall be deemed earned and shall be due and payable only if, as, and when the sale contemplated by this Agreement is consummated. Buyer and Seller each hereby agree to indemnify, defend, and hold the other harmless from any claim, liability, obligation, cost, or expense (including attorneys' fees and expenses) for fees or commissions relating to Seller's sale, or Buyer's acquisition, of the Property asserted against either party by any broker or other person (other than Seller's Broker and Buyer's Broker) claiming by, through, or under the indemnifying party or whose claim is based on the indemnifying party's acts. The provisions of this **Section 18** shall survive the Closing or any termination of this Agreement.

19.     **Assignment**. This Agreement may not be assigned by Seller without the prior written consent of Buyer, which consent may be granted or withheld in Buyer's sole and absolute discretion. Buyer may assign its rights under this Agreement to an Affiliate of Buyer without seeking or obtaining Seller's consent, and any other proposed assignment by Buyer shall require Seller's consent, not to be unreasonably withheld, conditioned or delayed. For the purposes of this paragraph, the term "*Affiliate*" means any entity that directly or indirectly controls, is controlled by, or is under common control with Buyer, or Buyer's principals, and the term "control" means the power to direct the management of such entity through voting rights, ownership or contractual obligations. Such assignment shall not become effective until each assignee executes an instrument whereby such assignee expressly assumes each of the obligations of Buyer under this Agreement, including

specifically, without limitation, all obligations concerning the Earnest Money Deposit. Buyer may also designate someone other than Buyer, as grantee and/or assignee, under the Transaction Documents by providing written notice of such designation at least five (5) days prior to COE. No assignment shall release or otherwise relieve Buyer from any obligations hereunder; provided, however, with respect to any assignment, if COE occurs the assigning party (but not the assignee) shall be relieved of all its obligations arising under this Agreement before, on and after COE.

20.     **Risk of Loss**. Seller shall bear all risk of loss, damage or taking of the Property which may occur prior to COE. In the event of any loss, damage or taking with respect to the Property prior to COE, Buyer may, at Buyer's sole option, by written notice to Seller and Escrow Agent, terminate this Agreement, whereupon the Earnest Money Deposit shall be paid immediately to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation hereunder. In the alternative, Buyer may attempt to negotiate an appropriate downward adjustment of the Purchase Price. If Seller and Buyer cannot agree upon such a downward adjustment within a reasonable period (not to exceed ten (10) days from the date Buyer receives notice of the loss) Buyer may terminate this Agreement as provided above. In the event of any loss, damage or taking which does not result in a termination of this Agreement, Seller shall at COE and as a condition precedent thereto, pay Buyer or credit Buyer against the Purchase Price the amount of any insurance or condemnation proceeds, or assign to Buyer, as of COE and in a form acceptable to Buyer, all rights or claims for relief to the same, and credit to Buyer an amount equal to the deductible (if any) under the insurance policy.

21.     **Remedies**.

(a)     Seller's Breach. If Seller breaches this Agreement, Buyer may, at Buyer's sole option, either: (i) by written notice to Seller and Escrow Agent, terminate this Agreement, whereupon the Earnest Money Deposit shall be paid immediately by Escrow Agent to Buyer, Seller shall promptly reimburse to Buyer its reasonable out-of-pocket and third-party property diligence expenses (including, without limitation, attorneys' fees) up to Fifty Thousand Dollars & 00/100, ($50,000.00) and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation hereunder, or (ii) seek specific performance against Seller in which event COE shall be automatically extended as necessary. Notwithstanding the foregoing, if specific performance is unavailable as a remedy to Buyer because of Seller's affirmative act or intentional omission, Buyer shall be entitled to pursue all rights and remedies available at law or in equity. Seller hereby acknowledges and agrees that the provisions of this Section 21(a) shall not limit any rights or remedies Buyer may have against Seller after COE pursuant to any indemnification provisions of this Agreement or for any misrepresentation, breach of warranty or default by Seller in any of its obligations under this Agreement, the Transaction Documents, or any other documents to be entered into pursuant to this Agreement.

(b)     Buyer's Breach. IF THE TRANSACTION FAILS TO CLOSE ON OR PRIOR TO THE CLOSING DATE OR THE EXTENDED CLOSING DATE, AS APPLICABLE, DUE TO A FAILURE BY BUYER TO PERFORM BUYER'S OBLIGATIONS UNDER THIS AGREEMENT, AND SUCH FAILURE CONTINEUS FOR MORE THAN TEN (10) DAYS FOLLOWING BUYER'S RECEIPT OF WRITTEN NOTICE FROM SELLER, THE ENTIRE AMOUNT OF THE DEPOSIT, PLUS ACCRUED INTEREST, SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES. BUYER AND SELLER HEREBY ACKNOWLEDGE

AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF SUCH A BREACH OF THIS AGREEMENT BY BUYER WOULD BE DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE AMOUNT OF THE DEPOSIT PLUS ACCRUED INTEREST IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THE TRANSACTION PROVIDED FOR IN THIS AGREEMENT FAILS TO CLOSE, AND THAT SUCH ESTIMATE IS REASONABLE UNDER THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT. BUYER AND SELLER AGREE THAT SELLER'S RIGHT TO RETAIN THE DEPOSIT PLUS ACCRUED INTEREST SHALL BE THE SOLE REMEDY OF SELLER AT LAW IN THE EVENT OF A BREACH OF THIS AGREEMENT BY BUYER.

22. **Attorneys' Fees**. If there is any litigation to enforce any provisions or rights arising under this Agreement, the unsuccessful party in such litigation, as determined by the court, agrees to pay the successful party, as determined by the court, all costs, and expenses, including, but not limited to, reasonable attorneys' fees incurred by the successful party, such fees to be determined by the court. For purposes of this Section 22, a Party will be considered to be the "successful party" if (a) such Party initiated the litigation and substantially obtained the relief which it sought (whether by judgment, voluntary agreement or action of the other Party, trial, or alternative dispute resolution process), (b) such Party did not initiate the litigation and either (i) received a judgment in its favor, or (ii) did not receive judgment in its favor, but the Party receiving the judgment did not substantially obtain the relief which it sought, or (c) the other Party to the litigation withdrew its claim or action without having substantially received the relief which it was seeking.

23. **Notices**.

(a)     Except as otherwise required by law, any notice required or permitted hereunder shall be in writing and shall be given by (i) personal delivery, (ii) deposit in the U.S. Mail, certified or registered, return receipt requested, postage prepaid, (iii) any express or overnight delivery service (e.g., Federal Express), delivery charges prepaid; (iv) facsimile; or (v) electronic mail, in each case addressed to the Parties at the addresses set forth below, or at such other address as a Party may designate in writing pursuant hereto, except that any notice of default must simultaneously be sent by the method set forth in subparagraph (iii) above:

if to Seller:

    Mesilla Valley Ventures, LLC,
    c/o PDG Prestige, Inc.
    Attn: Michael J. Dixson
    154 N. Festival
    Building D
    El Paso, TX 79912
    Tel.: (575) 532-9779
    Fax: (575) 521-9330
    E-mail: mdixson@pdgnm.com

with copies to:

    WKPZ
    Attn: Jeff Carruth
    Phone: 214-552-7242
    Email: jcarruth@wkpz.com

if to Buyer:

    LPC RETAIL, LLC
    c/o Lincoln Property Company, Retail Division
    2000 McKinney Ave., Suite 1000
    Dallas, TX 75201
    Attention: Matthew Gallo, COO, Senior Vice President
    Phone: 214.740.3482
    E-Mail: mgallo@lpc.com

with copies to:

    Chaiken Legal Group, P.C.
    5960 W. Parker Rd., Ste. 278 – 194
    Plano, TX 75093
    Attention: Michael J. Chaiken, Esq.
    Telephone: (214) 751-3433, Ext. 221
    Facsimile: (214) 751-3438
    E-mail: mchaiken@chaikenlegalgroup.com

if to Escrow Agent:

    Southwestern Abstract & Title Co.
    c/o Gricel Chavez
    1125 S. Main Street
    Las Cruces, NM 88005
    575-523-8561 Tel
    575-526-8390 Fax
    Email: justin@swatlc.com
           Gricel@swatlc.com

     (b)    Notice shall be deemed to have been delivered on (i) the date on which the notice is received, if notice is given by personal delivery, (ii) the third business day following the day of deposit of such notice with the U.S. Mail, if notice is given by certified or registered mail, return receipt requested; (iii) the next business day, if notice is delivered by a reputable express overnight delivery service; and (iv) the date on which confirmation of facsimile or electronic mail

is received, if notice is given by facsimile or electronic mail. If escrow has opened, a copy of any notice given to a party shall also be given to Escrow Agent by regular U.S. Mail or by any other method provided for herein.

24. **Approvals**. Concerning all matters in this Agreement requiring the consent or approval of any Party, the Parties agree that any such consent or approval shall not be unreasonably withheld unless otherwise provided in this Agreement.

25. **Additional Acts**. The Parties agree to execute promptly such other documents and to perform such other acts as may be reasonably necessary to carry out the purpose and intent of this Agreement.

26. **Governing Law**. This Agreement shall be construed and interpreted in accordance with and shall be governed and enforced in all respects according to the laws of the state in which the Property is located, without regard to any conflict of laws principles.

27. **Construction**. The terms and provisions of this Agreement represent the results of negotiations among the Parties, each of which has been represented by counsel of its own choosing, and neither of which has acted under any duress or compulsion, whether legal, economic, or otherwise. Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the Parties each hereby waive the application of any rule of law which would otherwise be applicable in connection with the interpretation and construction of this Agreement that ambiguous or conflicting terms or provisions contained in this Agreement shall be interpreted or construed against the Party whose attorney prepared the executed Agreement or any earlier draft of the same.

28. **Time of Essence**. Time is of the essence of this Agreement. However, if this Agreement requires any act to be done or action to be taken on a date which is a Saturday, Sunday or legal holiday, such act or action shall be deemed to have been validly done or taken if done or taken on the next succeeding day which is not a Saturday, Sunday or legal holiday, and the successive periods shall be deemed extended accordingly.

29. **Interpretation**. If there is any specific and direct conflict between, or any ambiguity resulting from, the terms and provisions of this Agreement and the terms and provisions of any document, instrument or other agreement executed in connection herewith or in furtherance hereof, including any Exhibits hereto, the same shall be consistently interpreted in such manner as to give effect to the general purposes and intention as expressed in this Agreement which shall be deemed to prevail and control.

30. **Headings**. The headings of this Agreement are for reference only and shall not limit or define the meaning of any provision of this Agreement.

31. **Fax and Counterparts**. This Agreement may be executed by facsimile or electronically mailed .pdf file, and/or in any number of counterparts. Each Party may rely upon any facsimile, electronically mailed .pdf file or counterpart copy as if it were one original document.

32. **Incorporation of Exhibits**. All Exhibits to this Agreement are fully incorporated herein as though set forth at length herein.

33. **Severability**. If any provision of this Agreement is unenforceable, the remaining provisions shall nevertheless be kept in effect.

34. **Entire Agreement**. This Agreement contains the entire agreement between the Parties and supersedes all prior agreements, oral or written, with respect to the subject matter hereof. The provisions of this Agreement shall be construed as a whole and not strictly for or against any Party.

35. **Intentionally Omitted**.

36. **Privilege Taxes**. Seller represents, warrants, and covenants to Buyer that all state and local transaction privilege, sales, excise, use or similar taxes relating to the development, sale or rental of the Property (including, without limitation any speculative builder tax, owner-builder tax, or construction contractor tax) have been paid and Seller shall pay any such taxes that may arise as a result of the sale of the Property to Buyer as and when due. Seller shall indemnify, hold harmless and defend the Indemnified Parties from any and all Claims relating to a breach of the preceding sentence. The provisions of this Section 36 shall survive COE.

37. **Tax Deferred Exchange**. Each Party agrees to cooperate with each other in effecting the other Party's exchange of the Property that qualifies for tax deferred treatment pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and corresponding provisions of applicable state law by executing and delivering to each other or the applicable exchange company, consents reasonably necessary to effect the tax-deferred exchange; *provided,* that (a) such cooperation does not result in a delay of the Closing, (b) such consents do not modify the terms of this Agreement nor impose any liability or obligations on the Party signing such consent and (c) Buyer is not required to take title to any other real property. Such tax-deferred exchange shall be affected at the requesting Party's sole cost, expense, and liability.

38. **Waiver of Jury Trial and Certain Damages.** EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO SHALL AND THEY HEREBY DO INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND/OR ANY CLAIM OR INJURY OR DAMAGE RELATED THERETO. SELLER FURTHER WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL, AND INDIRECT DAMAGES FROM BUYER IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND/OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.

39. **Escrow Instructions**.

        (a)    Escrow Agent is hereby employed by the Parties to act as escrow agent in connection with this Transaction. This Agreement shall be used as instructions to Escrow Agent, as escrow agent, which may provide its standard conditions of acceptance of escrow; *provided, however,* that in the event of any inconsistency between such standard conditions of acceptance and the terms of this Agreement, the terms of this Agreement shall prevail. Escrow Agent's receipt of this Agreement and the opening of an escrow pursuant to this Agreement shall be deemed to constitute conclusive evidence of Escrow Agent's agreement to be bound by the terms and conditions of this Agreement pertaining to Escrow Agent.

        (b)    Escrow Agent is authorized to pay, at COE, from any funds held by it for each Party's respective credit, all amounts necessary to procure the delivery of any documents and to pay, on behalf of Buyer and Seller, all charges, and obligations payable by them hereunder, respectively. Buyer and Seller will pay all charges payable by them to Escrow Agent. Escrow Agent shall not cause the Transaction to close unless and until it has received written instructions from Buyer and Seller to do so. Escrow Agent is authorized, in the event any conflicting demand is made upon it concerning these instructions or the escrow, at its election, to hold any documents and/or funds deposited hereunder until an action shall be brought in a court of competent jurisdiction to determine the rights of Buyer and Seller or to interplead such documents and/or funds in an action brought in any such court.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

SELLER:

**MESILLA VALLEY VENTURES, LLC**, a Texas limited liability company

By: PDG PRESTIGE, Inc., a Texas corporation, its Manager

By: *Michael Dixson*

Name: Michael Dixson

Its: President

BUYER:

**LPC RETAIL, LLC**, a Delaware limited liability company

By: _____

Name: MATTHEW GALLO

Its: VICE PRESIDENT

## ESCROW AGENT'S ACCEPTANCE

The foregoing fully executed Agreement together with the Earnest Money Deposit is accepted by the undersigned this _____ day of _____, _____, which for the purposes of this Agreement shall be deemed to be the date of Opening of Escrow. Escrow Agent hereby accepts the engagement to handle the escrow established by this Agreement in accordance with the terms set forth in this Agreement.

Southwestern Abstract & Title Co.

By: _____

Title: _____

## EXHIBIT A

## <u>LEGAL DESCRIPTION OF REAL PROPERTY</u>

Address: 510 S. Telshor Blvd Las Cruces, NM 88011 – See Assignment of Lease into Seller – dated February 25, 2022

TRACT 1A OF THE MESILLA VALLEY MALL SUBDIVSION REPLAT #5

## EXHIBIT B

## BILL OF SALE

## BILL OF SALE

**Date:** _____, 2022

**Seller:** [SELLER], [Seller Entity]

**Seller's Mailing Address:**

**Buyer:**  [BUYER], [Buyer Entity]

**Buyer's Mailing Address:**

### Definitions:

As used herein, the following terms shall have the meanings assigned to such terms in the following provisions:

"**Improvements**" means the buildings, structures, fixtures and other improvements situated on the Land; all rights and appurtenances pertaining to the Land; and all fixtures and equipment attached to or located upon or within the Land or the Improvements thereto.

"**Land**" means that certain tract of land located in the City of Durham, Durham County, North Carolina, and legally described on **Exhibit A** which is attached hereto and made a part hereof.

"**Personal Property**" means all tangible personal property owned by Seller, if any, currently used in the operation, repair and maintenance of the Real Property and situated thereon.

"**Real Property**" means the Land and the Improvements.

### Transfer of Personal Property:

For value received, Seller sells, assigns and delivers all of Seller's right, title and interest in and to the Personal Property to Buyer.

Seller has not made and does not make any express or implied warranty or representation of any kind whatsoever with respect to the Personal Property, including, but not limited to: title; merchantability of the Personal Property or its fitness for any particular purpose; the design or condition of the Personal Property; the quality or capacity of the Personal Property; workmanship or compliance of the Personal Property with the requirements of any law, rule, specification or contract pertaining thereto; patent infringement or latent defects. Buyer accepts the Personal Property on an "AS IS, WHERE IS" basis, and "WITH ALL FAULTS." The sale, delivery and assignment of the Personal Property is subject to the matters to which that certain Special Warranty Deed ("**Deed**") of even date herewith from Seller to Buyer conveying the Land is further made subject as fully as if and for all purposes as if the Personal Property were included and described in the Deed.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, Seller has caused this instrument to be executed and delivered as of the _____ day of _____, 2022.

**SELLER**:

**Mesilla Valley Ventures, LLC**

**By:  PDG PRESTIGE, Inc. a Texas Corporation**

By: _____
Name: Michael Dixson
Title: President

## EXHIBIT C

## ASSIGNMENT AGREEMENT

This Assignment Agreement (the "Agreement") dated as of _____, 202____ (the "Effective Date"), is by and between _____, a _____ ("Assignor"), and _____, a _____ ("Assignee").

WHEREAS, Assignor, as Seller, and [Assignee, as Buyer][_____, LLC, as Buyer ("Original Buyer")], have entered into that certain Purchase and Sale Agreement dated as of _____, 201____ [as modified by amendment dated _____,] ([collectively, ](the "Purchase Agreement"), providing for, among other things, the transfer and sale by Assignor to [Assignee] [Original Buyer] of Contracts, Warranties and Permits (capitalized terms used herein and otherwise not defined shall have the meaning given in the Purchase Agreement); and

[WHEREAS Original Buyer assigned its right, title and interest in and to the Purchase Agreement to Assignee pursuant to that certain Assignment of Purchase and Sale Agreement dated as of _____, 201____; and]

WHEREAS Assignor desires to assign to Assignee all of Assignor's right, title, and interest in and to the Permits, Warranties and the Contracts including, without limitation, as more particularly listed in Exhibit A attached hereto (collectively, the "Assigned Contracts").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1. Assignment. Assignor does hereby convey and assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Assigned Contracts (and Assignor covenants to cooperate with Assignee to secure performance by any warrantor for any work under such Assigned Contracts); provided, however, that to the extent the assignment of any Assigned Contract shall require the consent of any other party, this Agreement shall not constitute a contract to assign the same or any rights or liabilities thereunder if an attempted assignment thereof would cause a breach of the terms of the Assigned Contract, and the assignment of such Assigned Contract shall not be effective unless and until the consent of such other party shall have been obtained.

2. Binding Agreement. The terms and conditions of this Agreement shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

3. Interpretation. If there is any conflict as to the terms of this Agreement and the Purchase Agreement, the terms of the Purchase Agreement shall prevail.

4. Governing Law. This Assignment Agreement shall be governed by and construed in accordance with the laws of _____ applicable to contracts made and performed entirely therein.

5. Headings. The headings of this Agreement are for reference only and shall not limit or define the meaning of any provision of this Agreement.

6.    <u>Counterparts</u>. The parties agree that this Agreement may be executed by the parties in one or more counterparts and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Agreement as of the date set forth above.

ASSIGNOR:                                _____

                                          By: _____

                                          Its: _____

ASSIGNEE:                                _____

                                          By: _____

                                          Its: _____

## EXHIBIT A

### LIST OF CONTRACTS
NA

## EXHIBIT D

**RECORDING REQUESTED BY AND**
**WHEN RECORDED RETURN TO:**

**[to be conformed to state requirements]**
**SPECIAL WARRANTY DEED**

      For the consideration of Ten Dollars ($10.00), and other valuable considerations, _____ ("Grantor"), hereby conveys to _____, a _____ ("Grantee"), the following described real property situated in _____ County, _____, together with all rights and privileges appurtenant thereto:

      See legal description set forth in Exhibit A attached and incorporated by this reference (the "Property").

      together with all improvements, buildings, structures and fixtures located thereon; all easements, if any, benefiting the Property; all rights, benefits, privileges and appurtenances pertaining to the Property, including any right, title and interest of Grantor in and to any property lying in or under the bed of any street, alley, road or right-of-way, open or proposed, abutting or adjacent to the Property; the strips, gaps or gores, if any, between the Property and abutting properties; all water, water rights, oil, gas or other mineral interests in, on, under or above the Property; and all rights and interests to receive any condemnation awards from any condemnation proceeding pertaining to the Property, sewer rights, water courses, wells, ditches and flumes located on or appurtenant to the Property.

      SUBJECT ONLY TO the matters set forth on Exhibit "B" attached hereto and made a part hereof, as well as taxes and assessments for 2022 and subsequent years.

      TOGETHER WITH all the easements, tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

      TO HAVE AND TO HOLD, the same in fee simple forever.

      GRANTOR hereby covenants with Grantee that it owns the Property in fee simple; that it has good right and lawful authority to convey the Property; and that it warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other.

      Dated this ____ day of _____, 201____.

GRANTOR:

_____

By: _____

Title: _____

STATE OF _____ )
                                ) Ss:
COUNTY OF _____ )

This instrument was acknowledged and executed before me this _____ day of _____,
201_____, by _____.

_____
Notary Public

My Commission Expires: _____

**EXHIBIT A TO**
**SPECIAL WARRANTY DEED**

**Legal Description**

**EXHIBIT E**

**LEASE ASSIGNMENT**

      **THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Assignment"), is made as of _____, 202\_\_\_\_ by and between _____, a _____ ("Assignor") and _____, **LLC**, a Delaware limited liability company ("Assignee").

**W I T N E S S E T H:**

      **WHEREAS,** pursuant to the terms of that certain Purchase and Sale Agreement, dated as of_____, by and between Assignor, as Seller, and [Assignee, as Buyer][_____, LLC, as Buyer ("Original Buyer")] (the "Purchase Agreement"), Assignor agreed to sell to [Assignee] [Original Buyer], *inter alia*, certain real property, the improvements located thereon and certain rights appurtenant thereto owned by Assignor, all as more particularly described in the Purchase Agreement (collectively, the "Property"). Initially capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement; [and]

      **WHEREAS,** the Purchase Agreement provides, *inter alia*, that Assignor shall assign to [Assignee] [Original Buyer] the Assignor's/landlord's interest in the lease (and associated guaranties, if any) affecting the Property described on Exhibit A attached hereto (collectively, the "Lease"), and that Assignor and [Assignee] [Original Buyer] shall enter into this Assignment[.] [; and

      **WHEREAS** Original Buyer assigned its right, title and interest in and to the Purchase Agreement to Assignee pursuant to that certain Assignment of Purchase and Sale Agreement dated as of _____, 201\_\_\_\_.]

      **NOW, THEREFORE,** in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

      1.    Assignment. Assignor hereby assigns, transfers, and conveys to Assignee, all right, title and interest of Assignor as landlord under the Lease. Assignor shall remain liable for the performance of any obligation required to be performed by the landlord under the Lease for all periods prior to the date hereof. Assignor shall indemnify, defend, and save Assignee harmless from and against any and all claims, demands or liabilities arising pursuant to the Lease as a result of any act or omission of Assignor occurring prior to the date hereof. The original signed counterparts of the Lease, or copies thereof, if no originals are available, together with any and all supplements and amendments thereto, have been delivered to Assignee herewith.

      2.    Assumption. Assignee, by acceptance of this Assignment and the Lease, hereby assumes and agrees to keep, observe, and perform all of the covenants, conditions, terms, and provisions under the Lease to be kept, observed, and performed by the landlord thereunder from and after the date hereof. Assignee shall indemnify, defend, and save Assignor harmless from and

against any and all claims, demands or liabilities arising pursuant to the Lease as a result of any act or omission of Assignee occurring from and after the date hereof.

3.     Miscellaneous. This Assignment and the obligations of the parties hereunder shall survive the closing of the transaction referred to in the Purchase Agreement and shall not be merged therein, shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

4.     Severability. If any term or provision of this Assignment or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforced to the fullest extent permitted by law.

5.     Counterparts. This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

6.     Attorneys' Fees. If any litigation between Assignor and Assignee arises out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such litigation, including, without limitation, reasonable attorneys' fees.

**IN WITNESS WHEREOF,** the undersigned have executed this Assignment as of the date first set forth hereinabove.

**ASSIGNOR:**

**ASSIGNEE:**

## Exhibit A

[insert description of the existing lease and any applicable guaranty]

**[NOTE: ADD GUARANTOR CONSENT AND CONFIRMATION OF GUARANTY IF APPLICABLE]**

## EXHIBIT F

## SELLER'S DILIGENCE MATERIALS

1.    All agreements relating to possession, use or occupancy of any portion of the Real Property.

2.    Agreements in Seller's possession or under its control relating to the management, operation, repair, or maintenance of the Improvements, if any, and all amendments and modifications thereto.

3.    Maps, reports, documents, surveys, studies, plans and specifications, drawings, and other governmental permits and approvals, notices from insurer or governmental authority regarding the Property or any portion thereof, warranties, documents of significance to the Real Property, correspondence, or other materials pertaining to or concerning the Real Property that are in Seller's possession or under its control, including, without limitation:

- Any and all ALTA surveys for the Real Property.

- Any and all soil, geotechnical, grading, drainage, hydrology, or other engineering studies relating to the Real Property.

- Any and all environmental assessments, Phase I reports, Phase II reports and environmental remediation contracts for the Real Property.

- Any and all seismic or earthquake reports relating to the Real Property.

- Any and all architectural schematic or design development plans.

- Any and all applications for or copies of licenses, permits, conditional use permits, variances, certificates of occupancy, or for other land use entitlements to any governmental agency for the use, occupancy, and development of the Real Property, together with relating supporting materials; and

- Property condition reports.

4.    Property tax statements and assessed value notices for the past three years.

5.    Copies of all insurance policies.

6.    Annual operating statements within the last three (3) year period prior to the date of this Agreement.

7.    Annual store sales reports for the three (3) year period prior to the date of this Agreement.

8.    Budgets for the Real Property for the next fiscal year.

9.    Unaudited profit and loss statement for the most recent calendar quarter.

10.   All correspondence from governmental agencies relating to the Real Property, and all correspondence from neighboring property owners regarding the operation and use of the Real Property.

11.   Any marketing studies relating to the Real Property.

12.     Seller's title insurance policy for the Real Property with all endorsements thereto.

13.     Any and all correspondence, notifications or other documentation relating to condemnation of any portion of the Real Property or any real property adjacent to the Real Property.

14.     Any and all contracts and warranties relating to the Real Property, whether or not such warranties are assignable or transferrable to Buyer.

15.     Any other documents or other information in the possession or control of Seller or its agents pertaining to the Property.

16.     As built survey required under Section 9 (f) of the Lease.

# EXHIBIT G

## FORM OF TENANT NOTICE LETTER

**[seller name]**
**[seller address]**

### NOTICE TO TENANT

_____ ___, 201____

[tenant]

_____

_____

Re:    Lease dated _____ (as amended, modified and supplemented from time to time, and any guaranties relating thereto, collectively the "Lease") by and between _____ ("**Landlord**") and _____ ("**Tenant**") with respect to the real property located at _____ /Store # _____ (the "**Property**")

Dear Tenant:

Please be advised that the Property and Landlord's interest in the Lease were purchased by _____ _____, ("**Buyer**") from Landlord, effective as of the date hereof (the "**Closing Date**"). Buyer has assumed all of the obligations of Landlord arising from and after the Closing Date. Landlord hereby irrevocably instructs and authorizes you to hereafter make all rent and other monetary obligation payments payable directly to Buyer, commencing with your _____, 20 ___ payment. Buyer's notice information is as follows:

_____

_____

_____

_____

Telephone: _____
Fax No.: _____
Email: _____

For billing and collection questions or issues, please contact _____, at (____) _____, Email: _____.

For all other purposes under the Lease, please contact _____, at (____) _____, Email: _____.

Please direct your insurance broker to obtain a certificate of insurance identifying Buyer as an additional named insured as required pursuant to the terms of the Lease and request that all future communication to your landlord be sent to Buyer.

To facilitate your payment of rent and other monetary obligations to Buyer, Buyer's W-9 Form in enclosed with this letter. Buyer's tax identification number is _____.

In addition, Buyer requests that all payments to be made via wire transfer or ACH utilize the following:

| | |
|---|---|
| Beneficiary Account Name: | |
| Beneficiary Account Number: | |
| Bank Name: | |
| Bank Address: | |
| Wire Routing Transit Number: | |
| For International transfer only International SWIFT/BIC code: | |

****To ensure proper credit, please indicate the address of the Property for which the payment is being made on the wire.

The instructions set forth herein are irrevocable and are not subject to modification in any manner except as expressly provided by, or on behalf of, the General Counsel of Buyer.

*Remainder of Page Intentionally Left Blank*
*Signature Page to Follow*

NOTICE TO TENANT
[date]
[concept], [address]

Sincerely,

**SELLER**
**PDG PRESTIGE, INC, A TEXAS CORPORATION**

By: _____

Name: _____

Title: _____


LEASE ASSUMPTION

ACKNOWLEDGED: BUYER:


By: _____

Name: _____

Title: _____