**Dated: September 26, 2025.**

_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**
_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| In re:<br>PDG PRESTIGE, INC.,<br>　　　　Debtor. | Case No. 21-30107-cgb<br>Chapter 7 |
| LEGALIST DIP GP, LLC;<br>PDG PRESTIGE, INC.,<br>　　　　Plaintiffs, | |
| v.<br><br>MICHAEL DIXSON; MESILLA VALLEY VENTURES, LLC; MICHAEL DIXSON TRUST; CHRISTINA DIXSON; WEYCER KAPLAN, PULASKI & ZUBER, P.C.; FSLRO 510 SOUTH TELSHOR LAS CRUCES, LLC; LPC RETAIL, LLC; THE GATEWAY VENTURES, LLC; ENTRADA DEVELOPMENT, LLC,<br>　　　　Defendants. | Adv. No. 23-03004-cgb |

1

# OPINION AND ORDER GRANTING DEFENDANT WEYCER, KAPLAN, PULASKI & ZUBER, P.C.'S MOTION FOR SUMMARY JUDGMENT

## Introduction

A law firm represented a chapter 11 debtor whose president is accused of misappropriating proceeds from the sale of property of the debtor's bankruptcy estate. The firm seeks summary judgment dismissing the claims against it, primarily arguing that it has attorney immunity against the non-trustee plaintiff's claims. The Court finds that it should grant summary judgment because (1) the attorney immunity doctrine—which bars non-client claims against attorneys acting in the scope of their representation of a client—bars most of the non-trustee plaintiff's claims against the law firm and (2) the non-trustee plaintiff failed to submit sufficient evidence to show a genuine issue of material fact as to any of its claims.

## Jurisdiction and Authority

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding to recovery money under 28 U.S.C. § 157(b)(2)(H). Venue is proper under 28 U.S.C. §§ 1408 and 1409(a).

## Procedural Background

On June 16, 2023, Legalist DIP GP, LLC ("Legalist") filed this adversary proceeding against PDG Prestige Inc. ("PDG" or the "Debtor") and PDG's president, Michael Dixson ("Dixson").[1] After PDG's case was converted to chapter 7, the chapter 7 trustee Ronald E. Ingalls (the "Trustee"), moved to realign PDG as a party plaintiff, which the Court granted.[2] On February 23, 2024, Legalist and PDG (collectively the "Plaintiffs") filed an amended complaint adding various defendants, including Weycer, Kaplan, Pulaski & Zuber, P.C. ("Weycer Kaplan").[3] Weycer Kaplan moved to dismiss the civil conspiracy claim asserted against it under Rule 12(b)(6).[4] After a hearing, the Court entered an order denying the motion to dismiss.[5]

---

[1] Comp., ECF No. 1.
[2] Mot. to Realign PDG Prestige, Inc., ECF No. 29; Order Realigning PDG Prestige, Inc. as Party Pl., ECF No. 30.
[3] Pls.' Second Am. Comp., ECF No. 36.
[4] Mot. Dismiss, ECF No. 56.
[5] Order Den. Mot. Dismiss, ECF No. 56.

2

A few months later, the Plaintiffs filed a third amended complaint.[6] The Plaintiffs' claims against Weycer Kaplan stem from Weycer Kaplan's representation of PDG in PDG's chapter 11 case.[7] In the Third Amended Complaint, the Plaintiffs assert claims against Weycer Kaplan for (1) civil conspiracy; (2) civil contempt; and (3) revocation of the order retaining Weycer Kaplan and fee disgorgement.[8]

In specific, the Plaintiffs allege that Weycer Kaplan, through attorney Jeff Carruth ("Carruth"), conspired with Dixson to sell estate property outside of the Court's supervision by transferring an asset, Lot 1A, to Mesilla Valley Ventures, LLC ("Mesilla Valley"), another entity controlled by Dixson, for no consideration.[9] They allege that prior to confirmation of the chapter 11 plan, Carruth facilitated the transfer to Mesilla Valley and then negotiated the sale of Lot 1A, representing both PDG and Mesilla Valley in the transaction.[10] The Plaintiffs further allege that this conspiracy led to Dixson's fraudulent use of the sale proceeds, which violated the terms of the Court's order authorizing PDG to borrow money from Legalist post-petition (the "DIP Order") and so the Plaintiffs also seek a judgment that Weycer Kaplan, PDG, and Dixson committed civil contempt.[11] Finally, the Plaintiffs contend that Weycer Kaplan failed to disclose its representation of entities related to PDG and then sought approval of fees in connection with that non-debtor representation from the Court.[12] The Plaintiffs argue that this violated the order authorizing Weycer Kaplan's employment and ask the Court to revoke that order and disgorge all the fees awarded to Weycer Kaplan in its final fee application.[13]

In answer, Weycer Kaplan denies these allegations and asserts various affirmative defenses, including contributory negligence, attorney immunity, estoppel, waiver, and ratification—because it contends that Legalist agreed to the sale of Lot 1A and agreed to release its lien.[14]

---

[6] Third Am. Compl., ECF No. 97.
[7] *Id.*; *see* Appl. to Employ, Case No. 21-30107, ECF No. 16; Order Granting Appl. to Employ, Case No. 21-30107, ECF No. 47.
[8] Third Am. Compl. ECF No. 97.
[9] *Id.* ¶¶ 201–09.
[10] *Id.*
[11] *Id.* ¶¶ 245–49.
[12] *Id.* ¶¶ 251–58.
[13] *Id.*
[14] Weycer Kaplan Answer, ECF No. 120, ¶¶ 260–62.

3

Weycer Kaplan then moved for summary judgment on its attorney immunity affirmative defense and on each of the Plaintiffs' claims against it.[15] The Plaintiffs objected to summary judgment and Weycer Kaplan filed a reply in support.[16]

Thereafter, the Trustee settled the bankruptcy estate's claims against Weycer Kaplan.[17] The Court entered an order approving the settlement on September 15, 2025.[18] Thus, the Court will only consider Legalist's claims.

## Factual Background

The evidence presented in support of the summary judgment motion is largely uncontroverted by the Plaintiffs, or is verifiable from the pleadings filed in the main bankruptcy case.

In February of 2021, Weycer Kaplan, through Carruth, filed a chapter 11 case on behalf of PDG.[19] It sought and obtained Court approval to represent PDG.[20] PDG's schedules listed real property, usually referred to as Lot 1A and Lot 3A (collectively the "Property").[21] On April 12, 2021, the Court entered the DIP Order, which authorized PDG to take out a DIP Loan through Legalist and to use the proceeds to pay off a first lien and to complete development of the Property.[22] The DIP Order gave Legalist a security interest on all of PDG's assets, including the Property.[23]

Almost a year later, in January of 2022, PDG filed its First Amended Disclosure Statement (the "Disclosure Statement").[24] The Court approved the

---

[15] Mot. Summ. J., ECF No. 139.
[16] Opp'n to Mot. Summ. J., ECF No. 147; Reply, ECF No. 149.
[17] Mot. to Approve Compromise, Case No. 21-30107, ECF No. 422.
[18] Order Granting Mot. to Approve Compromise, Case No. 21-30107, ECF No. 424.
[19] Mot. Summ. J., ECF No. 139, Ex. 3 (Voluntary Pet.).
[20] Mot. Summ. J., ECF No. 139, Ex. 6 (Order Granting Appl. to Employ Weycer Kaplan).
[21] Mot. Summ. J., ECF No. 139, Ex. 4 (Schedules). The schedules list "510 and 550 S Telshor, Las Cruces. Referred to by parties often as Lot 1A and Lot 3A." The property is valued at $4,700,000.
[22] Mot. Summ. J., ECF No. 139, Ex. 5 (DIP Order); Mot. Summ. J., Ex. 10, p. 34, 9–18 (Dep. Tr. of Brian T. Rice); Mot. to Obtain Credit, Case No. 21-30107, ECF No. 24
[23] Mot. Summ. J., ECF No. 139, Ex. 5 (DIP Order); Mot. to Obtain Credit, Case No. 21-30107, ECF No. 24.
[24] Mot. Summ. J., ECF No. 139, Ex. 8 (Disclosure Statement).

4

Disclosure Statement and set PDG's Amended Chapter 11 Plan for confirmation.[25] Section 6.1 of the Disclosure Statement stated that the Plan would constitute "a sale motion under Code §363(f) to sell Lot 1A free and clear and all liens, claims, and encumbrances . . . with the proceeds of such sale being used to fund the Plan as described herein."[26] It also stated that PDG anticipated proceeds from the sale Lot 1A to be between 1.8 and 2 million and that almost all of those proceeds would go to reduce the claims of Legalist.[27]

At some point, negotiations began regarding a sale of Lot 1A to LPC Retail, LLC ("LPC").[28] Between March 3-4, 2022, several people, including Dixson, Carruth, and Michael Chaiken, LPC's counsel, ("Chaiken") communicated about a Purchase and Sale Agreement ("PSA").[29] The executed PSA attached to the emails is between Mesilla Valley and LPC.[30] On March 3, 2022, Carruth sent an email to Chaiken that purportedly attached an updated PSA with "the missing information."[31] The email also included a screen shot of "clean up fixes in the bk provision."[32] Notably, the screen shot shows section (t) which states "[s]eller is currently the Debtor in a Chapter 11 reorganization proceeding, Case No. 21-30107, *In re PDG Prestige, Inc.* . . . ."[33] The language then goes on to explain that PDG would need to obtain approval of the Court before closing either through a 363 sale or confirmation of a Chapter 11 Plan.[34] This language was incorporated in the executed version of the PSA.[35]

---

[25] Mot. Summ. J., ECF No. 139, Ex. 7 (Order Approving Disclosure Statement). The Court notes that Weycer Kaplan uses the original order approving the Disclosure Statement as an exhibit, but an amended order was entered on the same date at Case No. 21-30107, ECF No. 119.

[26] Mot. Summ. J., ECF No. 139, Ex. 8 (Disclosure Statement). The Disclosure Statement states that PDG had entered into a sale agreement for Lot 1A in December 2021 with an entity called The Paul Rothbard Revocable Living Trust for a purchase price of $2,615,000. According to Weycer, this proposed sale ultimately did not go through. *Id.*, p. 4, n 15.

[27] Mot. Summ. J., Ex. 8, ¶ 6.2 (Disclosure Statement).

[28] Opp'n to Mot. Summ. J., ECF No. 147, Ex. B (Emails between, in part, Dixson, Carruth, and LPC dated March 3–4, 2022, enclosing executed PSA between Mesilla Valley and LPC).

[29] *Id.*

[30] *Id.* at p. 5.

[31] *Id.* at p. 3.

[32] *Id.* at p. 4.

[33] *Id.*

[34] *Id.*

[35] *Id.* at pp. 14-15.

5

On March 31, 2025, the date of the confirmation hearing, PDG filed its Second Amended Chapter 11 Plan (the "Plan").[36] According to the Plan, PDG intended to fund payments to creditors through the Plan by, in part, a sale of Lot 1A.[37] The Plan also provided that any sales of the "Subject Property" (including Lot 1A) would constitute sales under code sections 363(f), 1122(a)(5), or 1125(b)(4).[38] In paragraph 10, the Plan also provided that "upon the Effective Date, all property of the estate . . . including without limitation each of Lot 1A and Lot 3A of the Subject Property, shall vest and/or return to Reorganized Debtor, and which property the Reorganized Debtor shall be free to sell, lease, encumber, and otherwise transact and/or use in any manner without the necessity of further notice to any creditors and/or parties in interest and without the necessity of prior approval of the Bankruptcy Court."[39]

The day before the confirmation hearing, Carruth emailed Brian Rice, Legalist's Chief Operating Officer and General Counsel ("Rice"), a redline of amendments to the Plan for Legalist's input on the Plan as amended.[40] Legalist did not object to the above sale language in the Plan (as Rice has confirmed in his deposition).[41] Carruth then asked Rice whether he could inform the Court that Legalist approved of the Plan.[42] Rice responded "[s]o long as we're getting repaid from a post-confirmation refi/sale, which I think everyone is on the same page about – and not 120 monthly payments of 10 years [emoji] – then, yes, we consent.[43] Ultimately, PDG's Second Amended Chapter 11 Plan, filed on March 29, 2022, was confirmed on March 31, 2022.[44]

On April 20, 2021, Dixon executed a Special Warranty Deed that transferred Lot 1A from PDG to Mesilla Valley.[45] According to Dixson's testimony, Dixson

---

[36] Second Am. Chapter 11 Plan, Case No. 21-30107, ECF No. 145.
[37] Mot. Summ. J., Ex. 9, p. 18, ¶ 8.1 (Order Confirming Plan).
[38] Id. p. 19, ¶ 9.9 ("Any sales, transfers, and/or conveyances of some or all of the Subject Property shall be made pursuant to, at minimum, constitutes sales [sic] under Code §§ 363(f), 1122(a)(5), and/or 1125(b)(4) . . . .").
[39] Id. at p. 20, ¶ 10.
[40] Mot. Summ. J., Ex. 10, p. 20, 9–19; p. 57, 4–18; p. 59, 13–15 (Dep. T. of Brian T. Rice); Ex.11 (Email from Jeff Carruth to Brian Rice dated March 30, 2022).
[41] Mot. Summ. J., Ex. 10, p. 61–62, 21–23, 16–17 (Dep. Tr. of Brian T. Rice).
[42] Mot. Summ. J., Ex. 12.
[43] Id. at p. 1.
[44] Mot. Summ. J., Ex. 9 (Order Confirming Plan). The Court notes that the Plan was filed along with a redline showing the amendments to the last filed plan. Case No. 21-30107, ECF No. 142.
[45] Mot. Summ. J., Ex. 16 (Special Warranty Deed).

6

himself represented both PDG and Mesilla Valley in the transaction, decided to transfer Lot 1A, and negotiated the sale of Lot 1A.[46]

A couple of weeks after confirmation, Carruth again emailed Rice and Zach Campbell, Legalist's Investment Manager ("Campbell") a release of lien document so that Lot 1A could be sold.[47] Rice then conferred with Campbell and Nate Jones, Legalist's Head of Underwriting, who had discussed the lien release with Dixson, and executed the release based on those discussions.[48] The next day, Rice asked Carruth for a copy of the Lot 1A Purchase and Sale Agreement (the "PSA"), which Carruth provided.[49] The enclosed PSA stated that it was between Mesilla Valley and LPC.[50] Rice raised no objection to the PSA and asked about use of proceeds.[51] In response, Carruth stated "[Dixson] and other Legalist folks have been working on use of proceeds, separately from me. The basic concept, though, is to use net proceeds to pay claims (including yours truly) and use the remaining net (around $1.8M) to complete development. There is take out of Legalist waiting in the wings for this to close, and [Dixson] has sent those terms."[52] Rice testified that he understood this to mean that Carruth was giving his understanding of how the proceeds would be used and testified that Legalist expected repayment through a subsequent refinancing.[53]

In early May 2022, Weycer Kaplan filed its third and final fee app.[54] Several weeks later, the Court granted the application and awarded it $90,469 in fees.[55] On May 26, 2022, Mesilla Valley sold Lot 1A for $2,545,000 to FSLRO 510 South Telshor Las Cruces, LLC ("FSLRO").[56] After payment of various claims, including $75,000 to Weycer Kaplan, the sale proceeds were $1,916,558.82.[57] Although the PSA was with Mesilla Valley, the proceeds were deposited into PDG's bank

---

[46] Mot. Summ. J., Ex. 13, pp. 42–46 (Dep. Tr. of Michael Dixson).
[47] Mot. Summ. J., Ex. 14 (Email from Carruth to Rice dated April 12, 2022).
[48] Mot. Summ. J., Ex. 10 pp. 47–52 (Dep. Tr. of Brian T. Rice).
[49] Mot. Summ. J., Ex. 17 (Emails between Carruth and Rice dated April 13, 2022); Ex. 18 (Email from Carruth to Rice attaching executed sale agreement for Lot 1A dated April 13, 2022).
[50] Mot. Summ. J., Ex. 18.
[51] Mot. Summ. J., Ex. 19 at p. 1 (Emails between Carruth and Rice dated April 13, 2022).
[52] *Id*.
[53] Mot. Summ. J., Ex. 10 pp. 80–82 (Dep. Tr. of Brian T. Rice).
[54] Final Fee Appl., Case No. 21-30107, ECF No. 154.
[55] Order Granting Final Fee Appl., Case No. 21-30107, ECF No. 156.
[56] LPC had previously transferred its interest in the PSA to FSLRO. Opp'n to Mot. Summ. J., ECF No. 147, Ex. E (Assignment of Purchase and Sale Agreement).
[57] Mot. Summ. J., Ex. 20 (Seller's Statement).

account.[58] A little over a year later, PDG's bankruptcy case was converted from chapter 11 to chapter 7 and the Trustee was appointed.[59] Shortly thereafter, Weycer Kaplan withdrew as counsel.[60]

## Analysis

Summary judgment is to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[61] A fact is material if it "might affect the outcome of the suit under the governing law."[62] This standard of review does not merely ask the court to determine "whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court."[63] To defeat a motion for summary judgment, "the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial."[64] In determining a summary judgment motion, all facts and evidence must be taken in the light most favorable to the non-movant.[65]

### A. The Attorney Immunity Doctrine Bars Legalist's Claims.

Weycer Kaplan seeks summary judgment that its attorney immunity affirmative defense bars Legalist's claims against it. To be entitled to summary judgment on this issue, Weycer Kaplan must prove that there is no genuine issue of material fact that its conduct is protected by the attorney immunity doctrine and that it is entitled to judgment as a matter of law.[66]

---

[58] Mot. Summ. J., Ex. 21 (May 2022 PDG Bank Statement).
[59] Mot. Summ. J., Ex. 22 (Order Converting PDG Case).
[60] Mot. Summ. J., Ex. 25 (Order Granting Mot. to Withdraw).
[61] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[62] *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[63] *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).
[64] *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007) (citation omitted).
[65] *United Fire & Cas. Co. v. Hixson Bros.*, 453 F.3d 283, 285 (5th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587).
[66] *Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (applying Texas law governing attorney immunity doctrine); *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015).

Under Texas law, attorneys are generally immune from civil liability to *non-clients* for actions taken within the scope of representing their client.[67] Even wrongful conduct is not actionable "if it is part of the discharge of the lawyer's duties in representing his or her client."[68] To determine whether conduct falls outside the scope of an attorney's representation, the Texas Supreme Court directs courts to look at "the *kind* of conduct at issue rather than the *alleged wrongfulness* of said conduct."[69]

In the Response, Legalist primarily argues that the attorney immunity doctrine does not apply because the claims against Weycer Kaplan were brought by both Legalist and the Trustee.[70] Indeed, in chapter 7, a trustee stands in the shoes of the debtor.[71] Because of this, the trustee effectively becomes a former client of debtor's counsel and so the attorney immunity doctrine does not apply.[72] Once this case was converted to chapter 7, the Trustee stepped into PDG's shoes and became a former client of Weycer Kaplan. Thus, the attorney immunity doctrine does not bar any of the Trustee's claims. However, Legalist, indisputably a non-client of Weycer Kaplan, provides no support for its attempt to bootstrap this analysis to *its* claims. Further, the Trustee has now settled its claims against Weycer Kaplan so only Legalist's claims remain.[73] As Legalist is inarguably not Weycer Kaplan's client, Legalist's claims are barred as a matter of law if the alleged wrongful conduct is the kind of conduct that falls within the scope of Weycer Kaplan's representation of PDG.

The summary judgment evidence shows that Weycer Kaplan:

---

[67] *Cantey Hanger,* 467 S.W.3d at 481.
[68] *Id.* (internal citation omitted); *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018) ("[A]n attorney may be liable to nonclients only for conduct outside the scope of his representation of his client or for conduct foreign to the duties of a lawyer.").
[69] *Youngkin*, 546 S.W.3d at 681 (emphasis in original).
[70] Opp'n to Mot. Summ. J., ECF 147, ¶ 78.
[71] *See Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) ("[A chapter 7] trustee, as the representative of the bankruptcy estate, is the real party in interest, and is the only party with standing to prosecute causes of action belonging to the estate once the bankruptcy petition has been filed."); *In re Shurley*, 139 F.3d 899, 1998 WL 127867, at *3 (5th Cir. 1998) (holding that a chapter 7 trustee "who steps into the shoes of the debtor" was also bound by a debtor's pre-petition waiver of notice); *In re Johns*, 667 B.R. 322, 326 (Bankr. N.D. Tex. 2025) ("Upon appointment, the trustee steps into the shoes of the debtor . . . .").
[72] *In re Texas E&P Operating, Inc.*, No. 17-34386, 2024 WL 3490242, at *12 (Bankr. N.D. Tex. July 19, 2024).
[73] Order Approving Mot. to Compromise, Case No. 21-30107, ECF No. 424.

9

- Served as bankruptcy counsel to PDG[74]
- Filed the Petition and Schedules for PDG[75]
- Filed and prosecuted the DIP Motion on behalf of PDG[76]
- Filed and prosecuted PDG's Disclosure Statement and Plan (along with amendments) on behalf of PDG[77]
- Worked on the PSA for the sale of Lot 1A in some capacity[78]
- Communicated with Legalist regarding the Disclosure Statement and Plan[79]
- Communicated with Legalist regarding the sale of Lot 1A, lien release, and Carruth's understanding of Dixson's negotiations regarding use of the sale proceeds[80]
- Filed a Fee Application and obtained Court approval of its fees[81]
- Received payment from the proceeds of the Lot 1A sale[82]
- Moved to Convert the Case to Chapter 7[83]
- Withdrew as counsel post-conversion[84]

These services fall squarely within the kind of conduct expected of bankruptcy counsel and are certainly within the scope of Weycer Kaplan's representation of PDG. Although Legalist alleges that Carruth was secretly representing Mesilla Valley in the PSA negotiations, Legalist's evidence on this point—the email from Carruth to LPC's counsel wherein he added some "missing information" to the PSA and edited information about PDG's bankruptcy is insufficient to counter the deposition testimony that Dixson himself negotiated the PSA on behalf of Mesilla. As PDG's counsel, Carruth understandably had an interest in reviewing documents for a sale that brought nearly $2 million into PDG's coffers, and his actions are consistent with his service in his court-approved role.

---

[74] Mot. Summ. J., Ex. 6 (Order Granting Application to Employ).
[75] Mot. Summ. J., Exs. 3, 4 (Voluntary Petition and Schedules).
[76] Mot. Summ. J., Ex. 5 (DIP Order); Case No. 21-30107, ECF No. 24 (DIP Motion).
[77] Mot. Summ. J., Ex. 9 (Order Confirming Plan).
[78] Opp'n to Mot. Summ. J., Exs. A, B. The PSA lists Mesilla Valley as seller. Although the March 3, 2022 email does not state who Carruth was representing for his work on the PSA, the email shows that Carruth edited language in the PSA about PDG's bankruptcy case.
[79] Mot. Summ. J., Exs. 10, 12 (Emails between Carruth and Rice dated March 30-31, 2022).
[80] Mot. Summ. J., Exs. 14, 17, 18, 19 (Emails between Carruth and Rice dated April 12-13, 2022).
[81] Case No. 21-30107, ECF Nos. 154, 156.
[82] Mot. Summ. J., Ex. 20 (Seller's Statement).
[83] Mot. Summ. J., Ex. 23.
[84] Mot. Summ. J., Exs. 24, 25.

Thus, Legalist has failed to provide sufficient evidence to create a genuine issue of material fact for trial regarding whether Weycer Kaplan performed any services outside the scope of its representation of PDG and the Court finds that summary judgment should be granted in favor of Weycer Kaplan as to Legalist's claims.[85]

### B. **Legalist's Civil Contempt and Disgorgement Claims are Unsupported.**

Legalist argues that, regardless of the attorney immunity doctrine, the Court should (1) sanction Weycer Kaplan for violating the bankruptcy code because under the DIP Order Lot 1A should have been sold pursuant to section 363(f) and the proceeds should have been used to pay Legalist and (2) order Weycer Kaplan to disgorge its fees because it failed to disclose its representation of Mesilla Valley.[86]

Weycer Kaplan contends that Legalist waived its rights under the DIP Order by knowingly releasing its lien on Lot 1A.[87] Indeed, based on Rice's uncontroverted deposition testimony, Legalist was well aware—through an email from Carruth wherein he merely passed along his understanding of negotiations Dixson was separately having with other members of the Legalist team—that PDG intended to use some of the sale proceeds to pay claims, including Weycer Kaplan's, and Legalist clearly consented to PDG's proceeds distribution plan by releasing its lien on Lot 1A.[88] In addition, the confirmation order clearly provides that any sale of Lot 1A would constitute a sale "under Code §§ 363(f), 1122(a)(5), and/or 1125(b)(4)."[89] Thus, the post-confirmation sale was a sale pursuant to those sections.

---

[85] Legalist cites a few cases to support its contention that its claims should not be dismissed at the pleadings stage, but in this case, discovery is closed, and it simply did not present enough counter evidence to raise a genuine issue of fact necessitating trial.

[86] Opp'n to Mot. Summ. J., ECF No. 147, ¶¶ 80–89.

[87] *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 298 (5th Cir. 2010) ("In Texas, 'waiver is the 'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'").

[88] Whether or not Dixson in fact used or intended to use the proceeds in the manner described by Carruth to Legalist (through Rice) is a question that will be resolved through the Plaintiffs' claims against Dixson.

[89] Mot. Summ. J., p. 10, ¶ 9.9 ("Any sales, transfers, and/or conveyances of some or all of the Subject Property shall be made pursuant to, at minimum, constitutes sales [sic] under Code §§ 363(f), 1122(a)(5), and/or 1125(b)(4) . . . ."). Although the PSA was negotiated prior to confirmation, the actual sale was consummated post-confirmation.

11

As for disgorgement, as discussed above, to the extent that Legalist (rather than the Trustee) even has standing to seek disgorgement,[90] Legalist failed to provide sufficient evidence that Weycer Kaplan represented Mesilla Valley in any capacity. Thus, the Court finds it should grant summary judgment in favor of Weycer Kaplan on all of Legalist's claims.

**FOR THESE REASONS, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Motion for Summary Judgment is GRANTED.

# # #

---

[90] Any disgorged fees would clearly be property of the bankruptcy estate and the Trustee settled the estate's claims against Weycer Kaplan.