## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-30107-CGB |
| | § | |
| PDG PRESTIGE, INC., | § | |
| | § | |
| Debtor. | § | CHAPTER 7 |

| | | |
|---|---|---|
| LEGALIST DIP GP, LLC AND PDG PRESTIGE, INC. (by and through Ronald Ingalls, Chapter 7 Trustee), | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADV. PRO. NO. 23-03004-CGB |
| | § | |
| MICHAEL DIXSON, individually, MESILLA VALLEY VENTURES, LLC, MICHAEL DIXSON TRUST THROUGH ITS TRUSTEE MICHAEL J. DIXSON, CHRISTINA DIXSON, SOUTHWESTERN ABSTRACT & TITLE COMPANY, INC., WEYCER, KAPLAN, PULASKI & ZUBER P.C., ENTRADA DEVELOPMENT, LLC, THE GATEWAY VENTURES, LLC, LPC RETAIL, LLC AND FSLRO 510 SOUTH TELSHOR LAS CRUCES, LLC, | § § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS FSLRO 510 SOUTH TELSHOR, LAS CRUCES, LLC AND LPC RETAIL, LLC'S MOTION FOR SUMMARY JUDGMENT

**TO THE HON. CHRISTOPHER G. BRADLEY,**
**UNITED STATES BANKRUPTCY JUDGE:**

Defendants FSLRO 510 South Telshor, Las Cruces, LLC ("**FSLRO**") and LPC Retail, LLC ("**LPC**") (collectively "**Defendants**"), file this Motion for Summary Judgment on the claims brought against them by Plaintiffs Legalist DIP GP, LLC ("**Legalist**") and PDG Prestige, Inc. (by and through Ronald Ingalls, Chapter 7 Trustee) ("**Trustee**") (collectively "**Plaintiffs**").

1

## I. SUMMARY

Plaintiffs' claims are legally unsupportable.  Other than the claim for relief under 11 U.S.C. §1144 (which is time barred), the claims assume that the sale of Lot 1A (the "**Property**") occurred pre-confirmation and/or without authority.  Not only were the relevant transfers post-confirmation (rendering 11 U.S.C. §362, 363, and 549 inapplicable), the sale of the Property was specifically contemplated by the confirmed Plan, which required no further disclosure or approval. Moreover, the net proceeds of the sale went to the Reorganized Debtor; Defendants are in no way responsible for the use of the funds.  Accordingly, entry of summary judgment is warranted.

## II. UNDISPUTED FACTS FOR SUMMARY JUDGMENT

1.     The following facts are undisputed for the purposes of this Motion:

   a.     On or about March 4, 2022, LPC and Mesilla entered a Purchase and Sale Agreement ("**PSA**") for the Property.[1]  Though incorrectly identifying Mesilla as the "Debtor" in "Case No. 21-30107, *In re PDG Prestige, Inc.*, Section 12(t) of  PSA provides that, following the earlier of "(i)…Bankruptcy Approval of this sale pursuant to a Section 363 sale *or (ii) confirmation of a Chapter 11 plan*, as evidenced by an Order from the Court, no further approval by the Court of this Agreement and Closing will be required." (emphasis added).

---

[1] *See generally*, description of the transaction at pp.67-73 of the Deposition of Michael Dixson, **Exhibit A** hereto. The PSA is Ex. 9 to the Dixson Deposition.

11666248 v2 (75311.00002.000)

b.      The Debtor filed its Second Amended Plan filed March 29, 2022 [Main Case Dkt. 141], and its Second Amended Plan, as Modified, on March 31, 2022 (the "**Plan**[2]") [Main Case Dkt. 145]. The Plan provides that:

> **8.1 Source of Payments**. Payments and distributions under the Plan will be funded by (1) a sale of the Subject Property, (2) lease and/or rental income of the Subject Property, and/or (3) existing financing and/or post-Effective Date re-financing. For the avoidance of doubt, the potential sale of Lot 1A to The Paul Rothbard Revocable Living Trust Dated August 23, 2006 ("Rothbard Trust") that was referenced and descried in the Disclosure Statement shall not occur because the Rothbard Trust withdrew the offer. Thus, each of Lot 1A and Lot 3A (the two (2) lots of the Subject Property) will be the subject of one or more sales post Effective Date by the Reorganized Debtor.

c.      The Plan additionally provides:

> **9.8 Corporate Authority**. All actions and transactions contemplated under the Plan shall be authorized upon confirmation of the Plan without the need of further approval, notice or meetings, that might otherwise be required under applicable state law or otherwise, other than the notice provided by serving this Plan on all known creditors of PDGP, all interest holders, and all current directors or managers o of PDGP.

d.      Similarly, Section 10 ("Effect of Confirmation of Plan, Discharge") of the Plan provides:

> For the avoidance of doubt, and without contradiction of any portion of the Code, upon the Effective Date, *all property of the estate*, including but not limited to any and all real property of the Debtor in Dona Ana County, New Mexico and *further including without limitation each of Lot 1A* and Lot 3A of the Subject Property, shall vest and/or return to Reorganized Debtor, and *which property the Reorganized Debtor shall be free to sell, lease, encumber, and otherwise*

---

[2] The Court may take judicial notice of the pleadings and orders on file in the Main Case, and Defendants request that the Court do so with respect to the items referenced in this Motion.  *Manix Energy, Ltd. v. James (In re James)*, 300 B.R. 890, 894 (Bankr. W.D. Tex. 2003)(citing, *inter alia*, *MacMillan Bloedel Ltd. v. Flintkote Co*., 760 F.2d 580, 587 (5th Cir. 1985).  A copy of the Confirmation Order, which contains the confirmed Plan, as attached as **Exhibit B**.

11666248 v2 (75311.00002.000)

> *transact and/or use in any manner without the necessity of further notice to any creditors and/or parties in interest and without the necessity of prior approval of the Bankruptcy Court.*

e.    The Court entered its Order confirming the Plan on March 31, 2022 [Main Case Dkt. 148].[3]  As is reflected in the docket, Legalist did not object to confirmation of the Plan.

f.    On April 14, 2022, Legalist, which held a lien on the Property, signed a "Release of Lien Granted Pursuant to Bankruptcy Court Order" (the "**Lien Release**").[4] Legalist was aware that the sale of the Property was to occur.[5] Legalist did not place any restrictions on the use of the Lien Release.[6]

g.    On April 20, 2022, the Reorganized Debtor transferred the Property to Mesilla pursuant to a "Special Warranty Deed" which was filed on April 21, 2022.[7]

h.    On May 4, 2022, LPC assigned the PSA to FSLRO pursuant to an "Assignment of Purchase and Sale Agreement" (the "**Assignment**").[8]

i.    The Lien Release was filed on May 13, 2022.[9]

j.    Mesilla sold the property to FSLRO, pursuant to a Special Warranty Deed (the "**FSLRO Deed**") dated May 9, 2022, which was filed in the Dona Ana County, New Mexico real property records on May 27, 2022.[10]

---

[3] *See* Exhibit B hereto.
[4] Nov. 24, 2024 Deposition of Brian Rice, Legalist's representative, at p. 72, and Exhibit 3A thereto, attached as **Exhibit C** (the copy of the Ex. 3A was procured from the Dona Ana County, NM real property records but is the same exhibit).
[5] Rice transcript, Exhibit C, at pp. 72-75.
[6] *Id.* at p. 52-53; Aug. 6, 2025 Deposition of Brian Rice, p. 37, attached as **Exhibit D**.
[7] Dixson Transcript, p. 50 and Ex. 5 thereto.
[8] Dixson Transcript, at Ex. 10.
[9] Rice Transcript, Ex. 3A.
[10] Dixson transcript, Ex. 8.

11666248 v2 (75311.00002.000)

k. The Reorganized Debtor received the net proceeds (approximately $1.9 million) from the sale.[11]

## III. LPC AND FSLRO ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS

*Summary Judgment Standard*

2. Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on files, and any affidavits show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."[12] While facts and evidence are to be viewed in the "light most favorable to the non-movant," a court, presiding over a non-jury matter, "has somewhat greater discretion to consider what weight it will accord the evidence," and "has the limited discretion to decide that the same evidence, presented to him as a trier of fact in a plenary trial, could not possibly lead to a different result."[13] As set forth below, Defendants are entitled to summary judgment as a matter of law.

*Count XVII – Willful Violation of the Automatic Stay*

3. Plaintiffs first contend that Defendants violated the automatic stay by entering the PSA. First, the PSA was not a contract entered by the Debtor. Second, even construing it as a contract entered by the Debtor, the PSA was specifically conditioned upon either approval as a §363 sale *or* entry of an order confirming a plan.

4. Additionally, it is undisputed that there was no conveyance of the Property until the Reorganized Debtor transferred the Property to Mesilla, and here was no closing of a sale until May 2022 – both after entry of the Confirmation Order, which specifically allowed for the

---

[11] Dixson transcript, Ex. 11; Third Amended Complaint, ¶50; *see also*, Trustee's Responses to Defendants' Interrogatories, response to No. 7, **Exhibit E** hereto; Legalist's Responses to Defendants' Interrogatories, response to No. 7, **Exhibit F** hereto.
[12] *Jones v. New Orleans Regional Physician Hospital Org.*, 981 F.3d 428, 432 (5th Cir. 2020)(citations omitted).
[13] *Id.* at 432-33 (citations omitted).

sale.  The confirmation (1) discharged the Debtor and (2) vested the Property in the Reorganized

Debtor, and not the estate, resulting in termination of the automatic stay as a matter of law.[14]  As

such, the automatic stay did not apply post-confirmation, when the Property was transferred. [15]

### Count XVIII – Unauthorized Post-Petition Transfers

5.     Plaintiffs next contend that Defendants engaged in an "unauthorized postpetition

transfer."  11 U.S.C. §549 allows a trustee to avoid a postpetition transfer that was "not authorized

by this title or by the court."  Again, (1) the PSA was not a transfer by the Debtor and did not

effect a transfer of property of the estate, (2) the ultimate sale was condition upon an order or

confirmation, and (3) the transfer of the Property did not occur until after entry of the

Confirmation Order.  Moreover, Section 10 of the Plan specifically authorized the sale.  Not only

was the transaction specifically authorized by the Plan, the Plaintiffs cannot avoid a transfer of

property under §§459 and 550 which was vested in the Roerganized Debtor, because §549 only

applies to property of the estate, even though the case was converted to Chapter 7.[16]

### Count XIX – Unauthorized Sale of Estate Property

6.     Plaintiffs' third claim is that the sale of the Property was not authorized by

11 U.S.C. §363.  As discussed above, the Property was not transferred pre-confirmation, and any

sale was subject to an order or confirmation of a plan.  The sale was specifically authorized by

the Plan, which provided that no Court approval was required.  Not only was the sale specifically

authorized, the requirements of 11 U.S.C. §363 do not apply to post-confirmation sales.[17]  To the

---

[14] *See* Plan, §10 (vesting Property in the Reorganized Debtor); *see also* 11 U.S.C. §§362(c)(1), 1141(b), (d)(1)(A).

[15] *In re Greater Am. Land Resources, Inc.,* 452 B.R. 532, 538 (Bankr. D.N.J. 2011); *Draggoo Elec. Co., Inc. v. State of Indiana (In re Dragoo Elec. Co., Inc.),* 57 B.R. 916, 919-920 (Bankr. N.D. Ind. 1986)

[16] *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.),* 930 F.2d 458, 462 (6th Cir. 1991); *Kepler v. Independence Bank of Madison (Matter of Ford),* 61 B.R. 913, 917(Bankr. W.D. Wis. 1986).

[17] *In re RCP Investments VI, LLP*, No. 11-81357C-11D, 2012 WL 5832427 at * 1 (Bankr. M.D.N.C. Nov. 16, 2012); *Matter of Golf,* 322 B.R. 874, 877 (Bankr. D. Neb. 2004)(holding that "Post-confirmation sales are accomplished pursuant to the terms of the confirmed plan…"); *accord In re Altmeyer*, No. 10-60275, 2014 WL 4959146 at *2 (Bankr. S.D. Ill. Oct. 2, 2014)(same result in Chapter 13 context).

6

extent some form of §363 notice was required, the Plan specifically provided that sales were "under code sections 363(f), 1122(a)(5), or 1125(b)(4).[18]

### *Count XX –Revocation of the Confirmation Order*

7.      Plaintiffs' final claim is for revocation of the Confirmation Order based on fraud. Plaintiffs' claims are barred by the unequivocal limitations period set forth in the Bankruptcy Code. 11 U.S.C. §1144 contains its own limitations period: any action to revoke a confirmation order for fraud must be filed within 180 days after entry of the order confirming a plan. This deadline is absolute and is not subject to tolling.[19] While the *Lothian* opinion is unpublished, other courts have affirmed its holding.[20] Bankruptcy courts in Texas examining this issue have uniformly enforced this deadline.[21] Additionally, the absolute bar has been acknowledged by other circuit courts, with no opinions to the contrary.[22]

8.      It is undisputed that Plaintiffs did not file this action until June 16, 2023, more than 14 months after the date of the Confirmation Order and did not assert the §1144 claim until the Third Amended Complaint on August 8, 2024, over two years after the Confirmation Order. Accordingly, the claim is barred by the precise terms of §1144.

### *Defendants' actions did not cause damages*

9.      Plaintiffs fail to allege how the sale of the Property damaged Legalist or other creditors. It is undisputed that the net proceeds were paid to the Reorganized Debtor. The

---

[18] Plan, Exhibit B hereto, at §9.9.
[19] *Anti-Lothian Fraud Comm. v. Lothian Oil, Inc. (In re Lothian Oil, Inc.),* 508 Fed. Appx. 352, 356-57 (5th Cir. 2022).
[20] *See, e.g., In re Lillis Energy, Inc.*, No. 20-33274, 2022 WL 1051101 at *5 (Bankr. S.D. Tex. Apr. 7. 2022).
[21] *See, e.g., In re Cleveland Imaging & Surgical Hospital, LLC,* No. 14-34974, 2022 WL 677459 at *3 (Bankr. S.D. Tex. March 7, 2022); *In re Renaissance Radio, Inc.,* No. 03-33479-BJH, 2019 WL 1503787 at *9 (Bankr. N.D. Tex. Apr. 4, 2019).
[22] *See, e.g., Selinger v. Whiteman (In re Midstate Mortgage Investors, Inc.),* 105 Fed. Appx. 420, 423 (3rd Cir. 2004); *Zerand-Bernal Group, Inc. v. Cox,* 23 F.3d 159, 164 (7th Cir. 1994); *Dale C. Eckert Corp. v. Orange Tree Assoc., Ltd. (In re Orange Tree Assoc., Ltd),* 961 F.2d 1445, 1447-48 (9th Cir. 1991)

damages asserted by Plaintiffs resulted from the allegedly wrongful use of the funds after the Reorganized Debtor received them.  Plaintiffs fail to explain how the actions of Defendants resulted in the Reorganized Debtor's alleged misuse of funds.  In fact, as noted above, Legalist was aware that the sale was to occur, did occur, and provided a lien release.  Accordingly, Plaintiffs have failed to show a fundamental element of a cause of action: that Defendants' actions caused damages.

WHEREFORE, based on the foregoing, Defendants request that the Court grant this Motion and enter judgment that Plaintiffs take nothing by way of their claims against Defendants, and that Defendants have such other and further relief to which they may be entitled.

Respectfully submitted,

KANE RUSSELL COLEMAN LOGAN PC

By: */s/ Mark C. Taylor*
               Mark C. Taylor
               State Bar No. 19713225
               401 Congress Avenue, Suite 2100
               Austin, Texas 78701
               Telephone:  (512) 487-6560
               Telecopier:  (214) 777-4299
               Email: Mtaylor@krcl.com

**ATTORNEYS FOR DEFENDANTS FSLRO 510 SOUTH TELSHOR, LAS CRUCES, LLC AND LPC RETAIL, LLC**

11666248 v2 (75311.00002.000)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2025, a true and correct copy of the foregoing was served upon counsel listed below via CM/ECF delivery of the Bankruptcy Court for the Western District of Texas pursuant to Bankruptcy Local Rule 7005:

Frances A. Smith
Ross & Smith, PC
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Frances.smith@rsbfirm.com

Ronald Ingalls, Chapter 7 Trustee
P.O. Box 2867
Fredericksburg, Texas 78624
ingallstrustee@gmail.com

Richard Corbi
Law Offices of Richard Corbi, PLLC
1501 Broadway, 12th Fl
New York, NY 10036
rcorbi@corbilaw.com

Thomas A. Culpepper
Riley Tunnell
Thompson, Coe, Cousins & Irons, L.L.P.
700 North Pearl Street, 25th Floor
Dallas, Texas 75201-2832
tculpepper@thompsoncoe.com
rtunnell@thompsoncoe.com

David P. Lutz
Martin, Lutz, Roggow & Eubanks, P.C.
2100 N. Main Street
Las Cruces, New Mexico 88001
dplutz@qwestoffice.net

*/s/ Mark C. Taylor*
Mark C. Taylor

# EXHIBIT A

1            IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                     EL PASO DIVISION
    IN RE:              ) Chapter 11
3   PDG PRESTIGE, INC.,  ) Case No. 21-30107
        Debtor.          )
4


5                  ------------------------
            ORAL and VIDEOTAPE DEPOSITION OF
6                     MICHAEL DIXSON
                     May 16, 2023
7                      Volume 1
                  ------------------------

8

9        ORAL DEPOSITION OF MICHAEL DIXSON, Volume 1,

10  produced as a witness at the instance of Legalist, and

11  duly sworn, was taken in the above-styled and numbered

12  cause on the May 16, 2023, from 10:08 a.m. to 2:57

13  p.m., before Dana Shapiro, CSR, in and for the State of

14  Illinois, reported by machine shorthand, at 5301

15  Southwest Parkway, Suite 400, Austin, Texas 78735,

16  pursuant to the Federal Rules of Civil Procedure and

17  any provisions stated on the record or attached hereto.

18

19

20

21

22

23

24

25

LEXITAS

1  appear for deposition, the -- your counsel filed that

2  response there.

3                          (WHEREUPON, a certain document was

4                          marked Deposition Exhibit No. 4,

5                          for identification, as of 5/16/23.)

6  BY MR. MILLS:

7        Q.    So have you seen that before?

8        A.    I have, yes.

9        Q.    There was a special warranty deed, a deed

10  was filed.  Let's look at that.

11        MR. MILLS:  If we can have E.

12                          (WHEREUPON, a certain document was

13                          marked Deposition Exhibit No. 5,

14                          for identification, as of 5/16/23.)

15  BY MR. MILLS:

16        Q.    Now, again, this is from PDG the debtor to

17  Mesilla Valley.  Here you go.  Now, have you seen that

18  before?

19        A.    I have.

20        Q.    Is this the deed for the transfer of Lot 1A

21  from PDG the debtor to Mesilla Valley?

22        A.    Yes.

23        Q.    You signed that?

24        A.    I did, yes.

25        Q.    As an officer of PDG the debtor, right?



```
 1   Exhibit 8 is a deed from the Mesilla Valley to FSLRO,

 2   510 South Telshor.

 3        A.     Okay.

 4        Q.     Have you seen that before?

 5        A.     I have, yes.

 6        Q.     You signed it?

 7        A.     I did, yes.

 8                        (WHEREUPON, a certain document was

 9                        marked Deposition Exhibit No. 9,

10                        for identification, as of 5/16/23.)

11   BY MR. MILLS:

12        Q.     I'm going to show you Exhibit 9.  Starting

13   on the fourth page is the purchase and sale agreement

14   between Mesilla and LPC?

15        A.     Uh-huh.

16        Q.     That's No. 9.  That PSA was ultimately

17   assigned from LPC to FSLRO, right?

18        A.     I believe so.  They had -- that would have

19   been their business not mine, but yes.

20        Q.     But you are aware of it?

21        A.     Yes.

22                        (WHEREUPON, a certain document was

23                        marked Deposition Exhibit No. 10,

24                        for identification, as of 5/16/23.)

25   BY MR. MILLS:
```

1        Q.      That's Exhibit 10, right?

2        A.      Okay.  Yes.

3        Q.      So who negotiated that transfer?

4        A.      Who -- well, there is three.

5        MR. CARRUTH:  Objection, form.  Which transfer?

6   BY MR. MILLS:

7        Q.      The one we are talking about here.  Not the

8   assignment, correct.  Who negotiated the sale of Lot 1A

9   from PDG the debtor to this FSLRO?

10       MR. LUTZ:  Objection, form.

11  BY MR. MILLS:

12       Q.      Mesilla Valley.  Sorry.  Let me do it

13  again.  Who negotiated the transfer of Lot 1A from

14  Mesilla Valley to FSLRO?

15       A.      I negotiated the sale of Mesilla Valley to

16  LPC.  I didn't negotiate anything with FSLRO.

17       Q.      Okay.  Who did you negotiate with at LPC?

18       A.      Michael Chaiken was their attorney.

19       Q.      Do you have any interest or any of your

20  entities have any interest in LPC?

21       A.      In Lincoln Property Company?  I wish.  No.

22       Q.      That sale closed, the deed was executed on

23  May 27; is that right?

24       A.      9, May 9.  It was executed May 9.

25       Q.      Filed?

LEXITAS

Michael Dixson

```
 1         A.      Record.

 2         Q.      Filed the record May 27?

 3         A.      Yes.

 4         Q.      Do you know when the sale was funded?  In

 5   other words, when did the sale close and the moneys

 6   paid?

 7         A.      I don't have the specific date.  I would --

 8   within a few days of the 27.  I believe the 27 was on a

 9   Friday so probably that following Monday.

10         MR. MILLS:  Do you have K?  Is that it?

11                       (WHEREUPON, a certain document was

12                       marked Deposition Exhibit No. 11,

13                       for identification, as of 5/16/23.)

14   BY MR. MILLS:

15         Q.      This is the closing statement.  You have

16   seen this before, correct?

17         MR. CARRUTH:  Are we identifying these exhibits

18   on the record by the way?

19         MR. MILLS:  Uh-huh.

20         THE WITNESS:  She's got them.  This is 11.  This

21   is unsigned copy.

22         MR. CARRUTH:  You just said closing statement.

23   We didn't say an exhibit number.

24         MR. MILLS:  I'm sorry.  It's No. 11.

25   BY MR. MILLS:
```



1    Q.    Is that the closing statement?

2    A.    That's not signed so it's unofficial

3    closing statement.

4    Q.    Do you have any -- look at the numbers,

5    please.  Do you have any reason to think it's not

6    accurate?

7    A.    Without it being signed, I can't testify to

8    whether it's right or wrong.

9    Q.    Was this property sold?

10   A.    It was.

11   Q.    To this buyer?

12   A.    It was.

13   Q.    For this amount?

14   A.    It was.

15   MR. CARRUTH:  I'm sorry.  Objection, form.  What

16   buyer?  What amount?

17   MR. MILLS:  I'm just identifying the entries on

18   the paper.

19   MR. CARRUTH:  Okay.

20   MR. MILLS:  Okay.

21   BY MR. MILLS:

22   Q.    Were the moneys distributed as this says

23   here on Exhibit 9 -- Exhibit 11?  You are looking at

24   exhibit what, 11, right?

25   A.    I have Exhibit C, 9 and 11.



1    Q.    I know it's confusing because it's been

2  used in different places.  We are talking about Exhibit

3  11.

4    A.    I'm looking at Exhibit 11.

5    Q.    That's right.

6    MS. WALRAVEN:  The ones written in red are

7  current.

8    THE WITNESS:  Got it.

9  BY THE WITNESS:

10    A.    I don't believe this is the actual final

11  closing statement to be honest with you.

12  BY MR. MILLS:

13    Q.    Why do you think that?

14    A.    I think this is missing a few payments to

15  vendors on this, I believe.  I may be incorrect, but

16  without it having a fully signed executed document I

17  have to double check to it.  I think we are missing two

18  payments to two vendors down here.

19    Q.    Who would they be?

20    A.    I believe we are missing the one to Toro

21  Rock, and I believe we are missing another one to

22  Brunswick Companies.

23    Q.    Would that make this number right here on

24  the second page of Exhibit 11 different?  See here it

25  says due to seller 1,916,558; do you see that?

Michael Dixson

1    A.    Let me see what are you asking me.

2    Q.    You say that this is incomplete because you

3  think there's some other payments made out?

4    A.    Yes, I agree that's what I'm saying.

5    Q.    So I'm asking you, if that were true, when

6  it says due to seller $1,916.558.82 it would be an

7  incorrect number?

8    A.    Yeah.  It could go up or down, of course,

9  yeah.

10   Q.    If that's the right number, if that's the

11  right number then this is an accurate statement, if

12  that's the right number?

13   A.    I'm telling you I don't think this is the

14  right statement.  I think the net may be right or may

15  be close, but I think we are missing two statements.  I

16  think we are missing Toro Rock and Brunswick Company.

17   Q.    But then that's right?

18   A.    I think it would be close.  It's not

19  signed, but I think it's close, I can say that, but I

20  think we are talking a difference of like less than --

21  less than probably $35,000.

22   Q.    Okay.

23   A.    That's all I'm saying.

24   Q.    All right.  So when we asked --

25   THE VIDEOGRAPHER:  I'm sorry.  Excuse me.  Real



1    quick.  Can we go off the record?  There is something

2    wrong with the microphone.

3          MR. MILLS:  Sure.

4          THE VIDEOGRAPHER:  The time is 11:46 a.m. We are

5    off the record.

6                    (WHEREUPON, a recess was had.)

7          THE VIDEOGRAPHER:  The time is 11:47 a.m. We are

8    on the record.

9    BY MR. MILLS:

10         Q.    So, Mr. Dixson, during this bankruptcy

11    case --

12         A.    Uh-huh.

13         Q.    -- Legalist and your counsel signed an

14    agreement which required that you give to us the

15    sources and uses, the sales proceeds from Lot 1A; do

16    you remember that?

17         A.    I don't remember that.

18                    (WHEREUPON, a certain document was

19                    marked Deposition Exhibit No. 12,

20                    for identification, as of 5/16/23.)

21    BY MR. MILLS:

22         Q.    Handing you Exhibit 12.  So this number

23    that's 12, that's a stipulation that was signed by your

24    counsel.  I believe it was counsel.  I direct you to

25    paragraph 5, item B.

LEXITAS

1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
2                          EL PASO DIVISION
   IN RE:                    ) Chapter 11
3  PDG PRESTIGE, INC.,       ) Case No. 21-30107
        Debtor.              )
4

5

                     REPORTER'S CERTIFICATION
6                    ORAL DEPOSITION OF
                       MICHAEL DIXSON
7                       May 16, 2023

8       I, Dana Shapiro, a Certified Shorthand Reporter,

9  hereby certify to the following:

10      That the witness, MICHAEL DIXSON, was duly sworn

11 by the officer and that the transcript of the oral

12 deposition is a true record of the testimony given by

13 the witness;

14      I further certify that pursuant to FRCP Rule

15 30(e)(1) that the signature of the deponent:

16 was requested by the deponent or a party before the

17 completion of the deposition and that the signature is

18 to be before any notary public and returned within 30

19 days from date of receipt of the transcript.  If

20 returned, the attached Changes and Signature Pages

21 contain any changes and reasons therefore;

22      I further certify that I am neither counsel for,

23 related to, nor employed by any of the parties or

24 attorneys in the action in which this proceeding was

25 taken, and further that I am not financially or

```
1   otherwise interested in the outcome of the action.

2        Certified to by me this May 24, 2023.

3

4        _____
          DANA SHAPIRO, Illinois CSR 84-3597
5        CSR Expiration:  5/31/25
          Illinois Certified Shorthand Reporter
6        Registered Agent Solutions, Inc.,
          A Lexitas Company, Firm No. 17
7        5301 Southwest Parkway
          Corporate Center One, Suite 400
8        Austin, Texas 78735
          888-893-3767
9        Expires: 1/31/2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   COUNTY OF TRAVIS )

 2   STATE OF TEXAS   )

 3        I hereby certify that the witness was notified on

 4   May 24, 2023 that the witness has 30 days

 5   after being notified by the officer that the transcript

 6   is available for review by the witness and if there are

 7   changes in the form or substance to be made, then the

 8   witness shall sign a statement reciting such changes

 9   and the reasons given by the witness for making them;

10        That the witness' signature was/was not returned

11   as of _____.

12        Subscribed and sworn to on this _____ day of

13   _____, 20___.
```

*Dana Shapiro*

```
15   _____
     DANA SHAPIRO, Illinois CSR 84-3597
16   CSR Expiration: 5/31/25
     Illinois Certified Shorthand Reporter
17   Registered Agent Solutions, Inc.,
     A Lexitas Company, Firm No. 17
18   5301 Southwest Parkway
     Corporate Center One, Suite 400
19   Austin, Texas 78735
     888-893-3767
20   Expires: 1/31/2025
```

# Request No. 7



EXHIBIT

5

tabbies

Dixson1



2211613          APR 21, 2022 02:59:58 PM     PAGES: 2
SPECIAL WARRANTY DEED          Deputy: Tonya Wall
Amanda López Askin, County Clerk, Dona Ana, NM



swat 7434-GC-2022                **SPECIAL WARRANTY DEED**

STATE OF NEW MEXICO      )

)      KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF DONA ANA      )

    PDG PRESTIGE, INC A TEXAS CORPORATION (collectively, "Grantor") for Ten
Dollars ($10.00) and other good and valuable consideration to him in hand paid by MESILLA
VALLEY VENTURES, LLC. A TEXAS LIMITED LIABILITY COMPANY Grantee")
Whose address is 154 N. Festival Suite D El Paso, TX 79912, the receipt and sufficiency of which
Is hereby acknowledged, has GRANTED, SOLD, and CONVEYED and by these presents does
Hereby GRANT, SELL, and CONVEY unto the said Grantee, all that parcel of land situated
In Dona Ana County, New Mexico, described as followed:

**PARCEL 1:** Lot 1A, MESILLA VALLEY MALL SUBDIVISION REPLAT NO. 5, in the City of Las Cruces, Dona
Ana County, New Mexico, as shown and designated on the plat thereof, filed in the office of the County
Clerk of said County on August 19, 2020, in Book 24 Page(s) 581-582 of Plat Records.

    TO HAVE AND TO HOLD the above described premises together with all and singular
the rights and appurtenances thereto in anywise belonging unto the said Grantee, its successors
and assigned forever, and Grantor does hereby bind himself, his heirs, executors, administrators,
successors and assigns to warrant and forever defend, all and singular, Grantor's interest in the
premises unto the said Grantee, its successors and assigns against every person whomsoever
lawfully claiming or to claim the same or any part thereof, by, through, or under Grantor, but not
otherwise.

    IN WITNESS WHEREOF, this Special Warranty Deed is executed the 20th day of
April, 2021

PDG PRESTIGE, INC., A TEXAS CORPORATION

By:        _____

Michael Dixson, President

Dixson2

## ACKNOWLEDGEMENT

STATE OF NEW MEXICO
COUNTY OF DOÑA ANA

This instrument was acknowledged before me on 20th day of April, 2022, by Michael Dixson as President of PDG Prestige, Inc, A Texas Corporation.

Signature of notarial officer
My commission expires: 12.10.23

OFFICIAL SEAL
GRICEL R. CHAVEZ
NOTARY PUBLIC - STATE OF NEW MEXICO
My commission expires: 12.10.23

Dixson3

DONA ANA COUNTY, NM     Filed: 05/27/2022 02:25:48 PM     Instrument #: 2215299     Page: 1 of 5



2215299     MAY 27, 2022 02:26:48 PM     PAGES: 5
SPECIAL WARRANTY DEED     Deputy: Marissa Robinson
Amanda López Askin, County Clerk, Dona Ana, NM



**RECORDING REQUESTED BY AND**
**WHEN RECORDED RETURN TO:**

**FSLRO 510 SOUTH TELSHOR LAS CRUCES, LLC**
c/o Lincoln Property Company, Retail Division
Attn: Matthew Gallo
2000 McKinney Ave., Suite 1000
Dallas, TX 75201

THE STATE OF NEW MEXICO     §
                                     §
COUNTY OF DONA ANA         §

### SPECIAL WARRANTY DEED

For the consideration of Ten Dollars ($10.00), and other valuable considerations, **MESILLA VALLEY VENTURES, LLC,** a Texas limited liability company ("Grantor"), hereby conveys to **FSLRO 510 SOUTH TELSHOR LAS CRUCES, LLC,** a Delaware limited liability company ("Grantee"), the following described real property situated in Dona Ana County, New Mexico, together with all rights and privileges appurtenant thereto:

See legal description set forth in **Exhibit A** attached and incorporated by this reference (the "Property") together with all improvements, buildings, structures and fixtures located thereon; all easements, if any, benefiting the Property; all rights, benefits, privileges and appurtenances pertaining to the Property, including any right, title and interest of Grantor in and to any property lying in or under the bed of any street, alley, road or right-of-way, open or proposed, abutting or adjacent to the Property; the strips, gaps or gores, if any, between the Property and abutting properties; all water, water rights, oil, gas or other mineral interests in, on, under or above the Property; and all rights and interests to receive any condemnation awards from any condemnation proceeding pertaining to the Property, sewer rights, water courses, wells, ditches and flumes located on or appurtenant to the Property.

SUBJECT ONLY TO the matters set forth on **Exhibit B** attached hereto and made a part hereof, as well as taxes and assessments for 2022 and subsequent years.

TOGETHER WITH all the easements, tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD, the same in fee simple forever.

GRANTOR hereby covenants with Grantee that it owns the Property in fee simple; that it has good right and lawful authority to convey the Property; and that it warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other.

[Signature on following page.]

Special Warranty Deed -                    Page 1

Dated this _9_ day of May , 2022.

GRANTOR:

**MESILLA VALLEY VENTURES, LLC**
a Texas limited liability company

By: PDG PRESTIGE, Inc. a Texas Corporation, its Manager

By: _____
Michael Dixson, its President

STATE OF _Texas_ )
                          ) Ss:
COUNTY OF _El Paso_ )

This instrument was acknowledged and executed before me this _9_ day of May, 2022, by Michael Dixson as President of PDG Prestige, Inc. a Texas Corporation as Manager of Mesilla Valley Ventures, LLC a Texas limited liability company.

JASMINE MERCEDES ESNAYDER
Notary ID #13344O212
My Commission Expires
November 9, 2025

_____
Notary Public
My Commission Expires: November 9, 2025

Special Warranty Deed -

Page 2

DOÑA ANA COUNTY, NM    05/27/2022 02:25:48 PM    Instrument #: 2215299    Page: 3 of 5

## EXHIBIT A TO
## SPECIAL WARRANTY DEED

### Legal Description

Lot 1A, MESILLA VALLEY MALL SUBDIVISION REPLAT NO. 5, in the City of Las Cruces, Dona Ana County, New Mexico, as shown and designated on the plat thereof, filed in the office of the County Clerk of said County on August 19, 2020, in Book 24 Page(s) 581-582 of Plat Records.

# EXHIBIT "B" TO
# SPECIAL WARRANTY DEED

## PERMITTED EXCEPTIONS

- Reservations contained in the Patent(s) from the United States of America recorded in Book 30 Page(s) 55 of Deed Records of Dona Ana County, New Mexico.

- Operating Agreement by and among H.J. Wilson Co. Realty Inc., 3 Beall Brothers 3, Inc., d/b/a Beall Brothers, Beall Properties, Inc., Construction Developers, Inc., Dillard Department Stores, Inc., and Mesilla Valley Mall Company, a Mississippi General Partnership, dated January 3, 1980 and recorded January 24, 1980, in Book 140 Page(s) 82-182, Supplement to Operating Agreement, dated January 9, 1980, and recorded July 15, 1980, in Book 144 Page(s) 516-521-Supplement-to-Operating-Agreement.pdf), and First Amendment to Operating Agreement, dated March 9, 1982, and recorded March 16, 1982, in Book 159 Page(s) 655-685-First-Amendment-to-Operating-Agreement.pdf), all of Miscellaneous Records, and Assignment of Reciprocal Easement Agreement by and between Marathon U.S. Realties, Inc., a Delaware corporation, successor in interest to Mesilla Valley Mall Company, a Mississippi general partnership, and Southwest Shopping Centers Co. II, L.L.C., a Delaware limited liability company, recorded October 1, 1996, in Book 66 Page(s) 912-915-Assignment-of-Reciprocal-Easement-Agreement.pdf), Assignment of Anchor Agreements (REA) by and between Southwest Shopping Centers Co. II, L.L.C., a Delaware limited liability company, and WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, dated December 14, 1999, and recorded December 15, 1999, in Book 204 Page(s) 1556-1572-Assignment-of-Anchor-Agreements.pdf), and Assignment and Assumption of Operating Agreement between WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, and New Mexico Mall Partners, L.P., a Delaware limited partnership, dated October 22, 2004, and recorded October 22, 2004, in Book 559 Page(s) 976-993-Assignment-and-Assumption-of-Operating-Agreement.pdf), all of Official Records.

- Declaration of Restrictions recorded March 16, 1982, in Book 159 Page(s) 686-695 of Miscellaneous Records. Restrictions indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin are hereby deleted to the extent such restrictions violate 42 USC 3604(c). Restrictions indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin are hereby deleted to the extent such restrictions violate 42 USC 3604(c).

- Assignment of Leases and Specialty License Agreements by and between Southwest Shopping Centers Co. II, L.L.C., a Delaware limited liability company, and WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, dated December 14, 1999, and recorded December 15, 1999, in Book 204 Page(s) 1573-1589 of Official Records.

- Assignment of Anchor Agreements (Leases) by and between Southwest Shopping Centers Co. II, L.L.C., a Delaware limited liability company and WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, dated December 14, 1999, and recorded December 16, 1999, in Book 204 Page(s) 1769-1785 of Official Records.

- Reciprocal Perpetual Access Easement by and between WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, and Springer Management of Las Cruces, L.L.C., a New Mexico limited liability company, recorded December 20, 2000, in Book 307 Page(s) 1211-1217 of Official Records, as disclosed in ALTA/NSPS Land Title Survey dated March 31, 2022, last revised April 25, 2022 prepared by Shannon D. Ozment, Registration No. 23783, for Partner Engineering and Science, Inc., Project No. 22-357212.1. As shown on Subdivision Plat by Souder, Miller & Associates, dated April 7, 2020, filed for record August 19, 2020 in Book 24 Pages 581-582, Instrument No. 2020257 of Official Records.

- Parking Easement by and between WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, and Springer Management of Las Cruces, L.L.C., a New Mexico limited liability company, recorded December 20, 2000, in Book 307 Page(s) 1222-1228 of Official Records.

- Ring Road Access Easement and Maintenance Reimbursement Agreement by and between WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, and Springer Management of Las Cruces, L.L.C., a New Mexico limited liability company, recorded December 20, 2001, in Book 307 Page(s) 1229-1235 of Official Records.

- Development and Cost-Sharing Agreement by and between WXI/Z Southwest Malls Real Estate Limited Liability Company, a Delaware limited liability company, and Springer Management of Las Cruces, L.L.C., a New Mexico limited liability company, recorded December 20, 2001, in Book 307 Page(s) 1248-1260 of Official Records.

- Easements in favor of El Paso Electric Company and The Mountain States Telephone and Telegraph Company, affecting a portion of said land, recorded August 16, 2002, in Book 355 Page(s) 1681-1682, and recorded January 6, 2004, in Book 489 Page(s) 295-296, both of Official Records; as disclosed on ALTA/NSPS Land Title Survey dated March 31, 2022, last revised April 25, 2022 prepared by Shannon D. Ozment, Registration No. 23783, for Partner Engineering and Science, Inc., Project No. 22-357212.1. As disclosed on Subdivision Plat by Souder, Miller & Associates, dated April 7, 2020, filed for record August 19, 2020 in Book 24 Pages 581-582, Instrument No. 2020257 of Official Records.

- Declaration of Covenants, Conditions, Restrictions and Reciprocal Easement Agreement recorded July 9, 2007, as Instrument #0723983, and Amendment to Declaration of Covenants, Conditions, Restrictions and Reciprocal Easement Agreement recorded April 1, 2020, as Instrument #2007993, both of Official Records. Restrictions indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin are hereby deleted to the extent such restrictions violate 42 USC 3604(c). Restrictions indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin are hereby deleted to the extent such restrictions violate 42 USC 3604(c).

- Access and Parking Easement Agreement with Use Restrictions by and between PDG Prestige, Inc., a Texas Corporation, and PDG Prestige, Inc., a Texas Corporation, dated October 12, 2018, and recorded October 23, 2018, as Instrument #1825387 of Official Records. All the terms and conditions of the Amended and Restated Access and Parking Agreement With Use Restrictions by and between Mesilla Valley Ventures, LLC, a Texas limited liability company and PDG Prestige, Inc., a Texas Corporaiton, recorded May 9, 2022, as Instrument # 2213476 of Official Records.

- Easements, building setbacks, and other matters as shown on filed plat of subdivision and dedication thereof, by Souder, Miller & Associates, dated April 7, 2020, filed August 19, 2020 in Book 24 Pages 581-582 of Official Records; as noted on the Survey dated March 31, 2022, last revised April 25, 2022 prepared by Shannon D. Ozment, Registration No. 23783, for Partner Engineering and Science, Inc., Project No. 22-357212.1.

- Parking Easement by and between PDG Prestige, Inc., a Texas Corporation, and Springer Management of Las Cruces, L.L.C., a New Mexico limited liability company, recorded February 5, 2021, as Instrument #2103909 of Official Records.

- Memorandum of Lease dated November 22, 2021, by and between PDG Prestige, Inc., a Texas corporation, Landlord, and Bubba's Holdings LLC, a Kentucky limited liability company, Tenants, recorded November 24, 2021, as Instrument #2137634 of Official Records.

| | |
|---|---|
| **From:** | Michael Dixson <mike@pdgnm.com> |
| **Sent:** | Friday, March 4, 2022 5:16 PM |
| **To:** | Charlie Bernet; Michael Chaiken; Jeff Carruth; Gricel Chavez; Jasmine Esnayder |
| **Subject:** | Re: PDGP - B33 - LPC - final PSA - transmit final execution draft - LPC.37 - 3-3-22 |
| **Attachments:** | PSA - Bubba's 33 - Las Cruces, NM.pdf |

Good afternoon all,
Please see the attached

Gricel,
Please confirm receipt of PSA and escrow deposit upon receipt

Thank you all have a good weekend

Michael Dixson
President
Prestige Development
915-243-0720
www.PDGNM.com

---

**From:** Charlie Bernet <CBernet@LPC.com>
**Sent:** Friday, March 4, 2022 2:13:52 PM
**To:** Michael Chaiken <mchaiken@chaikenlegalgroup.com>; Jeff Carruth <jcarruth@wkpz.com>
**Cc:** Michael Dixson <mike@pdgnm.com>
**Subject:** RE: PDGP - B33 - LPC - final PSA - transmit final execution draft - LPC.37 - 3-3-22

See attached, executed by Purchaser.

Thanks,

**Charlie Bernet**
Associate – Acquisitions | Asset Management
Lincoln Property Company | Retail Division
2000 McKinney Ave, Suite 1000 | Dallas, TX 75201
C: 214.534.5551 | O: 214.661.2803
cbernet@lpc.com

**From:** Michael Chaiken <mchaiken@chaikenlegalgroup.com>
**Sent:** Thursday, March 3, 2022 8:21 PM
**To:** Jeff Carruth <jcarruth@wkpz.com>
**Cc:** Charlie Bernet <cbernet@lpc.com>; mdixson@pdgnm.com
**Subject:** RE: PDGP - B33 - LPC - final PSA - transmit final execution draft - LPC.37 - 3-3-22

**EXHIBIT**

9

Jeff, I have accepted your changes and attached is a final clean execution version of the PSA which I have named accordingly.

Thank you.

*WE HAVE A NEW MAILING ADDRESS.*

*PLEASE DIRECT ALL U.S. MAIL AND OVERNIGHT MAIL TO THE ADDRESS SET FORTH BELOW IN MY EMAIL SIGNATURE.*

Michael J. Chaiken
**Chaiken Legal Group, P.C.**
5960 W. Parker Rd., Ste. 278 -194
Plano, TX 75093
Direct Dial – (469) 808-0406
Direct Fax – (214) 416-7877

phone – (214) 751-3433, Ext. 221
facsimile – (214) 751-3438

mchaiken@chaikenlegalgroup.com
Notice of Confidentiality:
This e-mail communication and the attachments hereto, if any, are intended solely for the information and use of the addressee(s) identified above and may contain information which is legally privileged and/or otherwise confidential. Accordingly, if a recipient of this e-mail communication is not an addressee (or an authorized representative of an addressee), such recipient is hereby advised that any review, disclosure, reproduction, re-transmission or other dissemination or use of this e-mail communication (or any information contained herein) is strictly prohibited. If you are not an addressee and/or have received this e-mail communication in error, please advise the sender of that circumstance either by reply e-mail or by telephone at (214) 751-3433, immediately delete this e-mail communication from any computer and destroy all physical copies of same.

**From:** Jeff Carruth [mailto:jcarruth@wkpz.com]
**Sent:** Thursday, March 03, 2022 11:16 AM
**To:** Michael Chaiken <mchaiken@chaikenlegalgroup.com>
**Cc:** 'Charlie Bernet <cbernet@lpc.com>' <cbernet@lpc.com>; mdixson@pdgnm.com; Jeff Carruth <jcarruth@wkpz.com>
**Subject:** PDGP - B33 - LPC - final PSA

Michael –
Attached is updated PSA with the missing information.
I made a couple of clean up fixes in the bk provision – see image below.
Please circulate clean final for execution or approve the attached.

      (t)  →  Seller is currently the Debtor in a Chapter 11 reorganization proceeding, Case No. 21-30107, *In re PDG Prestige, Inc.*, (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Western District of Texas, El Paso Division (the "Court"). Prior to confirmation of a Chapter 11 plan, Seller will be required to obtain approval of the Court to proceed to Closing (the "Bankruptcy Approval"), which Bankruptcy Approval Seller will timely seek with due diligence and in good faith, and for which Bankruptcy Approval the Seller expects no opposition from any creditor or party in interest. The approval process will require disclosure of the sales price and/or this Agreement. Following the earlier to occur of (i) Seller's receipt of the Bankruptcy Approval of this sale pursuant to a ~~Chapter Section~~ 363 sale or (ii) confirmation of a Chapter 11 plan, as ~~evidence~~evidenced by an Order from the Court ~~(the "Plan Confirmation")~~, no further approval by the Court of this Agreement and Closing will ~~not~~ be required. Seller will notify Buyer of the setting of the confirmation hearing and of the entry of the order on the confirmation of the Chapter 11 plan, both of which are anticipated to occur in early March, 2022, and Seller shall otherwise keep Buyer apprised as to the status of the Bankruptcy Case as requested by Buyer.¶



*Trusted Legal Advisors Since 1976*

DALLAS ▪ HOUSTON ▪ AMARILLO

D. <u>(713) 341-1158</u>

M. <u>(214) 552-7242</u>

F. <u>(866) 666-5322</u>

<u>jcarruth@wkpz.com</u>

<u>www.wkpz.com</u>

This communication and any attachments to it are confidential and intended solely for the use of the person to whom they are addressed. If you have received this e-mail in error, please notify us by telephone immediately at (713) 961-9045, and you are notified that any disclosure, distribution, or the taking of any action in reliance on the contents of this information is prohibited. Nothing in this message may be construed as a digital or electronic signature of any employee of Weycer, Kaplan, Pulaski & Zuber, P.C. ("WKPZ"). WKPZ automatically blocks e-mails containing objectionable language or suspicious content. Messages sent to WKPZ should be considered received only if confirmed by a return receipt. The IRS does not allow the use of informal tax advice, such as this communication, to avoid tax penalties. WKPZ expressly reserves and maintains any attorney-client privilege or work-product protections in this communication.

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is entered into as of the ___ day of March, 2022, (the "Effective Date"), by and between **MESILLA VALLEY VENTURES, LLC**, a Texas limited liability company ("Seller"), and **LPC RETAIL, LLC**, a Delaware limited liability company ("Buyer").

### WITNESSETH:

For and in consideration of the promises set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer (each, a "Party" and, collectively, the "Parties") hereby covenant and agree as follows:

1. **Agreement to Purchase**. Buyer agrees to purchase, and Seller agrees to sell, in accordance with the terms, conditions and stipulations set forth in this Agreement (the "Transaction"), all of Seller's right, title and interest in and to:

(a) the parcel of real property, as more particularly described on Exhibit A attached hereto (the "Real Property").

(b) all buildings and other improvements located on the Real Property (collectively, the "Improvements"), and all of Seller's interest, if any, in any equipment, machinery and personal property on or used in connection with the Real Property (collectively, the "Personalty").

(c) all plans, specifications and studies pertaining to the Real Property in Seller's possession or under its control, and to the extent the same are not to be assigned to Tenant under the Lease, Seller's interest in all permits and licenses (collectively, the "Permits"), warranties and guarantees (collectively, the "Warranties"), and contracts and intangibles relating to the Real Property (collectively, the "Contracts").

(d) all mineral, oil and gas rights, water rights, sewer rights and other utility rights appurtenant to or allocated to the Real Property.

(e) the Lease (defined below), including without limitation, all rent, prepaid rent, security deposits and other payments and deposits thereunder and all guarantees thereof (subject to the requirements of this Agreement); and

(f) all fixtures, appurtenances, easements, licenses, privileges, and other property interests belonging or appurtenant to the Real Property (all of the foregoing items in clauses (a) through (f) above, now, or hereafter existing, collectively, the "Property").

2. **Purchase Price**. The purchase price to be paid by Buyer to Seller for the Property is Two Million Five Hundred Forty-Five Thousand Dollars and No Cents ($2,545,000.00) (the "Purchase Price"), which Purchase Price is payable as follows:

(a) Two Hundred Thousand and No/100 Dollars ($200,000.00) earnest money (said amount, plus all interest earned or accrued thereon, the "Earnest Money Deposit") to be

deposited in escrow with Southwestern Abstract & Title Co. c/o Gricel Chavez (the "Escrow Agent") not later than three (3) business days following the receipt by Escrow Agent of a fully-executed original of this Agreement (said receipt by Escrow Agent of both a fully-executed original of this Agreement and the Earnest Money Deposit, the "Opening of Escrow"), which Earnest Money Deposit is to be held by Escrow Agent until released to Seller or Buyer as provided herein or paid to Seller at close of escrow ("COE");

(b)     The balance of the Purchase Price in the amount of Two Million Five Hundred Forty Thousand Dollars and no Cents ($2,345,000.00) shall be paid in cash or by wire transfer of good U.S. funds, and delivered at Closing. Upon payment of the Purchase Price, Seller shall execute and deliver to Buyer its recordable and transferable Special Warranty Deed (or New Mexico equivalent thereto) conveying to Buyer or its nominee, good, record and marketable title to the Property in fee simple, free, and clear of all liens, encumbrances, covenants, restrictions, easements, rights of way, claims, rights, and other matters except as set forth in the final Buyer approved Title Commitment. If Buyer, in its sole discretion shall elect to close this transaction prior to the actual date upon which the actual commencement of payment of rents under the Lease shall occur (the "Rent Commencement Date"), then Buyer shall receive a credit against the Purchase Price equal to one hundred fifty percent (150%) of all rents or other monetary obligations of the Tenant under the Lease which would have been due from the Tenant if said rents had commenced as of the Close of Escrow for the period from the Close of Escrow through the actual Rent Commencement Date (the "Rent Credit"). Buyer and Seller shall provide Escrow Agent with their best estimate of the Rent Credit. Following the Close of Escrow, in the event that the amount of the Rent Credit is not accurate based on the actual Rent Commencement Date under the Lease, the parties shall make the appropriate adjustment with any shortfall or excess payment tendered or refunded by the appropriate party as applicable. The provisions of this Section 2(b) shall survive Close of Escrow.

(c)     Upon deposit of the Deposit, Buyer will be deemed to have irrevocably paid to Seller a portion thereof equal to ONE HUNDRED AND NO/100 DOLLARS ($100.00) ("Independent Contract Consideration"), which amount Seller and Buyer bargained for and agreed to as consideration for Seller's execution and delivery of this Agreement. The Independent Contract Consideration is non-refundable from and after said date of delivery, and Seller shall retain the Independent Contract Consideration notwithstanding any other provision of this Agreement to the contrary and all references to a return of the Deposit to Buyer shall exclude the Independent Contract Consideration, which shall be delivered to Seller.

3.     **Application of Earnest Money Deposit**. Seller and Buyer hereby instruct Escrow Agent to place the Earnest Money Deposit in a federally insured interest-bearing passbook account on behalf of Seller and Buyer. The Earnest Money Deposit shall be applied as follows:

(a)     if Buyer cancels this Agreement as Buyer is so entitled to do as provided in this Agreement, the Earnest Money Deposit shall be paid immediately to Buyer.

(b)     if the Earnest Money Deposit is forfeited by Buyer pursuant to this Agreement, such Earnest Money Deposit shall be paid to Seller as Seller's agreed and total liquidated damages as contemplated in Section 21(b) below, it being acknowledged and agreed that it would be difficult or impossible to determine Seller's exact damages; and

(c)     if escrow closes, the Earnest Money Deposit shall be credited to Buyer, automatically applied against the Purchase Price, and paid to Seller at COE.

4.      **Transaction Documents**. The personal property shall be transferred by that certain bill of sale from Seller to Buyer, the agreed upon form of which is attached hereto as Exhibit B (the "Bill of Sale"); the Permits, Warranties and Contracts shall be transferred by that certain assignment and assumption agreement, the agreed upon form of which is attached hereto as Exhibit C (the "Assignment Agreement"); the Real Property and the Improvements shall be transferred and conveyed by execution and delivery of Seller's special or limited warranty deed, the agreed upon form of which is attached hereto as Exhibit D (the "Deed"); and the Lease shall be assigned by Seller to Buyer pursuant to certain assignment of lease, the agreed upon form of which is attached hereto as Exhibit E (the "Lease Assignment"). The Bill of Sale, the Assignment Agreement, the Deed, and the Lease Assignment are hereinafter collectively referred to as the "Transaction Documents". Notwithstanding the foregoing, if any Warranty transfer requires the approval of the applicable warrantor and/or satisfaction of any other conditions to such transfer, Seller shall obtain such approval and satisfy all such conditions no later than COE.

5.      **Lease**. The Property is subject to a lease with Texas Roadhouse, Inc., a Kentucky limited liability company, d/b/a Bubbas 33, as Tenant (the "Tenant") (the "Lease") dated November 8, 2019, together with its subsequent Amendments 1-6 and Seventh Amendment and Reinstatement to Ground Lease.  The Lease will survive Closing and will not constitute an Objectionable Matter (as defined in Section below).

6.      **Title Report; Survey; Objectionable Matters**. (a) Within ten (10) days after the Opening of Escrow, Escrow Agent shall deliver a current Preliminary Title Report (the "Report") for an ALTA or TLTA, as applicable, extended coverage title insurance policy (the "Owner's Policy") on the Property to Buyer and Seller. The Report shall show the status of title to the Property as of the date of such Report and shall also describe the requirements of Escrow Agent for the issuance of the Owner's Policy as described herein. The cost of the Owner's Policy shall be paid by as set forth in this Agreement. In addition to the Report, Escrow Agent shall simultaneously deliver to Buyer complete, legible copies of all documents identified in Schedule B of the Report.

(b)     Promptly after the Opening of Escrow, and receipt of the Report and title exception documents, Buyer shall cause a surveyor licensed in the State in which the Property is located to complete and deliver to Escrow Agent and Buyer a current, certified ALTA survey of the Real Property and Improvements (the "Survey"), whereupon the legal description in the Survey shall control over the description in Exhibit A attached hereto to the extent they may be inconsistent. The Survey shall set forth the legal description and boundaries of the Real Property and all easements, encroachments, and improvements thereon.

(c)     If Buyer determines, in its sole and absolute discretion, that any exception to title as shown in the Report and/or any matter disclosed by the Survey is objectionable and/or unacceptable to Buyer (collectively, the "Objectionable Matters"), then Buyer may, by giving written notice thereof to Escrow Agent and Seller on or before expiration of the Inspection Period or ten (10) days from Buyer's receipt of the Report or Survey disclosing such Objectionable Matter, whichever is later, but in no event later than the later to occur of (i) thirty (30) days after

mutual execution of this Agreement or (ii) five (5) days following Buyer's receipt of Seller's Title Response Notice (defined below) either (i) terminate this Agreement, whereupon the Earnest Money Deposit shall be paid immediately to Buyer and all documents deposited in escrow by Buyer shall be returned to Buyer without delay, or (ii) provisionally accept the title to the Property, subject to Seller's agreement to cause the removal of or otherwise cure such Objectionable Matters prior to COE. If Buyer gives notice to Seller of its election of option (ii) above, Seller shall notify Buyer in writing ("Seller's Title Response Notice") within five (5) days after receiving Buyer's written notice of Objectionable Matters whether Seller intends to remove (or cause Escrow Agent to endorse over, to Buyer's satisfaction) or otherwise cure any such Objectionable Matters. If Seller fails to notify Buyer of its intentions within such five (5) day period, Seller shall be deemed to have elected not to remove or otherwise cure such Objectionable Matters. Buyer acknowledges that Seller shall have no obligation to remove or otherwise cure any Objectionable Matters, except as otherwise expressly provided herein. All costs and expenses to remove or otherwise cure the Objectionable Matters shall be borne by Seller.

(d)     In no event may Seller encumber or allow to be encumbered the Property with any new title matter after the Opening of Escrow. In the event the Report is amended (an "Amended Report") to include new exceptions that are not set forth in the prior Report, or in the event the Survey is amended (an "Amended Survey") to include or depict matters that are not set forth in the prior Survey, Buyer shall have until the later of (i) the expiration of the Inspection Period, (ii) the date five (5) days after Buyer's receipt of both such Amended Report and copies of the documents identified in the new exceptions or new requirements, or (iii) the date five (5) days after Buyer's receipt of the Amended Survey, as applicable, within which to either (Y) terminate this Agreement as set forth in Section 6(c)(i) above, or (Z) to provisionally accept the title to the Property corresponding to such Amended Report or Amended Survey subject to Seller's agreement to cure or otherwise cause the removal of any Objectionable Matters identified by Buyer in a written notice to Seller in the manner set forth in Section 6(c) above.

(e)     In the event Buyer provisionally accepts title to the Property subject to Seller's agreement to cure one or more Objectionable Matters pursuant to Sections 6(c) and/or 6(d) above, if Seller serves notice (or is deemed to have served notice) to Buyer that Seller does not intend to remove or otherwise cure such Objectionable Matters before COE, Buyer shall, within five (5) days after receipt of such notice from Seller, notify Seller and Escrow Agent in writing of Buyer's election to either (i) terminate this Agreement as set forth in Section 6(c)(i) above, or (ii) waive such Objectionable Matter(s). If written notice of either satisfaction or dissatisfaction as to any Report, Survey, Amended Report or Amended Survey is not timely given by Buyer to Seller pursuant to this Section 6, then Buyer shall be deemed to have disapproved of the condition of the title of the Property and shall have elected to terminate this Agreement as set forth in Section 6(c)(i) above.

(f)     If Buyer and Seller mutually agree that an Objectionable Matter cannot be cured by either Seller or Escrow Agent within the five (5) day period specified in this Section 6, but such Parties mutually agree that such Objectionable Matter is reasonably susceptible to cure within thirty (30) days following the scheduled Closing Date, then Seller and Buyer shall amend this Agreement to provide that the Closing shall be delayed until the date which is no later than thirty (30) days following the scheduled Closing Date to allow time for such Objectionable Matter to be cured by Seller or Escrow Agent.

(g)    Notwithstanding anything to the contrary set forth in this Agreement, any lien, including, without limitation, any mortgage lien, deed of trust lien, tax lien, judgment lien and/or mechanics liens affecting the Property must be paid and satisfied by Seller at Closing, whether or not Buyer objects thereto, and such items shall be deemed to be included in all Objectionable Matters even if not specifically so included by Buyer.

(h)    If Seller is unable to convey title to the Property free and clear of the lien of any state or local tax now due and owing, Seller shall be responsible for either paying such tax or providing to Escrow Agent security (such as a cash deposit) so that Escrow Agent can issue the Title Policy to Buyer free and clear of such liens, whether or not Buyer includes such liens as Objectionable Matters.

7.    **Seller's Diligence Materials**. Seller agrees to deliver to Buyer, contemporaneously with the Opening of Escrow, copies of all documents and information in Seller's possession or control relating to the ownership, use, management, or operation of the Property (collectively, "Seller's Diligence Materials"), all at no cost to Buyer. The foregoing deliveries shall include, but not be limited to, the documents, materials and information set forth on the attached Exhibit F. Should Seller receive new or updated information regarding any of the matters set forth in this Section 7 after the Effective Date and prior to COE, Seller will immediately notify Buyer of such fact and will promptly deliver complete copies thereof to Buyer.

8.    **Inspection Period; Entry Rights.**

(a)    Buyer shall have until 11:59 p.m. MST on the twenty first (21st) day after the Opening of Escrow (the "Inspection Period"), at Buyer's sole cost, within which to conduct and approve any investigations, studies or tests deemed necessary by Buyer, in Buyer's sole discretion, to determine the feasibility of acquiring the Property, including, without limitation, Buyer's right to: (i) review and approve the Report and Survey, review and approve the Lease, review Seller's operating statements with respect to the Property, and review the Permits, Warranties and Contracts; and (ii) obtain, review and approve an environmental, property condition and zoning study of the Property (collectively, "Buyer's Diligence").

(b)    Seller hereby grants to Buyer and Buyer's agents, employees, and contractors the right to enter upon the Property, at any time or times prior to COE, to conduct Buyer's Diligence. Buyer and/or its consultants shall, during any entry upon the Property, carry not less than One Million Dollars ($1,000,000.00) commercial general liability insurance insuring all activity and conduct of Buyer and/or such consultants. Buyer agrees that in exercising its right of access hereunder, Buyer will use and will cause its consultants to use commercially reasonable efforts not to unreasonably interfere with the activity of Tenant or any persons providing service at the Property. Buyer shall repair damage to the Property resulting from Buyer's Diligence, and Buyer shall and does hereby agree to indemnify and hold Seller harmless from any and all liabilities, claims, losses, or damages, including, but not limited to, court costs and attorneys' fees, which may be incurred by Seller as a direct result of Buyer's Diligence, but such indemnification shall not apply to the mere discovery of existing conditions or the acts or omissions of any person or party other than Buyer, and/or Buyer's agents, employees or contractors.. Buyer's indemnity and hold harmless obligation shall survive cancellation of this Agreement or COE for a period of six (6) months.

9. **Buyer's Termination Right**. Buyer shall have the right, at any time on or prior to the expiration of the Inspection Period to terminate this Agreement for no reason or any reason at all, by delivering written notice to Seller and Escrow Agent on or before the expiration of the Inspection Period, in which event, this Agreement shall be terminated, whereupon the Earnest Money Deposit shall be returned immediately to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation under this Agreement.

10. **Close of Escrow**. The COE shall occur on that date which is **fifteen (15) days** after the expiration of the Buyer's Inspection Period (the "Closing Date").

11. **Closing Prorations and Costs.**

(a) Insurance, taxes, special assessments, utilities, or any other costs related to the Property shall be prorated between Seller and Buyer at Closing only if and to the extent such costs are not borne by Tenant pursuant to the Lease, but any the same which are not the responsibility of the Tenant and which predate the Closing Date shall be the responsibility of Seller. Any such costs that are not borne by Tenant pursuant to the Lease shall be prorated as of the Closing Date. All rents paid or payable for the month in which the Closing occurs pursuant to the Lease shall be prorated on a per diem basis as of the Closing Date. All such items attributable to the period up to the Closing Date shall be credited or charged to Seller. All such items attributable to the period on and after the Closing Date shall be credited or charged to Buyer. At the Closing, Buyer will be credited with the full amount of all security deposits paid by Tenant, if any, to the extent not previously applied by Seller in accordance with the Lease. Seller shall be credited with the full amount of any refundable deposits paid in connection with contracts with utility providers or vendors that are assumed by Buyer; *provided,* that such providers and vendors acknowledge that such deposits are held, as of the Closing, for Buyer's account. Seller shall not receive any credit at Closing for rents that have not been collected as of Closing. Buyer will pay over to Seller any rents received by Buyer after the Closing attributable to the period prior to the Closing Date (determined on the basis of applying rents received to the most recently accrued rent first), after deduction by Buyer of all expenses incurred in collecting same. If Closing occurs on or after the twenty-fourth (24th) day of the calendar month, the monthly scheduled rent amount(s) payable to the landlord under the Lease for the full calendar month following the month in which Closing occurs will be credited to Buyer at Closing (and, in such event, Seller will be entitled to receive and retain such credited amounts when paid by Tenant). Seller shall be required to deliver to Escrow Agent at COE such affidavits, documents, and security that Escrow Agent may reasonably require so that Escrow Agent can insure title to the Property free and clear of the lien of any state or local tax, and the performance of Seller's obligation set forth in this sentence shall be a condition to Buyer's obligation to purchase the Property.

(b) Seller and Buyer shall be responsible for the payment of costs and expenses incurred by Seller and Buyer in connection with the Transaction as follows:

(i) Seller shall pay: (i) any and all municipal, county and state documentary transfer taxes due on the transfer of the Real Property from Seller to Buyer, (ii) the costs of releasing all liens, judgments, and other encumbrances that are to be released and of recording such releases, (iii) any costs associated with the delivery of the Report, and the cost of

the standard coverage and extended coverage portion of the Owner's Policy, any endorsements which are the obligation of Seller pursuant to Section 6(a); (iv) the cost of the Survey, and (v) one-half (1/2) of any escrow fee charged by Escrow Agent.

(ii)  Buyer shall pay: (i) any endorsements to the Owner's Policy costs for an extended coverage policy and any endorsements thereto, except endorsements which are the obligation of Seller pursuant to Section 6(a), (ii) the standard coverage portion of Buyer's lender's title policy (if any) and any endorsements thereto, and (iii) one-half (1/2) of any escrow fee charged by Escrow Agent.

(iii)  Any other closing costs not specifically designated as the responsibility of either Party to this Agreement shall be paid by Seller and Buyer according to the usual and customary allocation of the same in the jurisdiction in which the Property is located. Except as otherwise set forth in this Agreement, Seller and Buyer will each be solely responsible for and bear all of their own respective expenses, including, without limitation, expenses of legal counsel. Seller agrees that all closing costs payable by Seller shall be deducted from Seller's proceeds otherwise payable to Seller at COE. Buyer shall deposit with Escrow Agent sufficient cash to pay all of Buyer's closing costs.

(c)  If, after COE, the Parties discover any errors in adjustments and apportionments or additional information becomes available which would render the closing prorations inaccurate, the same shall be corrected as soon after their discovery as possible. The provisions of this Section 11(c) shall survive COE except that no adjustment shall be made later than one (1) year after COE unless prior to such date the Party seeking the adjustment shall have delivered a written notice to the other Party specifying the nature and basis for such claim; provided, however, if an adjustment is sought due to the fact that current tax bills with respect to the Property had not yet been issued as of COE, the provisions of this Section 11(c) shall survive with respect to any closing proration of real property taxes until thirty (30) days after Buyer's receipt of tax bills for the period of time during which COE occurred. If any such claim is valid, the Party against whom the claim is sought shall have ten (10) days in which to remit any adjustment due.

12.  **Seller's Representations and Warranties**. Seller hereby represents and warrants to Buyer as of the Effective Date and again as of COE, and subject to Section 40 below, that:

(a)  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has the full power and lawful authority to enter into and carry out the terms and conditions of this Agreement and to execute and deliver all documents which are contemplated by this Agreement; and all actions necessary to confer such power and authority upon the persons executing this Agreement and all documents which are contemplated by this Agreement to be executed on behalf of Seller have been taken. Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

(b)  Seller's organizational documents and applicable laws do not in any way prohibit, limit, or otherwise affect the right or power of Seller to enter into and perform all of the terms and covenants of this Agreement. Seller is not a party to or bound by any contract,

agreement, indenture, trust agreement, note, obligation or other instrument that could prohibit, limit, or otherwise affect the same. No consent, authorization, or approval of, or other action by, and no notice to or filing with, any governmental agency or any other person are required for the due execution, delivery, and performance by Seller of this Agreement or any of the terms and covenants contained in this Agreement.

(c) the execution, delivery and performance of this Agreement do not and will not result in the creation or imposition of any lien or other encumbrance upon the assets of Seller, nor will this transaction in any way violate any other agreements to which Seller is a party.

(d) there are no unrecorded leases, liens or encumbrances which may affect title to the Property (other than the Lease); any existing financing secured by the Property or any part thereof shall be satisfied and discharged in full at or prior to COE and any liens or encumbrances relating thereto shall be terminated and released of record at or prior to COE; and Seller does not have any defeasance, lender approval or prepayment obligations with respect to any existing financing which will delay COE;

(e) to Seller's knowledge, no notice of violation has been issued with regard to any applicable regulation, ordinance, requirement, covenant, condition, or restriction relating to the present use or occupancy of the Property by any person, authority or agency having jurisdiction, which violation has not been cured.

(f) to Seller's knowledge, there are no intended public improvements which will or could result in any charges being assessed against the Property which will result in a lien upon the Property, and there is no impending or contemplated condemnation or taking by inverse condemnation of the Property, or any portion thereof, by any governmental authorities.

(g) there are no suits or claims pending or to Seller's knowledge, threatened with respect to or in any manner affecting the Property, nor does Seller know of any circumstances which should or could reasonably form the basis for any such suits or claims which have not been disclosed in writing to Buyer by Seller.

(h) Seller has not taken any action before any governmental authority having jurisdiction thereover, the object of which would be to change the present zoning of or other land-use limitations, upon the Property, or any portion thereof, or its potential use, and, to Seller's knowledge, there are no pending proceedings, the object of which would be to change the present zoning or other land-use limitations.

(i) except as set forth in Seller's Diligence Materials, Seller has no actual knowledge that there exists or has existed, and Seller itself has not caused any generation, production, location, transportation, storage, treatment, discharge, disposal, release or threatened release upon, under or about the Property of any Hazardous Materials. "Hazardous Materials" shall mean any flammables, explosives, radioactive materials, hazardous wastes, hazardous and toxic substances or related materials, asbestos or any material containing asbestos (including, without limitation, vinyl asbestos tile), or any other substance or material, defined as a "hazardous substance" by any federal, state, or local environmental law, ordinance, rule or regulation including, without limitation, the Federal Comprehensive Environmental Response Compensation

and Liability Act of 1980, as amended, the Federal Hazardous Materials Transportation Act, as amended, the Federal Resource Conservation and Recovery Act, as amended, and the rules and regulations adopted and promulgated pursuant to each of the foregoing;

(j)  except as set forth in Seller's Diligence Materials, to Seller's actual knowledge, there is not now, nor has there ever been, on or in the Property or any portion thereof underground storage tanks, any asbestos-containing materials, or any polychlorinated biphenyls, including those used in hydraulic oils, electric transformers, or other equipment.

(k)  to Seller's knowledge, there are no proceedings pending for the increase of the assessed valuation of the Property or any portion thereof.

(m)  to Seller's knowledge, all certificates, permits and licenses from any governmental authority having jurisdiction over the Property and/or any approvals from any third parties under any recorded title instruments which encumber the Property which are necessary to permit the lawful use and operation of the Improvements and the Property as they presently exist, have been obtained (or will be obtained prior to the COE), and are now, and will continue to be at all times before the COE, in full force and effect, and, to Seller's knowledge, there is no pending threat of modification, cancellation, termination or expiration of any such certificate, permit, approval or license;

(n)  with respect to the Lease: (i) the Lease is in full force and effect, (ii) Seller is not in default under the Lease, (iii) Tenant is not in default under the Lease; (iv) Seller has not received any rent paid by Tenant more than thirty (30) days in advance, (v) except as may be set forth therein, no rent concessions have been provided by Seller or asserted by Tenant, (vi) neither the rents nor the Lease have been assigned, transferred or hypothecated by Seller (or any such assignment, transfer or hypothecation shall be terminated and released at Closing), (vii) the Lease delivered with the Seller's Diligence Materials is a true, accurate and complete copy; (viii) Seller has not received any notice or correspondence from Tenant or Tenant's agents indicating Tenant's desire, willingness or intent to amend, modify, assign or terminate the Lease nor any notice or correspondence requesting the consent of Seller to any of the foregoing, (ix) the contingencies in Section 7 (a) and (b) of the Lease have been satisfied and/or waived in writing by Tenant, (x) the contingency set forth in Section 7 (c) of the Lease has been satisfied and/or waived in writing by Seller and Tenant, Seller has obtained all Approvals from the Approval Period, and Seller shall deliver evidence of the same to Buyer as part of the Seller's Diligence Materials, (xi) all of Landlord's Preliminary Site Work, Landlord's Secondary Site Work, and any and all other Landlord's Work, relating to the Premises, the Adjacent Parcel, the Development and/or Common Areas (as such terms are defined in the Lease), have been completed by seller in accordance with the Lease prior to the occurrence of any deadlines and without the imposition of any free rent or termination remedies by Tenant, and has been accepted by Tenant and any and all items on the Final Punchlist have been completed by Landlord in accordance with the Lease prior to the occurrence of any deadlines and without the imposition of any free rent or termination remedies by Tenant and Seller shall deliver evidence of the same to Buyer as part of the Seller's Diligence Materials; (xii) Seller has delivered to the as-built survey to Tenant as and when required by Section 7 (f) of the Lease and Seller shall deliver evidence of the same to Buyer as part of the Seller's Diligence Materials; (xiii) Tenant does not have any right of first offer or first refusal under the Lease; (xiv) the current annual Base Rent due under the Lease, upon the occurrence of

the Rent Commencement Date under the Lease will be **$140,000.00** and will not be subject to any reconciliation or adjustment based on the actual cost to acquire or develop the Premises, the Rent Commencement Date under the Lease is expected to occur by no later than April 30, 2022, the expiration date for the initial Term of the Lease is ten (10) years following the Rent Commencement Date, and Landlord is not currently holding a security deposit from the Tenant under the Lease, (xv) Seller has no outstanding obligation that will not be satisfied by Closing (a) to construct, or pay for, any tenant fixtures or improvements under the Lease, or (b) to pay any leasing or brokerage commission(s) in connection with the Lease..

(o)     with respect to any applicable reciprocal easement agreement or declaration of covenants, conditions and/or restrictions (collectively, the "CC&Rs"): (i) all amounts due and payable by under the CC&Rs with respect to the Property have been paid in full, (ii) no default of Seller or Tenant exists under any of the CC&Rs, and (iii) to Seller's knowledge, no default of any other party exists under any of the CC&Rs, and Seller shall request an obtain an estoppel certificate from all applicable parties to said CC&Rs as a condition to Buyer's obligation to close this transaction;

(p)     Seller has in place and in force such insurance with such coverages and in such amounts that are equal to or greater than those customarily maintained by similar businesses in the same geographic area in which the Property is located;

(q)     the following documents are duly executed and filed of record against the "Adjacent Parcel" (as defined in the Lease), the "Development" (as defined in the Lease), and the "Common Areas" (as defined in the Lease), which contain provisions which provide for the owner of the Property to enforce any and all of the provisions in the Lease which relate to said Adjacent Parcel, Development and/or Common Areas, including, without limitation, the following provisions of the Lease:  Section 1 (b), 1 (d), 11 (b), 14 (f), 21 (a), 28 (a), and 31 (d): Instrument # 2007993 "Amendment to Declaration" Recorded April 1, 2020; Instrument # 1825387 Recorded October 23, 2018.

(r)     the Premises is a separately assessed tax parcel with a separate tax identification number and Seller will provide evidence of same as part of Seller's Diligence Materials; and

(s)     any and all representations and warranties contained in the Lease made by the Landlord thereunder to Tenant as relates to the Development are hereby made to Buyer.

(t)     Seller is currently the Debtor in a Chapter 11 reorganization proceeding, Case No. 21-30107, *In re PDG Prestige, Inc.*, (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Western District of Texas, El Paso Division (the "Court"). Prior to confirmation of a Chapter 11 plan, Seller will be required to obtain approval of the Court to proceed to Closing (the "Bankruptcy Approval"), which Bankruptcy Approval Seller will timely seek with due diligence and in good faith, and for which Bankruptcy Approval the Seller expects no opposition from any creditor or party in interest. The approval process will require disclosure of the sales price and/or this Agreement. Following the earlier to occur of (i) Seller's receipt of the Bankruptcy Approval of this sale pursuant to a Section 363 sale or (ii) confirmation of a Chapter 11 plan, as evidenced by an Order from the Court, no further approval by the Court of

this Agreement and Closing will be required. Seller will notify Buyer of the setting of the confirmation hearing and of the entry of the order on the confirmation of the Chapter 11 plan, both of which are anticipated to occur in early March, 2022, and Seller shall otherwise keep Buyer apprised as to the status of the Bankruptcy Case as requested by Buyer.

If, prior to COE, Seller becomes aware of any fact or circumstance that would materially change a representation or warranty of Seller in this Agreement, then Seller shall promptly, and in all events at least five (5) days prior to the Closing Date (which date shall be extended if necessary to give Buyer five days to review such material change), give written notice of such changed fact or circumstance to Buyer. If, prior to COE, upon Seller's notice or otherwise, Buyer becomes aware of the untruth or inaccuracy of, or facts or circumstances that would change materially, any representation or warranty of Seller in this Agreement or would constitute a material adverse change in the Property or its future use or operation, then Buyer shall have the option of: (i) waiving such breach of representation or warranty or material adverse change and completing its purchase of the Property pursuant to this Agreement; (ii) reaching agreement with Seller to adjust the terms of this Agreement to compensate Buyer for such change, but only to the extent Seller agrees in its sole discretion; or (iii) terminating this Agreement and receiving reimbursement by Seller for Buyer's actual, verifiable out-of-pocket costs and expenses incurred with respect to Buyer's Diligence (including, without limitation, reasonable attorneys' fees). Upon a termination of the Agreement pursuant to clause (iii) in the forgoing sentence, the Earnest Money Deposit shall be paid immediately by Escrow Agent to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation hereunder. Seller shall and does hereby indemnify against and hold harmless Buyer from any loss, damage, liability, and expense, together with all court costs and attorneys' fees, if awarded by a court of law, which Buyer may incur, by reason of any material misrepresentation by Seller or any material breach of any of Seller's warranties or covenants. All representations and warranties of Seller made in this Agreement, and Seller's indemnity and hold harmless obligations, shall survive COE for a period of one (1) year.

13. **Buyer's Representations and Warranties**. Buyer hereby represents and warrants to Seller as of the Effective Date and again as of COE that:

(a) In the event that prior to COE, the Buyer, through a valid assignment, is an entity, Buyer is duly formed and validly existing and authorized to transact business in and under the laws of the State of New Mexico and the individuals executing this Agreement on behalf of Buyer are duly authorized to execute and deliver this Agreement and all documents that are contemplated by this Agreement: and

Buyer shall and does hereby indemnify against and hold Seller harmless from any loss, damage, liability, and expense, together with all court costs and attorneys' fees, if awarded by a court of law, which Seller may incur, by reason of any material misrepresentation by Buyer or any material breach of any of Buyer's warranties or covenants. All representations and warranties of Buyer made in this Agreement, and Buyer's indemnity and hold harmless obligations, shall survive COE for a period of six (6) months

14. **Anti-Terrorism**. Each Party hereby represents that, to the actual knowledge of such Party, neither such Party nor any of such Party's affiliated entities, is in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law No. 107-56. Each Party hereby further represents that, neither such Party, nor to the actual knowledge of such Party, any of such Party's affiliated entities, or their respective brokers or agents acting or benefiting in any capacity in connection with the purchase of the Property, is any of the following: (i) a person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (ii) a person or entity owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order; (iii) a person or entity with which a Party is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Laws; (iv) a person or entity that commits, threatens, or conspires to commit or supports "terrorism" as defined in the Executive Order; or (v) a person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list. Neither Party nor, to the actual knowledge of such Party, any of its brokers or other agents acting in any capacity in connection with the purchase of the Property: (x) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person as described above; (y) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order; or (z) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any of the Anti-Terrorism Laws.

15. **Seller's Covenants During Contract Period**. Seller hereby covenants to Buyer as of the Effective Date that:

(a) From and after the Effective Date, Seller shall: (i) not execute, modify, terminate or amend the Lease, and/or approve any new leases or any contracts or commitments of any kind affecting the Property, or any interest therein, without Buyer's written approval (which approval may be granted or withheld in Buyer's sole and absolute discretion); (ii) not encumber the Property with any liens, encumbrances or other instruments creating a cloud on title or securing a monetary obligation with the Property; (iii) not, without the prior written consent of Buyer, take any action before any governmental authority having jurisdiction thereover, the object of which would be to change the present zoning of or other land-use limitations, upon the Property, or any portion thereof, or its potential use; (iv) continue to operate the Property as heretofore operated by Seller subject to Buyer's rights under this Agreement to direct specific activities of Seller; (v) not make or affirmatively consent to any capital improvements or any material physical changes to the Real Property without the Buyer's written consent, which consent may be granted or withheld in Buyer's sole and absolute discretion; and (vi) upon the reasonable request of Buyer, require Tenant to deliver such documentation and information as landlord is permitted to obtain, and/or Tenant is required to deliver, pursuant to the terms of the Lease.

(b)    From and after the Effective Date, Seller shall, or shall cause Tenant to: (i) maintain the Property in its current condition; and (ii) perform required and routine repairs and maintenance to, and make necessary replacements of, each tangible portion of the Property (whether real or personal) as the relevant conditions require.

(c)    Seller shall reasonably cooperate with Buyer in timely providing information requested by Buyer that is readily available to Seller or within Seller's control. In addition, each Party agrees to provide the other with such consents as may reasonably be necessary so that the other may independently confirm information provided to it by third parties. Seller and Buyer shall cooperate with each other and exercise commercially reasonably efforts to obtain, as of the Closing Date, all approvals, permits, consents from, and provide all notices to, any third party and any governmental or regulatory authority, which are required in connection with the execution, delivery, or performance of this Agreement.

(d)    Until the Closing Date or prior termination of this Agreement by the Parties, Seller shall not offer the Property for sale publicly or otherwise solicit, make, pursue, negotiate, or accept offers for the sale of the Property to or from any party.

16.    **Buyer's Conditions Precedent**. In addition to all other conditions precedent set forth in this Agreement, Buyer's obligations to perform under this Agreement and to close escrow are expressly subject to the following:

(a)    the delivery by Seller to Escrow Agent, for delivery to Buyer at COE, of the executed original Transaction Documents and such further documents as reasonably may be required in order to fully and legally close this Transaction, including a tenant notice letter in the form attached hereto as Exhibit G and any required assignments and assumptions of operating agreements related to the Property.

(b)    the issuance of the Owner's Policy (or a written commitment therefor) subject only to those matters approved or deemed approved by Buyer pursuant to this Agreement (collectively, the "Permitted Exceptions").

(c)    within ten (10) days following the Effective Date, Seller shall request a tenant estoppel certificate with respect to the Lease addressed to Buyer, its lender, and their respective successors and assigns, reasonably acceptable to Buyer, which estoppel certificate: (i) shall be substantially in the form specified by the Lease or, if no form is specified by the Lease, in a commercially reasonable form to be provided by Buyer; (ii) shall be acknowledged by any guarantor of the Lease; (iii) shall not identify any amendment, assignment, modification, or other lease-related documentation which has not been previously provided to Buyer; and (iv) shall not identify any landlord defaults or other claims or exceptions taken by Tenant, or in the event the estoppel certificate identified landlord defaults or other claims or exceptions taken by Tenant, Seller shall have promptly resolved same to Buyer's and Tenant's reasonable satisfaction. Provided that Seller uses commercially reasonable efforts to obtain the estoppel certificate, the Parties agree that any failure by Seller to obtain the estoppel certificate shall in no event be a Seller default under this Agreement; but the receipt of a duly executed estoppel by Tenant in form approved by Buyer and date no sooner than fifteen (15) days prior to Closing shall be an express condition to Buyer's obligation to close this transaction.

(d)　　if reasonably requested by Buyer, the deposit by Seller with Buyer not later than three (3) business days prior to COE of (i) an original estoppel certificate executed by all other parties to any CC&Rs and addressed or certified to Buyer stating that such CC&R is in full force and effect and is not modified (except as disclosed in such estoppel certificate) and, to the best knowledge of the party giving the estoppel, the other party or parties thereto is/are not in default under the applicable CC&R and all amounts, if any, owing under the applicable CC&R have been paid in full, and (ii) a subordination, non-disturbance and attornment agreement executed by Tenant, in form and substance reasonably acceptable to Tenant, for the benefit of Buyer's lender (if any).  Provided that Seller uses commercially reasonable efforts to obtain the estoppel certificate, the parties agree that any failure by Seller to obtain any CC&R estoppel or SNDA shall in no event be a Seller Default.

(e)　　the deposit with Escrow Agent of an executed affidavit of Seller and such other documentation as may be reasonably required by Escrow Agent to allow for the deletion of the mechanics' lien exception from the Owner's Policy.

(f)　　there shall have been no material adverse change to the financial condition of Tenant, nor any material adverse change to the Property, nor any fact, circumstance, condition, or occurrence which would materially and adversely affect the marketability, financing, or insurability of the Property.

(g)　　all (i) representations and warranties of Seller set forth herein shall have been true and correct in all respects when made, and (ii) covenants, agreements and conditions required to be performed or complied with by Seller prior to or at the time of COE in connection with the Transaction shall have been duly performed or complied with by Seller prior to or at such time or waived in writing by Buyer.

(h)　　delivery to Buyer of certificates evidencing the insurance coverage, limits, and policies to be carried by Tenant under and pursuant to the terms of the Lease.

(i)　　except with respect to the Bankruptcy Case, there has been no "Insolvency Event" with respect to either Seller or Tenant. As used in this subsection (i), an "Insolvency Event" shall have occurred if either Seller or Tenant becomes insolvent within the meaning of the United States Bankruptcy Code, 11 U.S.C. Sec. 101 *et seq.*, as amended (the "Bankruptcy Code"), files or notifies Seller or any affiliate of Seller that it intends to file a petition under the Bankruptcy Code, initiates a proceeding under any similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts (collectively, hereinafter, an "Action"), becomes the subject of either a petition under the Bankruptcy Code or an Action, or is not generally paying its debts as the same become due; and

(j)　　delivery to Buyer of originals of the Contracts, Warranties and Permits, if any, in the possession of Seller or Seller's agents, including, without limitation, any warranties covering the roof or any other part of the Improvements, and any correspondence with respect thereto, together with such non-proprietary leasing and property manuals, files and records which are material in connection with the continued operation, leasing and maintenance with respect to the Property.

(k)    the occurrence of the Rent Commencement Date under the Lease.

(l)    Seller has obtained Bankruptcy Approval if required at the time of sale.

If the foregoing conditions have not been satisfied by the specified date or COE as the case may be, then Buyer shall have the right, at Buyer's sole option, by giving written notice to Seller and Escrow Agent, to (i) terminate this Agreement as it relates to the Property, whereupon the Earnest Money Deposit shall be paid immediately by Escrow Agent to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation under this Agreement, provided that if the applicable failure of a condition is due to the breach or default by a Party to this Agreement, then the non-defaulting Party shall also have such rights and remedies as are provided for under this Agreement as a result of such breach or default, or (ii) extend such specified date or COE, as applicable, for the Property for such amount of time as Buyer deems reasonably necessary to allow Seller to satisfy such conditions. In any event, Buyer's consent to the closing of the Transaction as to the Property pursuant to this Agreement shall waive any remaining unfulfilled conditions for the benefit of Buyer with respect thereto.

17.    **Seller's Condition Precedent**. Notwithstanding anything in this Agreement to the contrary, Seller's obligation to sell the Property shall be subject to and contingent upon the due performance by Buyer of each and every undertaking and agreement to be performed by Buyer hereunder.

18.    **Brokerage Commissions and Finder's Fees**. Seller and Buyer each represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with this Agreement or the sale of the Property, except CP Commercial Real Estate, Attn: Kirby Dederian ("Seller's Broker") and Lincoln Property Company ("Buyer's Broker"). Seller's Broker and Buyer's Broker will be compensated by Seller pursuant to the terms of a separate agreement between Seller and Seller's Broker, and Buyer's Broker, as applicable, which compensation shall be deemed earned and shall be due and payable only if, as, and when the sale contemplated by this Agreement is consummated. Buyer and Seller each hereby agree to indemnify, defend, and hold the other harmless from any claim, liability, obligation, cost, or expense (including attorneys' fees and expenses) for fees or commissions relating to Seller's sale, or Buyer's acquisition, of the Property asserted against either party by any broker or other person (other than Seller's Broker and Buyer's Broker) claiming by, through, or under the indemnifying party or whose claim is based on the indemnifying party's acts. The provisions of this **Section 18** shall survive the Closing or any termination of this Agreement.

19.    **Assignment**. This Agreement may not be assigned by Seller without the prior written consent of Buyer, which consent may be granted or withheld in Buyer's sole and absolute discretion. Buyer may assign its rights under this Agreement to an Affiliate of Buyer without seeking or obtaining Seller's consent, and any other proposed assignment by Buyer shall require Seller's consent, not to be unreasonably withheld, conditioned or delayed. For the purposes of this paragraph, the term "*Affiliate*" means any entity that directly or indirectly controls, is controlled by, or is under common control with Buyer, or Buyer's principals, and the term "control" means the power to direct the management of such entity through voting rights, ownership or contractual obligations. Such assignment shall not become effective until each assignee executes an instrument whereby such assignee expressly assumes each of the obligations of Buyer under this Agreement, including

specifically, without limitation, all obligations concerning the Earnest Money Deposit. Buyer may also designate someone other than Buyer, as grantee and/or assignee, under the Transaction Documents by providing written notice of such designation at least five (5) days prior to COE. No assignment shall release or otherwise relieve Buyer from any obligations hereunder; provided, however, with respect to any assignment, if COE occurs the assigning party (but not the assignee) shall be relieved of all its obligations arising under this Agreement before, on and after COE.

20.  **Risk of Loss**. Seller shall bear all risk of loss, damage or taking of the Property which may occur prior to COE. In the event of any loss, damage or taking with respect to the Property prior to COE, Buyer may, at Buyer's sole option, by written notice to Seller and Escrow Agent, terminate this Agreement, whereupon the Earnest Money Deposit shall be paid immediately to Buyer and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation hereunder. In the alternative, Buyer may attempt to negotiate an appropriate downward adjustment of the Purchase Price. If Seller and Buyer cannot agree upon such a downward adjustment within a reasonable period (not to exceed ten (10) days from the date Buyer receives notice of the loss) Buyer may terminate this Agreement as provided above. In the event of any loss, damage or taking which does not result in a termination of this Agreement, Seller shall at COE and as a condition precedent thereto, pay Buyer or credit Buyer against the Purchase Price the amount of any insurance or condemnation proceeds, or assign to Buyer, as of COE and in a form acceptable to Buyer, all rights or claims for relief to the same, and credit to Buyer an amount equal to the deductible (if any) under the insurance policy.

21.  **Remedies**.

(a)  Seller's Breach. If Seller breaches this Agreement, Buyer may, at Buyer's sole option, either: (i) by written notice to Seller and Escrow Agent, terminate this Agreement, whereupon the Earnest Money Deposit shall be paid immediately by Escrow Agent to Buyer, Seller shall promptly reimburse to Buyer its reasonable out-of-pocket and third-party property diligence expenses (including, without limitation, attorneys' fees) up to Fifty Thousand Dollars & 00/100, ($50,000.00) and, except as otherwise provided in this Agreement, neither of the Parties shall have any further liability or obligation hereunder, or (ii) seek specific performance against Seller in which event COE shall be automatically extended as necessary. Notwithstanding the foregoing, if specific performance is unavailable as a remedy to Buyer because of Seller's affirmative act or intentional omission, Buyer shall be entitled to pursue all rights and remedies available at law or in equity. Seller hereby acknowledges and agrees that the provisions of this Section 21(a) shall not limit any rights or remedies Buyer may have against Seller after COE pursuant to any indemnification provisions of this Agreement or for any misrepresentation, breach of warranty or default by Seller in any of its obligations under this Agreement, the Transaction Documents, or any other documents to be entered into pursuant to this Agreement.

(b)  Buyer's Breach. IF THE TRANSACTION FAILS TO CLOSE ON OR PRIOR TO THE CLOSING DATE OR THE EXTENDED CLOSING DATE, AS APPLICABLE, DUE TO A FAILURE BY BUYER TO PERFORM BUYER'S OBLIGATIONS UNDER THIS AGREEMENT, AND SUCH FAILURE CONTINUES FOR MORE THAN TEN (10) DAYS FOLLOWING BUYER'S RECEIPT OF WRITTEN NOTICE FROM SELLER, THE ENTIRE AMOUNT OF THE DEPOSIT, PLUS ACCRUED INTEREST, SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES. BUYER AND SELLER HEREBY ACKNOWLEDGE

AND AGREE THAT SELLER'S DAMAGES IN THE EVENT OF SUCH A BREACH OF THIS AGREEMENT BY BUYER WOULD BE DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE AMOUNT OF THE DEPOSIT PLUS ACCRUED INTEREST IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THE TRANSACTION PROVIDED FOR IN THIS AGREEMENT FAILS TO CLOSE, AND THAT SUCH ESTIMATE IS REASONABLE UNDER THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT. BUYER AND SELLER AGREE THAT SELLER'S RIGHT TO RETAIN THE DEPOSIT PLUS ACCRUED INTEREST SHALL BE THE SOLE REMEDY OF SELLER AT LAW IN THE EVENT OF A BREACH OF THIS AGREEMENT BY BUYER.

22. **Attorneys' Fees**. If there is any litigation to enforce any provisions or rights arising under this Agreement, the unsuccessful party in such litigation, as determined by the court, agrees to pay the successful party, as determined by the court, all costs, and expenses, including, but not limited to, reasonable attorneys' fees incurred by the successful party, such fees to be determined by the court. For purposes of this Section 22, a Party will be considered to be the "successful party" if (a) such Party initiated the litigation and substantially obtained the relief which it sought (whether by judgment, voluntary agreement or action of the other Party, trial, or alternative dispute resolution process), (b) such Party did not initiate the litigation and either (i) received a judgment in its favor, or (ii) did not receive judgment in its favor, but the Party receiving the judgment did not substantially obtain the relief which it sought, or (c) the other Party to the litigation withdrew its claim or action without having substantially received the relief which it was seeking.

23. **Notices**.

    (a)    Except as otherwise required by law, any notice required or permitted hereunder shall be in writing and shall be given by (i) personal delivery, (ii) deposit in the U.S. Mail, certified or registered, return receipt requested, postage prepaid, (iii) any express or overnight delivery service (e.g., Federal Express), delivery charges prepaid; (iv) facsimile; or (v) electronic mail, in each case addressed to the Parties at the addresses set forth below, or at such other address as a Party may designate in writing pursuant hereto, except that any notice of default must simultaneously be sent by the method set forth in subparagraph (iii) above:

| | |
|---|---|
| if to Seller: | Mesilla Valley Ventures, LLC,<br>c/o PDG Prestige, Inc.<br>Attn: Michael J. Dixson<br>154 N. Festival<br>Building D<br>El Paso, TX 79912<br>Tel.: (575) 532-9779<br>Fax: (575) 521-9330<br>E-mail: mdixson@pdgnm.com |
| with copies to: | WKPZ<br>Attn: Jeff Carruth<br>Phone: 214-552-7242<br>Email: jcarruth@wkpz.com |
| if to Buyer: | LPC RETAIL, LLC<br>c/o Lincoln Property Company, Retail Division<br>2000 McKinney Ave., Suite 1000<br>Dallas, TX 75201<br>Attention: Matthew Gallo, COO, Senior Vice President<br>Phone: 214.740.3482<br>E-Mail: mgallo@lpc.com |
| with copies to: | Chaiken Legal Group, P.C.<br>5960 W. Parker Rd., Ste. 278 – 194<br>Plano, TX 75093<br>Attention: Michael J. Chaiken, Esq.<br>Telephone: (214) 751-3433, Ext. 221<br>Facsimile: (214) 751-3438<br>E-mail: mchaiken@chaikenlegalgroup.com |
| if to Escrow Agent: | Southwestern Abstract & Title Co.<br>c/o Gricel Chavez<br>1125 S. Main Street<br>Las Cruces, NM 88005<br>575-523-8561 Tel<br>575-526-8390 Fax<br>Email: justin@swatlc.com<br>Gricel@swatlc.com |

(b)     Notice shall be deemed to have been delivered on (i) the date on which the notice is received, if notice is given by personal delivery, (ii) the third business day following the day of deposit of such notice with the U.S. Mail, if notice is given by certified or registered mail, return receipt requested; (iii) the next business day, if notice is delivered by a reputable express overnight delivery service; and (iv) the date on which confirmation of facsimile or electronic mail

is received, if notice is given by facsimile or electronic mail. If escrow has opened, a copy of any notice given to a party shall also be given to Escrow Agent by regular U.S. Mail or by any other method provided for herein.

24.     **Approvals**. Concerning all matters in this Agreement requiring the consent or approval of any Party, the Parties agree that any such consent or approval shall not be unreasonably withheld unless otherwise provided in this Agreement.

25.     **Additional Acts**. The Parties agree to execute promptly such other documents and to perform such other acts as may be reasonably necessary to carry out the purpose and intent of this Agreement.

26.     **Governing Law**. This Agreement shall be construed and interpreted in accordance with and shall be governed and enforced in all respects according to the laws of the state in which the Property is located, without regard to any conflict of laws principles.

27.     **Construction**. The terms and provisions of this Agreement represent the results of negotiations among the Parties, each of which has been represented by counsel of its own choosing, and neither of which has acted under any duress or compulsion, whether legal, economic, or otherwise. Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the Parties each hereby waive the application of any rule of law which would otherwise be applicable in connection with the interpretation and construction of this Agreement that ambiguous or conflicting terms or provisions contained in this Agreement shall be interpreted or construed against the Party whose attorney prepared the executed Agreement or any earlier draft of the same.

28.     **Time of Essence**. Time is of the essence of this Agreement. However, if this Agreement requires any act to be done or action to be taken on a date which is a Saturday, Sunday or legal holiday, such act or action shall be deemed to have been validly done or taken if done or taken on the next succeeding day which is not a Saturday, Sunday or legal holiday, and the successive periods shall be deemed extended accordingly.

29.     **Interpretation**. If there is any specific and direct conflict between, or any ambiguity resulting from, the terms and provisions of this Agreement and the terms and provisions of any document, instrument or other agreement executed in connection herewith or in furtherance hereof, including any Exhibits hereto, the same shall be consistently interpreted in such manner as to give effect to the general purposes and intention as expressed in this Agreement which shall be deemed to prevail and control.

30.     **Headings**. The headings of this Agreement are for reference only and shall not limit or define the meaning of any provision of this Agreement.

31.     **Fax and Counterparts**. This Agreement may be executed by facsimile or electronically mailed .pdf file, and/or in any number of counterparts. Each Party may rely upon any facsimile, electronically mailed .pdf file or counterpart copy as if it were one original document.

32.    **Incorporation of Exhibits**. All Exhibits to this Agreement are fully incorporated herein as though set forth at length herein.

33.    **Severability**. If any provision of this Agreement is unenforceable, the remaining provisions shall nevertheless be kept in effect.

34.    **Entire Agreement**. This Agreement contains the entire agreement between the Parties and supersedes all prior agreements, oral or written, with respect to the subject matter hereof. The provisions of this Agreement shall be construed as a whole and not strictly for or against any Party.

35.    **Intentionally Omitted**.

36.    **Privilege Taxes**. Seller represents, warrants, and covenants to Buyer that all state and local transaction privilege, sales, excise, use or similar taxes relating to the development, sale or rental of the Property (including, without limitation any speculative builder tax, owner-builder tax, or construction contractor tax) have been paid and Seller shall pay any such taxes that may arise as a result of the sale of the Property to Buyer as and when due. Seller shall indemnify, hold harmless and defend the Indemnified Parties from any and all Claims relating to a breach of the preceding sentence. The provisions of this Section 36 shall survive COE.

37.    **Tax Deferred Exchange**. Each Party agrees to cooperate with each other in effecting the other Party's exchange of the Property that qualifies for tax deferred treatment pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and corresponding provisions of applicable state law by executing and delivering to each other or the applicable exchange company, consents reasonably necessary to effect the tax-deferred exchange; *provided,* that (a) such cooperation does not result in a delay of the Closing, (b) such consents do not modify the terms of this Agreement nor impose any liability or obligations on the Party signing such consent and (c) Buyer is not required to take title to any other real property. Such tax-deferred exchange shall be affected at the requesting Party's sole cost, expense, and liability.

38.    **Waiver of Jury Trial and Certain Damages**. EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO SHALL AND THEY HEREBY DO INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND/OR ANY CLAIM OR INJURY OR DAMAGE RELATED THERETO. SELLER FURTHER WAIVES THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL, AND INDIRECT DAMAGES FROM BUYER IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND/OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.

39.    **Escrow Instructions**.

(a) Escrow Agent is hereby employed by the Parties to act as escrow agent in connection with this Transaction. This Agreement shall be used as instructions to Escrow Agent, as escrow agent, which may provide its standard conditions of acceptance of escrow; *provided, however,* that in the event of any inconsistency between such standard conditions of acceptance and the terms of this Agreement, the terms of this Agreement shall prevail. Escrow Agent's receipt of this Agreement and the opening of an escrow pursuant to this Agreement shall be deemed to constitute conclusive evidence of Escrow Agent's agreement to be bound by the terms and conditions of this Agreement pertaining to Escrow Agent.

(b) Escrow Agent is authorized to pay, at COE, from any funds held by it for each Party's respective credit, all amounts necessary to procure the delivery of any documents and to pay, on behalf of Buyer and Seller, all charges, and obligations payable by them hereunder, respectively. Buyer and Seller will pay all charges payable by them to Escrow Agent. Escrow Agent shall not cause the Transaction to close unless and until it has received written instructions from Buyer and Seller to do so. Escrow Agent is authorized, in the event any conflicting demand is made upon it concerning these instructions or the escrow, at its election, to hold any documents and/or funds deposited hereunder until an action shall be brought in a court of competent jurisdiction to determine the rights of Buyer and Seller or to interplead such documents and/or funds in an action brought in any such court.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the Effective Date.

SELLER:

**MESILLA VALLEY VENTURES, LLC**, a Texas limited liability company

By: PDG PRESTIGE, Inc., a Texas corporation, its Manager

*Michael Dixson*

Its: President

BUYER:

**LPC RETAIL, LLC**, a Delaware limited liability company

By: _____

Name: MATTHEW GALLO

Its: VICE PRESIDENT

## ESCROW AGENT'S ACCEPTANCE

The foregoing fully executed Agreement together with the Earnest Money Deposit is accepted by the undersigned this _____ day of _____, _____, which for the purposes of this Agreement shall be deemed to be the date of Opening of Escrow. Escrow Agent hereby accepts the engagement to handle the escrow established by this Agreement in accordance with the terms set forth in this Agreement.

Southwestern Abstract & Title Co.

By: _____

Title: _____

## EXHIBIT A

## LEGAL DESCRIPTION OF REAL PROPERTY

Address: 510 S. Telshor Blvd Las Cruces, NM 88011 – See Assignment of Lease into Seller – dated February 25, 2022

TRACT 1A OF THE MESILLA VALLEY MALL SUBDIVSION REPLAT #5

## EXHIBIT B

## BILL OF SALE

## BILL OF SALE

**Date:** _____, 2022

**Seller:** [SELLER], [Seller Entity]

**Seller's Mailing Address:**

**Buyer:**      [BUYER], [Buyer Entity]

**Buyer's Mailing Address:**

### Definitions:

As used herein, the following terms shall have the meanings assigned to such terms in the following provisions:

**"Improvements"** means the buildings, structures, fixtures and other improvements situated on the Land; all rights and appurtenances pertaining to the Land; and all fixtures and equipment attached to or located upon or within the Land or the Improvements thereto.

**"Land"** means that certain tract of land located in the City of Durham, Durham County, North Carolina, and legally described on **Exhibit A** which is attached hereto and made a part hereof.

**"Personal Property"** means all tangible personal property owned by Seller, if any, currently used in the operation, repair and maintenance of the Real Property and situated thereon.

**"Real Property"** means the Land and the Improvements.

### Transfer of Personal Property:

For value received, Seller sells, assigns and delivers all of Seller's right, title and interest in and to the Personal Property to Buyer.

Seller has not made and does not make any express or implied warranty or representation of any kind whatsoever with respect to the Personal Property, including, but not limited to: title; merchantability of the Personal Property or its fitness for any particular purpose; the design or condition of the Personal Property; the quality or capacity of the Personal Property; workmanship or compliance of the Personal Property with the requirements of any law, rule, specification or contract pertaining thereto; patent infringement or latent defects. Buyer accepts the Personal Property on an "AS IS, WHERE IS" basis, and "WITH ALL FAULTS." The sale, delivery and assignment of the Personal Property is subject to the matters to which that certain Special Warranty Deed (**"*Deed*"**) of even date herewith from Seller to Buyer conveying the Land is further made subject as fully as if and for all purposes as if the Personal Property were included and described in the Deed.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, Seller has caused this instrument to be executed and delivered as of the _____ day of _____, 2022.

**SELLER:**

**Mesilla Valley Ventures, LLC**

**By:  PDG PRESTIGE, Inc. a Texas Corporation**

By: _____
Name: Michael Dixson
Title: President

## EXHIBIT C

## ASSIGNMENT AGREEMENT

This Assignment Agreement (the "Agreement") dated as of _____, 202____ (the "Effective Date"), is by and between _____, a _____ ("Assignor"), and _____, a _____ ("Assignee").

WHEREAS, Assignor, as Seller, and [Assignee, as Buyer][_____, LLC, as Buyer ("Original Buyer")], have entered into that certain Purchase and Sale Agreement dated as of _____, 201____ [as modified by amendment dated _____,] ([collectively, ](the "Purchase Agreement"), providing for, among other things, the transfer and sale by Assignor to [Assignee] [Original Buyer] of Contracts, Warranties and Permits (capitalized terms used herein and otherwise not defined shall have the meaning given in the Purchase Agreement); and

[WHEREAS Original Buyer assigned its right, title and interest in and to the Purchase Agreement to Assignee pursuant to that certain Assignment of Purchase and Sale Agreement dated as of _____, 201____; and]

WHEREAS Assignor desires to assign to Assignee all of Assignor's right, title, and interest in and to the Permits, Warranties and the Contracts including, without limitation, as more particularly listed in Exhibit A attached hereto (collectively, the "Assigned Contracts").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.  Assignment. Assignor does hereby convey and assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Assigned Contracts (and Assignor covenants to cooperate with Assignee to secure performance by any warrantor for any work under such Assigned Contracts); provided, however, that to the extent the assignment of any Assigned Contract shall require the consent of any other party, this Agreement shall not constitute a contract to assign the same or any rights or liabilities thereunder if an attempted assignment thereof would cause a breach of the terms of the Assigned Contract, and the assignment of such Assigned Contract shall not be effective unless and until the consent of such other party shall have been obtained.

2.  Binding Agreement. The terms and conditions of this Agreement shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

3.  Interpretation. If there is any conflict as to the terms of this Agreement and the Purchase Agreement, the terms of the Purchase Agreement shall prevail.

4.  Governing Law. This Assignment Agreement shall be governed by and construed in accordance with the laws of _____ applicable to contracts made and performed entirely therein.

5.  Headings. The headings of this Agreement are for reference only and shall not limit or define the meaning of any provision of this Agreement.

6.    Counterparts. The parties agree that this Agreement may be executed by the parties in one or more counterparts and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Agreement as of the date set forth above.

ASSIGNOR:                  _____

                                By: _____

                                Its: _____

ASSIGNEE:                  _____

                                By: _____

                                Its: _____

# EXHIBIT A

## LIST OF CONTRACTS
NA

## EXHIBIT D

**RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:**

**[to be conformed to state requirements]
SPECIAL WARRANTY DEED**

For the consideration of Ten Dollars ($10.00), and other valuable considerations, _____ ("<u>Grantor</u>"), hereby conveys to _____, a _____ ("<u>Grantee</u>"), the following described real property situated in _____ County, _____, together with all rights and privileges appurtenant thereto:

See legal description set forth in Exhibit A attached and incorporated by this reference (the "<u>Property</u>").

together with all improvements, buildings, structures and fixtures located thereon; all easements, if any, benefiting the Property; all rights, benefits, privileges and appurtenances pertaining to the Property, including any right, title and interest of Grantor in and to any property lying in or under the bed of any street, alley, road or right-of-way, open or proposed, abutting or adjacent to the Property; the strips, gaps or gores, if any, between the Property and abutting properties; all water, water rights, oil, gas or other mineral interests in, on, under or above the Property; and all rights and interests to receive any condemnation awards from any condemnation proceeding pertaining to the Property, sewer rights, water courses, wells, ditches and flumes located on or appurtenant to the Property.

SUBJECT ONLY TO the matters set forth on <u>Exhibit "B"</u> attached hereto and made a part hereof, as well as taxes and assessments for 2022 and subsequent years.

TOGETHER WITH all the easements, tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD, the same in fee simple forever.

GRANTOR hereby covenants with Grantee that it owns the Property in fee simple; that it has good right and lawful authority to convey the Property; and that it warrants the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other.

Dated this ____ day of _____, 201____.

GRANTOR:

_____

By: _____

Title: _____

STATE OF     _____ )
                                   ) Ss:
COUNTY OF _____ )

This instrument was acknowledged and executed before me this _____ day of _____,
201_____, by _____.

_____
Notary Public

My Commission Expires: _____

**EXHIBIT A TO
SPECIAL WARRANTY DEED**

<u>**Legal Description**</u>

**EXHIBIT E**

**LEASE ASSIGNMENT**

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Assignment"), is made as of _____, 202____ by and between _____, a _____ ("Assignor") and _____, **LLC**, a Delaware limited liability company ("Assignee").

**WITNESSETH:**

**WHEREAS,** pursuant to the terms of that certain Purchase and Sale Agreement, dated as of _____, by and between Assignor, as Seller, and [Assignee, as Buyer][_____, LLC, as Buyer ("Original Buyer")] (the "Purchase Agreement"), Assignor agreed to sell to [Assignee] [Original Buyer], *inter alia*, certain real property, the improvements located thereon and certain rights appurtenant thereto owned by Assignor, all as more particularly described in the Purchase Agreement (collectively, the "Property"). Initially capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement; [and]

**WHEREAS,** the Purchase Agreement provides, *inter alia*, that Assignor shall assign to [Assignee] [Original Buyer] the Assignor's/landlord's interest in the lease (and associated guaranties, if any) affecting the Property described on Exhibit A attached hereto (collectively, the "Lease"), and that Assignor and [Assignee] [Original Buyer] shall enter into this Assignment[.] [; and

**WHEREAS** Original Buyer assigned its right, title and interest in and to the Purchase Agreement to Assignee pursuant to that certain Assignment of Purchase and Sale Agreement dated as of _____, 201____.]

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.    Assignment. Assignor hereby assigns, transfers, and conveys to Assignee, all right, title and interest of Assignor as landlord under the Lease. Assignor shall remain liable for the performance of any obligation required to be performed by the landlord under the Lease for all periods prior to the date hereof. Assignor shall indemnify, defend, and save Assignee harmless from and against any and all claims, demands or liabilities arising pursuant to the Lease as a result of any act or omission of Assignor occurring prior to the date hereof. The original signed counterparts of the Lease, or copies thereof, if no originals are available, together with any and all supplements and amendments thereto, have been delivered to Assignee herewith.

2.    Assumption. Assignee, by acceptance of this Assignment and the Lease, hereby assumes and agrees to keep, observe, and perform all of the covenants, conditions, terms, and provisions under the Lease to be kept, observed, and performed by the landlord thereunder from and after the date hereof. Assignee shall indemnify, defend, and save Assignor harmless from and

against any and all claims, demands or liabilities arising pursuant to the Lease as a result of any act or omission of Assignee occurring from and after the date hereof.

3.     Miscellaneous. This Assignment and the obligations of the parties hereunder shall survive the closing of the transaction referred to in the Purchase Agreement and shall not be merged therein, shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.

4.     Severability. If any term or provision of this Assignment or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Assignment shall be valid and enforced to the fullest extent permitted by law.

5.     Counterparts. This Assignment may be executed in counterparts, each of which shall be an original and all of which counterparts taken together shall constitute one and the same agreement.

6.     Attorneys' Fees. If any litigation between Assignor and Assignee arises out of the obligations of the parties under this Assignment or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such litigation, including, without limitation, reasonable attorneys' fees.

**IN WITNESS WHEREOF,** the undersigned have executed this Assignment as of the date first set forth hereinabove.

**ASSIGNOR:**

**ASSIGNEE:**

## Exhibit A

[insert description of the existing lease and any applicable guaranty]

**[NOTE:  ADD GUARANTOR CONSENT AND CONFIRMATION OF GUARANTY IF APPLICABLE]**

## EXHIBIT F

## SELLER'S DILIGENCE MATERIALS

1. All agreements relating to possession, use or occupancy of any portion of the Real Property.

2. Agreements in Seller's possession or under its control relating to the management, operation, repair, or maintenance of the Improvements, if any, and all amendments and modifications thereto.

3. Maps, reports, documents, surveys, studies, plans and specifications, drawings, and other governmental permits and approvals, notices from insurer or governmental authority regarding the Property or any portion thereof, warranties, documents of significance to the Real Property, correspondence, or other materials pertaining to or concerning the Real Property that are in Seller's possession or under its control, including, without limitation:

   - Any and all ALTA surveys for the Real Property.

   - Any and all soil, geotechnical, grading, drainage, hydrology, or other engineering studies relating to the Real Property.

   - Any and all environmental assessments, Phase I reports, Phase II reports and environmental remediation contracts for the Real Property.

   - Any and all seismic or earthquake reports relating to the Real Property.

   - Any and all architectural schematic or design development plans.

   - Any and all applications for or copies of licenses, permits, conditional use permits, variances, certificates of occupancy, or for other land use entitlements to any governmental agency for the use, occupancy, and development of the Real Property, together with relating supporting materials; and

   - Property condition reports.

4. Property tax statements and assessed value notices for the past three years.

5. Copies of all insurance policies.

6. Annual operating statements within the last three (3) year period prior to the date of this Agreement.

7. Annual store sales reports for the three (3) year period prior to the date of this Agreement.

8. Budgets for the Real Property for the next fiscal year.

9. Unaudited profit and loss statement for the most recent calendar quarter.

10. All correspondence from governmental agencies relating to the Real Property, and all correspondence from neighboring property owners regarding the operation and use of the Real Property.

11. Any marketing studies relating to the Real Property.

12. Seller's title insurance policy for the Real Property with all endorsements thereto.

13. Any and all correspondence, notifications or other documentation relating to condemnation of any portion of the Real Property or any real property adjacent to the Real Property.

14. Any and all contracts and warranties relating to the Real Property, whether or not such warranties are assignable or transferrable to Buyer.

15. Any other documents or other information in the possession or control of Seller or its agents pertaining to the Property.

16. As built survey required under Section 9 (f) of the Lease.

## EXHIBIT G

### FORM OF TENANT NOTICE LETTER

**[seller name]**
**[seller address]**

### NOTICE TO TENANT

_____, 201____

[tenant]

_____

_____

Re:    Lease dated _____ (as amended, modified and supplemented from time to time, and any guaranties relating thereto, collectively the "Lease") by and between _____ ("**Landlord**") and _____ ("**Tenant**") with respect to the real property located at _____ /Store # _____ (the "**Property**")

Dear Tenant:

Please be advised that the Property and Landlord's interest in the Lease were purchased by _____ _____, ("**Buyer**") from Landlord, effective as of the date hereof (the "**Closing Date**"). Buyer has assumed all of the obligations of Landlord arising from and after the Closing Date. Landlord hereby irrevocably instructs and authorizes you to hereafter make all rent and other monetary obligation payments payable directly to Buyer, commencing with your _____, 20 ___ payment. Buyer's notice information is as follows:

        _____

        _____

        _____

        _____

        Telephone: _____
        Fax No.: _____
        Email: _____

For billing and collection questions or issues, please contact _____, at ( ___ ) _____, Email: _____.

For all other purposes under the Lease, please contact _____, at ( ___ ) _____, Email: _____.

Please direct your insurance broker to obtain a certificate of insurance identifying Buyer as an additional named insured as required pursuant to the terms of the Lease and request that all future communication to your landlord be sent to Buyer.

To facilitate your payment of rent and other monetary obligations to Buyer, Buyer's W-9 Form in enclosed with this letter. Buyer's tax identification number is _____.

In addition, Buyer requests that all payments to be made via wire transfer or ACH utilize the following:

| | |
|---|---|
| Beneficiary Account Name: | |
| Beneficiary Account Number: | |
| Bank Name: | |
| Bank Address: | |
| Wire Routing Transit Number: | |
| For International transfer only International SWIFT/BIC code: | |

****To ensure proper credit, please indicate the address of the Property for which the payment is being made on the wire.

The instructions set forth herein are irrevocable and are not subject to modification in any manner except as expressly provided by, or on behalf of, the General Counsel of Buyer.

*Remainder of Page Intentionally Left Blank*
*Signature Page to Follow*

NOTICE TO TENANT
[date]
[concept], [address]

Sincerely,

**SELLER**
**PDG PRESTIGE, INC, A TEXAS CORPORATION**

By: _____

Name: _____

Title: _____

LEASE ASSUMPTION

ACKNOWLEDGED; BUYER:

By: _____

Name: _____

Tide: _____

## ASSIGNMENT OF PURCHASE AND SALE AGREEMENT

THIS ASSIGNMENT OF PURCHASE AND SALE AGREEMENT (this "**Assignment**") is made by and between **LPC RETAIL, LLC**, a Delaware limited liability company (the "**Assignor**"), and **FSLRO 510 SOUTH TELSHOR LAS CRUCES, LLC**, a Delaware limited liability company (the "**Assignee**") effective as of the 4th day of May, 2022 (the "**Effective Date**").

RECITALS:

A.     Assignor, as Purchaser, and **MESILLA VALLEY VENTURES, LLC**, a Texas limited liability company, as Seller, heretofore entered into that certain Purchase and Sale Agreement dated effective as of March 4, 2022 (as may have heretofore been amended, the "**Agreement**") covering land and improvements located at **510 S. Telshor Blvd., Las Cruces, NM 88011**, as more particularly described in the Agreement. Unless otherwise defined herein, the terms used in this Assignment shall have the same meaning as given to such terms in the Agreement.

B.     Assignor desires to assign all of its right, title and interest in and to the Agreement, as Purchaser thereunder, to Assignee, and Assignee desires to accept such assignment.

AGREEMENTS:

NOW, THEREFORE, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged as paid by each party hereto unto the other, the parties hereby agree as follows:

1.     Assignor hereby SELLS, ASSIGNS, TRANSFERS and SETS OVER to Assignee (a) all of Assignor's right, title and interest in and to the Agreement, as Purchaser thereunder, specifically including, without limitation, all of Assignor's interest in the Deposit heretofore deposited by Assignor with the Escrow Agent pursuant to the Agreement, together with (b) any and all reports, investigations, studies, plans, surveys, title commitments, lease files, appraisals, environmental and geotechnical reports, and other documents, materials and  information received or developed by Assignor or any affiliate of Assignor and relating in any way to the acquisition, ownership, management or operation of the Property (collectively, the "Other Assigned Items").

2.     Assignee hereby accepts the foregoing assignment and agrees to assume and perform (a) all of the duties and obligations to be paid or performed by Purchaser under the Agreement  after the date of this Assignment to the same extent as if Assignee had originally been named as Purchaser in the Agreement, and (b) all of the duties and obligations to be paid or performed by Assignor under the Other Assigned Items after the date of this Assignment.

3.     Assignee agrees to indemnify and hold Assignor harmless from and against any and all liability for performance or non-performance of the duties and obligations of Purchaser under the Agreement and Assignor under the Other Assigned  Items accruing on and after the date of this Assignment. Assignor agrees to indemnify and hold Assignee harmless from and against any and all liability relating to the Agreement and the Other Assigned Items arising outof the acts or omissions of Assignor or its agents occurring prior to the date of this Assignment.



EXHIBIT

10

4.     This Assignment may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. This Assignment may be delivered by email by the executing party, and the deliveryby email of a PDF of the signature page hereof bearing the execution of such party will be binding against such party for all purposes to the same extent as the delivery of an original of thisAssignment executed by such party.

[Signature page follows]

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

ASSIGNOR:

**LPC RETAIL, LLC,**
a Delaware limited liability company

By: _____

Name: Matthew Gallo
Title: Vice President

ASSIGNEE:

**FSLRO 510 SOUTH TELSHOR LAS CRUCES, LLC,**
a Delaware limited liability company

By: _____

Name: Matthew Gallo
Title: Vice President

**EXHIBIT**

**C**

Southwestern Abstract & Title Co.
1125 South Main Street
Las Cruces, NM 88005
(575) 523-8561

ALTA Seller's Settlement Statement

| File #: | 7434-GC-2022 | Property | 510 South Telshor Boulevard | Settlement Date | 05/26/2022 |
|---|---|---|---|---|---|
| Prepared: | 05/26/2022 | | Las Cruces, NM 88011 | Disbursement Date | 05/26/2022 |
| Escrow Officer: | Gricel R. Chavez | | MESILLA VALLEY MALL | | |
| | | | REPLAT NO 5 (BK 24 PG | | |
| | | | 581-582 - 2020257) Lot: 1A | | |
| | | | S: 16 T: 23S R: 2E | | |
| | | Buyer | FSLRO 510 South Telshor | | |
| | | | Las Cruces, LLC | | |
| | | | 2000 McKinney Avenue | | |
| | | | Suite 1000 | | |
| | | | Dallas, TX 75201 | | |
| | | Seller | Mesilla Valley Ventures, LLC | | |
| | | | 154 North Festival Drive | | |
| | | | Building D | | |
| | | | El Paso, TX 79912 | | |
| | | Lender | | | |

| Description | Seller | |
|---|---|---|
| | Debit | Credit |
| **Primary Charges & Credits** | | |
| Sales Price of Property | | $2,545,000.00 |
| Rent Holdback | $35,000.00 | |
| Escrow Holdback | $200,000.00 | |
| 2021 Property Taxes 1905155 | $1,535.02 | |
| | | |
| **Prorations/Adjustments** | | |
| County Taxes 01/01/2022 to 08/08/2022 | $1,851.16 | |
| Credit water line installation | $23,977.54 | |
| | | |
| **Loan Charges** | | |
| Escrow holdback fee to Southwestern Abstract & Title Co. | $100.00 | |
| | | |
| **Government Recording and Transfer Charges** | | |
| Recording Fees to Southwestern Abstract & Title Co. | $300.00 | |
| | | |
| **Commissions** | | |
| Listing Agent Commission to CP Partners Commercial Real Estate | $101,800.00 | |
| | | |
| **Title Charges** | | |
| Title - Settlement Fee to Southwestern Abstract & Title Co. | $541.56 | |
| Title - Owner's NM-6 Endorsement to Southwestern Abstract & Title Co. | $100.00 | |
| Title - Owner's Title Policy to Southwestern Abstract & Title Co. | $8,506.00 | |
| | | |
| **Miscellaneous Charges** | | |
| Legal Fees to Ferguson Braswell Fraser Kubasta PC | $50,000.00 | |
| Legal Fees to Weycer, Kaplan, Pulaski & Zuber, P.C. | $75,000.00 | |
| Payoff Claim of Lien to New Mexico Real Estate Advisors, Inc. | $47,572.88 | |
| Payoff Claim of Lien to R2 Contractors Specialty, Inc. | $4,825.32 | |
| Payoff Claim of Lien to Utility Block Company, Inc. | $70,981.70 | |
| Survey Invoice (s) to Partner Engineering and Science, Inc. | $6,350.00 | |

**EXHIBIT**

I I

**EXHIBIT**

**9**

|  | Debit | Credit |
|---|---|---|
| Subtotals | $628,441.18 | $2,545,000.00 |
| Due to Seller | $1,916,558.82 | |
| Totals | $2,545,000.00 | $2,545,000.00 |

See signature addendum

# Signature Addendum

**Acknowledgement**

We/I have carefully reviewed the Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the Settlement Statement.

We/I authorize Southwestern Abstract & Title Co. to cause the funds to be disbursed in accordance with this statement.

Mesilla Valley Ventures, LLC, a Texas Limited Liability Company
By: PDG PRESTIGE, Inc. a Texas Corporation, its Manager

By: _____          _____
Michael Dixson, President                                               Date

_____          _____
Settlement Agent                                                         Date

# EXHIBIT B

**The relief described hereinbelow is SO ORDERED.**

**Signed March 31, 2022.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 21-30107 |
| PDG PRESTIGE, INC. | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

**ORDER CONFIRMING SECOND AMENDED PLAN OF REORGANIZATION PDG PRESTIGE, INC. DATED MARCH 29, 2022 AS MODIFIED (RE: DOCKET NO. 145)**

On March 30, 2022, the Court conducted a hearing and considered confirmation of the

_Plan of Reorganization of PDG Prestige, Inc. Dated November 3, 2021_ (Docket No. 94) (the "Initial Plan"), as amended by the

_First Amended Plan of Reorganization of PDG Prestige, Inc. Dated January 17, 2022_ (Docket No. 110) and as amended by the

_Second Amended Plan of Reorganization of PDG Prestige, Inc. Dated March 29, 2022_ (Docket No. 141), and as modified by the

_Second Amended Plan of Reorganization of PDG Prestige, Inc. Dated March 29, 2022, as Modified_ (Docket No. 145) (the "Plan")

---

**ORDER CONFIRMING SECOND AMENDED PLAN OF REORGANIZATION PDG PRESTIGE, INC. DATED MARCH 29, 2022, AS MODIFIED (RE: DOCKET NO. 145) — Page 1**

filed herein by PDG Prestige, Inc. ("PDGP" or the "Debtor"), which final confirmed Plan is attached hereto and incorporated by reference herein as **Exhibit PDGP499**, and which Plan is and/or was supported by the:

> *First Amended Disclosure Statement (as Corrected) In Support of First Amended Plan of Reorganization of PDG Prestige Inc. Dated January 17, 2022* (Docket No. 116) (the "Disclosure Statement"), and the

> *First Supplement to Chapter 11 Plan and Disclosure Statement Regarding Retained Claims and Causes of Action* (Docket No. 126).

After reviewing the Plan, taking judicial notice of all appropriate papers and pleadings on file in this Chapter 11 case, considering the testimony, and other evidence presented, and hearing the arguments of counsel at the hearing to consider the adequacy of the Disclosure Statement confirmation of the Plan (together the "Confirmation Hearing"), the Court FINDS:

A.      All capitalized terms not defined herein shall have the same meaning as ascribed to such terms in the Plan.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334 and 157.

C.      Venue in this District for this proceeding is proper pursuant to 28 U.S.C. §§1408 and 1409.

D.      This matter involves, *inter alia*, the administration of the estate, the allowance and disposition of certain claims, the adjudication of the relative rights of parties, and the discharge of the Debtor, all as embodied in and implemented by virtue of the Plan and confirmation of the Plan.  Accordingly, the matters determined herein constitute a core proceeding under 28 U.S.C. §§157(b)(2)(A), (B), (L), and (O), without limitation.

E.      The Debtor commenced this case on February 15, 2021, by filing a voluntary petition.

F.      Since the entry of the Order of Relief, Debtor has continued its operations and managed its affairs as debtor in possession pursuant to §§1107 and 1108 of the United States Bankruptcy Code, Title 11 of the United States Code, 11 U.SC. §101 et seq. (the "Code").

G.      On November 3, 2021, the Debtor filed the Initial Plan and sought approval of the Disclosure Statement.

H.      On January 20, 2022, the Court entered an order (Docket No. 118) approving the Disclosure Statement (the "Disclosure Statement Order") and permitting solicitation of the Initial Plan.

I.      The Plan, the Disclosure Statement, the Disclosure Statement Order, the notice of the Confirmation Hearing, and the official ballots for voting for or against confirmation of the

Plan (the "Solicitation Package") were duly and timely served upon the known members or potential members of all impaired Classes in accordance with the Disclosure Statement Order.

J.      Service of the Solicitation Package constituted adequate and sufficient notice of the Plan, the voting deadline, the objection deadline, and the Confirmation Hearing, and no other or further notice is or shall be required.

K.      Various objections to the Plan or the Disclosure Statement were filed or otherwise received prior to the Confirmation Hearing.  All such objections have been withdrawn prior to or at the Confirmation Hearing or are otherwise overruled by this Order.

L.      The Disclosure Statement contains adequate information within the meaning of Code § 1125.

M.      Based upon the Ballots submitted to the Court, the announcements made into the record, and the contents of the Plan, all holders of all Claims and Interests addressed in the Plan are either unimpaired and thus are deemed to accept the Plan or have accepted the Plan.

N.      The solicitation of acceptances or rejections has been conducted pursuant to and in compliance with Code § 1125.

O.      The Plan complies with all applicable provisions of Code §§ 1122, 1123, and 1124.

P.      Specifically, in addition to Administrative Claims and Priority Tax Claims, which need not be classified, the Plan designates six (6) classes of Claims and Interests, each as defined in the Plan.  Classes are appropriately designated as impaired or unimpaired, as the case may be. The Claims or Interests placed in each such Class are substantially similar to other Claims or Interests, as the case may be, in such Class.  The classification scheme of the Plan complies with Code §§1122 and 1123(a).

Q.      The Plan provides adequate and proper means for its implementation, thereby satisfying Code § 1123(a)(5).

R.      The Plan complies with the applicable provisions of the United States Bankruptcy Code, thereby satisfying Code § 1129(a)(1).

S.      The Plan proponents have complied with all applicable provisions of the Bankruptcy Code, thereby satisfying Code § 1129(a)(2).  Specifically, the Debtor is a proper debtor under Code § 109 and has properly complied with the Bankruptcy Code and applicable rules in propounding the Plan and Disclosure Statement and in soliciting and tabulating votes on the Plan.

T.      The Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying Code § 1129(a)(3).

U.      Any payments made or to be made by the Debtor for services or for costs and expenses in or in connection with the Debtor's Chapter 11 case or in connection with the Plan

and incident to such Chapter 11 case have been approved by, or are subject to the approval of, this Court as to reasonableness, thereby satisfying Code § 1129(a)(4).

V. The identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer, trustee, or administrator of the Debtor has been disclosed prior to or in connection with confirmation of the Plan, thereby satisfying Code § 1129(a)(5)(A)(i). The assumption of office of such directors, officers, trustees, or administrators as applicable is consistent with the interests of creditors and with public policy, thereby satisfying Code § 1129(a)(5)(A)(ii). The identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for each such insider has been disclosed prior to or in connection with confirmation of the Plan, thereby satisfying Code § 1129(a)(5)(B).

W. The Plan does not propose to change or alter any rates which are under the authority of any governmental regulatory commission, thereby satisfying Code § 1129(a)(6).

X. With respect to each impaired Class of Claims, each holder of a Claim in such impaired Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date (as defined in the Plan), that is not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date, thereby satisfying Code § 1129(a)(7)(A) and Code § 1129(a)(7)(B) is inapplicable.

Y. All impaired classes under the Plan have accepted the Plan pursuant to the criteria of Code § 1126, thereby satisfying Code § 1129(a)(8).

Z. No impaired class or holder of an impaired claim is discriminated against unfairly in the Plan.

AA. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such claim or is provided different treatment in this Confirmation Order, the Plan provides that, (a) as to each Claim of a kind specified in Code §§ 507(a)(2) or 507(a)(3), the holder of such Claim will receive on account of such Claim, on the Effective Date of the Plan, cash equal to the allowed amount of such Claim, in satisfaction of Code § 1129(a)(9)(A); (b) with respect to a Class of Claims of a kind specified in Code §§ 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7), each holder of a Claim in such Class will receive treatment comporting with the provisions of Code § 1129(a)(9)(B); and (c) with respect to a Claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of such Claim in such class will receive treatment comporting with the provisions of Code § 1129(a)(9)(C) (or Code § 1129(a)(9)(D) if applicable), thereby satisfying Code § 1129(a)(9).

BB. At least one Class of Claims impaired under the Plan has accepted the Plan, determined without including any acceptances of the Plan by any insider, thereby satisfying Code § 1129(a)(10).

CC. The Plan is feasible. Confirmation of the Plan is not likely to be followed by the liquidation of the Debtor or the need for further reorganization of the Debtor, other than any liquidation or reorganization proposed in the Plan, thereby satisfying Code § 1129(a)(11).

ORDER CONFIRMING SECOND AMENDED PLAN OF REORGANIZATION PDG PRESTIGE, INC. DATED MARCH 29, 2022, AS MODIFIED (RE: DOCKET NO. 145) — Page 4

2109224.DOC

DD.     All fees payable under 28 U.S.C. §1930, as determined by this Bankruptcy Court, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan, thereby satisfying Code § 1129(a)(12).

EE.     The requirements of Code § 1129(a)(13) are not applicable to this Debtor.

FF.     No garnishments or other orders pertaining to domestic support obligations exist as to the Debtor, and thus Code § 1129(a)(14) is not applicable to this Debtor.

GG.     This Debtor is not an individual, and thus Code § 1129(a)(15) is not applicable to this Debtor.

HH.     This Confirmation Order in Paragraph No. 16 below provides that, to the extent that the Debtor is not a moneyed, business, or commercial corporation within the meaning of Code § 1129(a)(16), that the Debtor shall follow the requirements of Code § 1129(a)(16), thereby satisfying Code § 1129(a)(16).

II.     The principal purpose of the Plan is not the avoidance of taxes.

JJ.     The Proponents have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and are entitled to the protections afforded by Code § 1125(e).

KK.     Bubba's Holdings LLC (f/k/a Strategic Restaurant Concepts, LLC has not objected to the assumption of the Bubba's Holding's Lease (as defined in Plan §7.1), and the Plan otherwise provides Plan § 7.1 a procedure for the possible assumption and potential assignment of other leases of nonresidential real property. .

LL.     The Court may properly retain jurisdiction over the matters set forth in Section 13.1 of the Plan.

MM.     This Bankruptcy Court adopts the findings announced on the record on March 30, 2022 and reserves the right to enter further findings of fact and conclusions of law.  As appropriate, all findings of fact are conclusions of law, and vice versa.

**Based upon the foregoing findings of fact and conclusions of law, IT IS THEREFORE ORDERED:**

1.     The Plan (a copy of which is attached hereto as **Exhibit PDGP499** is hereby CONFIRMED pursuant to Code §1129(a) and/or to the extent applicable Code § 1129(b).

2.     Pursuant to Code § 1141, effective as of the Effective Date, but subject to consummation of the Plan, and except as expressly provided in the Plan or in this Confirmation Order, the provisions of the Plan (including the exhibits thereto), and all documents and agreements to be executed pursuant to the Plan, are hereby approved and, together with this Confirmation Order, shall be binding on the Debtor and all holders of Claims against and Interests in the Debtor, whether or not impaired under the Plan and whether or not, if impaired, such holders accepted the Plan.

3.      The assumption by the Debtor of the Bubba's Holding's Lease (as defined in Plan § 7.1) is hereby approved.

4.      On and as of the Effective Date, all property of the Debtor's estate is and shall be vested in the Reorganized Debtor in the manner specified in the Plan except as otherwise specified herein.

5.      Except as otherwise provided in the Plan or herein, from and after the Effective Date, all persons and entities that have held, currently hold, or may hold any Claims against the Debtor (or other right of any equity security holder that is cancelled under the terms of the Plan) are forbidden from taking any of the following actions against the Debtor, the Reorganized Debtor or any of their respective property on account of any such Claims or Interests or rights related thereto:  (a) commencing or continuing in any manner, any suit, action, or other proceeding;  (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; (d) creating, perfecting, or enforcing any lien or encumbrance; and (e) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code; provided, however, that the foregoing injunction shall not limit or preclude any person or entity from exercising its rights pursuant to the terms of the Plan or any document executed pursuant thereto.

6.      Pursuant to Code § 1142, the Debtor, the Reorganized Debtor, and their respective officers, directors, trustees, and administrators, and all other necessary parties, are authorized and empowered, and hereby directed, to execute and deliver all other instruments, agreements, and documents, and to take any and all other actions that may be necessary or desirable to comply with the terms and conditions of the Plan or to consummate or implement the Plan or this Confirmation Order.

7.      With the exception of administrative expense claims that are post-petition ad valorem property taxes, all requests for payment of Administrative Claims, other than Fee Claims as set forth in this paragraph or Administrative Claims to the extent incurred by the Debtor in the ordinary course of business and recorded in the Debtor's books and records, shall be filed with the Bankruptcy Court and served upon the Debtor and other notice parties within **thirty (30) days** following the Effective Date or by such earlier deadline as may apply to such Administrative Claim pursuant to an earlier order of the Court, if any.  All requests for Fee Claims of Professional Persons shall be filed with the Bankruptcy Court and served upon the Debtor and other notice parties within **thirty (30) days** following the Effective Date.  Except as provided herein or in the Plan, any Administrative Claim or Fee Claim for which an application or request for payment is not filed within such time period shall be discharged and forever bared.

8.      Nothing in the Plan or in this Confirmation Order shall be construed to deprive any taxing authorities of any statutory liens which may inure to the benefit of such taxing authorities to secure payment of any pre-petition Priority Tax Claims, Secured Tax Claims, or any post-petition Administrative Claims for taxes.

9.      In the case of post-petition Administrative Claims for state and local taxes, the submission of tax bills or invoices presented in the ordinary course to the Debtor shall suffice in lieu of a formal claim for Administrative Payment.  With the exception of ad valorem property taxes, in the event that the Debtor contests any such bills or invoices, the Debtor may elect to contest such taxes in this Court prior to the entry of a Final Decree or pursuant to the state or local rules for contesting such taxes.

10.     On and as of the Effective Date, all contractual, legal, equitable, equitable subordination, and turnover rights that a holder of a Claim or Interest may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all suits, actions, and other proceedings and all other efforts to enforce or attempt to enforce any such contractual, legal, equitable, equitable subordination, and/or turnover rights are hereby permanently enjoined.  The provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies relating to the enforcement of all such contractual, legal, equitable, equitable subordination, and turnover rights.  The compromise and settlement of all such Claims and controversies is approved under Bankruptcy Rule 9019 as being fair, equitable, and reasonable and in the best interests of the Debtor, the Reorganized Debtor, and the holders of Claims and Interests.

11.     Except as otherwise expressly provided in the Plan or herein, the rights and treatment afforded in the Plan shall discharge all existing security interests, liens, debts, and claims of any kind, nature, or description whatsoever against the Debtor or any of its assets or properties to the fullest extent permitted by Code § 1141; upon the Effective Date, all existing Claims against the Debtor, except post-petition ad valorem property taxes, shall be, and shall be deemed to be, discharged, and all holders of Claims shall be precluded from asserting against the Debtor, or any of its assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim except for the claimant's rights as provided in this Plan.  Confirmation of the Plan and the obligations imposed on the Debtor and/or the Reorganized Debtor herein shall be in complete satisfaction, discharge, and release of all Claims of any nature whatsoever against the Debtor and/or the Reorganized Debtor or any of its assets or properties; and, except as otherwise provided herein, upon the Effective Date, the Debtor shall be deemed discharged and released from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Code §§ 502(g), 502(h), or 502(i) that arose prior to the Confirmation Date, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under Code § 501, (b) a Claim based upon such debt is allowed under Code § 502, or (c) the holder of a Claim based upon such debt has accepted the Plan.  Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtor.  As provided in Code § 524, such discharge shall void any judgment against the Debtor at any time obtained, to the extent it relates to a Claim, and operates as an injunction against the prosecution of any action against the Debtor, or its property, to the extent it relates to a Claim discharged.  However, any provision of this Order notwithstanding, the discharge granted herein shall not discharge the Reorganized Debtor from its obligations under the Plan or under any document executed pursuant thereto.

12. Pursuant to 28 U.S.C. §§ 1334 and 157, this Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to this Chapter 11 case and the Plan, including the matters specified in Plan § 13.1.

13. The classification of Claims and Interests for purposes of distributions to be made under the Plan shall be governed solely by the terms of the Plan. The classifications set forth on the Ballots tendered or returned by the holders of Claims in connection with voting on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for distribution purposes, and (c) may not be relied upon by the holder of any Claim as representing the actual classification of such Claims under the Plan for distribution purposes.

14. Where appropriate, the findings of fact and conclusions of law contained hereinabove shall also have the force of decretal paragraphs and the foregoing decretal paragraphs shall also have the force of findings of fact, conclusions of law, or both, as appropriate.

15. The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent. The failure specifically to include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be confirmed in its entirety. If there is any direct conflict between the Plan and this Confirmation Order, the terms of this Confirmation Order shall control.

16. To the extent that the Debtor constitutes a non-moneyed, non-business, or non-commercial corporation within the meaning of Code § 1129(a)(16), any transfers of property contemplated by the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

17. After the Confirmation Hearing, the Debtor or the Reorganized Debtor, as the case may be, may, subject to Court approval and so long as it does not materially or adversely affect the rights set forth in the Plan of creditors and other parties-in-interest, amend or modify the Plan and related documents to remedy any defect or omission or reconcile any inconsistencies in such documents or in this Order, in such manner that may be necessary to carry out the purposes and intent of the Plan.

18. In the event of a conversion of this case to Chapter 7 any time after the confirmation of this Plan, the assets of the Debtor shall re-vest to the bankruptcy estate of the Debtor upon such conversion.

19. Pursuant to Bankruptcy Rule 3020(c), the Debtor shall, within two (2) business days after the entry of this Order, serve notice of the entry of this Order as provided in Bankruptcy Rule 2002(f) to all persons and entities required in Rules 2002 and 3020(c)(2) of the Federal Rules of Bankruptcy Procedure.

**ORDER CONFIRMING SECOND AMENDED PLAN OF REORGANIZATION PDG PRESTIGE, INC. DATED MARCH 29, 2022, AS MODIFIED (RE: DOCKET NO. 145) — Page 8**

2109224.DOC

20.     Upon occurrence of the Effective Date, the Reorganized Debtor shall file and serve on all parties set forth in the foregoing paragraph a Notice of Effective Date, with deadlines for filing and serving rejection claims and administrative claims clearly indicated, no later than two (2) Business Days after the occurrence of the Effective Date.

---

21.     **THE EFFECTIVE DATE OF THE PLAN IS AND SHALL BE <u>April 1, 2022.</u>** Debtor shall file and serve a separate Notice of Effective Date.

---

# # #

EXHIBIT PDGP499

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 21-30107 |
| PDG PRESTIGE INC. | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

**SECOND AMENDED PLAN OF REORGANIZATION OF PDG PRESTIGE INC. DATED MARCH 29 2022, AS MODIFIED**

1. **INTRODUCTION.**

1.1. This *Second Amended Plan of Reorganization of PDG Prestige, Inc. Dated March 29, 2022, as Modified* (the "Plan") under Chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of PDG Prestige Inc. (the "Debtor" or "PDGP") from cash flow from future operations and/or sales of property. This Plan dated March 29, 2022 as modified on March 31, 2022 as shown in the file-stamp above, replaces and supersedes any Plan(s) of prior date(s) filed by the Debtor.

1.2. For convenience, this plan is based upon the official small business form, Form B25B. However, this is not a "small business case" as defined under Code § 101. ***Controlling definitions and rules of construction appear in Section 9 below.***

1.3. The proposed distributions under the Plan and the material terms of the Plan, including the estimated distribution to unsecured creditors is set forth in TABLE 1—Key Plan Terms, Section 2 of the accompanying Plan ("**TABLE 1**"). Secured claims will be paid in full according to the claim(s) filed or pursuant to the agreement of the parties. General unsecured creditors will receive payment in full.

1.4. All creditors and equity security holders should refer to Section 3 through Section 6 of this Plan for information regarding the precise treatment of their claim. A Disclosure Statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan. Your rights may be affected. ***You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)***

2. **SUMMARY OF THE PLAN, TABLE 1 — KEY PLAN TERMS**. The key terms of this Plan are set forth in TABLE 1 below.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **TABLE 1 KEY PLAN TERMS** | | | | | | | | |
| **TREATMENT OF CLAIMS** | | | | | | | | |
| Class | Creditor | Impaired | Asserted Claim | Interest Rate Per Year | Payments # | Payment Per Month | Total Payments | Note |
| **Non-classified Claims** | | | | | | | | |
| | WKPZ Fees (estimated) | n/a | 70,000.00 | n/a | 1.00 | n/a | 70,000.00 | |
| | IRS | n/a | 100,172.02 | 0.03 | 54.00 | 1,855.04 | 100,172.02 | |
| **Secured Claims** | | | | | | | | |
| 1 | Property Tax - Dona Ana Co. | No | 0.00 | n/a | n/a | n/a | n/a | |
| 2 | Legalist | No | 5,200,000.00 | 0.10 | 120.00 | n/a | 5,200,000.00 | Note 1 |
| 3 | NMREA | Yes | 168,862.00 | n/a | n/a | n/a | 168,862.00 | Note 2 |
| 4 | Crimmins | n/a | n/a | n/a | n/a | n/a | n/a | Note 3 |
| **General Unsecured Claims** | | | | | | | | |
| 5 | General Unsecured | Yes | 22,627.00 | 0.00 | 0.00 | see plan | 22,627.00 | 0.00 |
| 6 | Equity Interest | n/a | n/a | n/a | n/a | n/a | n/a | |
| **EQUITY IN REORGANIZED DEBTOR** | | | | | | | | |
| | Holder | % Interest | | Pre-Bk Interest | Consideration | | | |
| | Michael Dixson | 100.00 | | Class A | N/A - Payment in full to all creditors | | | |
| **MANAGEMENT AFTER REORGANIZATION** | | | | | | | | |
| | Name | Position | | | Comp. Per Month | Comp. Per Year | | |
| | Michael Dixson | Manager | | | 16,666.67 | 200,000.00 | | |
| *Note: Compensation dependent upon payment of claims and-or funds available.* | | | | | | | | |
| **EXECUTORY CONTRACTS AND/OR LEASES TO BE ASSUMED** | | | | | | | | |
| **See Section 7.1 of the Plan** | | | | | | | | |
| **Note 1:** Claim paid in accordance with DIP order. See Section 5. | | | | | | | | |
| **Note 2:** Contingent, disputed. Also subject to potential setoff. See Section 5. | | | | | | | | |
| **Note 3:** Crimmins has not filed a formal proof of claim. See Section 5. | | | | | | | | |

**3.** <u>CLASSIFICATION OF CLAIMS</u>

The classification of claims and interests and the impairment of claims and interests is set forth in TABLE 1.

**4.** <u>TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, U.S. TRUSTEES FEES, AND PRIORITY TAX CLAIMS</u>

4.1. **<u>Unclassified Claims.</u>** Certain types of claims are automatically entitled to specific treatment under the Code. Under Code §1123(a)(1), administrative expense claims, and priority tax claims are not in classes. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, pursuant to Code §1129(a)(1), the Debtor has *not* placed such claims in any class.

4.2. **<u>Administrative Expenses.</u>** Administrative expenses are costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code §507(a)(2). Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

As of the filing of this Plan, the Debtor has received no notice of any administrative expense, other than attorneys' fees and expenses of Weycer Kaplan Pulaski & Zuber P.C. ("WKPZ") incurred for PDGP. As a condition of and prior to the Effective Date, PDGP shall reserve sufficient funds to satisfy the anticipated final allowed administrative claim of WKPZ for fees and expenses.

4.3. **<u>Priority Tax Claims.</u>**

4.3.1. Priority tax claims are unsecured income, employment, and other taxes described by Code §507(a)(8). Pursuant to Code §1129(a)(9), unless the holder of such a §507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular monthly installments paid over a period not exceeding five (5) years from the order of relief (which order of relief occurred on February 15, 2021).

The two (2) claims in this class consist of the Internal Revenue Service (Proof of Claim No. 4, as amended, and discussed below) and the Texas Comptroller (Proof of Claim No. 6, in the amount of $1,000).

The Debtor will treat such claims, to the extent allowed, in accordance with Code §1129(a)(9) and commence equal monthly payments in the first full calendar month following the Effective Date (which month is anticipated as of the filing of this Plan to be May, 2022).

The outstanding balance of the IRS priority claim shall accrue interest at the rate of Three Percent (3.00%) per annum on and after the Effective Date until paid in full.

4.3.2. The Debtor recently cured various un-filed employment tax returns, and the Internal Revenue Service on March 21, 2022 amended Proof of Claim No. 4 to include a priority claim in the amount of $100,172.02 (and with a general unsecured claim in the amount of $2,627.64, for a total claim of $102,799.66).

4.3.3. *At the request of the Internal Revenue Service, the Debtor incorporates the following terms and conditions into the Plan.*

The debt owed by the Debtor to the Internal Revenue Service is a non-dischargeable debt, except as otherwise provided for in the Bankruptcy Code, and that if the Debtor should default, the Internal Revenue Service is not subject to the provisions of the Bankruptcy Code so that the Internal Revenue Service can take whatever actions are necessary to collect said debt in the event of default.

A failure by the Debtor to make a payment to the Internal Revenue Service pursuant to the terms of the Plan shall be an event of default, and as to the Internal Revenue Service, there is an event of default if payment is not received by the fifteenth (15th) day of each month. If there is a default, the Internal Revenue Service must send a written demand for payment, and said payment must be received by the Internal Revenue Service within fifteen (15) days of the date of the demand letter. The Debtor can receive up to three (3) notices of default from the Internal Revenue Service; however, on the third (3rd) notice of default from the Internal Revenue Service, the third (3rd) notice of default cannot be cured, and the Internal Revenue Service may accelerate its allowed claim(s), past and future, and declare the outstanding amount of such claim(s) to be immediately due and owing and pursue any and all available state and federal rights and remedies. These default provisions pertain to the entire claim(s) of the Internal Revenue Service, secured, unsecured priority, unsecured general and administrative priority.

The Internal Revenue Service is bound by the provisions of the confirmed Plan and is barred under Section 1141 of the Bankruptcy Code from taking any collection actions against the Debtor for pre-petition claims during the duration of the Plan (provided there is no default as to the Internal Revenue Service). The period of limitations on collection remains suspended under 26 U.S.C. § 6503(h) for the tax periods being paid under the Plan and terminates on the earlier of (1) all required payments to the Internal Revenue Service have been made; or (2) thirty (30) days after the date of the demand letter (described above) for which the debtor failed to cure the default.

The Debtor's failure to remain current on its ongoing tax obligations shall be an event of default under the terms of the Plan. The Debtor is required to stay current on all ongoing tax reporting/tax payments with the Internal Revenue Service. If the debtor defaults to the Internal Revenue Service (in the timely filing of any future tax return and/or the payment of any ongoing tax liability) this is an event of default to the plan term agreement. The Internal Revenue Service must send a written demand to the Debtor or Reorganized Debtor of the default and the Debtor must cure the default within fifteen (15) days of the date on the demand letter. If the default is not cured within fifteen (15) days, the Internal Revenue Service may assert the balance on the proof of claim still remaining which will include tax, interest and penalty to be due and owing and the entire balance (after crediting all payments made) may go out for collection.

Internal Revenue Service remedies upon default: Upon any final and non-curable default by the Reorganized Debtor, the Internal Revenue Service may accelerate its allowed pre-and post-petition claims (and any future administrative claims), and declare the outstanding amounts of such claims to be immediately due and owing. The Internal Revenue Service may pursue any and all available state and federal rights and remedies as provided by law without further order of this Court.

**5.** **TREATMENT OF CLAIMS AND INTERESTS.** The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

5.1. **Class 1 — Property Taxes / Ad Valorem Taxes**

5.1.1. Identity of Claims in Class: Class 1 consists of the allowed secured claim of Dona Ana County, New Mexico or any other governmental entity that assesses ad valorem property taxes.

5.1.2. Treatment:

5.1.2.1. Each such tax authority will retain its statutory lien in, to, and/or against the Subject Property.

5.1.2.2. Any ad valorem property taxes for 2021 if not already paid shall be paid upon the earlier of (1) within sixty (60) days of the Effective Date and/or (2) upon the closing of any sale or refinance of the Subject Property.

The property taxes shall be pro-rated for any such portion that is sold, as applicable, and upon such payment(s) the liens of Dona Ana County will be deemed to be satisfied.

5.1.2.3. Property taxes for 2022 shall be due and payable when due.

5.1.3. Voting. Class 1 is unimpaired and deemed to accept the Plan.

5.2. **Class 2 — Legalist allowed secured claim.**

5.2.1. Identity of Claims in Class: Class 2 consists of the allowed secured claim pursuant to the order entered by the Court on April 12, 2021 (Docket No. 43) (the "DIP Order") approving the Code § 364(d) debtor-in-possession financing and primary lien transaction between PDGP and Legalist (and which financing was used to extinguish the then existing first lien indebtedness owed to HD Lending, LLC). Capitalized terms in this Plan §5.2 shall have the same meaning as ascribed to such terms in the DIP Order unless otherwise defined herein.

5.2.2. Treatment: The DIP Credit Agreement and the DIP Order shall remain in effect and govern the relations between the parties following the Effective Date, including but not limited to Legalist retaining all liens and/or other interests provided in the DIP Credit Agreement and/or DIP Order.

5.2.3. Voting. Class 3 is unimpaired and deemed to accept the Plan.

5.3. **Class 3 — New Mexico Real Estate Advisors Inc. d/b/a Collier's International ("NMREA")**

5.3.1. Identity of Claims in Class: Class 3 consists of the claim of NMREA for the second half of its commission under a pre-petition Exclusive Right to Lease Listing Agreement (the "*Listing Agreement*") between PDGP and NMREA, which NMREA asserts is earned and payable and PDGP asserts is contingent, disputed, and not yet due. NMREA asserts a

secured claim based upon one or more statutory liens that purport to encumber the Subject Property.

5.3.2.  Treatment:

5.3.2.1.  NMREA shall retain its liens to secure the contingent commission claim(s) that remain under the Listing Agreement with respect to sales and/or leases of the Subject Property; provided, however, the liens are each reduced by the payment(s) previously received through the closing of the Legalist DIP loan (see Docket No. 43).  Within seven (7) days of the Effective Date, NMREA shall amend its recorded liens to reflect the previous paydown(s) under the order approving the Legalist DIP loan (see Docket No. 43).

5.3.2.2.  Upon the closing of a sale of the Subject Property or any portion thereof, or upon an applicable tenant taking possession under the Listing Agreement, for which event(s) a commission becomes payable under the Listing Agreement, the Debtor shall pay at closing such commission, and NMREA shall release its liens asserted against the Subject Property, or portion of the Subject Property as applicable, that is sold and/or for which a tenant takes possession, as applicable.

5.3.2.3.  Within the later of (i) thirty (30) days of the Effective Date or (ii) the closing of any refinancing or extension of the Legalist indebtedness, the Debtor shall deposit into escrow funds in accordance with the Order at Docket No. 43 less any amounts previously paid to NMREA under Section 5.3.2.2 above (the "*Escrowed Funds*") for use in satisfying the remaining commission that are or become payable to NMREA.

5.3.2.4.  If and/or when any of the remaining commissions to NMREA mature, such commissions will be paid upon closing of any applicable sale and/or lease. Upon any such closing and payment, and in conjunction with such closing, NMREA will releas its liens asserted against the Subject Property or such portion thereof in relation to which NMREA is receiving payment.

5.3.2.5.  NMERA and Debtor each reserves all rights, remedies, facts, claims, issues, and/or defenses with respect to the Escrowed Funds

5.3.2.6.  NMREA shall continue to adhere to the confidentially provisions of the Listing Agreement between PDG-P and NMREA and/or related to the Subject Property.

5.3.3.  If actions or events occur that under the terms of the Listing Agreement operate to nullify the contingency(ies) upon which the NMREA remaining commission is based and result in NMREA no longer being entitled to the balance of its commission, then NMREA shall be entitled to no claim and shall immediately release such portion of its liens to permit the other disposition to occur.

5.3.4.  Effective upon the release by NMREA of all of its liens, the Debtor for itself and the bankruptcy estate releases NMREA and its agents, officers, directors, employees, agents, successors and assigns from any and all claims arising out of or relating to the listing agreement and the services provided thereunder.  This Section 5.3.4 controls over any other

provision in the Plan, any plan supplement, the Disclosure Statement, and/or any other filing of the Debtor to the contrary.

5.3.5. The Bankruptcy Court shall retain jurisdiction over any dispute between NMREA and/or the Reorganized Debtor so long as this Bankruptcy Case remain pending.

5.3.6. If other dispositions of the Subject Property occur, by lease, sale, or otherwise, that operate to nullify the contingency(ies) upon which the NMREA contingency is based, then NMREA shall be entitled to no claim and shall immediately release such portion of its liens to permit the other disposition to occur.

5.3.7. <u>Voting</u>. Class 4 is impaired and is entitled to vote for or against the Plan.

5.4. <u>Class 4 — Dennis Crimmins ("Crimmins").</u>

5.4.1. <u>Identity of Claims in Class:</u> Crimmins is the Plaintiff with respect to the Crimmins Litigation that is referenced and described in the Disclosure Statement and the party which has filed a notice of lis pendens against the Subject Property. However, Crimmins has not filed a proof of claim in this case.

5.4.2. <u>Treatment:</u> This class was resolved by the disposition of the Crimmins Adversary as described in the Disclosure Statement. *<u>CRIMMINS HOLDS NO CLAIM OR INTEREST AND WILL RECEIVE NO DISTRIBUTION.</u>*

5.5. <u>Class 5 — General Unsecured Claims.</u> General unsecured claims are not secured by property of the estate and are not entitled to priority under Code §507(a).

5.5.1. <u>Identity of Claims in Class:</u> As set forth in **Exhibit PDGP304** to the Disclosure Statement, the Class 5 general unsecured creditors consists of general unsecured claims in aggregate minimum amount of at least / approximately $32,250.00 and consisting of only the disputed claim of City Bay Capital LLC.

Since the Disclosure Statement, the IRS has amended its proof of claim to include a general unsecured claim in the amount of $2,627.64.

5.5.2. <u>Treatment — City Bay:</u> Upon the agreement of City Bay and the Debtor, PDG, Inc., Michael Dixson, and any and all subsidiaries and/or affiliates of Michael Dixson, as referenced and described in City Bay proof of claim, the Debtor will pay $20,000 to City Bay within thirty (30) days of the Effective Date of the Plan in full and final satisfaction of the claims of City Bay against any of the Debtor and/or the aforementioned parties.

*<u>Mutual Releases.</u>* Upon City Bay's receipt of the $20,000.00 payment from Debtor, City Bay, on its own behalf and on behalf of all of its current and former partners, employees, agents, entities, attorneys, predecessors, subsidiaries, parent companies, successors, beneficiaries, representatives, insurers, affiliates, heirs, executives, administrators, directors, officers, board members, members, shareholders, mortgagors, mortgagees, investors, creditors, debtors, and assigns, and each of their respective successors and assigns, and for anyone claiming by, through or under any of them (the "*<u>City Bay Release Parties</u>*"), unconditionally and irrevocably releases, remises, forgives, and forever discharges Debtor, PDG, Inc., and Michael Dixson, and all of their current and former partners, employees, agents, entities, attorneys, predecessors, subsidiaries, parent

companies, successors, beneficiaries, representatives, insurers, affiliates, heirs, executives, administrators, directors, officers, board members, members, shareholders, mortgagors, mortgagees, investors, creditors, debtors, and assigns, and each of their respective successors and assigns, and for anyone claiming by, through or under any of them (the "*Dixson Release Parties*"), from and against any and all obligations, actions, suits, causes of action, claims, counterclaims, demands, liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, debts, sums of money, accounts, compensations, contracts, controversies, promises, covenants, judgments, losses, damages, costs, or expenses of any type, kind, nature, description, or character whatsoever, whether in law, admiralty, arbitration, equity, or otherwise, whether known or unknown, and whether accrued or hereafter maturing, from the beginning of the world to the date of this Agreement, relating to the Mortgage Brokerage Agreement, dated May 29, 2019 (the "*Brokerage Agreement*").

Upon City Bay's receipt of the $20,000.00 payment from Debtor, the Dixson Release Parties unconditionally and irrevocably releases, remises, forgives, and forever discharges the City Bay Release Parties from and against any and all obligations, actions, suits, causes of action, claims, counterclaims, demands, liabilities, indebtedness, breaches of contract, breaches of duty or any relationship, acts, omissions, misfeasance, malfeasance, debts, sums of money, accounts, compensations, contracts, controversies, promises, covenants, judgments, losses, damages, costs, or expenses of any type, kind, nature, description, or character whatsoever, whether in law, admiralty, arbitration, equity, or otherwise, whether known or unknown, and whether accrued or hereafter maturing from the beginning of the world to the date of this Agreement, relating to the Brokerage Agreement.

*Non-Disparagement.* City Bay, on the one hand, and Debtor, PDG, Inc., and Michael Dixson, on the other hand, each agree that they will refrain from making any statement having or causing a diminishing effect on the reputation, goodwill, or business of the other party (including its current and former employees, officers, directors, agents, attorneys, owners, shareholders, divisions, affiliates, parents, subsidiaries, predecessors, successors, beneficiaries, heirs, and assigns), or which tortiously interferes with the contracts and relationships of the other party, relating to events, occurrences, or transactions taking place from the beginning of the world to the date hereof.

*Treatment- IRS.* The IRS unsecured claim shall be paid in full according to the same schedule as the IRS priority claim as set forth above, but shall not bear interest.

5.5.3. **Voting.** Class 5 is impaired and may vote for or against the Plan.

5.6. **Class 6 — Class of Equity Interest Holders.**

All prepetition equity interest owners shall retain their equity interests in the reorganized Debtor following the Effective Date.

6. **ALLOWANCE AND DISALLOWANCE OF CLAIMS**

6.1. Disputed Claim. A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection or otherwise which is the subject of a pending contested matter, adversary proceeding and/or other contested matter; or (ii) no proof

of claim has been filed, and/or (iii) the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

6.2. _Delay of Distribution on a Disputed Claim._ No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

6.3. _Settlement of Disputed Claims._ After the Effective Date, the Debtor will have the power and authority to settle and compromise a disputed claim without court approval and without compliance with Bankruptcy Rule 9019.

**7. PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

7.1. **Assumed Executory Contracts and Unexpired Leases.**

The Debtor _ASSUMES_

(i) the Ground Lease Agreement dated November 8, 2019 between PDG Prestige, Inc., as landlord, and Bubba's Holdings LLC (f/k/a Strategic Restaurant Concepts, LLC) ("Bubba's Holdings"), as tenant, as amended January 22, 2020 (First Amendment), February 20, 2020 (Second Amendment), March 20, 2020 (Third Amendment), May 5, 2020 (Fourth Amendment), June 5, 2020 (Fifth Amendment), July 31, 2020 (Sixth Amendment), August 18, 2020 (Seventh Amendment), November 12, 2020 (Eighth Amendment), and March 2, 2022 (Ninth Amendment) (the "Bubba's Holdings Lease"), and

(ii) any lease of nonresidential real property which the Debtor may assume and potentially assign upon a motion filed with the Court and notice provided to the non-debtor party(ies) within thirty (30) days of the Effective Date of this Plan.

**8. MEANS OF IMPLEMENTING THE PLAN.**

8.1. **Source of Payments.** Payments and distributions under the Plan will be funded by (1) a sale of the Subject Property, (2) lease and/or rental income of the Subject Property, and/or (3) existing financing and/or post-Effective Date re-financing.

For the avoidance of doubt, the potential sale of Lot 1A to The Paul Rothbard Revocable Living Trust Dated August 23, 2006 ("Rothbard Trust") that was referenced and descried in the Disclosure Statement shall not occur because the Rothbard Trust withdrew the offer. Thus, each of Lot 1A and Lot 3A (the two (2) lots of the Subject Property) will be the subject of one or more sales post-Effective Date by the Reorganized Debtor.

The Debtor has owned and will continue to own its member units in The Gateway Ventures LLC (which is the subject of Case No. 21-30071 in this Court), and any distribution on account of such interest shall be available as additional resources of the Debtor.

8.2. **Post-confirmation Management.** The post-confirmation management of the Debtor, and the compensation for each such person is set forth in the Disclosure Statement and in TABLE 1.

8.3. **Risk Factors.** The proposed Plan has the following risks: The Debtor potentially will be unable to complete the sale of the Subject Property in accordance with the development plan. The Debtor potentially will not generate sufficient cash flow to service the debts to be paid over time under the

---

Plan. The general economic uncertainty associated with the COVID-19 pandemic provides substantial additional risk.

9. **GENERAL PROVISIONS**

9.1. **Definitions and Rules of Construction.** The definitions and rules of construction set forth in Code §§101 and 102 shall apply when terms defined or construed in the Code. Other terms are defined throughout the Plan and/or the Disclosure Statement, and terms may be defined in the Disclosure Statement and then used in the Plan and vice versa. Any reference to the Debtor that applies to any period of time after the Effective Date shall refer to the Debtor as the Reorganized Debtor. In addition, the following terms used in the Plan and/or Disclosure Statement are defined below.

9.1.1. [reserved].

9.2. **Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

9.3. **Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

9.4. **Primacy of the Plan and Confirmation Order.** To the extent of any conflict or inconsistency between the provisions of the Plan on the one hand, and the Confirmation Order on the other hand, the provisions of the Confirmation Order shall govern and control.

9.5. **Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

9.6. **Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Texas govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

9.7. **Corporate Governance.** After the Effective Date of the order confirming the Plan, the management of the Debtor will consist of the following: Michael Dixson, President, Director and Manager (compensation $200,000 per year, if funds available).

9.8. **Corporate Authority.** All actions and transactions contemplated under the Plan shall be authorized upon confirmation of the Plan without the need of further approval, notice or meetings, that might otherwise be required under applicable state law or otherwise, other than the notice provided by serving this Plan on all known creditors of PDGP, all interest holders, and all current directors or managers o of PDGP.

9.9. **Sales of Property.** Any sales, transfers, and/or conveyances of some or all of the Subject Property shall be made pursuant to, at minimum, constitutes sales under Code §§ 363(f), 1122(a)(5), and/or 1125(b)(4), and each such sale, transfer, and/or conveyance shall be free and clear and any lien, claims, encumbrances, and/or any other interests, except as specified above with respect to particular Lots and/or particular conveyances and except any interest of Bubba's Holdings in and to the Subject Property (Lot 1A) pursuant to the Bubba's Holdings Lease, to which any sale, transfer and/or conveyance of Lot 1A will be subject.. *See also* Plan §§ 8 and 10.

---

9.10. **Fixing of Claims.** To the extent that the modification and/or fixing of any claim occurs under the Plan, the Plan also constitutes an objection to any filed proof of claim and/or scheduled claim under Code §502 and/or Bankruptcy Rules 3007 and 9014, and any applicable Local Rules.

9.11. **Settlement of Claims and Disputes.** The Plan also constitutes a motion under Bankruptcy Rule 9019 to the extent necessary to confirm the Plan.

9.12. **Debtor name change.** The Debtor may change its name and/or adopt one or more business aliases after the Effective Date.

## 10. EFFECT OF CONFIRMATION OF PLAN, DISCHARGE

On the Effective Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the effective date, to the extent specified in Code §1141(d)(1)(A) except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in Code §1141(d)(6)(A) if a timely complaint was filed in accordance with Bankruptcy Rule 4007(c), or (iii) of a kind specified in Code §1141(d)(6)(B). After the effective date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence. All property of the Debtor shall be conveyed to the Reorganized Debtor free and clear and any liens, claims, encumbrances and/or other interests unless otherwise specified herein.

For the avoidance of doubt, and without contradiction of any portion of the Code, upon the Effective Date, all property of the estate, including but not limited to any and all real property of the Debtor in Dona Ana County, New Mexico and further including without limitation each of Lot 1A and Lot 3A of the Subject Property, shall vest and/or return to Reorganized Debtor, and which property the Reorganized Debtor shall be free to sell, lease, encumber, and otherwise transact and/or use in any manner without the necessity of further notice to any creditors and/or parties in interest and without the necessity of prior approval of the Bankruptcy Court.

## 11.   EFFECTIVE DATE OF PLAN.

The effective date of this Plan (the "Effective Date") is the first business day following the entry of the Order confirming this Plan. The Effective Date will be fixed in the Confirmation Order.

## 12. FINAL DECREE

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## 13. OTHER PLAN PROVISIONS

13.1. **Scope and Retention of Jurisdiction.** The Bankruptcy Court shall retain jurisdiction to: *(i)* hear and determine pending applications for the assumption or rejection of contracts or leases and the allowance of Claims resulting therefrom; *(ii)* hear and determine any and all adversary proceedings, applications, and contested matters, including any remands of appeals, and including any Estate Actions; provided, however, that the Reorganized Debtor shall not be required to seek or obtain approval of the Bankruptcy Court under Bankruptcy Rule 9019 or otherwise as to the settlement or compromise of any Estate Actions post-Effective Date; *(iii)* ensure that distributions to holders of Allowed Claims are accomplished as provided herein; *(iv)* hear and determine any timely objections

**EXHIBIT PDGP499**

to or applications concerning Claims or the allowance, classification, priority, estimation, or payment of any Claim or Interest, and to enter Estimation Orders; *(v)* hear and determine all Fee Applications and Fee Claims; provided, however, that the Reorganized Debtor shall not be required to seek or obtain approval of the Bankruptcy Court under section Code §330 or otherwise as to the allowance or payment of professional fees post-Effective Date; *(vi)* enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated; *(vii)* hear and determine disputes arising in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan; *(viii)* enter and implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder; *(ix)* consider any modification of the Plan pursuant to Code § 1127, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order; *(x)* enter and implement orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with the consummation or implementation of the Plan, including, without limitation, to issue, administer and enforce injunctions provided for in the Plan and the Confirmation Order; *(xi)* recover all assets of the Debtor and property of the estate, wherever located; *(xii)* hear and determine matters concerning state, local, and federal taxes in accordance with Code §§ 346, 505, and 1146; *(xiii)* hear and determine any other matter not inconsistent with the Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and enter a final decree closing the Bankruptcy Case.

13.2. **Avoidance actions and retained litigation.**

13.2.1. Post-confirmation litigation and the prosecution of avoidance actions and/or other estate claims are referenced and described in the Disclosure Statement and/or one or more plan supplements, including but not limited to the plan supplement on file at Docket No. 126. The claims and causes of action so described are expressly retained for the benefit of the estate and/or the Reorganized Debtor.

13.2.2. In addition, and for the avoidance of any potential doubt, the claims and/or causes of action that are retained for this Debtor and/or the Reorganized Debtor include any and all facts, claims, issues, rights, remedies, and/or defenses relating in any way to PDG Prestige Inc. on the one hand and Suresh Kumar and/or Bankim Bhatt on the other and relating in any way to:

    (1) any aspect of the raising of funds, financial contributions, and/or financing of any type in connection with the proposed and/or actual acquisition of the 20-acre tract of property that ultimately was acquired by The Gateway Venture LLC and which property is commonly referred to as 6767 W. Gateway Blvd., El Paso, Texas 79925 and 1122 Airway Blvd., El Paso, TX 79925 (and which property is identified through the proceedings in Case No. 21-30071),

    (2) otherwise relating to any of facts, claims, issues, rights, remedies, and/or defenses described in or otherwise relating to the facts and occurrences described in the various pleadings of any and all parties currently on file in Adversary Proceeding No. 21-03009;

    (3) otherwise relating to any of facts, claims, issues, rights, remedies, and/or defenses described in or otherwise relating to the facts and occurrences described in the various pleadings of The Gateway Ventures, LLC currently on file in Adversary Proceeding No. 21-03009; and/or

(4) and any facts, claims, issues, rights, remedies, and/or defenses which may be asserted by PDG Prestige, Inc. (as Debtor or Reorganized Debtor) in Adversary Proceeding No. 21-03009 under one or amended pleadings under the applicable scheduling order(s) in Adversary Proceeding No. 21-03009.

13.3.    **U.S. Trustee Fees and Reports.**  The reorganized PDGP shall (1) file all operating applicable reports as required and (2) timely pay all quarterly fees assessed after the Effective Date pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing this case or enters an order either converting this case to a case under Chapter 7 or dismisses the case. The Debtor and/or Reorganized Debtor as applicable shall remain current in the filing of monthly operating reports and/or quarterly operating reports, as applicable.

13.4.    **Assets after any subsequent conversion.**  In the event of a conversion of this case to Chapter 7 any time after the confirmation of this Plan, the assets of the Debtor shall re-vest to the bankruptcy estate of the Debtor upon such conversion.

*{continued on following page}*

EXHIBIT PDGP499

**PDG PRESTIGE, INC.**

/s/ Michael Dixson
_____
**By:  Michael Dixson, President**

Jeff Carruth (SBT #24001846)
**WEYCER, KAPLAN, PULASKI & ZUBER, P.C.**
3030 Matlock Rd., Suite 201
Arlington, TX 76015
(713) 341-1158, fax (866) 666-5322
jcarruth@wkpz.com
ATTORNEYS FOR PDG PRESTIGE INC.
DEBTOR AND DEBTOR IN POSSESSION

# EXHIBIT C

```
 1                                    VOLUME:    I

                                     PAGES:    1-94
 2                                   EXHIBITS:  1-7
 3            IN THE UNITED STATES BANKRUPTCY COURT
                    WESTERN DISTRICT OF TEXAS
 4                       EL PASO DIVISION
              BANKRUPTCY NO. 21-30107-CCGB
 5                         CHAPTER 7
 6    _____
 7    LEGALIST DIP GP, LLC and PDG PRESTIGE, INC.      )
 8    (By and through Ronald Ingalls, Chapter 7        )
 9    Trustee),                                        )
10                         Plaintiffs,                 )
11                 vs.                                 )
12    MICHAEL DIXSON, Individually; MESILLA VALLEY     )
13    VENTURES, LLC; MICHAEL DIXSON TRUST THROUGH ITS )
14    TRUSTEE MICHAEL J. DIXSON; CHRISTINA DIXSON;     )
15    SOUTHWESTERN ABSTRACT & TITLE COMPANY, INC.;     )
16    WEYCER KAPLAN PULASKI & ZUBER P.C.; ENTRADA      )
17    DEVELOPMENT, LLC; THE GATEWAY VENTURES, LLC;     )
18    LPC RETAIL, LLC, and FSLRO 510 SOUTH TELSHOR LAS )
19    CRUCES, LLC,                                     )
20                         Defendants.                 )
21    _____)
22
23        REMOTE VIDEOTAPED DEPOSITION OF BRIAN T. RICE
24              THURSDAY, NOVEMBER 21, 2024
25                    10:32 AM (EST)

                                            Page 1
```

1        A.   Yes, sir.

2        Q.   All right.  All right.  And did your --

3    did your role change from 2020 moving forward to

4    today?

5        A.   Yes, sir.

6        Q.   Can you walk me through the changes in

7    your roles -- your role at Legalist since you began

8    work there?

9        A.   At the end of 2021 I moved from chief

10   compliance officer to chief operating officer; and

11   at the end of 2022 I moved from investment counsel

12   to corporate counsel; and at the end of 2023 I

13   moved from corporate counsel to general counsel.

14   And so those are my two current titles, COO and GC.

15       Q.   All right.  Let me make sure I've got

16   that.  So you currently are corporate counsel and

17   general counsel for Legalist?

18       A.   Currently general counsel and chief

19   operating officer.

20       Q.   Oh, and chief operating -- all right.

21            And you became chief operating officer at

22   the end of 2021?

23       A.   Yes, sir.

24       Q.   All right.  What's the -- explain to me

25   what the difference is first in the -- the

Page 20

1    or accounts if there were more than one?

2        A.   Yes.

3        Q.   Now, you've previously told me about an

4    investment team that you mentioned previously.

5        Who were you referring to?

6        A.   At that time the -- the DIP strategy was

7    run by a gentleman named Nate Jones, Nathan Jones,

8    who had the title head of DIP underwriting.

9        Q.   Okay.  And was there anybody else

10    involved?

11        A.   He worked with Remy Cipriano --

12        Q.   Can you spell that?

13        A.   Ci -- C-i-p-r-i-a-n-o.

14        -- who -- at that time his title I believe

15    was underwriting coordinator.  So he assisted Mr.

16    Jones with the initial underwriting and then the

17    monitoring of the investments on this strategy.

18        Q.   Okay.  All right.  And so are Mr. Jones

19    and Mr. Cipriano still at Legalist?

20        A.   Nate Jones is not.  Remy Cipriano is.

21        Q.   And what's Mr. Cipriano's title today?

22        A.   I believe it's the same.

23        Q.   Underwriter coordinator?

24        A.   I believe so.

25        Q.   All right.  And do you know why Mr. Jones

Page 37

1           So in any event, either prior to this or

2      right after this is when you had your conversations

3      with Mr. Jones and Mr. -- is it -- it is Capriano,

4      isn't it? -- or Cipriano?

5           A.   Cipriano, yes, sir.

6           Q.   I'm sorry.  So either -- prior -- just

7      prior to this or after this is when you believe you

8      had your conversations with Jones and Cipriano that

9      you previously told me about?

10          A.   Yes, sir.

11          Q.   Okay.  All right.  All right.  So -- and

12     do you recall receiving an email enclosed --

13     attaching the partial release?

14          A.   I do, yes.  I remember this email.

15          Q.   All right.  And I'll go ahead and show you

16     3A, which is a copy of the release.

17               (Exhibit 3A, Release of Lien Granted

18               Pursuant to Bankruptcy Court Order (and

19               With Respect to Lot 1A Only).)

20          Q.   All right.  And 3A is a copy of the

21     release, do you recall -- proposed release.

22               Do you recall seeing that?

23          A.   Yes.  I don't have any reason to think

24     this isn't the version I'm thinking of, yes, sir.

25          Q.   All right.  And he enclosed also I guess a

Page 72

1    FedEx address for you to ship it to?

2            Did you see that in -- it was on the

3    attachments to Exhibit 3?  It would have been the

4    second attachment.

5        A.   Yes, sir.

6        Q.   Okay.  And did you execute that release

7    and send it on?

8        A.   I did.

9        Q.   All right.  And you were executing that

10   release based on your understanding that the

11   proceeds were going to be used to -- or put into

12   Lot 3A; correct?

13       A.   Yes, sir.

14       Q.   Okay.  All right.

15           MR. CULPEPPER:  So let's go to Exhibit 4.

16       Q.   And it's, again, just a continuation of

17   this email chain between you and Mr. Carruth.

18           (Exhibit 4, email, 4/13/2022, 1:43 p.m.)

19       Q.   And after -- if you just look at the

20   bottom -- Exhibit 4 again is a continuation of the

21   email chain -- do you recall receiving these

22   emails?

23       A.   (Witness reviews document.)  Yes, I -- I

24   don't know whether I saw it prepping for this

25   deposition -- you know, as part of the documents

Page 73

1    that were pulled for this deposition or I'm

2    remembering it from back then, but I know this

3    chain.  Yes, sir.

4         Q.   Okay.  Fair enough.  All right.

5              So Exhibit 4, after he sent you the

6    release on April 12th, 2022, you sent him an email

7    -- and "you" being -- you sent an email that same

8    day to Jeff Carruth and copied Michael Dixson and

9    Zach Campbell; correct?

10        A.   The next day, yes, sir.

11        Q.   All right.  And it says -- you asked "When

12   is the closing?"; correct?

13        A.   Yes, on the 12th.

14        Q.   All right.  And Mr. Carruth responded the

15   next day, saying "Trying to close as soon as

16   Friday"; correct?

17        A.   Yes, sir.

18        Q.   And then you asked for a copy of the "P&S

19   for 1A," meaning the purchase and sale agreement?

20        A.   Yes, sir.

21        Q.   Okay.  And so you wanted to see it and

22   review it?

23        A.   I am guessing that was something our

24   investment team wanted to see.  And I was, you

25   know, the attorney requesting it.  But, yes, that's

Page 74

1     what we asked for.

2          Q.   All right.  And that same day -- we're

3     going to go on to the next exhibit, Exhibit 5.

4               (Exhibit 5, email, 4/13/2022, 12:43 p.m..)

5          Q.   Exhibit 5 is a continuation of that email

6     chain between you and Mr. Carruth and you -- where

7     you requested Purchase and Sale Agreement for Lot

8     1A.  And that same day he sent you, on April 13th,

9     2022, an executed purchase-sale agreement; correct?

10         A.   Yes, sir.

11         Q.   All right.  And did you review -- or your

12    team or -- did Legalist review the document that

13    they requested?

14         A.   I don't have any reason to think we

15    didn't.

16         Q.   Okay.  Did you send any emails with any

17    concerns related to the sale agreement to your

18    knowledge?

19         A.   Not to my knowledge, no, sir.

20         Q.   Okay.  Did you, on behalf of Legalist,

21    raise any questions or concerns as it related to

22    the Purchase and Sale Agreement that was sent to

23    you on April 13th, 2022?

24         A.   Not to my knowledge, no.

25         Q.   All right.  So let's look at that

                                        Page 75

```
 1    Commonwealth of Massachusetts
 2    Middlesex, ss.
 3
 4
              I, P. Jodi Ohnemus, Notary Public
 5    in and for the Commonwealth of Massachusetts,
      do hereby certify that there came before me
 6    (remotely) on the 21st day of November, 2024, the
      deponent herein, who was duly sworn by me; that the
 7    ensuing examination upon oath of the said deponent
      was reported stenographically by me and transcribed
 8    into typewriting under my direction and control;
      and that the within transcript is a true record of
 9    the questions asked and answers given at said
      deposition.
10
11            I FURTHER CERTIFY that I am neither
      attorney nor counsel for, nor related to or
12    employed by any of the parties to the action
      in which this deposition is taken; and, further,
13    that I am not a relative or employee of any
      attorney or financially interested in the outcome
14    of the action.
15
              IN WITNESS WHEREOF I have hereunto set my
16    hand and affixed my seal of office this
      9th day of December, 2024, at Waltham.
17
18    _____

19    _____

20            P. Jodi Ohnemus, RPR, RMR, CRR,
              CSR, Notary Public,
21            Commonwealth of Massachusetts
              My Commission Expires:
22            3/3/2028
23
24
25
```

Page 93



2213904      MAY 13, 2022 11:05:43 AM    PAGES: 4
RELEASE OF LIEN       Deputy: Edward Kriner
Amanda López Askin, County Clerk, Dona Ana, NM



## RELEASE OF LIEN GRANTED PURSUANT TO
## BANKRUPTCY COURT ORDER
## (WITH RESPECT TO LOT 1A ONLY)

| | |
|---|---|
| STATE OF NEW MEXICO | §§ |
| DONA ANA COUNTY | § |

**Party Information and Defined Terms.** The following descriptions below shall also constitute defined terms which may be used throughout this instrument. Additional terms may be defined below.

**Date:**          April 14, 2022

**Lender:**        Legalist DIP GP, LLC, a Delaware limited liability company as general partner of
Legalist DIP Fund I, LP a Delaware limited partnership
and Legalist DIP SPV II, LP a Delaware limited partnership

**Lender's Address:**    c/o Legalist, Inc.
10120 W. Flamingo Rd., Ste. 4, No. 3015
Las Vegas, NV 89147

**Debtor:**        PDG Prestige, Inc.
a Texas corporation

**Debtor's Address:**    154 N. Festival Dr., Suite D
El Paso, TX 79912

**Judicial Lien:**     The liens contained in that certain *Final Order Granting Motion of Debtor to (I) Enter into Debtor Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec. 364(D), and (III) Provide Related Relief* (Docket No. 43) (the "***DIP Order***") entered on April 12, 2021 in Case No. 21-30107, *In re: PDG Prestige, Inc.*, in the United States District Court for the Western District of Texas, El Paso Division.

**Subject Property:**    The property that is the subject of this Release is referenced and described in **Exhibit 001**.

For good and value consideration, the receipt and sufficiency of which are acknowledged by the Lender and the Debtor, the Lender has released and relinquished and discharges, and does by these presents release and relinquish and discharge unto Debtor, its successors, its assigns, and their successors and assigns, the above-described Judicial Lien with respect to the Subject Property, only.

It is expressly agreed and understood that this is a release of lien *only with respect to the Subject Property* and that the same shall in no way release, affect, or impair said Judicial Lien against any other property.

The Judicial Lien remains and shall remain in full force in effect with respect to all other referenced and described collateral in the Judicial Lien and/or DIP Order unless and until separately and expressly released by the Lender.

*{continued on following page}*

**LEGALIST DIP FUND I, LP AND
LEGALIST DIP SPV II, LP**

**BY: INVESTMENT ADVISER**

**LEGALIST, INC.**

BY: _____

NAME: Brian T. Rice

TITLE: Chief Operating Officer

THE STATE OF __MA__         §
                            §

__PLYMOUTH__ COUNTY       §

Before me, a Notary Public in and for this state, on this April **14**, 2022, personally appeared **BRIAN T. RICE** and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed for the uses and purposes therein set forth.



_____
Notary Public, State of __MA__

*{continued on following page}*

**EXHIBIT 001**

---

## EXHIBIT "A"
## Property Description

**Closing Date: April 18, 2022**

**Buyer(s):     LPC Retail, LLC**

**Property Address:    510 South Telshor Boulevard, Las Cruces, NM 88011**

PROPERTY DESCRIPTION:

Lot 1A, MESILLA VALLEY MALL SUBDIVISION REPLAT NO. 5, in the City of Las Cruces, Dona Ana County, New Mexico, as shown and designated on the plat thereof, filed in the office of the County Clerk of said County on August 19, 2020, in Book 24 Page(s) 581-582 of Plat Records.

# EXHIBIT D

Brian Thomas Rice - August 6, 2025

Page 1

```
 1        UNITED STATES BANKRUPTCY COURT
          WESTERN DISTRICT OF TEXAS
 2        EL PASO DIVISION

 3        _____
                                                 )
 4        PDG PRESTIGE, INC.,                    )
                              Debtor,            )
 5        _____)
          LEGALIST DIP GP, LLC AND PDG PRESTIGE, INC. )
 6        (by and through Ronald Ingalls, Chapter 7 )
          Trustee),                              )
 7                           Plaintiffs,         )  Case No.:
                      - against -                )  21-30107-CGB
 8                                               )
          MICHAEL DIXSON, individually, MESILLA VALLEY )
 9        VENTURES, LLC, MICHAEL DIXSON TRUST THROUGH )
          TRUSTEE MICHAEL J. DIXSON, CHRISTINA DIXSON, )
10        SOUTHWESTERN ABSTRACT & TITLE COMPANY, INC., )
          WEYCER, KAPLAN, PULASKI & ZUBER P.C., ENTRADA )
11        DEVELOPMENT, LLC, THE GATEWAY VENTURES, LLC, LPC )
          RETAIL, LLC AND FSLRO 510 SOUTH TELSHOR LAS )
12        CRUCES, LLC,                           )
                              Defendants.        )
13        _____)

14

15

16

17                       Zoom Conference

18                       August 6, 2025
                         10:30 a.m.
19

20

21             Examination Before Trial of the

22        Plaintiff, LEGALIST DIP GP, LLC, by

23        BRIAN THOMAS RICE, pursuant to Notice, before

24        Marina Radinovskiy, a Notary Public of the

25        State of New York.
```

Brian Thomas Rice - August 6, 2025

```
1
2          agreed.
3                  MR. TAYLOR:  Mark Taylor; yes.
4                  MR. TUNNELL:  Riley Tunnell;
5          agreed.
6                  MR. LUTZ:  David Lutz; agreed.
7
8                  (Whereupon, the witness
9          produced a Massachusetts driver's
10         license identification card.)
11
12         B R I A N   T H O M A S   R I C E, called as a
13         witness, having been duly sworn by a Notary
14         Public, was examined and testified as
15         follows:
16         EXAMINATION BY
17         MR. TAYLOR:
18             Q.    Please state your full name for
19         the record.
20             A.    Brian Thomas Rice.
21             Q.    What is your address?
22             A.    2700 19th Street, San Francisco,
23         California 94110.
24             Q.    Good morning, Mr. Rice.
25             A.    Good morning.
```

Brian Thomas Rice - August 6, 2025

```
 1                      B. T. RICE
 2           Q.     You are here, today, as the
 3    designated representative of Legalist Dip GP,
 4    LLC; is that right?
 5           A.     Yes, sir.
 6           Q.     Okay.  And you were deposed
 7    earlier in this case; weren't you?
 8           A.     Yes, sir.
 9           Q.     I've read that deposition a
10    couple of times.  I'm going to try and not to
11    rehash what everyone went through previously.
12    My clients were not parties at that time.
13    There may be some questions that need to be
14    asked to put other questions in context, but I
15    don't intend to redo that deposition.
16           A.     Okay.
17           Q.     Just for the record, you are a
18    licensed attorney; is that right?
19           A.     Yes, sir.
20           Q.     Where are you licensed?
21           A.     I believe my only active license
22    today is Massachusetts.  I believe --
23           Q.     You previously testified -- I'm
24    sorry.
25           A.     I believe my New York license is
```

Brian Thomas Rice - August 6, 2025

Page 37

1                    B. T. RICE

2          Q.     The e-mail string starts on

3    April 12th, Mr. Carruth sent you and your

4    colleague a release form to release -- or a

5    partial release of Legalist's lien on the lot

6    1A Property; right?

7          A.     (Perusing.)

8                 Yes, sir.

9          Q.     And as I understand from your

10   prior deposition and I'm not going to take you

11   all back through that, you did -- either you

12   or someone on behalf of Legalist executed the

13   release and returned it to the Title company;

14   right?

15         A.     Correct.

16         Q.     And as I understand, you did not

17   provide any closing instructions to the Title

18   company in connection with the release; did

19   you?

20         A.     We did not.

21         Q.     Okay.  On or about April 13th,

22   Mr. Carruth had sent you a copy of the

23   executed Purchase and Sale Agreement; is that

24   right?

25         A.     (Perusing.)

Brian Thomas Rice - August 6, 2025

Page 50

1                    C E R T I F I C A T E

2

3

       STATE OF NEW YORK    )

4                           ) ss.:
       COUNTY OF KINGS      )

5

6                    I, MARINA RADINOVSKIY, a

7        Notary Public within and for the

8        State of New York, do hereby certify:

9                    That BRIAN THOMAS RICE, the

10       witness whose deposition is

11       hereinbefore set forth, was duly

12       sworn by me and that such deposition

13       is a true record of the testimony

14       given by such witness.

15                    I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage; and that I am

18       in no way interested in the outcome of

19       this matter.

20                    IN WITNESS WHEREOF, I have

21       hereunto set my hand this 6th day of

22       August, 2025.

23

24                    MARINA RADINOVSKIY

25

# EXHIBIT E

**LIN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **BANKRUPTCY NO. 21-30107-CGB** |
| PDG PRESTIGE, INC., | § | |
| | § | **CHAPTER 7** |
| *Debtor.* | § | |
| | § | |
| | § | |
| LEGALIST DIP GP, LLC and PDG | § | |
| PRESTIGE, INC. (by and through | § | |
| Ronald Ingalls, Chapter 7 Trustee), | § | **ADVERSARY NO. 23-03004-CGB** |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| MICHAEL DIXSON, individually, | § | |
| MESILLA VALLEY VENTURES, | § | |
| LLC, MICHAEL DIXSON TRUST | § | |
| THROUGH ITS TRUSTEE | § | |
| MICHAEL J. DIXSON, CHRISTINA | § | |
| DIXSON, SOUTHWESTERN | § | |
| ABSTRACT & TITLE COMPANY, | § | |
| INC., DEFENDANTS, KAPLAN, | § | |
| PULASKI & ZUBER P.C., ENTRADA | § | |
| DEVELOPMENT, THE GATEWAY | § | |
| VENTURES, LLC, LPC RETAIL, | § | |
| LLC, and FSLRO 510 SOUTH | § | |
| TELSHOR LAS CRUCES, LLC, | | |
| | | |
| *Legalists.* | | |

**RESPONSES AND OBJECTIONS OF PDG PRESTIGE, INC. BY AND THROUGH
RONALD INGALLS, CHAPTER 7 TRUSTEE TO FSLRO 510 SOUTH TELSHOR, LAS
CRUCES, LLC AND LPC RETAIL, LLC'S FIRST
INTERROGATORIES AND REQUEST FOR PRODUCTION**

TO: FSLRO SOUTH TELSHOR, LAS CRUCES, LLC and LPC RETAIL, LLC, by and

through its counsels of record, Mark C. Taylor, KANE RUSSELL COLMAN LOGAN, PC, 401

Congress Ave., Suite 2100, Austin, TX 78701.

From: PDG Prestige, Inc. by and through Ronald Ingalls, Chapter 7 Trustee ("PDG"), and

its counsel of record, Ronald Ingalls, PO Box 2867, Fredericksburg, TX 78624.

PDG hereby responds to defendant FSLRO SOUTH TELSHOR, LAS CRUCES, LLC

("FSLRO") and LPC RETAIL, LLC ("LPC") (collectively, "**Defendants**") interrogatories and

request for production of documents (the "**Discovery Requests**") pursuant to Federal Rule of Civil

Procedure 33 and 34made applicable though Federal Rule of Bankruptcy Procedure 7033 and

7034.

## **GENERAL OBJECTIONS**

1.     PDG objects to Defendants' Discovery Requests to the extent they deviate from or purport

to impose requirements other than or in addition to those required by the Federal Rules of Civil

Procedure, the Federal Rules of Bankruptcy Procedure, the Local Court Rules of the United States

Bankruptcy Court for the Western District of Texas, and/or the orders of this Court.

2.     PDG objects to Defendants' Discovery Requests to the extent they seek information or

documents outside the scope of discovery permissible under the Federal Rules of Civil Procedure,

the Federal Rules of Bankruptcy Procedure, the Local Court Rules of the United States Bankruptcy

Court for the Western District of Texas, and/or the orders of this Court.

3.     PDG objects to Defendants' Discovery Requests to the extent that they seek information

or documents protected by the attorney-client privilege, the attorney work product doctrine, or any

other applicable privilege or immunity.  None of these responses is intended as, or should be

construed as a waiver or relinquishment of any part of the protections afforded by the attorney-

client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

4.      PDG objects to Defendants' Discovery Requests to the extent that they seek information or documents that are beyond his custody, possession, or control and/or seek information that is equally available to Defendants.

5.      PDG objects to Defendants' Discovery Requests to the extent they seek information or documents for any period of time beyond any applicable statute of limitations.

6.      PDG objects to Defendants' Discovery Requests because they contain undefined terms which make them vague, ambiguous, overbroad, unduly burdensome, and oppressive.

7.      PDG expressly limits its responses to Defendants' Discovery Requests to the information or documents that can be located after a reasonable and diligent search of its records believed most likely to contain the responsive information.

8.      PDG's investigation into the Discovery Requests is ongoing, and he continues to search for information or documents responsive to Defendants' Discovery Requests.  As additional information or documents become available, PDG reserves the right to amend, modify, clarify and/or supplement its responses and objections as appropriate.

9.      PDG's decision to provide information or documents notwithstanding the objectionable nature of Defendants' Discovery Requests is not to be construed as an admission that the information or document is relevant, as a waiver of the general or specific objections, or as an agreement that future requests for similar discovery will be treated in a similar manner.

10.      These General Objections apply to each of Defendants' Discovery Requests as though restated in full in response thereto.  To the extent PDG asserts objections to individual requests, those objections shall apply equally to any subparts of the request.  PDG will provide its responses based on terms as they are commonly understood, and consistent with the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Court Rules of the United States

Bankruptcy Court for the Western District of Texas, and/or the orders of this Court. PDG objects to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions.

### OBJECTIONS AND RESPONSES TO INTERROGATORIES

**REQUEST FOR PRODUCTION NO. 1**: All documents reflecting any communications between Debtor and any person or entity relating to the sale of the Property or the PSA.

**ANSWER**: PDG objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, PDG responds as follows: (i) ECF 148 Order Confirming Second Amended Plan of Reorganization of PDG Prestige, Inc. dated March 29, 2022 as Modified (Re: Docket No. 145); (ii) ALTA Seller's Settlement Statement(ECF 24, page 13 to 15, and Exhibit 11 to Deposition of Michael Dixson dated May 16, 2023 (hereinafter "Dixson Depo"); (iii) Chase Bank statement for PDG, dated May 31, 2022, Exhibit 16 to Dixson Depo; (iv) Exhibit 8 to Dixson Depo, Deed from Mesilla Valley Ventures LLC ("Mesilla"), to FSLRO; (v) Purchase and Sale Agreement from Mesilla to LPC, Exhibit 9 to Dixson Depo; (vi) Assignment of Purchase and Sale Agreement, Exhibit 10 to Dixson Depo.

**REQUEST FOR PRODUCTION NO. 2**: All documents reflecting any communications between Debtor and FSLRO or LPC.

**ANSWER**: See documents identified in Answer to RFP No. 1.

**REQUEST FOR PRODUCTION NO. 3:** All documents reflecting any communications between Debtor and Southwestern Abstract & Title Company, Inc. relating to the sale of the Property and/or any release of lien against the Property.

**ANSWER**: (i) See documents identified in Answer to RFP No. 1; (ii) Emails identified as Exhibit 6 and 7, to Dixson Depo.

**REQUEST FOR PRODUCTION NO. 4:** **All documents reflecting any internal communications of the Debtor relating to the sale of the Property or the PSA.**

**ANSWER**: None in possession of Ronald Ingalls, Chapter 7 Trustee, for PDG, save and except Exhibits to Dixson Depo, if any, that are responsive to this Request.

### ANSWERS TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1**: State all facts on which You base Your contention that "LPC intentionally and willfully negotiated, and entered into, the PSA in violation of the automatic stay."

**ANSWER**: The (ECF 148) Order Confirming Second Amended Plan of Reorganization of PDG Prestige, Inc. dated March 29, 2022 as Modified (Re: Docket No. 145)(hereinafter "the Order") did not provide for PDG to transfer the Property without consideration to any entity; when the Defendants negotiated with Mesilla Valley Ventures, LLC, the transaction violated the automatic stay and the Order.

**INTERROGATORY NO. 2**: Identify all damages purportedly suffered by the Debtor or its estate or creditors as a result of the sale of the Property. Identify all facts on which You contend that Defendants caused such damages.

**ANSWER**: The Defendants are subsequent transferees of the initial fraudulent transfer of the Property to Mesilla Valley Ventures, LLC. Neither the Order nor any subsequent order issued after notice and a hearing authorized the transfer of the Property by PDG to Mesilla Valley Ventures, LLC. The resulting loss of the value of the Property to PDG or its creditors constitute the damages suffered by the Debtor.

**INTERROGATORY NO. 3**:  State all facts on which You base Your contention that "The transfers constitute an unauthorized transfer of property of the Debtor's bankruptcy estate."

**ANSWER**:  The Order provided for PDG to sell the Property. The Order did not allow a transfer of the Property to Mesilla Valley, LLC, and that transfer was unauthorized; the Defendants are subsequent transferees of the unauthorized transfer of the Property.

**INTERROGATORY NO. 4**:  Identify what "notice and hearing" (as alleged by You) were required for the sale of the Property.

**ANSWER**:  The "notice and hearing" as defined in 11 USC § 102(1) should have been provided for a transaction that was not authorized by the Order. At a minimum, a motion should have been filed to authorize the initial transfer of the Property in a manner inconsistent with the Order.

**INTERROGATORY NO. 5**:  Identify all actions which You alleged constitute fraud committed by Defendants on which you base Your claim for revocation of the Confirmation Order.

**ANSWER**:  The Defendants are subsequent transferees of a fraudulent transfer from PDG to Mesilla Valley Ventures, LLC, which transfer was not authorized by the Order or any other order from the U.S. Bankruptcy Court.

**INTERROGATORY NO. 7:**  Do You contend that the funds from the sale of the Property were not placed in PDG Prestige, Inc.'s bank account? If so, identify where such funds were distributed from the closing of the sale of the Property.

**ANSWER:**  See the Seller's Settlement Statement, Exhibit 11 to Dixson Depo; payments to R2 Contractors Specialty Inc, and Utility Block Company Inc., were not provided for the Order or any subsequent court ordered entered after notice and a hearing. It is admitted that $1,916,558.82, was deposited into PDG's Chase account on or about May 31, 2022, and identified as proceeds of sale of 510 South Telshor Blvd.

Respectfully submitted,

Ronald Ingalls, Chapter 7 Trustee

Ronald Ingalls
SBT 10391900
PO Box 2867
Fredericksburg, TX 78624
(830) 321-0878
ingallstrustee@gmail.com

Attorney for the Trustee

## CERTIFICATE OF SERVICE

The signature above certifies that the foregoing document has been served by first class, US mail or by email on June 23, 2025, on the following:

| | |
|---|---|
| Thompson, Coe, Cousins & Irons, L.L.P.<br>THOMAS A. CULPEPPER<br>RILEY F. TUNNELL<br>Plaza of the Americas<br>700 N. Pearl Street, Twenty-Fifth Floor<br>Dallas, TX 75201-2832<br>tculpepper@thompsoncoe.com<br>rtunnell@thompsoncoe.com | Legalist DIP GP, LLC<br>c/o Richard Corbi<br>The Law Offices of Richard J. Corbi PLLC<br>1501 Broadway, 12th Floor<br>New York, NY 10036<br>rcorbi@corbilaw.com |
| Ross Smith & Binford PC<br>Jason Binford<br>2003 N. Lamar Blvd, Ste 100<br>Austin, TX 78705<br>Jason.binford@rsbfirm.com<br>Casey.roy@rsbfirm.com | Michael Dixson<br>% David P. Lutz<br>Martin Lutz Roggow & Eubanks PC<br>2100 N. Main St<br>Las Cruces, NM 88001<br>dplutz@qwestoffice.net |
| Michael Dixson<br>107 Bridie Ln<br>Lakeway, TX 78738<br>mike@pdgatx.com | Mesilla Valley Ventures LLC<br>% PDGTX Inc.<br>2921 E 17th St, Building B<br>Austin TX 78702 |
| Michael Dixson Trust, through<br>Its Trustee Michael J. Dixson<br>% David Lutz<br>Martin Lutz Roggow & Eubanks PC<br>2100 N. Main St | Christina Dixson<br>6 Candleleaf Ct<br>The Hills, TX 78738-1444 |

| | |
|---|---|
| Las Cruces, NM 88001<br>dplutz@qwestoffice.net | |
| Southwestern Abstract & Title Company, Inc<br>% Matthew P. Holt<br>Holt & Mason, PC<br>PO Box 16495<br>Las Cruces NM 88004<br>Matt.holt@attorneyholt.com | FSLRO 510 South Telshor Las Cruces LLC<br>% Mark Taylor<br>Holland & Knight LLp<br>98 San Jacinto Blvd, Ste 1900<br>Austin, TX 78701<br>Mark.taylor@hklaw.com |
| LPC Retail LLC<br>% Mark Taylor<br>Holland & Knight LLp<br>98 San Jacinto Blvd, Ste 1900<br>Austin, TX 78701<br>Mark.taylor@hklaw.com | Entrada Development LLC<br>% David P. Lutz<br>Martin Lutz Roggow & Eubanks PC<br>2100 N. Main St<br>Las Cruces, NM 88001<br>dplutz@qwestoffice.net |

# EXHIBIT F

## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **BANKRUPTCY NO. 21-30107-CGB** |
| **PDG PRESTIGE, INC.,** | § | |
| | § | **CHAPTER 7** |
| *Debtor.* | § | |
| | § | |
| | § | |
| **LEGALIST DIP GP, LLC and PDG** | § | |
| **PRESTIGE, INC. (by and through** | § | |
| **Ronald Ingalls, Chapter 7 Trustee),** | § | **ADVERSARY NO. 23-03004-CGB** |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MICHAEL DIXSON, individually,** | § | |
| **MESILLA VALLEY VENTURES,** | § | |
| **LLC, MICHAEL DIXSON TRUST** | § | |
| **THROUGH ITS TRUSTEE** | § | |
| **MICHAEL J. DIXSON, CHRISTINA** | § | |
| **DIXSON, SOUTHWESTERN** | § | |
| **ABSTRACT & TITLE COMPANY,** | § | |
| **INC., DEFENDANTS, KAPLAN,** | § | |
| **PULASKI & ZUBER P.C., ENTRADA** | § | |
| **DEVELOPMENT, THE GATEWAY** | § | |
| **VENTURES, LLC, LPC RETAIL,** | § | |
| **LLC, and FSLRO 510 SOUTH** | § | |
| **TELSHOR LAS CRUCES, LLC,** | § | |
| | | |
| *Defendants.* | | |

## RESPONSES AND OBJECTIONS OF LEGALIST DIP GP, LLC TO FSLRO 510 SOUTH TELSHOR, LAS CRUCES, LLC AND LPC RETAIL, LLC'S INTERROGATORIES

TO: FSLRO SOUTH TELSHOR, LAS CRUCES, LLC and LPC RETAIL, LLC, by and through its counsels of record, Mark C. Taylor, KANE RUSSELL COLMAN LOGAN, PC, 401 Congress Ave., Suite 2100, Austin, TX 78701.

From: Legalist DIP GP, LLC by and through its counsels of record, Richard J. Corbi, The Law Offices of Richard J. Corbi PLLC, 104 West 40th Street, 4th Floor, New York, NY 10018; Frances A. Smith, Ross & Smith, PC 2901 Via Fortuna, Bldg. 6, Suite 450, Austin, TX 78746.

Legalist DIP GP, LLC ("**Legalist**," or "**DIP Lender**" or "**Plaintiff**") hereby responds to defendants FSLRO 510 South Telshor, Las Cruces, LLC and LPC Retail, LLC (collectively, the "**Defendants**") interrogatories (the "**Discovery Requests**") pursuant to Federal Rule of Civil Procedure 33 made applicable though Federal Rule of Bankruptcy Procedure 7033.

## <u>GENERAL OBJECTIONS</u>

1.      Legalist objects to Defendants' Discovery Requests to the extent they deviate from or purport to impose requirements other than or in addition to those required by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Court Rules of the United States Bankruptcy Court for the Western District of Texas, and/or the orders of this Court.

2.      Legalist objects to Defendants' Discovery Requests to the extent they seek information or documents outside the scope of discovery permissible under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Court Rules of the United States Bankruptcy Court for the Western District of Texas, and/or the orders of this Court.

3.      Legalist objects to Defendants' Discovery Requests to the extent that they seek information or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.  None of these responses is intended as, or should be construed as a waiver or relinquishment of any part of the protections afforded by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity.

4.      Legalist objects to Defendants' Discovery Requests to the extent that they seek information or documents that are beyond his custody, possession, or control and/or seek information that is equally available to Defendants.

5.      Legalist objects to Defendants' Discovery Requests to the extent they seek information or documents for any period of time beyond any applicable statute of limitations.

6.      Legalist objects to Defendants' Discovery Requests because they contain undefined terms which make them vague, ambiguous, overbroad, unduly burdensome, and oppressive.

7.      Legalist expressly limits its responses to Defendants' Discovery Requests to the information or documents that can be located after a reasonable and diligent search of its records believed most likely to contain the responsive information.

8.      Legalist's investigation into the Discovery Requests is ongoing, and he continues to search for information or documents responsive to Defendants' Discovery Requests.  As additional information or documents become available, Legalist reserves the right to amend, modify, clarify and/or supplement its responses and objections as appropriate.

9.      Legalist's decision to provide information or documents notwithstanding the objectionable nature of Defendants' Discovery Requests is not to be construed as an admission that the information or document is relevant, as a waiver of the general or specific objections, or as an agreement that future requests for similar discovery will be treated in a similar manner.

10.      These General Objections apply to each of Defendants' Discovery Requests as though restated in full in response thereto.  To the extent Legalist asserts objections to individual requests, those objections shall apply equally to any subparts of the request.  Legalist will provide its responses based on terms as they are commonly understood, and consistent with the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Court Rules of the

United States Bankruptcy Court for the Western District of Texas, and/or the orders of this Court. Legalist objects to and will refrain from extending or modifying any words employed in the requests to comport with expanded definitions or instructions.

### OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**: State all facts on which You base Your contention that "LPC intentionally and willfully negotiated, and entered into, the PSA in violation of the automatic stay."

**ANSWER**: Legalist objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Legalist objects to INTERROGATORY NO. 1 as it requires a legal conclusion. As for the information requested in INTERROGATORY NO. 1, subject to and without waiving the foregoing objections, Legalist responds as follows: (i) The (ECF 148) Order Confirming Second Amended Plan of Reorganization of PDG Prestige, Inc. dated March 29, 2022 as Modified (Re: Docket No. 145) (hereinafter "the Order") did not provide for PDG to transfer the Property without consideration to any entity; when the Defendants negotiated with Mesilla Valley Ventures, LLC, the transaction violated the automatic stay and the Order; (ii) *Opposition of Legalist DIP GP, LLC to Weycer, Kaplan, Pulaski & Zuber P.C.'s Motion for Summary Judgment* [Adv. Pro. Doc. No.147]; and (iii) the amended complaint filed on bankruptcy court docket pertaining to the interrogatory speak for themselves.

**INTERROGATORY NO. 2**: Identify all damages purportedly suffered by the Debtor or its estate or creditors as a result of the sale of the Property. Identify all facts on which You contend that Defendants caused such damages.

**ANSWER**: Legalist objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Legalist objects to

INTERROGATORY NO. 2 as it requires a legal conclusion.  As for the information requested in INTERROGATORY NO. 2, the amended complaint and *Opposition of Legalist DIP GP, LLC to Weycer, Kaplan, Pulaski & Zuber P.C.'s Motion for Summary Judgment* [Adv. Pro. Doc. No.147] filed on bankruptcy court docket pertaining to the interrogatory speak for themselves.

Subject to and without waiving the foregoing objections, Legalist responds as follows: The Defendants are subsequent transferees of the initial fraudulent transfer of the Property to Mesilla Valley Ventures, LLC.  Neither the Order nor any subsequent order issued after notice and a hearing authorized the transfer of the Property by PDG to Mesilla Valley Ventures, LLC.  The resulting loss of the value of the Property to PDG or its creditors constitute the damages suffered by the Debtor.

**INTERROGATORY NO. 3**:  State all facts on which You base Your contention that "The transfers constitute an unauthorized transfer of property of the Debtor's bankruptcy estate."

**ANSWER**:  Legalist objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Legalist objects to INTERROGATORY NO. 3 as it requires a legal conclusion.  As for the information requested in INTERROGATORY NO. 3, the amended complaint and *Opposition of Legalist DIP GP, LLC to Weycer, Kaplan, Pulaski & Zuber P.C.'s Motion for Summary Judgment* [Adv. Pro. Doc. No.147] filed on bankruptcy court docket pertaining to the interrogatory speak for themselves.

Subject to and without waiving the foregoing objections, Legalist responds as follows: The Order provided for PDG to sell the Property.  The Order did not allow a transfer of the Property to Mesilla Valley, LLC, and that transfer was unauthorized; the Defendants are subsequent transferees of the unauthorized transfer of the Property.

**INTERROGATORY NO. 4**:  Identify what "notice and hearing" (as alleged by You) were required for the sale of the Property.

**ANSWER**:  Legalist objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Legalist objects to INTERROGATORY NO. 4 as it requires a legal conclusion.  As for the information requested in INTERROGATORY NO. 4, the amended complaint and *Opposition of Legalist DIP GP, LLC to Weycer, Kaplan, Pulaski & Zuber P.C.'s Motion for Summary Judgment* [Adv. Pro. Doc. No.147] filed on bankruptcy court docket pertaining to the interrogatory speak for themselves.

Subject to and without waiving the foregoing objections, Legalist responds as follows: The "notice and hearing" as defined in 11 USC § 102(1) should have been provided for a transaction that was not authorized by the Order.  At a minimum, a motion should have been filed to authorize the initial transfer of the Property in a manner inconsistent with the Order.

**INTERROGATORY NO. 5**:  Identify all actions which You alleged constitute fraud committed by Defendants on which you base Your claim for revocation of the Confirmation Order.

**ANSWER**:  Legalist objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Legalist objects to INTERROGATORY NO. 5 as it requires a legal conclusion.  As for the information requested in INTERROGATORY NO. 5, the amended complaint and *Opposition of Legalist DIP GP, LLC to Weycer, Kaplan, Pulaski & Zuber P.C.'s Motion for Summary Judgment* [Adv. Pro. Doc. No.147] filed on bankruptcy court docket pertaining to the interrogatory speak for themselves.

Subject to and without waiving the foregoing objections, Legalist responds as follows: The Defendants are subsequent transferees of a fraudulent transfer from PDG to Mesilla Valley

6

Ventures, LLC, which transfer was not authorized by the Order or any other order from the U.S. Bankruptcy Court.

**INTERROGATORY NO. 6**:  State all facts on which You base Your claim that the "transfers to LPC and FSLRO were not authorized by the bankruptcy court," and state what type of authorization was required.

**ANSWER**:  Legalist objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Legalist objects to INTERROGATORY NO. 6 as it requires a legal conclusion.  As for the information requested in INTERROGATORY NO. 6, the amended complaint and *Opposition of Legalist DIP GP, LLC to Weycer, Kaplan, Pulaski & Zuber P.C.'s Motion for Summary Judgment* [Adv. Pro. Doc. No.147] filed on bankruptcy court docket pertaining to the interrogatory speak for themselves.

Subject to and without waiving the foregoing objections, Legalist responds as follows: The Defendants are subsequent transferees of a fraudulent transfer from PDG to Mesilla Valley Ventures, LLC, which transfer was not authorized by the Order or any other order from the U.S. Bankruptcy Court.

**INTERROGATORY NO. 7:**  Do You contend that the funds from the sale of the Property were not placed in PDG Prestige, Inc.'s bank account?  If so, identify where such funds were distributed from the closing of the sale of the Property.

**ANSWER:**  Legalist objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Legalist objects to INTERROGATORY NO. 7 as it requires a legal conclusion.  As for the information requested in INTERROGATORY NO. 7, the amended complaint and *Opposition of Legalist DIP GP, LLC to*

*Weycer, Kaplan, Pulaski & Zuber P.C.'s Motion for Summary Judgment* [Adv. Pro. Doc. No.147] filed on bankruptcy court docket pertaining to the interrogatory speak for themselves.

Subject to and without waiving the foregoing objections, Legalist responds as follows:  See the Seller's Settlement Statement, Exhibit 11 to Dixson Deposition; payments to R2 Contractors Specialty Inc, and Utility Block Company Inc., were not provided for the Order or any subsequent court ordered entered after notice and a hearing.  It is admitted that $1,916,558.82, was deposited into PDG's Chase account on or about May 31, 2022, and identified as proceeds of sale of 510 South Telshor Blvd.

Dated: July 14, 2025                Respectfully Submitted,

By: /s/ Frances A. Smith (SBN 24033084)
**ROSS & SMITH, PC**
700 N. Pearl Street, Ste. 1610
Dallas, Texas 75201
Tel.: (214) 377-7879
Fax: (214) 377-9409
Email: frances.smith@ross-and-smith.com

-and-

By: /s/ Richard J. Corbi
Richard J. Corbi (*proc hac vice*)
**THE LAW OFFICES OF RICHARD J.  CORBI PLLC**
104 West 40th Street, 4th Floor
New York, NY 10018
Phone: (646) 571-2033
Email: rcorbi@corbilaw.com

***Counsel for Legalist DIP Fund I, LP; Legalist DIP SVP II, LP; and Legalist DIP GP, LLC***